**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RENE ANTONIO BENITEZ, J.R.H.L., DARWIN GARCIA MEDRANO, H.L.A.O., A.M.C., HESLER ASAF GARCIA LANZA, R.C.R., and F.R.P., on behalf of themselves and others similarly situated, and WORKERS' CENTER OF CENTRAL NEW YORK, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, in his official capacity as Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement; KENNETH GENALO, in his official capacity as Director of Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement, New York City Field Office; TAMMY MARICH, in her official capacity as Acting Director of Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement, Buffalo Field Office; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. BORDER PATROL; MICHAEL W. BANKS, in his official capacity as Chief of U.S. Border Patrol; U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as the Acting Attorney General of the United States; FEDERAL BUREAU OF INVESTIGATION; KASH PATEL, in his official capacity as Director of the Federal Bureau of Investigation; U.S. MARSHALS SERVICE; and GADYACES S. SERRALTA, in his official capacity as Director of the United States Marshals Service, <br><br> *Defendants*. | Case No. _____ <br><br> **COMPLAINT FOR VACATUR, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF** <br><br> **CLASS ACTION** |

**INTRODUCTION**

1. The Trump Administration's sweeping campaign of suspicionless stops and warrantless immigration arrests without probable cause is terrorizing New York communities and tearing families apart. This lawsuit seeks to end these unlawful policies and practices.

2. Across the state, roving bands of masked and heavily-armed federal agents, both on foot and in unmarked cars, are indiscriminately stopping and arresting thousands of Black and Brown people, the vast majority of whom are Latino,[1] based solely on their perceived race and ethnicity.

3. In the first six months of the second Trump Administration alone, immigration officials arrested 2,888 noncitizens in the greater New York City area, more than triple the number of arrests in the last six months of the Biden Administration.[2] Since then, the rate of arrests has increased.[3] Between January 20, 2025, and March 10, 2026, immigration officials arrested 9,346 people in the greater New York City area and 4,094 people elsewhere across New York State.[4]

---

[1] Many individuals use Latino and Hispanic interchangeably. For purposes of this complaint, the terms are used as synonyms.

[2] Eileen Grench et al., *ICE Street Arrests in New York City Increase 212% Under Trump*, Documented (Jan. 29, 2026), https://perma.cc/P44D-FXJ7.

[3] Albert Sun et al., *New Data Shows Where ICE Has Been Most Active This Year*, N.Y. Times (Mar. 20, 2026), https://perma.cc/KTW6-AHDY.

[4] *Deportation Data Project*, https://perma.cc/D7J8-SP2Y (filter for "apprehension_state" equal New York and "apprehension_aor" equal "New York City Area of Responsibility" and "apprehension_date" between 1/20/2025 and 3/10/2026 for New York City data; filter for "apprehension_state" equal New York and "apprehension_aor" equal "Buffalo Area of Responsibility" and "apprehension_date" between 1/20/2025 and 3/10/2026 for New York State data).

4.      This surge comes as federal agents have strived to meet President Trump's initial quota of 1,200 to 1,500 arrests per day[5] and subsequent demand for 3,000 arrests per day.[6] New York's communities of color have disproportionately borne the brunt of the Department of Homeland Security's ("DHS") implementation of these policies across the state.

5.      Defendants have explicitly targeted so-called sanctuary states and cities. Pursuant to President Trump's April 26, 2025, Executive Order 14287, titled "Protecting American Communities from Criminal Aliens," the Justice Department, in collaboration with DHS, published a list of "sanctuary jurisdictions,"[7] which includes New York State and New York City.[8] White House "Border Czar" Tom Homan warned, "we're going to flood the zone in sanctuary cities. You're going to see a record number of agents in the neighborhoods."[9]

6.      Targeted communities are living under a state of siege. Throughout New York State, from Buffalo to New York City and Long Island, federal agents are seizing people outside their homes, on their way to work, while driving their children to school, and in the parking lots of stores. The widespread targeting of people going about their daily lives has led many to limit their activities out of fear that they will be next. Even citizens and those with lawful immigration status fear that U.S. Immigration and Customs Enforcement ("ICE") will detain and arrest them based on their apparent race or ethnicity. Recently released data shows that between August 2025 and March 2026, ICE arrested, in New York City alone, over 800 people who were not the intended

---

[5] Gloria Oladipo, *Two Senior ICE Officials Reassigned over Slow Rate of Deportations and Arrests*, The Guardian (Feb. 12, 2025), https://perma.cc/4C2V-YJKB.
[6] Jose Olivares, *Trump Administration Sets Quota to Arrest 3,000 People a Day in Anti-Immigration Agenda*, The Guardian (May 29, 2025), https://perma.cc/ST6X-N4TR.
[7] Exec. Order No. 14287, 90 F.R. 18761 (Apr. 28, 2025).
[8] U.S. Dep't of Justice, *U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities from Criminal Aliens*, https://perma.cc/C6FA-6E26.
[9] Tex. Border Business, *Homan Vows Expanded Deportations in Sanctuary Cities* (Aug. 28, 2025), https://perma.cc/4WS7-F3W3.

target of any enforcement operation.[10] Of these "collateral arrests," 85% were arrests of "people with no criminal history."[11]

7.      This campaign violates basic constitutional and statutory protections. Instead of targeting only those people they have reasonable suspicion to believe are present in the United States in violation of the immigration laws, Defendants have broadly sanctioned a policy and practice of stopping people based solely on their perceived Latino ethnicity, in violation of the Fourth Amendment.[12]

8.      Defendants' use of "impermissible racial classifications in determining whom to stop, detain, and search" also violates the Fifth Amendment's guarantee of equal protection.[13] "Officers must not make interior immigration stops or arrests based on race or ethnicity."[14] The Constitution forbids this type of stereotyping: "even noncitizens must be treated equally as individuals, and not as members of racial, ethnic, or religious groups."[15]

9.      Finally, Defendants' warrantless arrest policy and practice ignores statutory and regulatory limits on their arrest authority, which require agents to have probable cause that a person is both in the United States unlawfully and that the person is likely to escape before a warrant can be obtained, before making a warrantless arrest.[16] Their policy and practice clearly violates the law.

---

[10] *See* Haidee Chu & Gwynne Hogan, *Drive-by Detention: 800 New Yorkers Swept Up in 'Collateral' ICE Arrests*, The City (Apr. 2, 2026), https://perma.cc/6DJ9-AWCR.

[11] *Id.*

[12] *See United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975).

[13] *See, e.g., Chavez v. Ill. State Police*, 251 F.3d 612, 635 (7th Cir. 2001).

[14] *See Trump v. Illinois*, 146 S. Ct. 432, 436 n.4 (2025) (Kavanaugh, J., concurring).

[15] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 241 (2023) (Thomas, J., concurring) (citation modified).

[16] *See Arizona v. United States*, 567 U.S. 387, 408 (2012) (citing 8 U.S.C. § 1357(a)(2)).

10.     Plaintiffs Rene Antonio Benitez, J.R.H.L., Darwin Garcia Medrano, H.L.A.O., A.M.C., Hesler Asaf Garcia Lanza, R.C.R., and F.R.P. bring this lawsuit on behalf of themselves and those similarly situated, along with Plaintiff Workers' Center of Central New York, to end these unlawful policies and practices in New York State.

## PARTIES

**Plaintiffs**

11.     Plaintiff Rene Antonio Benitez is a 36-year-old Latino resident of Brentwood, New York. He has lived in New York for almost 14 years. On February 26, 2026, ICE agents stopped and arrested him without a warrant while he was driving his daughter to school. Later that day, attorneys filed a petition for a writ of habeas corpus on his behalf with this Court. After he was released pursuant to an order from this Court, Mr. Benitez returned to Long Island. He continues to live in and drive around Brentwood and the surrounding area to take his daughter to school, to go to work, and to perform other daily activities. Due to his Latino ethnicity, Mr. Benitez is at significant risk of being stopped, arrested, and detained again while going about his daily life.

12.     Plaintiff J.R.H.L. is a 47-year-old Latino resident of Wyandanch, New York, where he has lived since 2007. On June 7, 2025, ICE agents stopped and arrested him without a warrant while he was walking across the parking lot next to his home on his way to work. J.R.H.L. spent two months in ICE detention until he was granted bond by an immigration judge. J.R.H.L. must comply with ICE's electronic monitoring requirements such as submitting a weekly "selfie" photograph of himself through BI SmartLink, and he has monthly ICE in-person check-ins and home visits through ICE's Intensive Supervision Appearance Program ("ISAP"). J.R.H.L. has applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). He still lives in the same house, has the same job, and, to get to work six days a week,

must cross the same parking lot where he was stopped and arrested by ICE. Due to his Latino ethnicity, J.R.H.L. is at significant risk of being stopped, arrested, and detained again while going about his daily life.

13. Plaintiff Darwin Garcia Medrano is a 19-year-old Latino resident of Farmingdale, New York. He has lived in New York since 2018. Since then, he has been granted Special Immigrant Juvenile Status and a related grant of deferred action by DHS. Yet, on January 17, 2026, ICE agents stopped and made a warrantless arrest of him, his 16-year-old brother, and his friend while he was pumping gas in Brentwood, New York. Mr. Garcia Medrano spent five days in ICE detention before being released without any explanation. Although he filed a habeas petition, it was not adjudicated because he was released prior to a decision. Mr. Garcia Medrano must regularly drive around the Brentwood area to get to work, see friends, and pursue his studies at Suffolk County Community College. Due to his Latino ethnicity, Mr. Garcia Medrano is at significant risk of being stopped, arrested, and detained again while going about his daily life.

14. Plaintiff H.L.A.O. is a 46-year-old Latino resident of Greenport, New York. He has lived in Greenport for over 20 years. On February 4, 2026, ICE agents stopped and arrested him without a warrant while he was waiting to take the Shelter Island ferry to work. H.L.A.O. spent 22 days in an ICE detention facility. After his release, he returned to his job. He regularly travels around the area and takes the Shelter Island ferry to work six days per week. Due to his Latino ethnicity, H.L.A.O. is at significant risk of being stopped, arrested, and detained again while going about his daily life.

15. Plaintiff A.M.C. is a 36-year-old Latino resident of Brooklyn, New York. He has lived in New York for 14 years. On February 24, 2026, ICE agents stopped and arrested A.M.C. without a warrant as he tried to enter his apartment building in Bushwick while returning home

6

from work. A.M.C. spent seven days in ICE detention. After his release, he returned to his home in Bushwick and resumed his job, working six days a week. Due to his Latino ethnicity, A.M.C. is at significant risk of being stopped, arrested, and detained again while going about his daily life.

16.     Plaintiff Hesler Asaf Garcia Lanza is a 24-year-old Latino resident of Hempstead, New York, with approved Special Immigrant Juvenile Status and a related grant of deferred action. He has lived in New York for 15 years. On January 3, 2026, ICE agents stopped and arrested Mr. Garcia Lanza without a warrant while he was on his way to work, walking from his home to the Long Island Railroad Hempstead station. Mr. Garcia Lanza spent two days in ICE detention. After his release, he returned to his job, to which he travels five days a week by taking the same route he took the day he was arrested. Due to his Latino ethnicity, Mr. Garcia Lanza is at significant risk of being stopped, arrested, and detained again while going about his daily life.

17.     Plaintiff R.C.R. is a 55-year-old Latina resident of Buffalo, New York with a pending asylum application and employment authorization. On January 24, 2026, an immigration officer stopped and arrested her and her husband, Plaintiff F.R.P., without a warrant in the parking lot of a Walmart in Cheektowaga, New York. On February 19, 2026, R.C.R. was released on bond. After her release, she returned to Buffalo. R.C.R. must regularly travel around the Buffalo area to commute to work, take her daughter to work, and shop for necessities. Due to her Latino ethnicity, R.C.R. is at significant risk of being stopped, arrested, and detained again while going about her daily life.

18.     Plaintiff F.R.P. is a 63-year-old Latino resident of Buffalo, New York with a pending asylum application and employment authorization. On January 24, 2026, an immigration officer stopped and arrested him and his wife, Plaintiff R.C.R., without a warrant in the parking lot of a Walmart in Cheektowaga, New York. On February 18, 2026, F.R.P. was released on bond.

He must wear an ankle monitor and attend regular ICE check-in appointments. After his release, he returned to Buffalo. F.R.P. must regularly travel around the Buffalo area to commute to work, take his daughter to work, visit his elderly mother, and shop for necessities. Due to his Latino ethnicity, F.R.P. is at significant risk of being stopped, arrested, and detained again while going about his daily life.

19.     Plaintiff Workers' Center of Central New York ("WCCNY") is a grassroots, member-based organization focused on workplace and economic justice. It is based in Syracuse, New York, and organizes low-wage, predominantly immigrant workers throughout Central New York and into the North Country. WCCNY facilitates worker empowerment and leadership development through trainings related to workers' rights and occupational health and safety, orchestrates campaigns to combat wage theft and to promote employer compliance with the law, and engages in organizing and coalition-building to push for policies that will increase wages and workplace standards and promote human rights. Defendants' policies of racial profiling, suspicionless stops, and warrantless arrests have also directly impaired WCCNY's ability to carry out its core organizational activities. The policies have also harmed multiple WCCNY members who have been stopped and arrested by immigration officials in New York without suspicion, a warrant, or probable cause as to immigration status and/or escape risk and are likely to face detention and/or warrantless arrest in the future. The policies have terrified WCCNY's members, deterring them from attending the organization's events and causing them to otherwise alter their daily lives.

**Defendants**

20.      Defendant U.S. Department of Homeland Security ("DHS") is a department of the executive branch of the United States government charged with the administration and enforcement of the nation's immigration laws.

21.      Defendant Markwayne Mullin is the Secretary of Homeland Security. As Secretary of Homeland Security, he is responsible for overseeing DHS and its component agencies. He is sued in his official capacity.

22.      Defendant U.S. Immigration and Customs Enforcement ("ICE") is a component agency of DHS and is tasked with managing enforcement of immigration laws. Among other functions, ICE carries out stops and arrests of individuals related to purported violations of civil immigration laws, assumes custody over individuals in immigration detention, and is responsible for the management and oversight of the civil immigration detention system.

23.      Defendant Todd M. Lyons is the Senior Official Performing the Duties of the Director of ICE. He has direct authority over all ICE policies and practices related to stops, arrests, and detention. He is sued in his official capacity.

24.      Defendant Kenneth Genalo is the Field Office Director for the New York City ICE Field Office. He has direct authority over all ICE policies and practices in New York City and Dutchess, Nassau, Orange, Putnam, Rockland, Suffolk, Sullivan, Ulster, and Westchester Counties. He is sued in his official capacity.

25.      Defendant Tammy Marich is the Acting Field Office Director for the ICE Buffalo Field Office. She has direct authority over all ICE policies and practices related to stops, arrests, and detention, in all areas of New York State outside of the New York City ICE Field Office's catchment area. She is sued in her official capacity.

26.    Defendant U.S. Customs and Border Protection ("CBP") is a component agency of DHS that is responsible for enforcing immigration laws at or close to the United States border.

27.    Defendant Rodney S. Scott is the Commissioner of CBP. He has direct authority over all CBP policies and practices related to stops, arrests, and detention. He is sued in his official capacity.

28.    Defendant U.S. Border Patrol ("USBP" or "Border Patrol") is a component agency of CBP. It is responsible for enforcing the immigration laws by detecting, interdicting, and apprehending individuals attempting to cross, or to bring contraband across, the United States border without authorization.

29.    Defendant Michael W. Banks is the Chief of U.S. Border Patrol. He is sued in his official capacity.

30.    Defendant U.S. Department of Justice is a department of the executive branch of the United States government charged with the enforcement of federal laws, and with overseeing its component agencies, including the Federal Bureau of Investigation and the United States Marshal Service.

31.    Defendant Todd Blanche is the Acting Attorney General of the United States, which leads the U.S. Department of Justice and its component agencies. He is sued in his official capacity.

32.    Defendant U.S. Federal Bureau of Investigation ("FBI") is a component agency of the U.S. Department of Justice charged with the enforcement of federal law.

33.    Defendant Kash Patel is the Director of the Federal Bureau of Investigation. He is sued in his official capacity.

34.    Defendant U.S. Marshals Service is a component agency of the U.S. Department of Justice charged with enforcing federal laws and supporting the federal justice system.

35.    Defendant Gadyaces S. Serralta is the Director of the U.S. Marshals Service. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

**The National Immigration Enforcement Surge under the Second Trump Administration**

36.    Since January 20, 2025, DHS has waged an unprecedented deportation campaign, aiming to deport one million people during the first year of the second Trump Administration.[17] DHS has widely promoted its ultimate goal of deporting 100 million people,[18] nearly 10 times the number of undocumented people in the United States.[19]

37.    In January 2025, the Administration called upon each ICE field office to fulfill a quota of 75 arrests per day, with a goal of 1,200 to 1,500 arrests per day nationally.[20] By May 2025, Homeland Security Advisor and White House Deputy Chief of Staff Stephen Miller increased this number to 3,000 arrests per day nationally, adding that the "number is going to keep getting bumped higher over time."[21]

38.    The Administration tasked ICE's Enforcement and Removal Operations ("ERO") division and the Border Patrol within CBP with fulfilling these quotas. ICE ERO conducts interior immigration enforcement out of 25 field offices across the country and manages all aspects of the

---

[17] Stuart Anderson, *Stephen Miller's Order Likely Sparked Immigration Raids and Protests*, Forbes, Jun. 9, 2025, https://perma.cc/4GPG-G75Z.

[18] DHS (@DHSgov), X (Dec. 31, 2025, 4:06 pm), https://perma.cc/L6HC-PUQE.

[19] Katie J.M. Baker & Hamed Aleaziz, *Gregory Bovino's Final Days: Harsh Words and Few Regrets*, N.Y. Times (Mar. 24, 2026), https://perma.cc/KA97-EPGW.

[20] Nick Miroff & Maria Sachetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, Wash. Post (Jan. 26, 2025), https://perma.cc/BP6F-6CY3.

[21] Cameron Arcand, *Trump Administration Sets New Goal of 3,000 Illegal Immigrant Arrests Daily*, Fox News (May 29, 2025), https://perma.cc/P6EY-D5ET.

immigration enforcement process.[22] Border Patrol's duties include the detection and apprehension of undocumented noncitizens at or near the border.[23]

39.    According to one ICE insider who spoke to the press about the administration's 3,000 arrests-per-day quota, the arrest mandate to ERO and CBP agents has been "numbers, pure numbers. Quantity over quality."[24] Still other ICE insiders reportedly complained that, under the pressure of the mandate, ICE agents were forced to "look[] for anyone they can get their hands on at the local Home Depot or bus stop."[25]

40.    To fulfill the Administration's extreme arrest quotas, Miller has directed ICE ERO agents to "just go out there and arrest."[26] While courting private contractors for ICE operations, Homan stated he wanted to see a mass deportation system "like Prime, but with human beings," emphasizing efficiency over humanity.[27] Senior ICE officials encouraged immigration agents to "turn the creative knob up to 11" when arresting people collateral to anyone identified in a warrant, emphasizing, "[i]f it involves handcuffs on wrists, it's probably worth pursuing."[28]

---

[22] U.S. Immigr. & Customs Enf't, *Enforcement and Removal Operations*, https://perma.cc/MSE3-BKJQ (last visited Apr. 7, 2026).

[23] U.S. Customs & Border Prot., *Along U.S. Borders*, https://perma.cc/2NWG-43G7 (last visited Apr. 7, 2026).

[24] Jennie Taer, *Trump Admin's 3000 ICE Arrests Per Day Quota is Taking Focus Off Criminals and 'Killing Morale': Insiders*, N.Y. Post (June 17, 2025), https://perma.cc/ZK6F-PRWR.

[25] *Id.*

[26] Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Str. J. (June 9, 2025), https://perma.cc/3JP5-MYE4.

[27] Jerod Macdonald-Evoy, *ICE Director Envisions Amazon-Like Mass Deportation System: 'Prime, But with Human Beings,'* Arizona Mirror (April 8, 2025), https://perma.cc/J7M3-V93K.

[28] Jose Olivares, *US Immigration Officers Ordered to Arrest More People Even Without Warrants*, The Guardian (June 4, 2025), https://perma.cc/2Y6P-3PGJ.

41.     Defendants no longer require immigration officers to obtain a supervisor's prior approval for an arrest, or even to fill out a form with information about the person they arrest. This reflects their "move[] from targeted enforcement to broad street sweeps."[29]

42.     Former DHS Secretary Kristi Noem confirmed that if a person is near a suspected unlawful immigrant, DHS's policy is to "detain them as well" to "validate their identity" and "determine if they are breaking our federal laws."[30]

43.     Similarly, the Acting Director of ICE ERO stated that "if [ICE officers] encounter [someone] in the area of which they're operating," they can stop those people and ask if they are citizens.[31]

44.     Senior immigration officials have declared in "unequivocal and unqualified terms that ICE *will* arrest anyone it encounters who is unlawfully present."[32]

45.     The budget bill enacted on July 4, 2025, included $8 billion for ICE to hire 10,000 new agents, and additional funding for CBP to hire 3,000 more Border Patrol agents.[33]

46.     DHS has also granted immigration enforcement powers to non-DHS federal agencies that are not typically charged with street-based immigration enforcement.[34]

---

[29] Julia Ainsley et al., *Under Trump Administration, ICE Scraps Paperwork Officers Once Had to Do before Immigration Arrests*, NBC News (Sept. 9, 2025), https://perma.cc/Q6NP-ME2K.

[30] WAAY 31 News, *Kristi Noem: ICE May Ask People to 'Validate' Their Identity* (YouTube, Jan. 15, 2026), https://perma.cc/QA8U-4RNM.

[31] Cecilia Vega et al., *Top ICE Official is Asked whether Americans Can Trust Investigation into Renee Good's Killing*, CBS News (Jan. 18, 2026), https://perma.cc/69CA-AQCG.

[32] *Ramirez Ovando v. Noem,* 810 F. Supp. 3d 1209, 1222 (D. Colo. 2025) (emphasis in original).

[33] *DHS Readies for Funding Surge After "Big Beautiful Bill" Passage*, FedAgent (July 10, 2025), https://perma.cc/FEH6-CR37.

[34] *See* U.S. Dep't of Homeland Sec., *Statement from a DHS Spokesperson on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials* (Jan. 23, 2025), https://perma.cc/8WBX-MGKS; N.Y.C. Bar Ass'n, *Report on the Trump Administration's 2025–26 Changes to Immigration Law*, at 29-30 (last updated Jan. 26, 2026), https://perma.cc/54ZF-9DJR.

47.    Defendants' unlawful actions are the predictable result of directives from top officials to agents and officers to ramp up immigration arrests and deportations by any means.

**Immigration Enforcement in New York: A Surge in the Shadows**

48.    Since January 2025, the Administration has singled out New York City and New York State—identified by the Administration as "Sanctuary Jurisdictions"[35]—as targets for its mass arrest policy. Early on, Homan explicitly warned of increased warrantless arrests, stating, "sanctuary cities are going to get exactly what they don't want: more agents in the community and more collateral arrests."[36] The overwhelming message to agents and officers carrying out immigration operations on the ground is to prioritize arrest numbers, regardless of the law.

49.    Homan's threats have become reality in New York. Unlike its high-profile, militarized operations in Minnesota,[37] Chicago,[38] and Los Angeles,[39] ICE's shift in policy and practice in New York has come with no fanfare. Nonetheless, it has caused profound harm and dramatically reshaped the lives of New York's immigrant communities.

---

[35] U.S. Dep't of Just., *U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities from Criminal Aliens*, https://perma.cc/C6FA-6E26 (last visited Apr. 8, 2026); *see also*, Donald J. Trump (@realDonaldTrump), Truth Social (June 15, 2025, 8:43 pm), https://perma.cc/9KXC-Y5FH ("In order to achieve this, we must expand efforts to detain and deport Illegal Aliens in America's largest Cities, such as Los Angeles, Chicago, and New York, where Millions upon Millions of Illegal Aliens reside. These, and other such Cities, are the core of the Democrat Power Center, where they use Illegal Aliens to expand their Voter Base, cheat in Elections, and grow the Welfare State, robbing good paying Jobs and Benefits from Hardworking American Citizens.").

[36] Dialynn Dwyer, *After ICE Operation in Mass. Trump Border Czar Says Sanctuary Cities Will Keep Seeing 'Collateral' Arrests*, Boston.com (Mar. 25, 2025), https://perma.cc/K3GB-H5VM.

[37] Alyssa Chen, *A Timeline of Operation Metro Surge*, Minn. Reformer (Feb. 20, 2026), https://perma.cc/D8SS-RHUW.

[38] Tim Sullivan, *In Chicago, an Immense Show of Force Signals a Sharp Escalation in White House Immigration Crackdown*, The Associated Press (Oct. 21, 2025), https://perma.cc/PAL9-UZNZ.

[39] Hamed Aleaziz & Orlando Mayorquín, *Immigration Arrests in Los Angeles Spike Amid Aggressive Enforcement*, N.Y. Times (June 11, 2025), https://perma.cc/3QVL-EDPE.

50.    Two ERO field offices cover New York State.[40] The New York City Field Office is responsible for the five boroughs of New York City, as well as Dutchess, Nassau, Orange, Putnam, Rockland, Suffolk, Sullivan, Ulster, and Westchester Counties; the Buffalo Field Office is responsible for enforcement and removal operations in the rest of the State.[41] CBP also conducts immigration enforcement in New York, primarily in Northern and Western New York.[42]

51.    January 28, 2025, marked the first recorded day of mass ICE arrests in New York City under the second Trump Administration, with 30 teams of federal agents arresting people across the city.[43] Since then, federal authorities have conducted mass militarized raids on Manhattan's Canal Street[44] and at the Jamaica, Queens, Home Depot.[45]

52.    Across New York State, ICE and CBP agents—sometimes accompanied by FBI agents and U.S. Marshals—carry out dragnet operations in targeted locations, where they stop and quickly make warrantless arrests of people whom they are not searching for, and do not know. These dragnets are only directed at people of color, particularly Latinos, who make up "just a quarter of the state's non-citizen population," but nonetheless "account[ed] for nearly three-quarters" of ICE arrests in New York in the first six months of this Administration.[46]

---

[40] U.S. Immigr. & Customs Enf't, *ICE Field Offices*, https://perma.cc/NKX3-3HQK (last visited Apr. 8, 2026).
[41] *Id.*
[42] Isabelle Taft, *In This Buffalo Suburb, a Brush With Mall Security Can Lead to Arrest by Border Patrol*, N.Y. Focus (Nov. 26, 2025), https://perma.cc/Z3RH-X8JF.
[43] Anthony DiLorenzo & Ben Mitchell, *Dozens Arrested on First Day of ICE Raids in NYC: Sources*, PIX 11 (Jan. 28, 2025), https://perma.cc/UJ4F-2R2T.
[44] Gwynne Hogan & Haidee Chu, *Military-Style Immigration Sweep Hits NYC as Masked Federal Agents Arrest Canal Street Vendors*, The City (Oct. 21, 2025), https://perma.cc/Y5YL-S7K9.
[45] Japneet Singh, COMMUNITY ALERT Mass ICE enforcements have been taking place in Jamaica Queens, Facebook (Jan. 22, 2026), https://perma.cc/4XAQ-RQ8Z.
[46] Arya Sundaram, *Latinos in NY Bearing Brunt of Immigration Arrests Statewide, Report says*, Gothamist (Dec. 10, 2025), https://perma.cc/N4XF-9773; *see also* New York Immigr. Coal., *Unmasking ICE's Anti-Latino Practices—and What New York City Can Expect*, at 4 (December

53. For over a year, ICE has been targeting low-income and immigrant communities instead of the wealthier and whiter areas of New York City. ICE established checkpoints in Queens neighborhoods such as Corona, Jackson Heights, and Flushing, where agents hid in unmarked cars near commercial thoroughfares and at busy intersections, jumping out to stop and arrest Latinos as they walked by while permitting non-Latinos to pass undisturbed.[47] Now, agents, generally wearing face coverings, eschew fixed checkpoints and instead prowl these neighborhoods in unmarked cars and jump out to surround unsuspecting New Yorkers—overwhelmingly Latinos— as they walk down the street, particularly during commuting hours.[48]

54. In Staten Island's Port Richmond neighborhood, where nearly half of the population is Latino, ICE has targeted Latino residents returning home from work and has conducted enforcement outside a church's food pantry, which has led many to forgo looking for work or seeking assistance.[49]

55. Similarly, on Long Island, ICE agents typically roam the streets, often in packs of unmarked cars, and target Latinos who are traveling to or from work or school, visiting neighborhood stores, and otherwise going about their daily lives. Agents use their cars to block vehicles and pedestrians, often targeting those walking in the early morning hours on their way to work. Multiple agents then swarm and surround the targeted individual, frequently using force to

---

2025), https://perma.cc/7CFV-SEN2 (Immigrants from Central and South America are 25% of New York City's immigrant population but make up 74% of ICE arrests in the city from January 20, 2025, to July 29, 2025).

[47] Gwynne Hogan, *Sidewalk Arrests Seize New Yorkers in ICE's Latest Surge*, The City (Nov. 26, 2025), https://perma.cc/5TRA-XUDQ.

[48] *E.g.*, *Weekend of ICE Detentions Shakes Sunset Park*, The Sunset Post, https://perma.cc/X9MK-KTVL (last visited Apr. 8, 2026).

[49] Chad Small, *In Staten Island's 'Little Mexico,' ICE Presence Rattles a Community*, Documented (Mar. 23, 2026), https://perma.cc/XZW4-2R5C; Jillian Delaney, *ICE Presence Near Staten Island Food Pantries: What Community Leaders Are Doing*, SI Live (Dec. 2, 2025), https://perma.cc/E38E-66CT.

detain them before moving quickly to an arrest. A U.S. citizen taxi driver in Nassau County with a primarily Latino clientele saw ICE surround and detain people every day between November 2025 and March 2026, with the result that his passengers were scared to spend even a few moments outside. He quit his job as a taxi driver because he feared that he could be stopped at any time due to his perceived Latino ethnicity, and the stress and anxiety became too much to take.

56.     Agents have also conducted mass raids on Long Island. On November 5, 2025, approximately two dozen agents from ICE and other federal agencies did an immigration enforcement sweep in Westhampton and Hampton Bays.[50] Almost all wore masks, and many wore no badge or identifying insignia.[51] At a shopping center in Hampton Bays, agents with guns drawn "fanned out across the parking lot, seemingly attempting to just chase down anyone who fled."[52]

57.     In Western and Northern New York, ICE and CBP agents stake out Walmarts and other shopping centers and target people speaking Spanish as they leave with their purchases.

58.     Agents have targeted Latino workers in Western New York. For example, on May 12, 2025, in Buffalo, four roofers had been working for an hour and a half when "armed, masked agents from ICE and the FBI jumped out of black, unmarked SUVs, rounded up four workers and whisked them away."[53] In December 2025, ICE and FBI agents entered an Amherst, New York homeowner's property, drew their guns on the two roofers working on her roof, and arrested them

---

[50] *Immigration Enforcement Sweep in Hampton Bays Causes Panic Among Undocumented Workers*, The Southampton Press (Nov. 25, 2025), https://perma.cc/8ABL-5W8E.
[51] *Id.*
[52] *Id.*
[53] J. Dale Shoemaker, *Latinos, Roofers Are Prime ICE Targets in WNY*, InvestigativePost (July 17, 2025), https://perma.cc/XV99-8HA9.

when they descended.[54]   The homeowner captured the operation on video, stills of which appear

below:

 

59.     ICE has also targeted other racial and ethnic groups in specific neighborhoods, such

as West Africans on Canal Street in lower Manhattan.[55] According to one witness: "These men,

they are just grabbing people, putting them in cuffs . . . . Nobody's identifying themselves,

explaining. There's no due process going on. It's just straight to the back of a van if you're African

on Canal."[56]   ICE agents reportedly surrounded, pushed to the ground, and handcuffed an

individual from Senegal, and only afterwards asked if he was legally present in the country.[57] After

he explained that he was from Senegal and had lived in the United States for 20 years and presented

---

[54] *'It's Sick': Amherst Homeowner Says ICE, FBI Arrested Two Roofers Working on Her Home*,
WKBW 7 Buffalo (Dec. 16, 2025), https://perma.cc/7AE2-78YA.
[55] *E.g.*, Arya Sundaram, *Judges Free Canal Street Vendors Arrested by ICE, Question Legality of
Raids*, Gothamist (Feb. 19, 2026), https://perma.cc/CEJ8-JYTL.
[56] Luis Ferre-Sadurni, *Federal Agents Stage Raid on Canal Street in New York City, Arresting 9*,
N.Y. Times (Oct. 21, 2025), https://perma.cc/NN6F-RT3Q.
[57]*See id.*

identification, ICE checked his status and let him go.[58] According to U.S. Congressman Dan Goldman, ICE arrested four U.S. citizens during its unlawful sweep before finally releasing them without charges.[59] The Congressman characterized ICE's actions as "lawless terror."[60] When questioned at a habeas hearing for one West African immigrant delivery worker arrested in the vicinity of Canal Street during the raid, the Government's attorney was unable to justify the arrest; despite repeated requests from the court, the attorney could not explain why the arrest was predicated on anything more than mere "happenstance."[61]

60.    ICE's pervasive presence has upended vibrant communities throughout the State and created an atmosphere of fear. Neighborhoods have been paralyzed, with restaurants sitting empty and sidewalks cleared of street vendors.[62] Barbershops, delis, and laundromats across the State struggle to stay open. Churches have reported fewer congregants and people receiving social services out of fear of encountering ICE when they leave their homes.[63] Students have stayed home from school after ICE conducted raids. People staying home and otherwise curtailing their activities include U.S. citizens and those with lawful immigration status.

61.    ICE's systematic policies and practices of racial profiling, suspicionless stops, and warrantless arrests without probable cause are unlawful regardless of whether those they target have had prior contact with the criminal legal system. But even former DHS Secretary Kristi

---

[58] *See id.*

[59] Luke Barr & Megan Forrester, *4 US Citizens Arrested During ICE Crackdown on NYC's Canal Street, Congressman Says*, ABC News (Oct. 22, 2025), https://perma.cc/5K2T-R3PN.

[60] *Id.*

[61] *Ndoye v. Joyce*, 2026 WL 306387, at *8 (S.D.N.Y. Feb. 5, 2026); Arya Sundaram, *Judges Free Canal Street Vendors Arrested by ICE, Question Legality of Raids*, Gothamist (Feb. 19, 2026), https://perma.cc/CEJ8-JYTL.

[62] Luis Ferre-Sadurni, *An Immigrant Neighborhood Where Trump Made Inroads Now Fears ICE Raids*, N.Y. Times (Mar. 2, 2025), https://perma.cc/HXL8-3EP7.

[63] *E.g.*, CBS New York, *ICE Activity across Long Island Impacting Local Businesses, Agencies That Help Immigrants* (YouTube, Jun. 11, 2025), https://perma.cc/2YLW-L6SQ.

Noem's claim that agents are arresting people with "the worst of the worst" criminal records is plainly untrue: the majority of people arrested by ICE in New York have no criminal conviction or charge.[64]

62.    ICE's operations in New York are likely to increase in the immediate future. ICE has made requests to expand its physical footprint in New York and New Jersey, with plans for new offices in Roseland, New Jersey, and in Woodbury and New Windsor, New York,[65] and has purchased a 470,000 square foot warehouse to use as an immigration detention facility in Roxbury, New Jersey,[66] indicating that Defendants intend to further ramp up the number of detentions in, and deportations from, New York. A senior White House official warned less than a week after an ICE agent shot and killed U.S. citizen Renée Good in Minneapolis in January 2026 that Minnesota was "only the beginning. CA and NY next."[67]

**Defendants Racially Profile New Yorkers and Stop Them Without Individualized Reasonable Suspicion of an Immigration Violation.**

63.    Immigration officers must comply with the Fourth Amendment, which protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. Amend. IV. Except at the border, immigration agents may stop individuals only after identifying "specific articulable facts, together with rational inferences from these facts,

---

[64] Luis Ferré-Sadurni & Ashley Cai, *Trump's Immigration Crackdown in New York: More Arrests, Longer Detention*, N.Y. Times (Aug. 4, 2025), https://perma.cc/38X5-NCVS; J. Dale Shoemaker, *Latinos, Roofers Are Prime ICE Targets in WNY*, InvestigativePost (July 17, 2025), https://perma.cc/XV99-8HA9; *see also* Albert Sun, *Most Immigrants Arrested in City Crackdowns Have No Criminal Record*, N.Y. Times (Dec. 4, 2025), https://perma.cc/M7N7-F5QK (explaining that majority of immigrants arrested by ICE in high-profile operations targeting "sanctuary jurisdictions" have no criminal record).

[65] Leah Feigher, *ICE Is Expanding Across the US at Breakneck Speed. Here's Where It's Going Next*, WIRED (Feb. 10, 2026), https://perma.cc/47AC-XQW8.

[66] Sophie Nieto-Muñoz, *ICE Buys Warehouse for Migrant Detention, Roxbury Officials Say*, N.J. Monitor (Feb. 20, 2026), https://perma.cc/8WR6-ESAN.

[67] Mekena Kelly & Leah Feiger, *Minnesota Is Just the Beginning. California and New York Are Next*, WIRED (Jan. 15, 2026), https://perma.cc/7X2C-3B3M.

that reasonably warrant suspicion" of a violation of immigration law.[68] But "race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop."[69] Moreover, "a person's mere propinquity to others independently suspected of criminal activity" cannot give rise to reasonable suspicion.[70]

64.     Immigration officials in New York are disregarding these constitutional mandates in favor of mass racial profiling.[71]

65.     In May 2025, Miller instructed high-level DHS officials that, instead of conducting targeted operations, they should "just go out there and arrest [unauthorized noncitizens]" by rounding up people in public spaces like "Home Depot" and "7-Eleven" convenience stores.[72]

66.     In New York, Defendants have dutifully carried out Miller's directive by enacting a policy and practice of stopping individuals based wholly or primarily on their race, and without reasonable suspicion about the individuals' immigration status.

---

[68] *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 236 (2d Cir. 2006) (quoting *Brignoni-Ponce*, 422 U.S. at 884).

[69] *United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) (citation modified); *Zuniga-Perez v. Sessions*, 897 F.3d 114, 124 (2d Cir. 2018); *see also Illinois,* 146 S. Ct. at 436 n.4 (Kavanaugh, J. concurring) ("The Fourth Amendment requires that immigration stops must be based on reasonable suspicion of illegal presence, stops must be brief, arrests must be based on probable cause, and officers must not employ excessive force. Moreover, the officers must not make interior immigration stops or arrests based on race or ethnicity.").

[70] *United States v. Owens*, 101 F.3d 559, 562 n.2 (8th Cir. 1996) (applying *Ybarra v. State of Illinois*, 444 U.S. 85, 91 (1979), in the reasonable suspicion context).

[71] Dean Moses, *3 of Every 4 New Yorkers Arrested by ICE Agents Are Latino: Immigration Coalition Report*, AMNY (Dec. 10, 2025), https://perma.cc/7AU7-5WUW ("ICE arrests in New York and other parts of America have disproportionately targeted Latino individuals for arrest and potential deportation," according to a report by the New York Immigration Coalition, which "also found that the person's Latino country of origin did not matter—the individuals were apprehended based merely on their ethnicity.").

[72] Cheyenne McNeill, *Just Go out There and Arrest Illegal Aliens: Stephen Miller Urged ICE to Target Home Depot,* Salon.com (Jun. 10, 2025), https://perma.cc/3TQX-3D9L; Elizabeth Findell et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, Wall St. J. (June 9, 2025), https://perma.cc/3JP5-MYE4.

67.     On the sidewalks of Brooklyn, Queens, and Long Island, parking lots in Buffalo, and elsewhere throughout the State, agents categorically stop Black and Brown individuals who appear to be Latino, while permitting non-Latino white people to pass undisturbed.

68.     ICE runs this coordinated campaign of race-based stops, without any individualized suspicion about immigration status, particularly in low-income and immigrant neighborhoods and during commuting hours when residents of those neighborhoods are likely to be going to and from work or taking their children to and from school.

69.     Plaintiffs and other individuals' experiences illustrate these policies and practices. Throughout New York, ICE and CBP agents are pulling drivers over based solely on their apparent race and perceived ethnicity, even when vehicles are lawfully registered and display standard New York license plates. These agents target Hispanic towns and communities—for instance, on Long Island, race-based stops are rampant in and around the areas of Brentwood and Hempstead. A taxi driver who drove almost exclusively Latino passengers in and around the area of Hempstead reported seeing at least one ICE raid a day in recent months; every single individual he saw detained was Latino.

70.     New York State law confirms that these are random and race-based stops. New York State law does not allow access to Department of Motor Vehicles (DMV) information on drivers' license or vehicle registration information for the purposes of civil immigration enforcement. In 2019, New York's Vehicle and Traffic Law was amended to expand access to drivers' licenses in the State and to add new privacy protections for New York drivers and vehicle owners. The amendments include a requirement that the DMV "shall not disclose or make accessible in any manner [agency] records or information" to ICE or CBP. N.Y. Veh. & Traf. Law § 201(12)(a)-(12)(c). Law enforcement agencies that retained access to New York DMV records

22

after 2019 are now required to certify that they will neither **"use such records or information for** civil immigration purposes" nor "disclose such records or information to any agency that primarily enforces immigration law," with limited exceptions. N.Y. Veh. & Traf. Law § 201(12)(b). Because ICE and CBP agents do not have access to New York DMV records, New York vehicle registration and license plate information cannot provide individualized reasonable suspicion that any particular vehicle's occupants are unlawfully present.

71.    On February 26, 2026, ICE agents stopped Plaintiff Rene Antonio Benitez, who is Latino, while he was driving his daughter to school in Brentwood, New York. Mr. Benitez was driving a car registered to his brother with valid New York license plates. He was obeying all traffic laws. There was no reasonable suspicion to stop Mr. Benitez.

72.    On the morning of May 28, 2025, N.D.L.A., a 36-year-old Latino resident of Amityville, New York with two U.S. citizen daughters, was driving to work. After he pulled out of his driveway, three patrol cars started following him. He was obeying all traffic laws and had valid New York license plates registered to his wife's name. He immediately pulled over, and two other patrol cars pulled in front of him, barricading his car. An agent wearing a bulletproof vest with the word ICE printed on it approached N.D.L.A.'s car and spoke Spanish to him. While the Spanish speaking agent spoke to N.D.L.A., about ten agents came out of their cars and surrounded N.D.L.A.'s car. The agent showed N.D.L.A. a photograph of people he said that the agents were looking for. N.D.L.A. looked nothing like the people in the photograph. His complexion is lighter, and he is much heavier. The agent then asked N.D.L.A. if he had seen the people. N.D.L.A. said that he thought they lived in the basement apartment of the multi-family home he lived in. N.D.L.A. said he had last seen them over a month ago. After N.D.L.A. answered the question, the

agent did not permit N.D.L.A. to leave. Instead, he demanded to see N.D.L.A.'s passport. There was no reasonable suspicion to stop N.D.L.A.

73.    On January 20, 2026, Santos Gonzalez Argueta, a Latino resident of Roosevelt, New York, was riding to work with a coworker in a van. The coworker picked up some more of their colleagues, and then drove to Freeport, New York, to pick up another person. All the people in the van were Latino. Right after the coworker in Freeport got in the van, immigration agents stopped them. Within two minutes, about six other cars, with a total of eight to ten agents, arrived and surrounded the van. An agent approached the front passenger side seat, where Mr. Gonzalez Argueta was sitting, banged on the window, and demanded to see his identification. There was no reasonable suspicion to stop the van or Mr. Gonzalez Argueta.

74.    On November 18, 2025, CBP agents stopped a car containing Edy Benjamin Salguero-Castro and three coworkers, including G.E.V.S., in North Tonawanda, New York at a Days Inn parking lot. Mr. Salguero-Castro is Latino, as are his three coworkers. Mr. Salguero-Castro and his coworkers made some purchases at Walmart. While shopping and walking to their car, they spoke to each other in Spanish. Mr. Salguero-Castro's coworker then drove them to the nearby Days Inn, where they were staying while working on a job. Mr. Salguero-Castro was in the backseat. The coworker who drove followed all traffic laws between leaving the Walmart parking lot and arriving at the Days Inn parking lot. Mr. Salguero-Castro and his coworkers were in the car, which belonged to their U.S.-citizen boss, and which had valid New York license plates. There was no reasonable suspicion to stop Mr. Salguero-Castro, G.E.V.S., or the others in the car.

75.    ICE has specifically targeted Latino neighborhoods like Corona, Queens,[73] where agents set up checkpoints and stop Latino men, including on their way to or from the subway

---

[73] NYU Furman Ctr., *Elmhurst/Corona*, (May 8, 2025), https://perma.cc/AP98-AUSP.

station, with no basis to do so but their apparent race or perceived ethnicity. Residents also report teams of ICE agents going door-to-door along residential streets and entering businesses with a largely Latino clientele to question people about their immigration status.



*October 14, 2025, Warrantless Immigration Arrest of a Delivery Worker in Sunset Park, Brooklyn.*[74]

76.     For example, O.T.M.M. is a Corona, Queens, resident who works delivering food on a bike. He has lived in Corona for three years. He is Latino. On November 1, 2025, O.T.M.M.

---

[74] Video Posted by Immigration Coalition (@immigrationcoalition), Instagram (Oct. 14, 2025), https://perma.cc/69J6-RBCZ.

was making a delivery in Corona when his phone fell out of his pocket as he turned a corner on his bike. After he retrieved his phone from under a parked car, he stood up and found that he was surrounded by six immigration agents who had emerged from several unmarked cars. The agents wore bulletproof vests, and several covered their faces with masks. They put their hands on his shoulders to hold him in place. Although the agents claimed they wanted his help to find someone, when an agent showed him a phone, it was not displaying a picture. The agents then forcibly removed his helmet and the hood he wore underneath and, while continuing to hold on to him, took his photograph without O.T.M.M.'s permission. One agent displayed and threatened to deploy a Taser if he ran. There was no reasonable suspicion to stop O.T.M.M.

77.     X.P.F. is a Corona, Queens, resident who has lived in New York City for 27 years. He is Latino. On November 30, 2025, he left his apartment to head to work. He walked down his block to the deli on the corner. As he was walking, he heard people shouting, but because it was cold and he was bundled up with his ears covered, he did not hear what they were saying. X.P.F. was walking at a normal pace and had just entered the deli when two agents ran in after him. Without asking X.P.F. any questions, they grabbed him. X.P.F. told the agents in English to please be careful because his left arm was injured, but they were aggressive anyway, tearing off his backpack, pushing his head down, and pulling his arms behind his back. Before placing X.P.F. in handcuffs, the agents did not ask him any questions about his immigration status. There was no reasonable suspicion to stop X.P.F.

78.     Throughout New York, ICE agents have followed Miller's instructions to the letter and targeted Home Depots, including in Freeport, Hempstead, and New Rochelle,[75] with witnesses

---

[75] *E.g.*, Arya Sundaram, *Immigration Police Making Their Presence Known at NYC-Area Home Depots*, Gothamist (Jun. 16, 2025), https://perma.cc/G775-GWN6.

reporting that ICE agents circled Latino laborers with cars and arrested everyone who could not provide photo identification.[76]



*Immigration Arrests at Home Depot in Jamaica, NY on December 20, 2025.*[77]

79.      For example, on the morning of January 8, 2026, J.G.G. was in the parking lot of a Home Depot in Nassau County, waiting for a man who had hired him to do a construction job to buy materials together. J.G.G. is a 66-year-old Latino man who has lived in Queens for 20 years.

---

[76] *Id.*
[77] Video posted by People Over Papers (@peopleoverpapers), Instagram (Dec. 20, 2025), https://perma.cc/D3LL-8ZPD.

After J.G.G. had been in the parking lot for about 30 minutes, several black vehicles suddenly pulled into the parking lot and surrounded him. Multiple agents with guns jumped out of the cars. One of the agents pushed J.G.G. from behind onto a moving car. Two agents held J.G.G. down against the car hood by his neck. One agent held a gun to J.G.G.'s head and yelled at him not to move. The agents then searched J.G.G. and took his phone, wallet, and other belongings without his consent. There was no reasonable suspicion to stop J.G.G.

80.     On June 5, 2025, A.J.M.C., a 15-year resident of Hempstead, New York, who has three U.S.-citizen children, was standing in a Home Depot parking lot near other Latino men while waiting for his boss to stop by and deliver his pay when about five unmarked cars surrounded them, after which ICE agents and U.S. Marshals wearing military vests and carrying long guns got out and approached them. A.J.M.C. had planned to be out of his apartment for only a few minutes and was dressed casually, not in work clothes and boots. A.J.M.C. did not observe the agents stop anyone who was not Latino. The agents stopped him and the other Latino men without any reasonable suspicion.

81.     Particularly in the Buffalo area, CBP and ICE agents routinely surveil Walmart locations and other stores, then either follow Latinos to their cars before detaining them, or tail them as they leave the store parking lots and stop and detain them elsewhere.

82.     CBP agents followed, then stopped and arrested Mr. Salguero-Castro, G.E.V.S., and their coworkers after observing them speaking Spanish to each other in a Walmart parking lot in North Tonawanda, New York. In the Form I-213 Record of Deportable/Inadmissible [Noncitizen] produced in the immigration court case of one of the arrestees, a CBP agent explicitly states that they targeted him and his coworkers because they were speaking Spanish. No other

28

reason was given. There was no reasonable suspicion to stop Mr. Salguero-Castro, G.E.V.S., or their coworkers.

83.    ICE also uses ruses and trickery to carry out their suspicionless stops. A common practice throughout the greater New York City metropolitan area is for agents to use a photo ruse to trick someone—almost always a Latino person—into stopping and engaging in conversation. However, this conversation is not consensual, as it generally is accompanied by a show of force and other coercive elements. The person approached and questioned by agents is not free to leave. Moreover, the selection of the "target" for the conversation is based on race. The photo ruse typically proceeds as follows: a Spanish-speaking agent, generally accompanied by multiple other armed agents, approaches and surrounds a Latino person. The agent then shows him a photo of another Latino person claiming they are looking for the person in the photo. Once the targeted person stops, the questions quickly turn to the targeted person's lawful status as other agents surround this person and further restrain this person's movement.

84.    For example, ICE agents stopped Plaintiff J.R.H.L. using the photo ruse and a show of force. J.R.H.L. is a landscaper who has lived in Wyandanch, New York, since 2007. He is Latino. On June 7, 2025, he was walking through the public parking lot across from his house to get to the bus he takes to work. As he was crossing the parking lot, four cars surrounded him, preventing him from walking away. An armed agent exited one of the cars and showed J.R.H.L. a photo of a young Latino man who looked nothing like J.R.H.L., who is in his late 40s. The agent then asked in Spanish if J.R.H.L. recognized the man in the photograph. J.R.H.L. told the agent that he might have seen the man in the photo, but that Wyandanch is a very Hispanic town. The agent then began asking J.R.H.L about his legal status and for his identification. At this point, there were two other armed agents standing behind J.R.H.L. He felt he had to answer the questions

29

because he was scared, intimidated, and could not leave. There was no reasonable suspicion to stop J.R.H.L.

85.    On February 24, 2026, ICE agents surrounded Plaintiff A.M.C. as he sought to enter his apartment building in the Bushwick neighborhood of Brooklyn. A.M.C. is a 36-year-old Latino who has lived in New York for approximately 14 years. He has two U.S.-citizen children. A Spanish-speaking ICE agent in plainclothes displayed a photograph of a man on his phone asked A.M.C. if he recognized him. The man in the photograph had a mustache, unlike A.M.C., and the two looked nothing alike. A.M.C. said that he did not recognize the man in the photograph. The agent then asked A.M.C. if he had any papers. While the agent was speaking to A.M.C., other agents wearing bulletproof vests exited their vehicles and surrounded him. And while the agents were surrounding A.M.C., they allowed a white woman to enter the building without stopping her or asking her any questions about the man in the photograph. Because A.M.C. was surrounded by agents, he felt that he had to answer the agent's questions and could not leave. There was no reasonable suspicion to stop A.M.C.

86.    On June 11, 2025, L.R.C. was standing in the parking lot for the Green Street Long Island Railroad station in Glen Cove, New York, looking for work. L.R.C. is Latino. He is seeking asylum in the United States and has been granted employment authorization through December 1, 2029. L.R.C. was standing separately from, but near, six other men looking for work. All were Latino. About seven unmarked cars pulled into the parking lot and surrounded L.R.C. and the other men. Eight to nine officers exited the cars; they were wearing bulletproof vests that said "FBI" or "ICE." Two men tried to run; L.R.C. did not. L.R.C. has a valid work permit. Three officers approached L.R.C. and the others and showed them a photograph of a white man with blonde hair. L.R.C. appears to be Latino and does not look anything like the man in the photograph, nor did

any of the other men looking for work. L.R.C. and the others said that they did not know the man. L.R.C. was not free to leave because he and the other men were surrounded by the cars, and there were many officers near him. The officers then asked L.R.C. for his identification, and he showed them his employment authorization card, as well as documents regarding his upcoming check-in with ICE and his next immigration court date. The agents nonetheless arrested and handcuffed L.R.C. There was no reasonable suspicion to stop L.R.C.

87.    Plaintiffs and others report that large numbers of agents have jumped out of unmarked cars and surrounded and stopped them before knowing their names or asking them for any identifying information. The only common, identifying factor is that they are all Latino.

88.    For example, on January 3, 2026, Plaintiff Hesler Asaf Garcia Lanza, a 24-year-old Latino with approved Special Immigrant Juvenile Status and a related grant of deferred action, as well as a valid Employment Authorization Document, was walking to the Hempstead Long Island Railroad station on his way to work. An unmarked SUV approached him, followed by three other vehicles. Four to six agents exited the vehicles and surrounded him, then demanded his identification and asked where he was from. Mr. Garcia Lanza is a *magna cum laude* graduate of The City University of New York and fluent in English, but the agents spoke to him in Spanish from the outset. After Mr. Garcia Lanza presented the agents with his Employment Authorization Document reflecting his deferred action status, they arrested him anyway. There was no reasonable suspicion to stop Mr. Garcia Lanza.

89.    Juan Carlos Quintero is a 41-year-old Latino resident of Staten Island. He has lived in New York since 2007, and he has four children, including two who are U.S. citizens. On December 4, 2025, Mr. Quintero was walking outside on his way to see his children when he stopped to watch some people play a game of dominos. He was among a group of ten people who

31

were either playing the game or watching. Suddenly, three unmarked cars sped toward them, then eight to ten agents sprinted toward them from different directions and surrounded them. One agent ran over to Mr. Quintero and demanded his identification. When Mr. Quintero responded that he did not have identification with him, the agent immediately handcuffed him, without asking any additional questions.

90.    DHS agents routinely stop Latinos for no other reason than their appearance and the language they are speaking.

91.    The Fourth Amendment prohibits Defendants from stopping anyone, whether they are U.S. citizens or not, without reasonable suspicion. However, Defendants' pervasive racial profiling has predictably resulted in the targeting of U.S. citizens and lawful permanent residents who appear to be Latino and work, reside, or happen to be in locations where Defendants operate.

92.    On January 20, 2026, ICE stopped, arrested, and detained an elderly Latino lawful permanent resident in Nassau County who was on his way to a doctor's appointment. Officers transported him to the ICE office in the Nassau County Jail, where he was detained for approximately an hour. ICE agents made him remove his shoelaces and drawstring from his jacket. Ten minutes later, the ICE agents returned and acknowledged that he was a lawful permanent resident. The man asked them, "Why did you make me take my shoelaces out before you checked my ID?"

93.    In June 2025, ICE agents stopped a Native American man in Hamburg, New York. Agents demanded the man's identification, then his passport. They allowed him to leave only after determining that he was a U.S. citizen.[78]

---

[78] J. Dale Shoemaker, *Latinos, Roofers Are Prime ICE Targets in WNY*, InvestigativePost (July 17, 2025), https://perma.cc/XV99-8HA9.

94.    On December 4, 2025, the same date that officers surrounded men playing dominos on the street in the Port Richmond neighborhood of Staten Island, ICE agents stopped and detained a longtime lawful permanent resident who was getting food at a deli near his home in Port Richmond. Officers gave no explanation for their actions and released the man, who is Latino, later that evening.

95.    Absent judicial intervention, Defendants will continue their policy and practice of racially discriminatory stops without reasonable suspicion, and Plaintiffs, other members of the class, and Plaintiff WCCNY's members, are likely to continue experiencing unlawful stops.

**Defendants' Reliance on Race and Ethnicity When Conducting Stops Violates the Fifth Amendment's Equal Protection Guarantee.**

96.    As detailed above, Defendants consistently rely on apparent race or ethnicity instead of reasonable suspicion as grounds for stops. Defendants' policy and practice of targeting people of color, particularly Latinos, in their immigration operations violates the Fifth Amendment's equal protection guarantee, which mandates that the government do "away with all governmentally imposed discrimination based on race."[79]

97.    The constitutional prohibition against discrimination based on race and ethnicity, incorporated through the Fifth Amendment's Due Process Clause, is distinct from the Fourth Amendment's protections against unreasonable searches and seizures. Governmental action may violate the right to equal protection even if it is not unlawful under the Fourth Amendment.

98.    Defendants have a policy and practice of intentionally stopping individuals based on their apparent Latino race, color, or ethnicity. When immigration agents "make interior

___

[79] *Students for Fair Admissions*, 600 U.S. at 206 (quoting *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984)).

33

immigration stops or arrests based on race or ethnicity,"[80] as Defendants are doing here, their conduct violates the Constitution.

99.    Defendants' policy and practice of choosing to stop individuals based on apparent Latino ethnicity expressly classifies individuals based on their race, color, and/or ethnicity.

100.    Defendants' policies and practices are motivated by discriminatory intent and have a discriminatory effect on Plaintiffs.[81] In addition, even if Defendants present a race-neutral justification for their policies and practices, their policies and practices are "unexplainable on grounds other than race."[82]

101.    Actions and statements by Defendants and other Trump Administration officials evidence Defendants' discriminatory intent. DHS regularly uses white supremacist messaging and other racist dog-whistles to recruit new officers, such as through a social media post stating, "We'll have our home again," which is "also the name of a song, written by members of a self-described 'pro-White fraternal order,' that has been embraced by the Proud Boys and other white-nationalist groups."[83]

102.    When "the post was opened on Instagram's mobile app, audio from the chorus of the song played in the background."[84] The Instagram post was deleted 40 minutes after the New York Times inquired about it, but it remained on X and Facebook.[85]

---

[80] *Illinois*, 146 S. Ct. at 436 n.4 (Kavanaugh, J., concurring).

[81] *See Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-68 (1977).

[82] *See id.* at 266 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).

[83] Evan Gorelick, *Administration Social Media Posts Echo White Supremacist Messaging*, N.Y. Times (Jan. 27, 2026), https://perma.cc/ZU2W-9QZX; *see also* Jonathan Montpetit, *ICE Nodding to Far-Right Extremists in Recruiting Posts, Experts Say*, CBC News (Jan. 25, 2026), https://perma.cc/CDZ2-J7PR; Gustavo Solis, *Experts Concerned About White Nationalist Imagery in ICE Recruiting Materials*, KPBS (Sept. 22, 2025), https://perma.cc/DKK4-KU9F.

[84] Evan Gorelick, *Administration Social Media Posts Echo White Supremacist Messaging*, N.Y. Times (Jan. 27, 2026), https://perma.cc/ZU2W-9QZX.

[85] *Id.*

34

103.    On December 31, 2025, the White House posted a photo of President Trump with the word "remigration"—"a decades-old European concept centered on the expulsion of nonwhite people and immigrants deemed 'unassimilated,'" that has been associated in recent years with neo-Nazis in Germany.[86]

104.    Defendants' departure from past norms and practices, including their shift away from targeted enforcement to prioritizing arrest quotas above all else, also evidences their discriminatory intent.

105.    Defendants and other government officials' actions leading up to and accompanying the challenged policy and practice demonstrates discriminatory intent. In early 2025, the Trump administration issued an executive order claiming that increased and aggressive immigration enforcement against the Latino community was necessary to "protect[] the American People against invasion."[87] President Trump had previously claimed that immigrants are "poisoning the blood of our country,"[88] that Mexican immigrants are "rapists" and "criminals,"[89] and that immigrants from South America are "drug lords" and "gang members"[90] that are "invading" the United States.

106.    Indeed, President Trump has exhibited a profound and unrelenting racial animus towards nonwhite immigrants for years. During President Trump's first term, several federal

---

[86] *Id.*

[87] The White House, *Protecting The American People Against Invasion*, (Jan. 20, 2025), https://perma.cc/K87F-HNZ4.

[88] Ginger Gibson, *Trump Says Immigrants Are 'Poisoning the Blood of Our Country.' Biden Campaign Likens Comments to Hitler*, NBC News (Dec. 17, 2023), https://perma.cc/A88G-FSWT.

[89] Morgan Winsor, *What Donald Trump Has Said About Mexico and Vice Versa*, ABC News (Aug. 31, 2016), https://perma.cc/45HC-ZJSJ.

[90] Amanda Terkel & Megan Lebowitz, *From 'Rapists' to 'Eating the Pets': Trump Has Long Used Degrading Language toward Immigrants*, NBC News (Sept. 19, 2024), https://perma.cc/T8FG-MT7Z.

district courts found there is "evidence that President Trump harbors an animus against nonwhite, non-European aliens which influenced his (and thereby the Secretary's) decision to end the [Temporary Protected Status] designation[s]" for El Salvador, Haiti, Sudan, and Nicaragua in 2017 and 2018.[91]

107.    President Trump has routinely dehumanized and demonized nonwhite immigrants, including Latinos, describing many as "animals,"[92] even comparing some immigrants to a "snake" that would bite and kill anyone foolish enough to give them shelter.[93]

108.    President Trump and former DHS Secretary Noem have also repeatedly claimed, without evidence, that Latin American countries including Venezuela are emptying their jails and mental health institutions to send criminals to the United States.[94] This discriminatory rhetoric has continued throughout President Trump's second term. In June 2025, President Trump claimed that

---

[91] *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1098 (N.D. Cal. 2018), *vacated and remanded*, *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023). *See also Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) ("[F]ind[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador and Honduras).

[92] Miriam Valverde, *In Context: Donald Trump's Comments about Immigrants, 'Animals',* POLITIFACT (May 17, 2018), https://perma.cc/KMW9-6QVY (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals."); *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018), https://perma.cc/8R22-LZJZ.

[93] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, Vox (Feb. 23, 2018), https://perma.cc/6NCQ-3K89.

[94] NBC News, *Meet the Press Full Broadcast* – Feb. 2, at 16:00 (YouTube, Feb. 2, 2025), https://perma.cc/7XKR-UYMU (16:00); Fox News, *President Donald Trump: We Will Bring Our Country Back*, at 17:25-18:20 (YouTube Jan. 22, 2025), https://perma.cc/Q8ZQ-D9NQ (17:25-18:20); Donald J. Trump (@realDonaldTrump), X (Apr. 18, 2025 6:30 PM), https://perma.cc/RW38-XQAT; CBS News, *South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race*, at 4:32 (Mar. 5, 2024), https://perma.cc/5FNB-UDJM (then-Governor Noem stating that "this invasion . . . is to remake the foundation of this country.").

"[m]any" recent immigrants were "Rapists, Murderers, and Terrorists," depicting them as a "tsunami" that "has destroyed Americans' Public Schools, Hospitals, Parks, Community Resources, and Living Conditions," and turned "once idyllic Communities" into "Third World Nightmares."[95] In the same vein, Miller proclaimed that immigration agents were engaged in "a fight to save civilization"[96] from immigrants, whom he demonized as "illegal alien invaders, cartel killers, foreign terrorists, transnational gangs and insurrectionist mobs."[97]

109.    Defendants' policies and practices of selecting whom to stop based on apparent Latino ethnicity are sanctioned by officials with authority over the policies.

110.    In the alternative, even if Defendants' policies and practices were not motivated by racial or ethnic animus, they would fail strict scrutiny because they are not narrowly tailored to achieve a compelling governmental interest. Defendants have other more tailored, and more effective, ways to conduct immigration enforcement than through their racially discriminatory policies and practices.

111.    Defendants' reliance on race and ethnicity is especially unreasonable because a large percentage—indeed, the vast majority—of Latinos living in the United States and in New York are U.S. citizens, and still more are lawfully present. New York City's Latino population is over 2.4 million, and New York State's Latino population is over 4 million.[98] Approximately

---

[95] Donald J. Trump (@realDonaldTrump), Truth Social (June 12, 2025 2:03 PM), https://perma.cc/FLC6-S959.

[96] Stephen Miller (@stephenM), X (June 8, 2025 1:42 PM), https://perma.cc/E2NJ-8EAM.

[97] Stephen Miller (@stephenM), X (June 9, 2025 9:59 PM), https://perma.cc/N4M3-W6VD.

[98] American Community Survey 1-Year Estimates Selected Population Profiles, *Age by Nativity and Citizenship Status (Hispanic or Latino)*, U.S. Census Bureau (2024), https://perma.cc/EE3G-FWEY (filter by State, "New York" and Place, "New York city, New York," and Race or Ethnicity, "Hispanic or Latino (of any race)").

seventy-nine percent of Latino New York residents are United States citizens.[99] The same is true of U.S. Latinos generally.[100]

112.    There are almost 1.6 million Latinos in New York outside of New York City. The Latino population in the suburbs of New York City grew 42% between 2020 and 2024, with large increases on Long Island and in Orange, Putnam, and Rockland Counties.[101] Over 30,000 Latinos live in Buffalo,[102] and approximately 15,000 live in Syracuse.[103] Latinos live, work, and travel throughout New York, and it is not unusual or suspicious for a Latino person to be anywhere in New York.

113.    Defendants' racially and ethnically discriminatory policies and practices have dramatically affected the lives of Latinos and other minority communities that call New York home. Many Latinos, irrespective of citizenship or immigration status, now hide in their homes. Fewer Latino people go to churches, patronize local businesses, attend events with their children, and participate in community life. Residents describe some areas with a high concentration of Latino New Yorkers as becoming like ghost towns.

114.    Through their pervasive policy, pattern, and practice of racial profiling, Defendants have harmed Latinos and other people of color who, irrespective of their citizenship or immigration status, experience fear, stigmatization, and humiliation due to Defendants' unequal treatment.

---

[99] U.S. Census Bureau, *American Community Survey 1-Year Estimates Selected Population Profiles, Age by Nativity and Citizenship Status (Hispanic or Latino)* (2024), https://perma.cc/EE3G-FWEY (filter by State, "New York," and Race or Ethnicity, "Hispanic or Latino (of any race)").

[100] *See* Gabriel Pina & Gracie Martinez, *Key Facts about U.S. Latinos*, Pew Research Center (Oct. 22, 2025), https://perma.cc/4DRT-9796.

[101] CUNY Graduate Center, *Latino Population Grows 12% in New York City, 42% in Suburbs From 2000-2024, CUNY Study Finds* (Mar. 9, 2026), https://perma.cc/98JF-DQQY.

[102] U.S. Census Bureau, *Quick Facts: Buffalo City, New York*, https://perma.cc/TB46-AYN3.

[103] U.S. Census Bureau, *Quick Facts: Syracuse City, New York*, https://perma.cc/U52A-XPFS.

115.    Absent judicial intervention, Defendants will continue their policy and practice in New York of making stops based on apparent Latino race or ethnicity, and Plaintiffs, other members of the class, and Plaintiff Workers' Center of Central New York's members are likely to experience unlawful stops.

**Defendants Arrest New Yorkers Without Warrants and Without Probable Cause.**

116.    Defendants have a policy and practice of making warrantless immigration arrests without probable cause that the person being arrested is unlawfully present in the country and is likely to escape before a warrant can be obtained, as 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii) require.

*Warrantless Civil Immigration Arrests Require Probable Cause.*

117.    Consistent with constitutional and historical norms, "[g]enerally, officers making civil immigration arrests must have an administrative warrant."[104] By contrast, 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i), (ii) govern—and significantly limit—an immigration officer's authority to make warrantless arrests.[105]

118.    An immigration officer may arrest an individual without a warrant only if they have "reason to believe" that the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely to escape before a warrant can be obtained" for their arrest. 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2) (i), (ii) (same). An officer must make an individualized determination that probable cause exists as to *both* unlawful immigration status and likelihood of escape before making a warrantless arrest.

---

[104] *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 30 (D.D.C. Dec. 2, 2025) (citing *Arizona*, 567 U.S. at 407-08).
[105] *Arizona*, 567 U.S. at 408.

*DHS Formalized the Probable Cause Requirement in a Nationwide Broadcast Statement of Policy, Yet Defendants Have Flouted It.*

119. Until recently, DHS recognized these clear statutory limitations on its warrantless arrest authority. After the first Trump Administration adopted a warrantless arrest policy ignoring 8 U.S.C. § 1357(a)(2)'s requirement of individualized probable cause and conducted large-scale immigration sweeps in Chicago, residents and community groups brought *Castañon Nava v. DHS*, a class action lawsuit challenging the policy.[106] Following the denial of its motion to dismiss,[107] DHS entered into a consent decree in which it agreed to issue a nationwide Broadcast Statement of Policy acknowledging section 1357(a)(2)'s requirement that officers have "probable cause that an individual is in the United States in violation of U.S. immigration laws *and* probable cause that the individual is likely to escape before a warrant can be obtained for the arrest."[108] Additionally, the Broadcast Statement of Policy set forth a non-exhaustive list of factors that may be relevant to the "likelihood of escape" determination, which include an individual's "ties to the community (such as a family, home, or employment) or lack thereof."[109] It further specified that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude" the individual "is likely to escape before a warrant for arrest can be *obtained*."[110]

120. Since the beginning of the second Trump Administration, Defendants have flouted these statutory and regulatory requirements throughout the country in service of their mass deportation agenda, making warrantless arrests of thousands of people without first conducting the

---

[106] *See* Second Am. Compl., *Castañon Nava v. Dep't of Homeland Sec.*, No. 1:18-cv-03757 (N.D. Ill. Dec. 18, 2018), Dkt. No. 58.

[107] *See Castañon Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880 (N.D. Ill. 2020).

[108] Settlement Agreement, *Castañon Nava*, No. 1:18-cv-03757, Appendix A at 1 (Feb. 7, 2022), Dkt. No. 155-1 (emphasis in original).

[109] *Id.* at 17.

[110] *Id.* at 17-18 (emphasis in original).

required individualized probable cause assessments. Following DHS's widespread violations of the settlement agreement, including unilateral pronouncements disavowing the Broadcast Statement of Policy while motions to enforce the settlement agreement were still pending, the district court in *Castañon Nava* extended its duration.[111] In the interim, and separate from *Castañon Nava*, courts across the country have consistently found that Defendants have implemented unlawful policies and practices of conducting warrantless arrests without probable cause of both unlawful immigration status and likelihood of escape.[112]

121.   In July 2025, the Department of Justice fired the acting U.S. Attorney for the Eastern District of California hours after she told Border Patrol official Gregory Bovino that he could not arrest immigrants without probable cause.[113]

122.   "[P]ublic official statements have misstated, eschewed or ignored the requisite legal standard for executing warrantless civil immigration arrests, while pressing the need for urgency in executing such arrests."[114] Indeed, Defendants have openly announced that they arrest individuals based on mere reasonable suspicion, not probable cause. For example, on "September 25, 2025, DHS issued a public statement calling the allegations related to warrantless arrests without probable cause in the *Escobar Molina* lawsuit "disgusting, reckless, and categorically FALSE" because "DHS law enforcement uses 'reasonable suspicion' to make arrests."[115] And the following month, former "Chief Border Patrol Agent Gregory Bovino, in a public statement,

---

[111] *Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 860-63 (N.D. Ill. 2025).
[112] *See M-J-M-A v. Hermosillo*, 2026 WL 562063, at *24-25 (D. Or. Feb. 27, 2026); *Escobar Molina*, 811 F. Supp. 3d at 49-50; *Ramirez Ovando*, 810 F. Supp. 3d at 1231-32; *United Farm Workers v. Noem*, 785 F. Supp. 3d 672 (E.D. Cal. 2025).
[113] Heather Knight & Hamed Aleaziz, *Trump Fired a U.S. Attorney Who Insisted on Following a Court Order*, N.Y. Times (Sept. 26, 2025), https://perma.cc/28MH-HTZE.
[114] *See Escobar Molina*, 811 F. Supp. 3d at 16.
[115] *Id.*

41

reiterated, 'We need reasonable suspicion to make an immigration arrest. You notice I did not say probable cause, nor did I say I need a warrant.'"[116]

123.    Even after the *Escobar Molina* decision, Defendants have maintained a policy authorizing immigration officers to conduct warrantless arrests without probable cause.

124.    Commenting on its operations in Minnesota, DHS confirmed its policy that "DHS law enforcement uses 'reasonable suspicion' to make arrests[,]" not probable cause.[117] "DHS Former Assistant Secretary for Public Affairs Tricia McLaughlin told press multiple times that '[l]aw enforcement uses "reasonable suspicion"' to make arrests, as allowed under the Fourth Amendment to the U.S. Constitution. "[118]

### Defendant Lyons Instructed ICE Officers to Apply a "Probable Cause" Standard That Does Not Meet Statutory Requirements.

125.    On January 28, 2026, Defendant Lyons issued a memorandum to ICE officers (hereinafter "Lyons Memo") claiming to provide "guidance for the lawful and consistent exercise of warrantless arrest authority for civil violations of immigration laws," specifically 8 U.S.C. § 1357(a)(2).[119] The memorandum acknowledges that section 1357(a)(2) authorizes a warrantless immigration arrest only upon "reason to believe"—which it correctly defines as "probable cause"—that the person "arrested is in the United States in violation of" the immigration laws "*and is likely to escape before a warrant can be obtained.*" Lyons Memo at 1-2 & nn. 3, 5 (emphasis in original). The memorandum then instructs that the plain meaning of "likely to escape" is that a

---

[116] *Id.*

[117] *Hussen v. Noem*, No. 26-cv-324, 2026 WL 657936, at *25 (D. Minn. Mar. 9, 2026)

[118] *Id.* (citing Anthony Iafrate, *'Nothing but Green Lights': ICE Memo Expands Agents' Warrantless Arrest Powers*, Daily Caller (Jan. 31, 2026), https://perma.cc/T96D-M8MQ); Michelle Hackman et al., *The Standoff that Has Turned Minneapolis into a Tinderbox*, Wall St. J. (Jan. 17, 2026), https://perma.cc/5A4X-XSPV.

[119] Memorandum from Todd M. Lyons, *Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests*, at 2 (Jan. 28, 2026), https://perma.cc/4QER-SQB8.

person is "'likely to escape' if an immigration officer determines he or she is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained."[120] But it then goes on to list several "[p]ossible factors" purportedly relevant to the likelihood of escape—including the person's "age and health," "ability and means to promptly depart the scene of the encounter," "control" over a vehicle in which they were "encountered," possession of "suspect[ed]" "fraudulent" identification or work authorization documents, or the "[p]resentation of unverifiable or suspected false information"—that together would render virtually anyone encountered on the street or in public likely to escape.[121]

126.    Conspicuously, the Lyons Memo omits all reference to a person's "ties to the community (such as a family, home, or employment)," which the Broadcast Statement of Policy issued by DHS under the *Castañon Nava* Consent Decree enumerated as a relevant factor.[122] Also missing from the Lyons Memo is the Broadcast Statement of Policy's clear and unambiguous statement that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that" a person "is likely to escape before a warrant for arrest can be *obtained*."[123] Nor does the Lyons Memo specify, as the Broadcast Statement of Policy did, that "ICE Officers may stop a vehicle to enforce civil immigration laws only if they are aware of specific, articulable facts that reasonably warrant suspicion that the vehicle contains" a noncitizen or noncitizens "who may be illegally in the country."[124]

---

[120] *Id.* at 4.

[121] *Id.* at 3-4.

[122] *See id.*; *see also* Settlement Agreement, *Castañon Nava*, No. 1:18-cv-03757, Appendix A at 17 (Feb. 7, 2022), Dkt. No. 155-1.

[123] *See* Lyons Memo; *see also* Settlement Agreement, *Castañon Nava*, Appendix A at 17-18 (emphasis in original).

[124] *See* Lyons Memo; *see also* Settlement Agreement, *Castañon Nava*, Appendix A at 19.

127.    As ICE's practice is largely to stop pedestrians and vehicles in public areas, this guidance improperly and arbitrarily defines virtually all people ICE encounters as "likely to escape," effectively rewriting the concept of probable cause out of the statute. The Lyons Memo is a further admission that ICE has a policy and practice of not making individualized probable-cause determinations of likelihood of escape and of violating 8 U.S.C. § 1357(a)(2).

128.    DHS's website states that its officers are "trained to ask a series of well-determined questions to determine status and removability" when they "encounter individuals subject to arrest."[125] It conspicuously omits mention of any such training for the coequal escape risk prong required to make a warrantless civil immigration arrest.[126]

129.    In sum, while the Lyons Memo purports to acknowledge that agents must have probable cause for an arrest, the standard it announces falls far short of what the INA requires.

### *Defendants Have a Pervasive Practice of Arresting New Yorkers Without Warrants and Without Probable Cause.*

130.    Here in New York, Defendants have implemented an unlawful policy and practice of making warrantless arrests without probable cause as to unlawful immigration status and likelihood of escape.

131.    Moreover, Defendants have sought to circumvent 8 U.S.C. § 1357(a)(2)'s requirements by fabricating Form I-200 warrants for detained individuals *after* a warrantless arrest. Defendants also routinely create these post-hoc Form I-200 warrants before issuing a Notice to

---

[125] U.S. Dep't of Homeland Sec., *DHS Debunks New York Times False Reporting: DHS Does NOT Deport U.S. Citizens* (Oct. 1, 2025), https://perma.cc/V74G-PNGJ.
[126] *Id.*

Appear, in violation of 8 C.F.R. § 1236.1(b)(1). These after-the-fact administrative warrants are unlawful and invalid.[127]

132.    Agents issue after-the-fact I-200 warrants in an attempt to cover up their lack of probable cause at the time they made warrantless arrests.

133.    Defendants' agents arrested Plaintiffs, putative class members, and WCCNY's members without warrants or with unlawful ex-post facto warrants, issued after the individual was already in handcuffs or otherwise detained, and without first having made the required probable cause determinations.

134.    For example, ICE agents arrested Plaintiff Rene Antonio Benitez without a warrant on February 26, 2026, without asking him any questions about his address, length of residency in New York, family, community ties, or any other similar questions.

135.    On June 7, 2025, ICE agents arrested Plaintiff J.R.H.L. without a warrant in Wyandanch, New York, without asking him any questions about his address, length of residency in New York, family, community ties, or any other similar questions.

136.    ICE agents arrested Plaintiff Darwin Garcia Medrano without a warrant on January 17, 2026, in Brentwood, New York, without asking him any questions about his immigration status, length of residency, family, community ties, or any other similar questions, even though he provided his Employment Authorization Document to the agents.

---

[127] An arrest under authority of a Form I-200 warrant issued before the issuance of a notice to appear is unlawful and invalid. *Gopie v. Lyons*, 2025 WL 3167130, at *1 (E.D.N.Y. Nov. 13, 2025); *see also M-J-M-A-*, 2026 WL 562063, at *20 (summarizing preliminary injunction hearing evidence "demonstrat[ing] ICE's practice [in Oregon] of fabricating warrants after arrests were made"). Further, the post-hoc issuance of a Form I-200 warrant and a notice to appear does not cure an unlawful arrest. It is a "manifestly illegal practice," *Garcia Lanza v. Noem*, No. 26-0029, 2026 WL 585130, at *5 (E.D.N.Y. Mar. 3, 2026), and "'any arrests made pursuant to these invalid Form I-200 warrants must be treated as warrantless arrests,'" *id.* (quoting *Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 841 (N.D. Ill. 2025)).

137. ICE agents arrested Plaintiff H.L.A.O. without a warrant on February 4, 2026, in Greenport, New York. Plaintiff H.L.A.O. presented his New York State driver's license to an agent who demanded his identification. After checking Plaintiff H.L.A.O.'s identification, the agent returned to Plaintiff H.L.A.O.'s vehicle and told Plaintiff H.L.A.O. to come with him. H.L.A.O. told the agent that he was on his way to work and that his wife and 10-day-old baby were still in the hospital and were very sick. The agent commanded Plaintiff H.L.A.O. to exit his vehicle and handcuffed him.

138. ICE agents arrested Plaintiff A.M.C. without a warrant on February 24, 2026, in Brooklyn, New York, after Plaintiff A.M.C. told the agent that he had lived in the same apartment building for three to four years. The agent told A.M.C. that he would be taken to the immigration office because he did not recognize the man in the photograph the agent showed him.

139. On January 3, 2026, ICE agents arrested Plaintiff Hesler Asaf Garcia Lanza without a warrant in Hempstead, New York, even though he had approved Special Immigrant Juvenile Status and a related grant of deferred action status, and presented a valid Employment Authorization Document indicating that he had been granted deferred action status, without asking him any further questions about his immigration status and without asking him any questions about his address, length of residency, family, community ties, or any other similar questions.

140. On January 24, 2026, immigration agents arrested Plaintiffs R.C.R. and F.R.P. without warrants in Cheekotwaga, New York, even though they presented valid Employment Authorization Documents, without asking them any questions about their family, community ties, or any similar questions. An agent told R.C.R. and F.R.P.'s daughter that he did not have a warrant for their arrest but would create one once he took them to his office.

46

141. On November 30, 2025, ICE agents arrested X.P.F. without a warrant in Corona, Queens, without asking him any questions whatsoever. ICE's own records indicate that he was detained at 6:55 a.m. as he walked to work in Corona, Queens; an administrative warrant was issued only after he was detained and questioned; and, finally, a Notice to Appear was issued at 9:30 a.m., hours later, once he was already in custody in Manhattan.

142. On November 1, 2025, in Corona, Queens, ICE agents arrested O.T.M.M. without a warrant. After forcibly stopping O.T.M.M. and photographing him without consent, ICE agents seized his wallet and identification card, also without his consent. In response to their questions, O.T.M.M. admitted he was from Guatemala and that he "did not have any papers." Without asking O.T.M.M. about his length of residency, family, community ties, or any other similar questions, agents then placed him in handcuffs and transported him to immigration custody at 26 Federal Plaza in Manhattan. Although the I-213 record issued in connection with his arrest claims he was arrested in Queens at 2:40 p.m., "pursuant to a signed I-200 warrant," the I-200 warrant bears a certificate of service stating it was served on him in "New York, NY," indicating that the warrant was issued after he was arrested.

143. On January 20, 2026, in Freeport, New York, ICE agents arrested Santos Gonzalez Argueta without a warrant and without asking him any questions about his length of residency, family, community ties, or any other similar questions.

144. On February 18, 2026, ICE agents arrested Eleuterio Maldonado Santos after pulling him over as he drove in Nassau County without asking him any questions about his length of residency, family, community ties, or any other similar questions. ICE's own records confirm that Mr. Maldonado was subject to a traffic stop and asked for identity documents *before* any administrative warrant was issued.

47

145.    On June 11, 2025, ICE agents arrested L.C. without a warrant in Glen Cove, New York, even though he presented a valid Employment Authorization Document, without asking him about his length of residency, family, community ties, or any other similar questions.

146.    On June 5, 2025, ICE agents and U.S. Marshals arrested A.J.M.C. without a warrant in Hempstead, New York, without asking him about his length of residency, family, community ties, or any other similar questions.

147.    On December 4, 2025, an ICE agent arrested Juan Carlos Quintero without a warrant on Staten Island, New York, after he told the agent that he did not have identification with him, without asking him any additional questions whatsoever.

148. Predictably, Defendants' policy and practice of making warrantless arrests without a pre-arrest probable cause assessment has led to individuals being arrested multiple times. For example, after Defendants' agents stopped G.E.V.S. and his co-workers without reasonable suspicion in North Tonawanda, NY, the agents arrested G.E.V.S. without asking him any questions about his family or community ties. It was his first time being arrested. G.E.V.S. was then held in ICE's Batavia detention center for over two months before being released from detention on bond with conditions including an ankle monitor and ISAP check-ins. G.E.V.S. applied for asylum. Months after his November 18, 2025 arrest, ICE and Border Patrol arrested him again without a warrant and without asking him any questions on February 20, 2026, in Geneva, New York. He was in a car driven by his brother, who followed all traffic laws. They were suddenly surrounded by four cars belonging to ICE or CBP. Agents dragged G.E.V.S. out of his brother's car, handcuffed him, and then drove G.E.V.S. to a gas station, at which time he informed the agents he had previously been arrested and released from immigration detention on bond. After an hour, the agents finally released him.

149.    Defendants' policy and practice of arresting noncitizens without probable cause of unlawful immigration status or likelihood of escape violates the INA.

150.    Absent judicial intervention, Defendants will continue their policy and practice of making warrantless arrests without probable cause, and Plaintiffs, other members of the class, and Plaintiff Workers' Center of Central New York's members are likely to suffer unlawful arrests.

**Workers' Center of Central New York**

151.    Plaintiff WCCNY is a membership-based nonprofit organization that has provided direct services, advocacy, and accompaniment to low-wage, predominantly immigrant workers in Central New York and the North Country since 2013. WCCNY serves 750 to 1,000 workers annually through its office in Syracuse, New York, and throughout five Central New York counties, as well as Jefferson and Lewis Counties in the North Country. WCCNY's core activities include providing worker rights and occupational health and safety trainings, assistance with wage theft and OSHA complaints, referrals to immigration legal service providers, and emergency housing assistance for displaced workers. Many of WCCNY's members are low-income Spanish-speaking agricultural workers in isolated rural communities with pending applications for immigration relief.

152.    Defendants' warrantless arrest policy has directly harmed WCCNY members throughout Central New York and the North Country.

153.    On May 22, 2025, in Watertown, New York, CBP and ICE agents surrounded WCCNY member Jane Doe 2's vehicle and detained her on the side of the road for approximately 90 minutes, openly acknowledging they had no warrant. During the stop, WCCNY staff informed the agents that Jane Doe 2 had lived in the United States for 30 years since the age of 13, had resided in the Watertown area for over 20 years, had four U.S. citizen children including a six-

49

month-old nursing infant, was not immediately deportable, and posed no flight risk. The agents ignored this information, threatened to shatter her car window, and transported her to a CBP facility, where she was held for three days. On the first day, agents had to take her to a local hospital due to pain from engorgement because she could not nurse and CBP had no accommodations for pumping. WCCNY coordinated with another nursing mother in the community to donate breast milk to help console and support the well-being of Jane Doe 2's baby while she was detained. Her infant was inconsolable during her detention. Her older children remain terrified that one of their parents may go outside and never return.

154.    On February 4, 2025, in Carthage, New York, CBP agents detained and arrested a WCCNY member, Luis Enrique Gomez Garcia, an asylum seeker with a valid work permit, without a warrant in his employer's parking lot. Mr. Gomez Garcia is Latino. After his wife was deported last year, he has been the sole caregiver for their two young daughters. The morning he was detained, Mr. Gomez Garcia dropped off his daughters at school, arrived at work, and parked in his employer's parking lot. He was then suddenly surrounded by multiple CBP vehicles. CBP agents approached Mr. Gomez Garcia and asked for his identification. Mr. Gomez Garcia produced his valid work permit and driver's license. Without further questioning, including without any inquiry into whether Mr. Gomez Garcia posed a flight risk, the agents told him that he was under arrest. Mr. Gomez Garcia and his bosses, who were present, repeatedly requested to see a warrant, and the agents told them that they did not need one. After Mr. Gomez Garcia explained that he had two young daughters—the eldest an asylum seeker and the youngest, just five years old and a U.S. citizen—the agents took Mr. Gomez Garcia to pick his daughters up from school and then transported the entire family to detention in Batavia, New York. The family was detained overnight. Mr. Gomez Garcia was released with an ankle monitor, which has since been

removed, and a requirement to have weekly mobile ICE check-ins, which he still completes to this day. Mr. Gomez Garcia used to live without fear because he felt he was following the rules, but his family's experience has left him anxious, and has left his children traumatized and afraid.

155. On February 10, 2026, in Syracuse, New York, WCCNY member and board member John Doe 4, was driving to work around 7:30 am when three vehicles cut him off and surrounded him. He has a pending asylum case and has been in the United States for 20 years. He is Latino. He has no criminal record of any kind. He lives in Syracuse with his wife and their three children; the eldest is a lawful permanent resident and the youngest two are U.S. citizens. His parents also live in Syracuse, in the same apartment complex. John Doe 4 owns his own contracting business and has numerous ties to the local community through work, church, family and community organizations. ICE agents surrounded John Doe 4's vehicle and requested identification. John Doe 4 provided his valid driver's license and work permit. The agents told him that the documents were insufficient and immediately placed him under arrest. They did not ask him any questions, and they did not produce a warrant. John Doe 4 spent 20 days detained in the Batavia detention center before being released with an ankle monitor and a monthly ICE check-in requirement. John Doe 4 was significantly affected by his detention and is now fearful each time he drives his car around his community that he will be detained again.

156. Defendants' suspicionless stops and warrantless arrest policies have also directly impaired WCCNY's ability to carry out its core organizational activities. In January 2025, WCCNY was forced to cancel a Know Your Rights training that had been promoted for weeks after a member's neighbor was detained three and a half miles from WCCNY's office, and members were too afraid to attend in person. WCCNY has since moved all monthly membership meetings to virtual format, which has reduced attendance, reduced the information and supportive

materials WCCNY is able to provide, and greatly diminished the quality and efficacy of WCCNY's trainings. Most members have limited technology skills and cannot receive materials, forms, or information online. Members are also afraid to travel to WCCNY's Syracuse office to receive services. A long-time WCCNY member and leader with a pending asylum case and a valid work permit was too afraid to come to WCCNY's office to complete a passport application for her 18-month-old U.S. citizen son. In October 2025, several families failed to appear for appointments at a mobile Mexican consulate event hosted by WCCNY at a church in Syracuse, with one member explaining she was afraid to travel into the city because of reports of ICE and CBP stops along Route 81 north of Syracuse. WCCNY's hotline has received a steady stream of panicked phone calls from people reporting loved ones who had been stopped and detained by ICE and CBP. Responding to these intakes from the hotline and impacted members has impaired the ability of WCCNY's staff to carry out their core business activities.

157.    Absent judicial intervention, Defendants will continue their policies and practices of making warrantless arrests without probable cause, and WCCNY's members remain at ongoing risk of unlawful arrest as they travel to work, attend required immigration appointments, and engage in the daily activities of community life throughout Central New York and the North Country.

**Individual Plaintiffs' Experiences**

158.    Each of the Individual Plaintiffs lives, works, travels, and socializes in communities where ICE and/or CBP agents have been active, and where ICE and/or CBP agents have repeatedly made unlawful stops and warrantless arrests.

159.    No individual plaintiff has a final order of removal.

*Plaintiff Rene Antonio Benitez*

160.    Plaintiff Rene Antonio Benitez is a 36-year-old Latino.

161.    Plaintiff Benitez has lived in the United States for approximately 14 years. He has lived in New York for most of that time.

162.    Plaintiff Benitez resides in Brentwood, New York. He has lived there since 2023.

163.    Plaintiff Benitez works at a local restaurant.

164.    Outside of work, Plaintiff Benitez's life revolves around his family. He has two daughters: one, a lawful permanent resident, is 17, and the other, a U.S. citizen, is nine. While Plaintiff Benitez is separated from their mother, he remains actively involved in his children's lives, and he and their mother share parenting responsibilities.

165.    Plaintiff Benitez regularly drives his older daughter to school in the neighboring town of Deer Park, which is approximately 20 minutes from his home.

166.    To take her to school, Plaintiff Benitez has to drive through Brentwood early in the morning.

167.    On the morning of February 26, 2026, at around 7:00 am, Plaintiff Benitez was driving his 17-year-old daughter to school.

168.    The car Plaintiff Benitez was driving belongs to his brother.

169.    Plaintiff Benitez often uses his brother's car to take his older daughter to school because he does not own a car.

170.    Only minutes after Plaintiff Benitez picked up his daughter and left his ex-partner's home, agents in an unmarked car activated their lights and stopped him.

171.    Plaintiff Benitez complied and pulled over.

172.    Plaintiff Benitez had been obeying all traffic laws when the agents stopped him.

173. At the time of his stop, agents had no reasonable suspicion that he lacked lawful immigration status.

174. Agents instead stopped Plaintiff Benitez based solely on his perceived Latino ethnicity.

175. After Plaintiff Benitez stopped, two agents carrying guns and wearing masks approached Plaintiff Benitez's window and asked for his identification.

176. Plaintiff Benitez provided his current New York state driver's license but otherwise remained silent.

177. The agents did not indicate that they were looking for Plaintiff Benitez or his brother, and at no point indicated that they knew him or his name before stopping him.

178. The agent then asked Plaintiff Benitez if he had papers, and he said no.

179. The agent then told Plaintiff Benitez that they were taking anyone who was here illegally and ordered him to get out of the car.

180. Plaintiff Benitez's daughter, who was still in the vehicle, told the officer that she needed to go to school.

181. The agent responded that he did not care and again ordered Plaintiff Benitez to exit the vehicle. An agent said that if Plaintiff Benitez did not get out of the car, they would take him out.

182. Plaintiff Benitez complied and exited the vehicle.

183. The agents patted Plaintiff Benitez down and handcuffed him.

184. The agents arrested Plaintiff Benitez without a warrant.

185. The agents arrested Plaintiff Benitez without probable cause of his likelihood of escape.

186. Had the agents evaluated Plaintiff Benitez's likelihood of escape, they would have discovered that he has a daughter who is a lawful permanent resident (who was present with him) and a U.S. citizen daughter, lives in Brentwood near his daughters, and has stable employment.

187. Plaintiff Benitez was not likely to escape before immigration officers could obtain a warrant.

188. The agents lacked probable cause that Plaintiff Benitez was likely to escape at the time of his arrest.

189. After the agents had handcuffed Plaintiff Benitez and placed him in the vehicle, they asked him how many years he had been in the United States, what he paid in rent, and whether the person in the car with him was his girlfriend.

190. Plaintiff Benitez told them that he had been in the United States for a number of years and reiterated that the person in the car with him was his daughter.

191. The agents then took Plaintiff Benitez to Central Islip, leaving his minor daughter alone in the car.

192. The agents told Plaintiff Benitez that he could sign a document if he wanted to self-deport.

193. Plaintiff Benitez said that he did not want to self-deport and wanted to speak with a lawyer.

194. The agents executed an administrative arrest warrant for Plaintiff Benitez after they had already arrested him without a warrant.

195. The agents executed an administrative arrest warrant for Plaintiff Benitez before they issued him with a Notice to Appear.

196.    Plaintiff Benitez had never been arrested by law enforcement or had contact with immigration enforcement before February 26, 2026.

197.    Plaintiff Benitez was detained for approximately 36 hours before the Court granted his habeas petition and ordered his release. While detained, Plaintiff Benitez shared a cell with three other men—all of whom were also Latino—who had been arrested recently. One of the men was arrested near Plaintiff Benitez's home.

198.    Following his release, Plaintiff Benitez continues to drive his daughter to school and to work in the same restaurant.

199.    Plaintiff Benitez fears that he will be stopped, arrested, and detained by ICE again merely because he is Latino.

200.    Despite his fear, he continues to drive around the area because he needs to take his daughter to school and go to work.

*Plaintiff J.R.H.L.*

201.    Plaintiff J.R.H.L. is a 47-year-old Latino.

202.    On the morning of June 7, 2025, Plaintiff J.R.H.L. was walking through a public parking lot adjoining his home in Wyandanch, New York, on his way to his job as a landscaper.

203.    As he was crossing the parking lot, four cars with black tinted windows surrounded him from the front and back, preventing him from walking away.

204.    An armed agent exited one of the cars, and showed Plaintiff J.R.H.L. a photo of a young Latino man, who looked nothing like J.R.H.L. J.R.H.L. is much older. The agent then asked in Spanish if Plaintiff J.R.H.L. recognized the man in the photograph. J.R.H.L. told the agent that he might have seen the man in the photo, but that Wyandanch is a very Hispanic town.

205. At the time that the agents stopped Plaintiff J.R.H.L., the agents did not have reasonable suspicion that he lacked lawful immigration status.

206. Agents instead stopped Plaintiff J.R.H.L. based solely on his perceived Latino ethnicity.

207. The agent then began asking Plaintiff J.R.H.L about his immigration status and for his identification. At this point, there were two other armed agents standing behind J.R.H.L. He felt he had to answer the questions because he was scared, intimidated, and could not leave.

208. After the first agent returned to his car with Plaintiff J.R.H.L.'s identification, three more agents with guns exited their cars. Eventually, the first agent came back, informed J.R.H.L. that he was under arrest, searched his pockets, and handcuffed him.

209. At no point did the agents identify themselves, present a warrant, explain why they stopped Plaintiff J.R.H.L., or indicate that they knew Plaintiff J.R.H.L. or his name before they stopped him.

210. The agents arrested Plaintiff J.R.H.L. without a warrant.

211. The agents arrested Plaintiff J.R.H.L. without probable cause that he was likely to escape. He had lived in Wyandanch since 2007, lived in a house next to the parking lot where they stopped him, and worked at the same company for over five years. He was not likely to escape before immigration officers could obtain a warrant.

212. After his arrest, ICE agents eventually transported Plaintiff J.R.H.L. to Orange County Jail, where he spent two months in ICE detention before he was granted bond on August 4, 2025, and released on August 6, 2025.

213. Plaintiff J.R.H.L. still has to comply with ICE electronic monitoring requirements such as submitting a weekly "selfie" photograph through BI SmartLink and having monthly in-

person ICE check-ins and home visits with the Intensive Supervision Appearance Program ("ISAP").

214.   Plaintiff J.R.H.L. still lives in the same house, has the same job, and has to cross the same parking lot where he was stopped and arrested in order to take the same bus to work six days a week.

215.   Plaintiff J.R.H.L. fears that he will be stopped, arrested and detained by ICE again merely because he is Latino. When J.R.H.L. sees cars coming toward him, he fears that they contain ICE agents coming to arrest him.

216.   Due to Plaintiff J.H.R.L's fear of arrest and detention, he rarely leaves his home except when going to work.

*Plaintiff Darwin Garcia Medrano*

217.   Plaintiff Darwin Garcia Medrano is a 19-year-old Latino.

218.   Plaintiff Garcia Medrano has lived in New York since he entered the United States in 2018.

219.   He subsequently applied for and was granted Special Immigrant Juvenile Status and has a valid Employment Authorization Document pursuant to a grant of deferred action.

220.   On the morning of January 17, 2026, Plaintiff Garcia Medrano was putting gas in his car at a gas station in Brentwood, New York.

221.   His 16-year-old brother and a friend were sitting inside the car.

222.   Plaintiff Garcia Medrano's car is registered to him and has valid New York license plates, and he had obeyed all traffic laws before parking at the gas pump.

223.    When Plaintiff Garcia Medrano finished pumping gas and got back in his car, he heard loud knocks on both sides of his car and saw approximately four masked agents surrounding it.

224.    The agents ordered him to lower his window, and he complied.

225.    At the time that the agents stopped Plaintiff Garcia Medrano and the cars' other occupants, the agents did not have reasonable suspicion that they lacked lawful immigration status.

226.    Agents instead stopped Plaintiff Garcia Medrano based solely on his perceived Latino ethnicity.

227.    At no point did the agents indicate that they knew Plaintiff Garcia Medrano or the other occupants or their names before stopping them.

228.    The agents demanded identification from the cars' occupants. Mr. Garcia Medrano and his friend provided their identification, but his brother had no identification because of his age.

229.    Plaintiff Garcia Medrano also handed agents his valid Employment Authorization Document, which indicated that he had been granted deferred action status.

230.    Plaintiff Garcia Medrano, his friend, and his brother remained in the car while the agents took the documents back to one of their cars.

231.    Mr. Garcia Medrano obeyed the agents' commands and did not attempt to flee.

232.    The agents then returned, and without asking any questions, ordered Plaintiff Garcia Medrano's friend to step out of the car. The agents placed him under arrest.

233.    Plaintiff Garcia Medrano repeatedly asked why the agents were arresting his friend, but they did not respond.

234.    One agent initially told Plaintiff Garcia Medrano that he and his brother could leave, but then another agent interrupted and said that they were also being detained.

235. After Plaintiff Garcia Medrano and his brother complied with the agents' instructions to exit their car, the agents handcuffed Plaintiff Garcia Medrano and put him and his brother in a truck with his friend.

236. The agents did not ask any questions about their immigration status or their countries of origin before arresting them.

237. At no point did the agents present a warrant, explain why they stopped Plaintiff Garcia Medrano, or indicate that they knew Plaintiff Garcia Medrano or his name before they stopped him.

238. The agents arrested Plaintiff Garcia Medrano without a warrant.

239. The agents arrested Plaintiff Garcia Medrano without probable cause of that he was present in violation of the immigration laws because they knew when he showed them his Employment Authorization Document that he has approved Special Juvenile Immigrant Status with a valid employment authorization and grant of deferred action status.

240. Plaintiff Garcia Medrano does not lack lawful immigration status.

241. The agents arrested Plaintiff Garcia Medrano without probable cause that he was likely to escape. He has lived in New York since 2018, is a long-term resident of Farmingdale, New York, is an active member of his church's youth group, and had enrolled in the Heating, Ventilation, and Air Conditioning program at Suffolk County Community College.

242. Plaintiff Garcia Medrano was not likely to escape before immigration officers could obtain a warrant.

243. The agents lacked probable cause that Plaintiff Garcia Medrano was present in the United States unlawfully at the time of his arrest.

244.    The agents lacked probable cause that Plaintiff Garcia Medrano was likely to escape at the time of his arrest.

245.    While the agents transported Plaintiff Garcia Medrano, his brother, and his friend, they asked the agents where they were being taken and why they had been arrested. The agents only responded that they would be taken somewhere to "see a judge."

246.    Plaintiff Garcia Medrano attempted to explain that he had a pending immigration case. An agent told him that he would check that when they arrived.

247.    The agents took Plaintiff Garcia Medrano to a holding room in Central Islip, where they kept him until approximately 7:00 pm. They fingerprinted him and took photographs of his face and tattoos.

248.    Another agent asked Plaintiff Garcia Medrano if he was a gang member and if he knew any gang members or drug dealers.

249.    Plaintiff Garcia Medrano told the agent that he is not a gang member and does not know anyone involved in those activities. He offered to let the agent search his phone.

250.    The agents released Plaintiff Garcia Medrano's minor brother to their mother that evening.

251.    ICE detained Plaintiff Garcia Medrano in Nassau County Jail for three days, and in Delaney Hall Detention Facility in New Jersey for two days. He was released after his attorneys filed a habeas petition but before it was adjudicated.

252.    Plaintiff Garcia Medrano had never been arrested since arriving in the United States as a child in 2018.

61

253. Plaintiff Garcia Medrano has felt fear and anxiety since his release. Some days, he does not leave his house due to his fear that he will be stopped, arrested, and detained merely because he is Latino.

254. Despite his fear, he has begun his studies at Suffolk County Community College. He regularly travels throughout the area to attend class, to work, and to conduct other daily activities.

255. There are continued reports of ICE presence in his neighborhood.

*Plaintiff H.L.A.O.*

256. Plaintiff H.L.A.O. is a 46-year-old Latino resident of Greenport, New York.

257. Plaintiff H.L.A.O has lived in Greenport, New York, for over 20 years.

258. Plaintiff H.L.A.O. has four U.S. citizen children under the age of seven.

259. Plaintiff H.L.A.O.'s two youngest children have serious medical issues.

260. At the time that ICE agents stopped and arrested Plaintiff H.L.A.O., his youngest child was only 10 days old. His wife was still recovering after giving birth.

261. Plaintiff H.L.A.O. works six days a week in construction and remodeling for a masonry company on Shelter Island. He has worked for this company since 2005.

262. Each day, Plaintiff H.L.A.O. leaves his house around 6:00 to 6:30 am to drive to the Shelter Island Ferry. He drives his car onto the ferry to get to Shelter Island and returns home in the evening.

263. On February 4, 2026, as usual, Plaintiff H.L.A.O. left home in the morning and drove to the Shelter Island ferry. He was first in the car line to get onto the ferry and waited in his parked car.

264. Around 6:30 to 7:00 am, Plaintiff H.L.A.O. heard a knock on his driver-side window. He looked out his window and saw a man wearing a bulletproof vest with ICE printed on it. Another agent wearing a similar vest and with a holstered gun stood on the passenger side of his car.

265. The ICE agent asked Plaintiff H.L.A.O. in English for his identification. Plaintiff H.L.A.O. did not feel that he could leave or decline to hand over his identification because he was stuck in line for the ferry with other cars behind him.

266. Plaintiff H.L.A.O. handed the agent his New York driver's license.

267. The agent took the identification and walked to the back of Plaintiff H.L.A.O.'s car, where an unmarked blue Ford Explorer was parked.

268. At the time that the agents stopped Plaintiff H.L.A.O., the agents did not have reasonable suspicion that he lacked lawful immigration status.

269. Agents instead stopped Plaintiff H.L.A.O. based solely on his perceived Latino ethnicity.

270. The agent returned after one to two minutes and told Plaintiff H.L.A.O. to get out of the car. In English, the agent told Plaintiff H.L.A.O. that he was with ICE and that H.L.A.O. needed to come with them.

271. The agent told Plaintiff H.L.A.O. that he had been in the U.S. for a long time but had not fixed his papers.

272. Plaintiff H.L.A.O. said that he had tried to seek immigration relief about five years ago, but an attorney had scammed him and took his money without helping him.

273. The agent asked Plaintiff H.LA.O. where he worked, and Plaintiff H.L.A.O. told him that he was on his way to work and what company he worked for.

63

274.    The agent then asked Plaintiff H.L.A.O. about his family, and Plaintiff H.L.A.O. told him that his wife and 10-day-old son were still in the hospital and were very sick.

275.    The agent told Plaintiff H.L.A.O. to get out of the car. Plaintiff H.L.A.O. stepped out of the car, and the agent immediately put handcuffs on him.

276.    Plaintiff H.L.A.O. obeyed the agent's commands and did not attempt to flee.

277.    Plaintiff H.L.A.O. exited the car, and the agent handcuffed him.

278.    At no point did the agent present a warrant, explain why he stopped Plaintiff H.L.A.O., or indicate that he knew Plaintiff H.L.A.O. or his name before he stopped him.

279.    The agent arrested Plaintiff H.L.A.O. without a warrant.

280.    The agent made the decision to arrest Plaintiff H.L.A.O. after returning with his identification, before asking him any questions.

281.    The agents arrested Plaintiff H.L.A.O. without probable cause that he was likely to escape.

282.    Plaintiff H.L.A.O. had lived in Greenport, New York, for the past 20 years with his wife and four U.S. citizen children, including a newborn and three others under the age of seven, and had worked for the same company for over 20 years. He was not likely to escape before immigration officers could obtain a warrant.

283.    Plaintiff H.L.A.O. told the agent that his car needed to be moved, or it would block everyone else from getting on the ferry. Another agent, without asking him for permission, got in the car, and parked the car in the parking lot.

284.    The agents took Plaintiff H.L.A.O. to a fire station parking lot.

285.    An agent removed Plaintiff H.L.A.O.'s handcuffs and replaced them with cuffs attached to his ankles and wrists that connected to a chain around his waist.

64

286.    A Spanish-speaking agent approached Plaintiff H.L.A.O. Plaintiff H.L.A.O. told him in Spanish that the agents were treating him like a dog. The Spanish-speaking agent told him that the more he talked, the worse he would be treated.

287.    At the fire station parking lot, Plaintiff H.L.A.O. met two other Latino men who had also been arrested. The two men informed Plaintiff H.L.A.O. that they had been arrested while dropping off their kids at school.

288.    Next, the agents took Plaintiff H.L.A.O. to Central Islip.

289.    The agents showed Plaintiff H.L.A.O. a photograph of two young Latino men and said that they were looking for them.

290.    Plaintiff H.L.A.O. told the agents that he recognized the boys and had seen them around Greenport.

291.    Plaintiff H.L.A.O. looks nothing like the two men in the photograph because they are in their 20s and he is in his 40s.

292.    Plaintiff H.L.A.O. told the agents that they clearly had the wrong guy.

293.    The agents took Plaintiff H.L.A.O.'s fingerprints and photographed his face. An agent tried to persuade Plaintiff H.L.A.O. to sign voluntary departure documents, but he declined.

294.    From Central Islip, the agents transferred Plaintiff H.L.A.O. to Nassau County Jail, a facility in New Jersey where he spent three days, and ultimately Metropolitan Detention Center in Brooklyn.

295.    ICE released Plaintiff H.L.A.O. on February 26, 2026, after a judge granted his habeas petition.

296.    As a result of his arrest and detention, Plaintiff H.L.A.O. was separated from his family, including his wife and newborn son, for about 23 days. During this time, he was unable to

work and help his wife. He was very anxious and stressed because he knew his wife was still recovering from childbirth and has other health issues, including diabetes.

297.    Prior to February 4, 2026, Plaintiff H.L.A.O. had never been arrested or had contact with immigration enforcement or law enforcement.

298.    Plaintiff H.L.A.O. is working with his immigration attorney to apply for relief from removal.

299.    Since his release, Plaintiff H.L.A.O. has returned to his job. He drives six days a week to take the Shelter Island Ferry and waits in line at the exact spot where he was stopped and arrested.

300.    Plaintiff H.L.A.O. must leave his home because he needs to work to support his family.

301.    Plaintiff H.L.A.O. experiences anxiety and often looks over his shoulder. He is very afraid that ICE will suddenly stop and arrest him again merely because he is Latino.

*Plaintiff A.M.C.*

302.    Plaintiff A.M.C. is a 36-year-old Latino resident of the Bushwick neighborhood of Brooklyn, New York.

303.    Plaintiff A.M.C. has lived in New York for approximately 14 years.

304.    Plaintiff A.M.C. has two U.S. citizen children. His son is three years old, and his daughter is three months old. At the time that ICE arrested Plaintiff A.M.C., his daughter was two months old.

305.    Prior to February 24, 2026, Plaintiff A.M.C. had never been arrested or had contact with immigration enforcement or law enforcement.

306. Plaintiff A.M.C. works six days a week at a grocery store managing inventory. He has worked at grocery stores in this role for almost 10 years.

307. Six days a week, Plaintiff A.M.C. travels from his home to work via the subway.

308. On February 24, 2026, Plaintiff A.M.C. left his job and headed home. Around 6:15 pm, he arrived at his apartment building.

309. Plaintiff A.M.C. saw that there were two unmarked cars with tinted windows parked in front of his building.

310. After Plaintiff A.M.C. walked up the stairs to the building front door, he stopped to wipe the snow off his feet. He heard someone behind him say "primo," and turned his head.

311. The person who spoke to Plaintiff A.M.C. was Latino and was wearing normal clothing. He was an ICE agent.

312. The agent held up his phone. The phone displayed a photograph of a man with a mustache, who appeared to Plaintiff A.M.C. to be Latino.

313. Plaintiff A.M.C. looks nothing like the man depicted in the photograph because Plaintiff A.M.C. is younger and does not have a mustache.

314. Speaking in Spanish, the agent asked Plaintiff A.M.C. if he knew the man in the photograph. Plaintiff A.M.C. told him no.

315. The agent next asked Plaintiff A.M.C. if he was the one in the photo. Plaintiff A.M.C. told him no.

316. The agent asked Plaintiff A.M.C. if the man lived in the building. Plaintiff A.M.C. said no, he did not know the man.

317. The agent then asked Plaintiff A.M.C. how long he had lived in the building. Plaintiff A.M.C. responded that he had lived in the building for around three or four years.

67

318. While the agent was speaking to Plaintiff A.M.C., around five other agents exited the unmarked cars and walked up behind the agent and surrounded Plaintiff A.M.C.

319. These agents were wearing bulletproof vests. Some were green and said FBI; others were black and said ICE. All the agents had pistols in their belts.

320. Plaintiff A.M.C. did not feel that he could leave or decline to answer the agent's questions because there were armed agents surrounding him and the building door was locked behind him.

321. At the time that the agents stopped Plaintiff A.M.C., the agents did not have reasonable suspicion that he lacked lawful immigration status.

322. Agents instead stopped Plaintiff A.M.C. based solely on his perceived Latino ethnicity.

323. The Spanish-speaking agent asked Plaintiff A.M.C. if he had any papers. Plaintiff A.M.C. told him no.

324. The agent asked Plaintiff A.M.C. again if he were the man in the photograph. Plaintiff A.M.C. again said no.

325. The agent asked Plaintiff A.M.C. for his identification, and Plaintiff A.M.C. gave him his Mexican identification card.

326. The agent then asked Plaintiff A.M.C. if he had family in the United States. Plaintiff A.M.C. told him that he had children and family here.

327. Next, the agent told Plaintiff A.M.C. that because Plaintiff A.M.C. did not know the man in the photograph, the agent would have to take Plaintiff A.M.C. to the immigration office.

328. While the agent was speaking to Plaintiff A.M.C., a white woman who lives in the same building walked up the steps with her dog. The agents let her enter the building. They did

68

not ask her anything about the man they claimed they were looking for. The woman came back out and yelled "La migra! La migra!" in Spanish.

329.    An agent then grabbed Plaintiff A.M.C.'s hands, put them behind his back, and handcuffed him.

330.    Plaintiff A.M.C. did not resist arrest.

331.    None of the agents identified themselves, presented a warrant, explained why they stopped Plaintiff A.M.C., or indicated that they knew Plaintiff A.M.C. or his name prior to stopping him.

332.    The agents arrested Plaintiff A.M.C. without a warrant.

333.    The agents arrested Plaintiff A.M.C. without probable cause that he was likely to escape.

334.    Plaintiff A.M.C. had lived in the same building for between three or four years with his wife and young children and had stable employment at a grocery store. Plaintiff A.M.C. was not likely to escape before an immigration officer could obtain a warrant.

335.    The agents then took Plaintiff A.M.C. to 26 Federal Plaza.

336.    While at 26 Federal Plaza, an agent told Plaintiff A.M.C. that he could agree to voluntary departure. Plaintiff A.M.C. declined because he has a family to raise and support in New York.

337.    Plaintiff A.M.C. remained in detention in Elizabeth, New Jersey and 26 Federal Plaza until March 2, 2026, when he was released after a judge granted his habeas petition.

338.    Plaintiff A.M.C. was detained for six days after his arrest. During his detention, he was unable to work and support his wife, who was caring for their newborn.

339.    Since Plaintiff A.M.C.'s release, he has returned to his job.

340.    Plaintiff A.M.C. and his family have temporarily moved in with a friend who lives nearby because they are too scared to go back to the building where he was arrested, though they continue to pay rent for that apartment.

341.    Plaintiff A.M.C. must leave home to work and support his family.

342.    Plaintiff A.M.C. is scared and nervous every time he leaves the apartment where he is staying. He often looks over his shoulder. He is very afraid that ICE will suddenly stop and arrest him again merely because he is Latino.

*Plaintiff Hesler Asaf Garcia Lanza*

343.    Plaintiff Garcia Lanza is a 24-year-old Latino.

344.    Plaintiff Garcia Lanza arrived in the United States when he was nine years old and has lived in Hempstead, New York, ever since.

345.    Plaintiff Garcia Lanza has been approved for Special Immigrant Juvenile Status, which has enabled him to also receive deferred action status and a valid Employment Authorization Document based on the grant of deferred action.

346.    Plaintiff Garcia Lanza graduated *magna cum laude* from the New York City College of Technology of The City University of New York in June 2024 with a Bachelor of Technology degree.

347.    Plaintiff Garcia Lanza works in the field of theater lighting design.

348.    Plaintiff Garcia Lanza has no criminal history, and he had no contact with immigration enforcement before January 3, 2026.

349.    On January 3, 2026, Plaintiff Garcia Lanza left home around 7:00 am to begin the 25-minute walk to the Long Island Railroad Hempstead stop, which he would take to work.

350.    As Plaintiff Garcia Lanza approached the crosswalk between Fulton Avenue and Washington Street in Hempstead, an unmarked black SUV with tinted windows almost hit him as it stopped halfway past the crosswalk where he had the right of way.

351.    Plaintiff Garcia Lanza walked around the car and crossed the street. He continued walking, and the black SUV made an aggressive U-turn and slowly approached him.

352.    Plaintiff Garcia Lanza feared that he would be robbed.

353.    An agent stepped out of the black SUV on the right side and approached Plaintiff Garcia Lanza.

354.    Plaintiff Garcia Lanza then noticed that at least three other vehicles had surrounded him.

355.    Approximately four to six officers exited those vehicles, surrounded Plaintiff Garcia Lanza, and yelled questions at him.

356.    At the time that the agents stopped Plaintiff Garcia Lanza, the agents did not have reasonable suspicion that he lacked lawful immigration status.

357.    Agents instead stopped Plaintiff Garcia Lanza based solely on his perceived Latino ethnicity.

358.    Plaintiff Garcia Lanza was so scared that he could not process what was happening. He began to shake violently as he realized the officers were ICE agents and would likely arrest him.

359.    One officer asked Plaintiff Garcia Lanza for his identification and another asked him, in Spanish, which country he came from and whether he had a green card.

360.    Plaintiff Garcia Lanza responded in English that he had a work permit and presented it to the officer.

71

361.    During this time, the officers who were not speaking to Plaintiff Garcia Lanza began closing in on him to ensure that he did not run away.

362.    At no point did Plaintiff Garcia Lanza feel like he had the option to leave.

363.    An officer took a picture of Plaintiff Garcia Lanza and told him, "Nice hair color, you look fine, don't worry."

364.    The officer who had taken Plaintiff Garcia Lanza's work permit then went to his car.

365.    The other officers seemed unsure what to do. Plaintiff Garcia Lanza heard one officer ask another, "What do we do?"

366.    The officer holding Plaintiff Garcia Lanza's work permit said, "We're going to take him with us anyway."

367.    While this was happening, Plaintiff Garcia Lanza, while shaking, managed to call a family member and asked them to let his stepfather know that he was being arrested by ICE.

368.    An officer then told Plaintiff Garcia Lanza to put his hands behind his back and face his vehicle.

369.    Plaintiff Garcia Lanza complied. One agent handcuffed him, while two others patted him down.

370.    At no point did the agents present a warrant, explain why they stopped Plaintiff Garcia Lanza, or indicate that they knew Plaintiff Garcia Lanza or his name before they stopped him.

371.    The agents arrested Plaintiff Garcia Lanza without a warrant.

372.    Plaintiff Garcia Lanza he has approved Special Juvenile Immigrant Status and a grant of deferred action status, with a valid Employment Authorization Document based on the

72

grant of deferred action. Plaintiff Garcia Lanza was not present in violation of the immigration laws at the time of his arrest.

373.    Plaintiff Garcia Lanza has lived in Hempstead, New York with his family for 15 years, was a *magna cum laude* college graduate, and works in theater lighting design. Plaintiff Garcia Lanza was not likely to escape before immigration officers could obtain a warrant.

374.    The agents lacked probable cause that Plaintiff Garcia Lanza was present in violation of the immigration laws at the time of his arrest.

375.    The agents lacked probable cause that Plaintiff Garcia Lanza was likely to escape at the time of his arrest.

376.    After handcuffing Plaintiff Garcia Lanza, the agents put him in a vehicle with another person they had arrested.

377.    Agents executed an administrative warrant for Plaintiff Garcia Lanza only after his arrest.

378.    Agents prepared a Notice to Appear for Plaintiff Garcia Lanza only after his arrest and after executing an administrative warrant.

379.    The Notice to Appear was typewritten except for the signature blocks. The typewritten entry provides that the agent explained Plaintiff Garcia Lanza's rights to him in Spanish; the agent then added a handwritten slash and the word "English."

380.    After putting him in the vehicle, agents then took Plaintiff Garcia Lanza to the Hempstead Armory parking lot.

381.    There, Plaintiff Garcia Lanza's stepfather arrived, and he spoke to the agents.

73

382. The agents moved Plaintiff Garcia Lanza to a van. While Plaintiff Garcia Lanza was in the van, one of the officers was writing on a piece of paper. The agent took the paper and showed it to Plaintiff Garcia Lanza's stepfather.

383. The agent told Plaintiff Garcia Lanza's stepfather that this piece of paper was the warrant for Plaintiff Garcia Lanza's arrest.

384. Plaintiff Garcia Lanza's stepfather took a photograph of the warrant.

385. The agents then drove Plaintiff Garcia Lanza to the Nassau County Correctional Center. There, an officer named Rodriguez asked Plaintiff Garcia Lanza about where he lived, what he did for work, and his income.

386. After several hours, other agents came to transport Plaintiff Garcia Lanza and other people who had been arrested to jail. Officer Rodriguez had not yet completed the paperwork for Plaintiff Garcia Lanza. He gave general explanations of the documents to Plaintiff Garcia Lanza and asked him to sign them.

387. Plaintiff Garcia Lanza declined to sign the documents.

388. Plaintiff Garcia Lanza was detained for two days before he was released by a judge who granted his habeas petition.

389. During the habeas proceeding, the government failed to rebut Plaintiff Garcia Lanza's evidence that his arrest was motivated by discriminatory animus.

390. After his release, Plaintiff Garcia Lanza returned to work.

391. He travels to work using the same route where ICE stopped him.

392. Since he was detained, Plaintiff Garcia Lanza has been terrified of leaving his house. Every time he walks to the train to go to work, he feels an immense amount of anxiety.

393. Plaintiff Garcia Lanza is very afraid that ICE will suddenly stop and arrest him again merely because he is Latino.

*Plaintiffs R.C.R. and F.R.P.*

394. Plaintiff R.C.R. is a 55-year-old Latina.

395. Plaintiff F.R.P. is a 63-year-old Latino.

396. Plaintiffs R.C.R. and F.R.P. have lived in Buffalo, New York, since 2025.

397. Plaintiffs R.C.R. and F.R.P. have pending asylum applications and valid Employment Authorization Documents.

398. Plaintiffs R.C.R. and F.R.P. entered the United States with valid tourist visas, and then applied for asylum.

399. Neither Plaintiff R.C.R. nor Plaintiff R.C.R. had ever had prior contact with law enforcement or been arrested.

400. Plaintiffs R.C.R. and F.R.P. live with their two daughters, ages 19 and 28.

401. Plaintiff F.R.P.'s mother also lives nearby.

402. Before her arrest and detention, Plaintiff R.C.R. worked at a restaurant as a cook and dishwasher.

403. After her release from detention, Plaintiff R.C.R. works as a cleaner at a medical clinic.

404. Plaintiff F.R.P. has worked for a housekeeping company since he arrived in Buffalo.

405. Prior to their arrest, Plaintiffs R.C.R. and F.R.P. regularly attended church.

406. On January 24, 2026, Plaintiffs R.C.R. and F.R.P. went shopping at a Walmart in Cheektowaga, New York.

407.    After purchasing their items, Plaintiffs R.C.R. and F.R.P. returned to their car.

408.    As they were shopping and walked through the parking lot, Plaintiffs R.C.R. and F.R.P. conversed in Spanish.

409.    Plaintiffs R.C.R. and F.R.P. were not dressed in work clothing and were wearing normal jackets.

410.    R.C.R. and F.R.P.'s car, a blue Hyundai sedan, is registered to their eldest daughter and has valid Florida license plates.

411.    Their car was properly parked in a handicap spot, with a valid handicap placard properly displayed.

412.    To Plaintiffs R.C.R. and F.R.P.'s knowledge, the car has never received any tickets or been involved in any criminal activity.

413.    When Plaintiffs R.C.R. and F.R.P. arrived at their car, they noticed a red car in the spot behind theirs, with its lights on.

414.    A man quickly exited the red car and ran toward Plaintiffs R.C.R. and F.R.P. He had his hand on a gun and pulled out a badge.

415.    The agent shouted, "Immigration, Immigration. Let me see your papers" in English.

416.    Plaintiff R.C.R. presented her Employment Authorization Document, Social Security Card, and non-driver's license REAL ID from Florida.

417.    Plaintiff F.R.P. presented his Employment Authorization Document, Social Security Card, and REAL ID driver's license from Florida.

418.    As soon as Plaintiffs R.C.R. and F.R.P. handed the agent their identity documents, and before he looked at the documents, he told them that they were detained and not to make a scene.

76

419. Plaintiffs R.C.R. and F.R.P. did not attempt to escape.

420. The parking lot was crowded. Plaintiffs R.C.R. and F.R.P. were the only Latinos in the parking lot. The agent ignored the many white people walking by.

421. As he stood by Plaintiffs R.C.R. and F.R.P., the agent kept his hand on his gun in its holster.

422. The agent held Plaintiffs R.C.R. and F.R.P.'s documents. He spoke on a radio device in English and told Plaintiffs R.C.R. and F.R.P. that they were "illegal."

423. Plaintiff F.R.P. tried to explain to the agent that he and Plaintiff R.C.R. had valid Employment Authorization Documents.

424. Plaintiff F.R.P. then called their younger daughter, who speaks English fluently.

425. Their daughter asked the agent why he had detained Plaintiffs R.C.R. and F.R.P., and if he had a warrant for their arrest.

426. The agent told their daughter that he did not need a warrant to arrest Plaintiff R.C.R. and F.R.P. and would create a warrant once he took them to his office.

427. After the agent had stopped and detained Plaintiffs R.C.R. and F.R.P. for approximately three minutes, another agent arrived in a white and green prison-style van. This agent spoke Spanish.

428. The first agent gave the second agent Plaintiffs R.C.R. and F.R.P.'s documents, and the second agent instructed Plaintiffs R.C.R. and F.R.P. to sit in the van.

429. The second agent also had a gun.

430. The second agent asked Plaintiffs R.C.R. and F.R.P. questions about their immigration status and called them "illegals" multiple times.

431.    The second agent asked Plaintiffs R.C.R. and F.R.P. where they were from, how they arrived in the United States, and long they had been in the country.

432.    Plaintiffs R.C.R. and F.R.P. answered the agent's questions and explained that they were not unauthorized and had pending asylum applications and valid Employment Authorization Documents.

433.    The Spanish speaking agent said that Plaintiff R.C.R. and F.R.P.'s documents were not valid, and that they did not give Plaintiffs R.C.R. and F.R.P. any valid legal status. The agent told Plaintiffs R.C.R. and F.R.P. that if they did not commit any crimes and were legal, he would let them go.

434.    The agent did not ask Plaintiffs R.C.R. and F.R.P. any questions about their family, their employment, their ties to the community in Buffalo, or any similar questions.

435.    After approximately thirty minutes of questioning, the agents took Plaintiffs R.C.R. and F.R.P. to a detention facility in Buffalo.

436.    At no point did the agents present a warrant, explain why they stopped Plaintiffs R.C.R. and F.R.P., or indicate that they knew Plaintiffs R.C.R. and F.R.P. or their names before they stopped them.

437.    The agents arrested Plaintiffs R.C.R. and F.R.P. without a warrant.

438.    Plaintiffs R.C.R. and F.R.P. live in Buffalo with their two daughters, and near Plaintiff F.R.P.'s mother, have pending asylum applications, have stable employment, and regularly attended church in their community. Plaintiffs R.C.R. and F.R.P. were not likely to escape before immigration officers could obtain a warrant.

439.    The agents lacked probable cause that Plaintiffs R.C.R. and F.R.P. were likely to escape at the time of his arrest.

440.    Agents questioned Plaintiffs R.C.R. and F.R.P. again at the Buffalo facility. The agents told Plaintiffs R.C.R. and F.R.P. that they had crossed the river illegally.

441.    Plaintiff F.R.P. explained that he and Plaintiff R.C.R. had entered the country with a visa and then applied for asylum.

442.    When Plaintiff F.R.P. tried to explain that he and Plaintiff R.C.R. had legal immigration status, the agents pretended not to understand Spanish.

443.    After Plaintiff F.R.P. explained that Plaintiff R.C.R. had nervous panic attacks, agents initially detained Plaintiffs R.C.R. and F.R.P. in a cell together in the Buffalo facility.

444.    Plaintiff R.C.R. was in the Buffalo facility cell for six days, and Plaintiff F.R.P. for three days.

445.    The Buffalo detention facility was very cold, and Plaintiffs R.C.R. and F.R.P. did not receive sufficient food or water.

446.    Plaintiff R.C.R. has several medical conditions and needs to take medicine every day.

447.    Plaintiff R.C.R.'s daughters sent her medical records to the agents at the Buffalo facility. Agents did not provide Plaintiff R.C.R. with her necessary medications.

448.    After six days, ICE transferred Plaintiff R.C.R. to another detention facility which is about two hours away from Buffalo.

449.    Plaintiff R.C.R. remained in this facility for approximately two and a half weeks. ICE then transferred her to a detention facility in Louisiana.

450.    While in Louisiana, Plaintiff R.C.R. contracted COVID-19, developed an ear infection, a tooth infection, and a gastrointestinal condition, with blood in her stool.

79

451. The agents at the Louisiana facility did not provide Plaintiff R.C.R. with a change of clothes or allow her to bathe. She had to sit in soiled underwear for three days.

452. On February 19, 2026, Plaintiff R.C.R. was released from detention on a $25,000 bond and flew back to New York at her own expense.

453. To date, immigration officers have not returned Plaintiff R.C.R.'s Employment Authorization Document, Social Security Card, or REAL ID.

454. Plaintiff R.C.R. cries every day when she remembers what it felt like to be imprisoned and separated from her family.

455. After three days, ICE transferred Plaintiff F.R.P. to the Batavia detention facility. He remained there for around 25 days.

456. Plaintiff F.R.P. has a thyroid condition and must take medicine every day, with potentially fatal consequences if he does not.

457. Plaintiff F.R.P. informed a guard that he needed thyroid medication and could die without it. The guard replied, "I don't care."

458. An agent told Plaintiff F.R.P. that he could have the medication if he agreed to voluntary departure from the United States and threatened him with solitary confinement.

459. For four days, agents did not give Plaintiff F.R.P. thyroid medication because he did not agree to voluntary departure.

460. Agents did not allow Plaintiff F.R.P. to shower or brush his teeth, and they did not give him any water. When Plaintiff F.R.P. asked for water, the agents told him to drink from the toilet.

461. Because the agents did not permit Plaintiff F.R.P. to shower, he began to stink. When the agents served him oranges to eat, he rubbed the orange peels on his underarms to try to combat the odor.

462. The agents also prevented Plaintiff F.R.P. from sleeping by making noise outside his cell at 1:00 am.

463. On Plaintiff F.R.P.'s fourth day at Batavia, agents permitted him to make a phone call. Plaintiff F.R.P. called his cousin.

464. Then, agents gave Plaintiff F.R.P. a form to sign for his medication, and he received the medication the following day.

465. Plaintiff F.R.P. did not see a doctor until days later.

466. Plaintiff F.R.P. was released on $10,000 bond on February 18, 2026, with an ankle monitor and ICE check-in appointments.

467. After his release, Plaintiff F.R.P. returned to his home in Buffalo.

468. Plaintiff F.R.P. still wears an ankle monitor, which prevents him from sleeping because it beeps when it notifies him that he needs to charge it.

469. Plaintiff F.R.P. has had two ICE check-in appointments since his release. His next appointment is June 24, 2026.

470. Plaintiff F.R.P. still has heart and chest pains to this day from his time in detention. His health has declined considerably. Because he does not have money for health insurance, he has not been able to get medical treatment.

471. Plaintiffs R.C.R. and F.R.P. fear that they will be rearrested and detained, both in their community and at F.R.P.'s ICE check-in appointments.

472.    Plaintiffs R.C.R. and F.R.P. have changed their behavior considerably since their arrests, but they remain at imminent risk of rearrest and detention.

473.    Plaintiffs R.C.R. and F.R.P. try to leave their house only to travel to and from work between Monday and Friday.

474.    Plaintiffs R.C.R. and F.R.P. also must take their youngest daughter to and from her job, where she works varied hours.

475.    Plaintiffs R.C.R. and F.R.P. visit Plaintiff F.R.P.'s elderly mother, who lives 15 to 20 minutes away.

476.    When Plaintiffs R.C.R. and F.R.P. shop, they go to a different Walmart that is farther away from their home.

477.    Plaintiffs R.C.R. and F.R.P. have stopped attending church because they heard that immigration officers arrested people in the church parking lot.

478.    Since returning home, Plaintiffs R.C.R. and F.R.P. witnessed other people being arrested. For example, Plaintiffs R.C.R. and F.R.P. witnessed officers arresting a man in a McDonald's parking lot who was wearing a construction vest and appeared to be Hispanic.

479.    Plaintiffs R.C.R. and F.R.P. are very afraid that ICE will suddenly stop and arrest them again merely because they are Latino.

## CLASS ACTION ALLEGATIONS

480.    Plaintiffs Rene Antonio Benitez, J.R.H.L., Darwin Garcia Medrano, H.L.A.O., A.M.C., Hesler Asaf Garcia Lanza, R.C.R., and F.R.P. bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

481.    Plaintiffs Rene Antonio Benitez, J.R.H.L., Darwin Garcia Medrano, H.L.A.O., A.M.C., and Hesler Asaf Garcia Lanza seek to represent the following class:

**Suspicionless Stop Class**: All persons who, since January 20, 2025, have been or will be subjected to a stop in New York without a pre-stop individualized assessment of reasonable suspicion concerning whether the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States.

482.    Plaintiffs Rene Antonio Benitez, J.R.H.L., Darwin Garcia Medrano, H.L.A.O., A.M.C., and Hesler Asaf Garcia Lanza seek to represent the following class:

**Discriminatory Treatment Class**: All persons who, since January 20, 2025, have been or will be stopped by federal agents in New York at least in part because of their apparent Latino race, color, and/or ethnicity.

483.    Plaintiffs Rene Antonio Benitez, J.R.H.L., Darwin Garcia Medrano, H.L.A.O., A.M.C., Hesler Asaf Garcia Lanza, R.C.R., and F.R.P. seek to represent the following class:

**Warrantless Arrest Class**: All persons who, since January 20, 2025, have been or will be arrested in New York for alleged immigration violations without a warrant and without a prearrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person is likely to escape before immigration officers can obtain a warrant for their arrest.

484.    Plaintiffs Darwin Garcia Medrano and Hesler Asaf Garcia Lanza seek to represent the following subclass:

**Immigration Status Subclass**: All persons who, since January 20, 2025, have been or will be arrested in New York for alleged immigration violations without a warrant and without

a prearrest, individualized assessment of probable cause that the person is in the United States unlawfully.

485. Plaintiffs Rene Antonio Benitez, J.R.H.L., Darwin Garcia Medrano, H.L.A.O., A.M.C., Hesler Asaf Garcia Lanza, R.C.R., and F.R.P. seek to represent the following subclass:

**Escape Risk Subclass**: All persons who, since January 20, 2025, have been or will be arrested in New York for alleged immigration violations without a warrant and without a prearrest, individualized assessment of probable cause that the person is likely to escape before immigration officers can obtain a warrant for their arrest.

486. The proposed classes and subclasses satisfy the prerequisites of Rule 23(a) and 23(b)(2).

487. *Numerosity*: The proposed classes and subclasses satisfy the numerosity requirement of Rule 23(a)(1) because they include anyone who has been or will be subjected to the policies and practices described above. Although the numbers of individuals in each class and subclass is not known with precision, ICE has arrested over 15,000 people in New York State since January 1, 2025.

488. *Commonality*: The proposed classes and subclasses satisfy the commonality requirement of Rule 23(a)(2) because they share issues of law and fact, including but not limited to—

    a. For the Suspicionless Stop Class, i) whether Defendants have a policy and practice of conducting stops without regard to whether reasonable suspicion exists that a person is engaged in an offense against the United States or is a noncitizen unlawfully in the United States and ii) whether this policy and practice violates the Fourth Amendment.

84

b. For the Discriminatory Treatment Class, i) whether Defendants have a policy or practice of stopping individuals at least in part on the basis of apparent Latino ethnicity and ii) whether this policy and practice violates the Fifth Amendment' equal protection guarantee.

c. For the Warrantless Arrest Class and the Immigration Status and Escape Risk Subclasses, i) whether Defendants have a policy and practice of making warrantless arrests without probable cause for an immigration law violation or likelihood of escape and ii) whether this policy and practice violates 8 U.S.C. § 1357(a)(2).

489. *Typicality*: The proposed classes and subclasses also satisfy the typicality requirement of Rule 23(a)(3). Plaintiffs' legal claims are typical of all members of the proposed classes and subclasses that they seek to represent. Plaintiffs have no interests separate from the classes they seek to represent and seek no relief other than the relief sought on behalf of each class and subclass.

490. *Adequacy*: The proposed classes meet the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). Each proposed class representative has committed to fairly representing the interests of the classes and subclasses. Plaintiffs are not aware of any conflict between their interests and those of the proposed class. Plaintiffs' counsel are experienced in class action, civil and constitutional rights, and immigrants' rights litigation and therefore are qualified to be certified as class counsel pursuant to Federal Rule of Civil Procedure 23(g).

491. The proposed classes satisfy the requirements of Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted and intend to act in a manner that applies generally to the classes as a whole, making class-wide relief appropriate.

**JURISDICTION AND VENUE**

492.    This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (right of review under the Administrative Procedure Act). It has remedial authority pursuant to 5 U.S.C. §§ 702, 705, and 706 (Administrative Procedure Act), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201-02 (Declaratory Judgment Act), and the inherent equitable powers of this Court.

493.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Plaintiffs Rene Antonio Benitez, J.R.H.L., Darwin Garcia Medrano, H.L.A.O., A.M.C., and Hesler Asaf Garcia Lanza reside in this district, and a substantial portion of the events giving rise to Plaintiffs' claims occurred in this district.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
*Violation of the Fourth Amendment and the Administrative Procedure Act, 5 U.S.C. § 706*
**Unreasonable Seizures**
**(On Behalf of the Suspicionless Stop Class and Plaintiff Workers' Center of Central New York)**

494.    With limited exceptions, the Fourth Amendment prohibits Defendants from conducting an investigative stop without reasonable suspicion that a person is a noncitizen unlawfully in the United States.

495.    Defendants cannot stop a person unless "they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion'" that the individual stopped is a noncitizen "'who may be illegally in the country.'" *United States v. Sugrim*, 732 F.2d 25, 29-30 (2d Cir. 1984) (quoting *Brignoni-Ponce*, 422 U.S. 873, 884 (1975)).

496.    Defendants have a policy, pattern, and practice of stopping individuals in New York without reasonable suspicion that they are unlawfully in the United States.

497.    As part of Defendants' policy, pattern, and practice, when conducting stops, Defendants engage in a show of force so overwhelming that a reasonable person would not feel free to leave. As a matter of policy and practice, Defendants do not evaluate the need for force or tailor the force they use to the circumstances of individual stops and arrests.

498.    Defendants' policy and practice of conducting stops without reasonable suspicion that a person is either engaged in an offense against the United States or is a noncitizen unlawfully in the United States, as required by the Fourth Amendment to the United States Constitution, is a final agency action that is "arbitrary, capricious,  . . . or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (B), (C).

499.    Defendants' actions or inactions alleged herein have violated and continue to violate the rights of the named Plaintiffs and the putative classes under the Fourth Amendment of the United States Constitution and under the Administrative Procedure Act.

500.    As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed Suspicionless Stop Class are facing irreparable harm and require vacatur of Defendants' unlawful policy, injunctive relief, and declaratory relief to prevent continued and irreparable injury.

**SECOND CAUSE OF ACTION**
*Violation of Fifth Amendment: Due Process, and the Administrative Procedure Act, 5 U.S.C.*
*§ 706*
**(On Behalf of the Discriminatory Treatment Class and Plaintiff Workers' Center of Central New York)**

501.    The Fourteenth Amendment's Equal Protection Clause prohibits states from "deny[ing] any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Fifth Amendment's Due Process Clause applies the same prohibition to the federal

government. *See* U.S. Const. amend. V; *Adarand Constructors v. Pena*, 515 U.S. 200, 224 (1995); *Washington v. Davis*, 426 U.S. 229, 239 (1976). The Fifth Amendment's Due Process Clause's equal protection component forbids the federal government from discriminating on the basis of a protected classification, including race, color, and/or ethnicity. *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 206 (2023).

502.    The Constitution does not permit race-based suspicion or the selective enforcement of the law based on race. *See, e.g., Floyd v. City of New York*, 959 F. Supp. 2d 540, 603 (S.D.N.Y. 2013); *Whren v. United States*, 517 U.S. 806, 813 (1996). This prohibition extends to Defendants' immigration enforcement and removal operations.

503.    Plaintiffs Rene Antonio Benitez, J.R.H.L., Darwin Garcia Medrano, H.L.A.O., A.M.C., Hesler Asaf Garcia Lanza, many of Plaintiff Workers' Center of Central New York's members, and members of the putative class are members of a protected class based on Latino race, color, and/or ethnicity.

504.    Defendants, acting under color of law, have a policy and practice of targeting and discriminating against individuals they perceive to be Latino, without regard to citizenship or immigration status, in violation of the Constitution. The policy and practice are not only systemic and pervasive throughout the State of New York; they are officially sanctioned and encouraged.

505.    By intentionally and systematically stopping individuals based on their apparent race, color, and/or ethnicity, Defendants deprive Plaintiffs and members of the putative class of the equal protection of the law within the meaning of the Fifth Amendment of the United States Constitution.

506.    Defendants' policies and practices of discriminating based on race, color, and/or ethnicity do not satisfy strict scrutiny. Defendants' policies and practices are not narrowly tailored to serve a compelling government interest.

507.    Defendants' policies and practices of discriminating based on race, color and/or ethnicity violate the Fifth Amendment's equal protection guarantee.

508.    Defendants' actions or inactions alleged herein have violated and continue to violate the rights of the named Plaintiffs and the putative classes under the Fifth Amendment of the United States Constitution.

509.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and members of the proposed Discriminatory Treatment Class have suffered and continue to suffer substantial and irreparable harm. They require injunctive relief and declaratory relief to prevent continued and future irreparable injury.

**THIRD CAUSE OF ACTION**
***Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(i), the* Accardi *doctrine, and the Administrative Procedure Act, 5 U.S.C. § 706***
**Warrantless Arrests Without Probable Cause of Unlawful Immigration Status**
**(On Behalf of the Warrantless Arrests Class and Immigration Status Subclass and Plaintiff Workers' Center of Central New York)**

510.    Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have reason to believe that (1) the individual "is in the United States in violation of any [immigration] law or regulation," *and* (2) the individual is "likely to escape before a warrant can be obtained for his arrest." The corresponding regulation, 8 C.F.R. § 287.8(c)(2), contains identical requirements. "As used in [8 U.S.C. § 1357], reason to believe is the equivalent of probable cause." *United States v. Sanchez*, 635 F.2d 47, 62 & n.13 (2d Cir. 1980) (citation modified).

511. Defendants have a policy and practice of making warrantless arrests in New York without probable cause of unlawful immigration status and/or likelihood of escape as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(2)(i), (ii).

512. Defendants also have a policy and practice in New York of creating I-200 warrants for individuals after arresting them without a warrant, in violation of 8 C.F.R. § 1236.1(b). Defendants' policy and practice is intended to rectify their lack of probable cause of unlawful immigration status and/or likelihood of escape at the time of the arrest. However, post-hoc issuance of I-200 warrants is a "manifestly illegal practice," *Lanza v. Noem*, 2026 U.S. Dist. LEXIS 43223, at *12 (E.D.N.Y. Mar. 3, 2026), and "'any arrests made pursuant to these invalid Form I-200 warrants must be treated as warrantless arrests,'" *id.* (quoting *Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 841 (N.D. Ill. 2025)).

513. Defendants' policy and practice of making warrantless arrests in New York without probable cause of unlawful immigration status as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i) is a final agency action that is "arbitrary and capricious, . . . or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A), (C), and violates the fundamental principle that agencies are required to follow their own regulations, *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

514. Defendants' actions or inactions alleged herein have violated and continue to violate the rights of the named Plaintiffs and the putative classes under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i)-(ii), *Accardi*, and the Administrative Procedure Act.

515. As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed Warrantless Arrests Class and Immigration Status Subclass are facing irreparable

90

harm and require vacatur of Defendants' unlawful policy, injunctive relief, and declaratory relief to prevent continued and irreparable injury.

**FOURTH CAUSE OF ACTION**
*Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), the* Accardi *doctrine, and the Administrative Procedure Act, 5 U.S.C. § 706*
**Warrantless Arrests Without Probable Cause Likelihood of Escape**
**(On Behalf of the Warrantless Arrests Class and Escape Risk Subclass and Plaintiff Workers' Center of Central New York)**

516.    Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have reason to believe that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual is "likely to escape before a warrant can be obtained for his arrest." The corresponding regulation, 8 C.F.R. § 287.8(c)(2)(i)-(ii), contains identical requirements. "As used in [8 U.S.C. § 1357], reason to believe is the equivalent of probable cause." *Sanchez*, 635 F.2d 47 at 62 & n.13 (2d Cir. 1980) (citation modified).

517.    Defendants have a policy and practice of making warrantless arrests in New York without probable cause of unlawful immigration status and/or likelihood of escape as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(2)(i), (ii).

518.    Defendants also have a policy and practice in New York of creating I-200 warrants for individuals after arresting them without a warrant, in violation of 8 C.F.R. § 1236.1(b). Defendants' policy and practice is intended to rectify their lack of probable cause of unlawful immigration status and/or likelihood of escape at the time of the arrest. However, post-hoc issuance of I-200 warrants is a "manifestly illegal practice," *Lanza*, 2026 U.S. Dist. LEXIS 43223, at *12, and "'any arrests made pursuant to these invalid Form I-200 warrants must be treated as warrantless arrests,'" *id.* (quoting *Castañon Nava*, 806 F. Supp. 3d at 841).

519.    Defendants' policy and practice of making warrantless arrests in New York without probable cause of likelihood of escape as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii) is a final agency action that violates the Fourth Amendment to the United States Constitution and is "arbitrary, capricious, . . . or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A), (C), and violates the fundamental principle that agencies are required to follow their own regulations, *see United States ex rel. Accardi*, 347 U.S. at 268.

520.    Defendants' actions or inactions alleged herein have violated and continue to violate the rights of the named Plaintiffs and the putative classes under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i)-(ii), *Accardi*, and the Administrative Procedure Act.

521.    As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed Warrantless Arrests Class and Escape Risk Subclass are facing irreparable harm and require vacatur of Defendants' unlawful policy, injunctive relief, and declaratory relief to prevent continued and future irreparable injury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Assume jurisdiction over this matter;

2.    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2); appoint Plaintiffs Rene Antonio Benitez, J.R.H.L., Darwin Garcia Medrano, H.L.A.O., A.M.C., and Hesler Asaf Garcia Lanza as class representatives for the Suspicionless Stop Class; Plaintiffs Rene Antonio Benitez, J.R.H.L., Darwin Garcia Medrano, H.L.A.O., A.M.C., and Hesler Asaf Garcia Lanza as class representatives for the Disparate Treatment Class; Plaintiffs Rene Antonio Benitez, J.R.H.L., Darwin

92

Garcia Medrano, H.L.A.O., A.M.C., Hesler Asaf Garcia Lanza, R.C.R., and F.R.P. as class representatives for the Warrantless Arrests Class; Plaintiffs Darwin Garcia Medrano and Hesler Asaf Garcia Lanza as class representatives for the Immigration Status Subclass; Plaintiffs Rene Antonio Benitez, J.R.H.L., Darwin Garcia Medrano, H.L.A.O., A.M.C., Hesler Asaf Garcia Lanza, R.C.R., and F.R.P. as class representatives for the Escape Risk Subclass; and appoint undersigned counsel as class counsel.

3.    Declare that Defendants' policy and practice of conducting stops without reasonable suspicion of a criminal or immigration violation violates the Fourth Amendment of the United States Constitution;

4.    Vacate and set aside Defendants' policy and practice of conducting stops without reasonable suspicion of an immigration violation;

5.    With respect to the Suspicionless Stop Class, enjoin Defendants' policy and practice of conducting stops without reasonable suspicion of a criminal or immigration violation, in violation of the Fourth Amendment of the United States Constitution.

6.    Declare that Defendants' policy and practice of discriminating on the basis of Latino ethnicity in conducting stops violates the Fifth Amendment of the United States Constitution;

7.    With respect to the Discriminatory Treatment class, enjoin Defendants' policy and practice of discriminating based on Latino ethnicity in conducting stops;

8.    Declare that Defendants' policy and practice of making warrantless immigration arrests without probable cause that the person is in the United States unlawfully violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i);

93

9.   Declare that Defendants' policy and practice of making warrantless immigration arrests without probable cause that the person is likely to escape violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

10.  Vacate and set aside Defendants' policy and practice of making warrantless immigration arrests without probable cause of both an immigration law violation and likelihood of escape, in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i), (ii);

11.  With respect to the Warrantless Arrests Class, enjoin Defendants' policy and practice of making warrantless immigration arrests without probable cause of both an immigration law violation and likelihood of escape in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i), (ii);

12.  With respect to the Immigration Status Subclass, enjoin Defendants' policy and practice of making warrantless immigration arrests without probable cause of an immigration law violation, in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i);

13.  With respect to the Escape Risk Subclass, enjoin Defendants' policy and practice of making warrantless immigration arrests without probable cause of likelihood of escape in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

14.  Order Defendants, their subordinates, agents, employees, and all others acting in concert with them to expunge all records collected and maintained regarding Plaintiffs and class members from their unlawful suspicionless stops and/or arrests, including any derivative information;

94

15.    Award reasonable attorney's fees and costs pursuant to the Equal Access to Justice Act,

5 U.S.C. § 504 and 28 U.S.C. § 2412; and

16.    Grant such further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Mark Gimbel
Mark Gimbel
Giovanni Scarcella*
Cecile Duncan**
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001
Phone: 212-841-1000
mgimbel@cov.com
gscarcella@cov.com
cduncan@cov.com

Jeffrey Cao**
COVINGTON & BURLING LLP
One CityCenter,
850 Tenth Street, NW
Washington, DC 20001
Phone: 202-662-6000
jcao@cov.com

Meghna Philip*
Hasan Shafiqullah*
Brian Perbix*
Evan Henley*
THE LEGAL AID SOCIETY[128]
49 Thomas St., 10th Floor
New York, N.Y. 10013
mphilip@legal-aid.org
hhshafiqullah@legal-aid.org
ewhenley@legal-aid.org
bperbix@legal-aid.org

---

[128] The Legal Aid Society recognizes and thanks law graduates Alice Min and Jacalyn Goldzweig Panitz for their contributions to the preparation of this complaint.

95

Amy Belsher*
Ifeyinwa Chikezie*
Wafa Junaid*
Molly Biklen*
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 19th Floor
New York, N.Y. 10004
abelsher@nyclu.org
ichikezie@nyclu.org
wjunaid@nyclu.org
mbiklen@nyclu.org

Paige Austin*
Harold Solis*
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: 718-418-7690
paige.austin@maketheroadny.org
harold.solis@maketheroadny.org

*Attorneys for Plaintiffs*

*\*Notice of appearance forthcoming*
*\*\*Pro hac vice application forthcoming*