**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

RENE ANTONIO BENITEZ *et al.*,

                    *Plaintiffs*,

     v.

U.S. DEPARTMENT OF HOMELAND
SECURITY *et al.*,

                 *Defendants*.

Case No. 2:26-cv-2082

**ORAL ARGUMENT**
**REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................................ 1

STATUTORY BACKGROUND ........................................................................................................ 2

FACTS ................................................................................................................................................ 3

I.    National Immigration Enforcement Has Surged Under the Second Trump Administration, with Agencies Adopting New Tactics to Meet High Daily Quotas .......... 3

II.   Defendants' Agents Conduct Mass Warrantless Immigration Arrests in New York. ........................................................................................................................................ 4

III.  To Meet the Trump Administration's Arrest Quotas, Defendants Follow a Policy and Practice of Arresting Individuals Without Probable Cause. ....................................... 5

IV.   Plaintiffs and Putative Class Members Face Arrest, Detention, and Separation from Their Families Under Defendants' Unlawful Policy and Practice. .......................... 10

LEGAL STANDARD ........................................................................................................................ 12

ARGUMENT ..................................................................................................................................... 12

I.    Plaintiffs Are Likely to Succeed on the Merits. ................................................................. 13

      A.    The INA and DHS Regulations Require Agents to Make an Individualized Determination That a Person Is Likely to Escape Before Arresting That Person Without a Warrant. .................................................................................. 13

      B.    Defendants' Warrantless Arrest Policy Is a Final Agency Action. ...................... 17

            1.    Defendants Have a Policy and Practice of Making Warrantless Immigration Arrests Without an Individualized Determination of Escape Risk. .......................................................................................... 17

            2.    Defendants' Warrantless Arrest Policy Is a Final Agency Action Under the APA. ............................................................................................ 19

      C.    Defendants' Warrantless Arrest Policy Violates the INA, Exceeds Defendants' Statutory Authority, and Is Contrary to Law. ................................. 20

      D.    Defendants' Warrantless Arrest Policy Is Arbitrary and Capricious. .................. 21

II.   Plaintiffs Face Irreparable Harm Absent an Injunction. .................................................... 23

III.  The Equities Weigh Heavily in Plaintiffs' Favor and a Preliminary Injunction Will Serve the Public Interest. ............................................................................................. 25

CONCLUSION .................................................................................................................................. 27

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdi v. Duke*,
280 F.Supp.3d 373 (W.D.N.Y. 2017) ...................................................................................25

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954) ...........................................................................................................21

*Afr. Comtys. Together v. Lyons*,
799 F.Supp.3d 362 (S.D.N.Y. 2025).....................................................................................12

*Am. Radio Relay League, Inc. v. FCC*,
524 F.3d 227 (D.C. Cir. 2008) .............................................................................................22

*Amadei v. Nielsen*,
348 F.Supp.3d 145 (E.D.N.Y. 2018) ....................................................................................19

*Araujo v. United States*,
301 F.Supp.2d 1095 (N.D. Cal. 2004) .............................................................................15, 16

*Arizona v. United States*,
567 U.S. 387 (2012)........................................................................................................2, 14, 15

*Avila-Gallegos v. Immigr. & Naturalization Serv.*,
525 F.2d 666 (2d Cir. 1975)..................................................................................................2

*Barker v. Wingo*,
407 U.S. 514 (1972).............................................................................................................24

*Beck v. State of Ohio*,
379 U.S. 89 (1964)...............................................................................................................13

*Bennett v. Spear*,
520 U.S. 154 (1997).............................................................................................................19

*Campos v. United States*,
888 F.3d 724 (5th Cir. 2018) ...............................................................................................15

*Castro Coneo v. Almodovar*,
2025 WL 3754079 (S.D.N.Y. Dec. 29, 2025) ...............................................................24, 25

*Contreras v. United States*,
672 F.2d 307 (2d Cir. 1982)...........................................................................................15, 16

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    603 U.S. 799 (2024)................................................................................................19

*De La Paz v. Coy*,
    786 F.3d 367 (5th Cir. 2015) ..................................................................................15

*Doe v. U.S. Immig. & Customs Enf't*,
    490 F.Supp.3d 672 (S.D.N.Y. 2020)........................................................................20

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)............................................................................................21, 22

*Escobar Molina v. U.S. Dep't of Homeland Sec.*,
    811 F.Supp.3d 1 (D.D.C. 2025)............................................................... *passim*

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)....................................................................................23

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)................................................................................................21

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ..................................................................................25

*Hussen v. Noem*,
    2026 WL 657936 (D. Minn. Mar. 3, 2026) ........................................................15, 22

*Kuehl v. Burtis*,
    173 F.3d 646 (8th Cir. 1999) ..................................................................................16

*M-J-M-A- v. Hermosillo*,
    2026 WL 562063 (D. Or. Feb. 27, 2026)..................................................................1

*Make the Road N.Y. v. Pompeo*,
    475 F.Supp.3d 232 (S.D.N.Y. 2020)........................................................................26

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ..................................................................................24

*Moreno v. Napolitano*,
    213 F.Supp.3d 999 (N.D. Ill. 2016)........................................................................15

*Mullins v. City of New York*,
    626 F.3d 47 (2d Cir. 2010)..................................................................................23, 24

*N. B. v. United States*,
    552 F.Supp.3d 387 (E.D.N.Y. 2021) ........................................................................22

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
 894 F.3d 95 (2d Cir. 2018)..................................................................................................20

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
 583 U.S. 109 (2018)............................................................................................................15

*State of New York v. Trump*,
 767 F.Supp.3d 44 (S.D.N.Y. 2025) ...................................................................................19

*Ojeda-Vinales v. Immigr. & Naturalization Serv.*,
 523 F.2d 286 (2d Cir. 1975)...............................................................................................15

*Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*,
 337 F.Supp.3d 308 (S.D.N.Y. 2018)..................................................................................26

*Ramirez Ovando v. Noem*,
 810 F.Supp.3d 1209 (D. Colo. 2025)............................................................................. *passim*

*Reuters Ltd. v. United Press Int'l, Inc.*,
 903 F.2d 904 (2d Cir. 1990)...............................................................................................23

*Saget v. Trump*,
 375 F.Supp.3d 280 (E.D.N.Y. 2019) .................................................................................25

*Sajous v. Decker*,
 2018 WL 2357266 (S.D.N.Y. May 23, 2018) ...................................................................24

*Salazar v. King*,
 822 F.3d 61 (2d Cir. 2016)..................................................................................................19

*Sanchez Alfaro v. Mullin*,
 2026 WL 734348 (E.D.N.Y. Mar. 16, 2026).....................................................................21

*Shoaibi v. Mayorkas*,
 2021 WL 4912951 (W.D.N.Y. Oct. 21, 2021) ..................................................................22

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*,
 120 F.4th 59 (2d Cir. 2024) ...............................................................................................12

*United Farm Workers v. Noem*,
 785 F.Supp.3d 672 (E.D. Cal. 2025)............................................................................1, 21, 26

*United States v. Afriyie*,
 27 F.4th 161 (2d Cir. 2022) ...............................................................................................15

*United States v. Bautista-Ramos*,
 2018 WL 5726236 (N.D. Iowa Oct. 15, 2018) ..................................................................16

iv

*United States v. Fisher,*
　702 F.2d 372 (2d Cir. 1983)..................................................................................13

*United States v. Pacheco-Alvarez,*
　227 F.Supp.3d 863 (S.D. Ohio 2016) ...................................................................14

*United States v. Puebla-Zamora,*
　996 F.3d 535 (8th Cir. 2021) ..........................................................................14, 15

*United States v. Sanchez,*
　635 F.2d 47 (2d Cir. 1980)....................................................................................2

*Velesaca v. Decker,*
　458 F.Supp.3d 224 (S.D.N.Y. 2020)........................................................19, 20, 24

*Ybarra v. State of Illinois,*
　444 U.S. 85 (1979)...............................................................................................13

*Zadvydas v. Davis,*
　533 U.S. 678 (2001)..............................................................................................24

## Statutes and Regulations

5 U.S.C. § 705......................................................................................................12

5 U.S.C. § 706.................................................................................13, 20, 21, 23

8 U.S.C. § 1357 ............................................................................................ *passim*

8 C.F.R. § 287.8 ...............................................................................................2, 13

## PRELIMINARY STATEMENT

Since January 2025, immigration enforcement in New York has taken on a new and chilling shape. In response to the Trump Administration's ever-increasing immigration arrest quotas, immigration officials have begun a mass arrest campaign, stopping people based on their perceived race and ethnicity and summarily arresting them without probable cause or a warrant. Thousands of New Yorkers, including the individual Plaintiffs, have been grabbed from the street while going about their daily lives: taking their children to school, going to work, buying groceries, or walking to the train. The result for these individuals is immediate and irreparable harm: sudden loss of liberty, family separation, disruption of employment and medical care, and a pervasive fear that they can be rearrested at any time, at any place, and without legal justification.

Defendants' policy and practice of racially profiling and arresting individuals without probable cause is unlawful and should be set aside under the Administrative Procedure Act ("APA"). The policy and practice plainly violate the Immigration and Nationality Act ("INA") and its implementing regulations, which state that immigration officers may only conduct a warrantless civil arrest when an officer has probable cause that a person is *both* in violation of federal immigration law *and* likely to escape before a warrant can be obtained. *See* 8 U.S.C. § 1357(a)(2). Defendants' departure from prior policies requiring that arrests be made with probable cause as required by § 1357 also lacks any justification and so is arbitrary and capricious.

Defendants have implemented the exact same warrantless arrest policy and practice across the country, and court after court has condemned it. *See, e.g.*, *M-J-M-A- v. Hermosillo*, 2026 WL 562063 (D. Or. Feb. 27, 2026); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F.Supp.3d 1 (D.D.C. 2025); *Ramirez Ovando v. Noem*, 810 F.Supp.3d 1209 (D. Colo. 2025); *United Farm Workers v. Noem*, 785 F.Supp.3d 672 (E.D. Cal. 2025). This Court should join them and grant a preliminary injunction against, or in the alternative, a stay of, this policy and practice.

1

## STATUTORY BACKGROUND

Generally, officers making immigration arrests must have a warrant. *See Arizona v. United States*, 567 U.S. 387, 408 (2012). "If no federal warrant has been issued, those officers have more limited authority." *Id.* Warrantless immigration arrests are permitted only if the officer has "reason to believe" that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii) (same). "Reason to believe," as used in § 1357, "is the equivalent of probable cause." *United States v. Sanchez*, 635 F.2d 47, 62 n.13 (2d Cir. 1980). An officer must therefore make an individualized determination that probable cause exists as to *both* unlawful immigration status and escape risk before making a warrantless arrest. *See Arizona*, 567 U.S. at 408; *Avila-Gallegos v. Immigr. & Naturalization Serv.*, 525 F.2d 666, 667 (2d Cir. 1975).

Defendants have recognized as much. In response to a class action lawsuit challenging ICE's policy and practice of making warrantless arrests without probable cause in the Chicago area, ICE issued a Broadcast Statement of Policy (hereinafter "Broadcast Statement") acknowledging section 1357(a)(2)'s requirement that officers have "probable cause that an individual is in the United States in violation of U.S. immigration laws *and* probable cause that the individual is likely to escape before a warrant can be obtained for the arrest." Settlement Agreement, *Castañon Nava v. Department of Homeland Security*, No. 1:18-cv-03757, Appendix A at 1 (Feb. 7, 2022), Dkt. No. 155-1 (emphasis in original). The Broadcast Statement acknowledges that an individual's "ties to the community (such as a family, home, or employment) or lack thereof," are relevant to the "likelihood of escape" determination. *Id.* at 1. It further specifies that "mere presence within the United States in violation of U.S. immigration law is not,

2

by itself, sufficient to conclude" the individual "is likely to escape before a warrant for arrest can be *obtained*." *Id.* at 2 (emphasis in original).

**FACTS**

**I.      National Immigration Enforcement Has Surged Under the Second Trump Administration, with Agencies Adopting New Tactics to Meet High Daily Quotas.**

Since January 20, 2025, DHS has unleashed an unprecedented deportation campaign. Initially, the Administration called for each ICE field office to fulfill a quota of 75 arrests per day. In May of 2025, DHS stated it had achieved "the highest number of arrests in its history." Declaration of Giovanni Scarcella ("Scarcella Decl."), Ex. 1 (Miroff & Sachetti). Soon after, Homeland Security Advisor and White House Deputy Chief of Staff Stephen Miller set an aggressive target of 3,000 arrests per day. *Id.*, Ex. 2 (Olivares), Ex. 3 (Gibson & Kight). Miller directed ICE agents to "just go out there and arrest." *Id.*, Ex. 4 (Findell). By December 2025, DHS was touting its ultimate goal of deporting 100 million people. *Id.*, Ex. 5 (DHS Post).

To fulfill these extreme arrest quotas, DHS has shifted away from targeted enforcement operations in favor of broad street sweeps. *Id.*, Ex. 6 (Ainsley). DHS's policy is to "detain" people to "validate their identity" and "determine if they are breaking … federal laws." *Id.*, Ex. 7 (Noem Video). Senior ICE officials have urged immigration agents to "turn the creative knob up to 11," and maximize arrests by sweeping in "collaterals"—people encountered during an operation who were not the intended targets (*e.g.*, coworkers, family members, or bystanders)—emphasizing that, "[i]f it involves handcuffs on wrists, it's probably worth pursuing." *Id.*, Ex. 8 (Olivares). DHS has also repeatedly announced that it is not required to assess a person's likelihood of escape before making a warrantless arrest, declaring in "unequivocal and unqualified terms that ICE *will* arrest anyone it encounters who is unlawfully present." *Ramirez Ovando,* 810 F.Supp.3d at 1222 (emphasis in original). Similarly, White House "Border Czar" Tom Homan said that if ICE officers

3

encounter people without lawful immigration status, "they're going to get arrested too." *Id.*, Ex. 9 (Collins).

Against this backdrop, on January 28, 2026, Defendant Lyons issued a memorandum (the "Lyons Memo") interpreting the phrase "likely to escape" under section 1357(a)(2) to mean "unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained." *Id.*, Ex. 10 (Lyons Memo). Departing from the *Castañon Nava* Broadcast Statement, the Lyons Memo identifies a "subject's age," "health," and "ability and means to promptly depart the scene of the encounter," but omits "ties to the community (such as a family, home, or employment)," from its list of "possible factors" relevant to the likelihood of escape determination. Settlement Agreement, *Castañon Nava*, Appendix A at 1. The Lyons Memo notably fails to state, as the Broadcast Statement did, that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that" a person "is likely to escape before a warrant for arrest can be *obtained*." *Id.*; *see also* Scarcella Decl., Ex. 10 (Lyons Memo).

## II.    Defendants' Agents Conduct Mass Warrantless Immigration Arrests in New York.

New York has become a focal point in this sweeping enforcement campaign. Since January 2025, the Administration has singled out New York State and New York City—identified by the Administration as "Sanctuary Jurisdictions"—as targets for its mass arrest policy. Scarcella Decl., Ex. 11 (DOJ Sanctuary Jurisdiction List). Early on, Homan explicitly warned of increased warrantless arrests: "sanctuary cities are going to get exactly what they don't want: more agents in the community and more collateral arrests." *Id.*, Ex. 12 (Dwyer), Ex. 13 (Zanger). Defendants have targeted New Yorkers through both of their New York ERO field offices. *Id.*, Ex. 14 (ICE Field Offices). CBP also conducts immigration enforcement in New York, primarily in upstate New York. *Id.*, Ex. 15 (Taft).

4

The Administration's threats have become reality in New York. In the first six months of the second Trump Administration alone, ICE arrests in the greater New York City area more than tripled compared to the prior six months. *Id.*, Ex. 16 (Grench & Vo). Street arrests—officers grabbing people outside of homes, at job sites, or on the sidewalk—skyrocketed by over 200% in the city. *Id.* Between January 20, 2025, and March 10, 2026, immigration officials arrested 9,346 people in the greater New York City area and 4,094 people elsewhere across New York State. *Id.*, Ex. 17 (Deportation Data Project).

### III. To Meet the Trump Administration's Arrest Quotas, Defendants Follow a Policy and Practice of Arresting Individuals Without Probable Cause.

Defendants' dramatic increase in arrests across New York has been driven by a profound shift in ICE's tactics on the ground. To meet mandated quotas, across the state, roving bands of masked and heavily armed federal agents, on foot and in unmarked cars, are indiscriminately stopping and arresting thousands of people, the vast majority of whom are Latino or Hispanic, based solely on their perceived race or ethnicity. *See* Scarcella Decl., Ex. 18 (Hogan & Kaufman). Under Defendants' *arrest everyone* policy, large teams of agents stake out bodegas, churches, schools, subway stations, parking lots, and other places they expect to encounter noncitizens. In a stark departure from prior practices, Defendants' agents routinely stop people solely for "driving while brown," abruptly ordering them out of their cars and then immediately placing them under arrest. *See, e.g.*, Scarcella Decl., Ex. 19 (Breidenbach). Agents often descend from unmarked vehicles and surround unsuspecting pedestrians to arrest them without warrants and without first ascertaining any information regarding community ties. Chou Decl. ¶¶ 5–6 (describing ICE stakeouts in Queens, during which officers park in bank or pharmacy parking lots in "nondescript vehicles with heavily tinted windows" to arrest those commuting to work). These dragnet operations are directed only at people of color, particularly Latinos, who make up "just a quarter

5

of the state's non-citizen population," but nonetheless "account[ed] for nearly three-quarters" of ICE arrests in New York in the first six months of this Administration. *Id.*, Ex. 20 (Sundaram), Ex. 21 (NY Immigration Coal.), at 4 (immigrants from Central and South America are 25% of New York City's immigrant population but make up 74% of ICE arrests in the city from January 20, 2025, to July 29, 2025). Predictably, this policy has not only resulted in the arrests of people with strong community ties; it has also resulted in the arrests of lawful permanent residents and others with lawful immigration status. *E.g.*, Gonzalez Decl. ¶¶ 11–12; Chou Decl. ¶ 15 (confirming receipt of reports of arrests of citizens, including one Latino citizen in Corona whom officers arrested and dropped off "randomly on Queens Boulevard" after confirming he was indeed a citizen).

Plaintiffs' and declarants' arrests confirm the existence of this policy and practice. For example, on February 26, 2026, ICE agents approached Plaintiff Rene Antonio Benitez, a Latino man who was driving his daughter to school. Benitez Decl. ¶¶ 6–7. One officer asked if Mr. Benitez had papers, to which he responded no. *Id.* ¶ 7. Without asking any other questions related to Mr. Benitez's likelihood of escape, and without first securing a warrant, the officer handcuffed and arrested Mr. Benitez. *Id.* ¶¶ 7–9. The officer plainly lacked probable cause of Mr. Benitez's escape risk, both because he had no reason to believe Mr. Benitez was likely to escape and because there was strong evidence of Mr. Benitez's family and community ties—Mr. Benitez's daughter was in the vehicle and told the agents that she was on her way to school. *Id.* ¶ 8.

On February 4, 2026, ICE agents arrested Plaintiff H.L.A.O. without a warrant and while ignoring evidence that he has strong community and family ties and posed no escape risk. H.L.A.O., a Latino man who has lived in New York for over 20 years and is his family's sole breadwinner, was waiting to board a ferry to work, when agents stopped him, asked him for

6

identification, and then placed him under arrest without presenting a warrant. H.L.A.O. Decl. ¶¶ 2, 5, 7–13. Before he was placed under arrest, H.L.A.O. pleaded for his release, informing the agent that his wife and their ten-day-old newborn were in the hospital. *Id.* ¶ 8. The agents ignored this information and placed H.L.A.O. in immigration detention, where he was detained for 23 days. *Id.* ¶¶ 8, 15–16.

Plaintiff A.M.C., a Latino man who has lived in New York for approximately 14 years and is also a father of young U.S. citizen children—a three-year old and, at the time, a twelve-week-old—was arrested on February 24, 2026, while returning home from work. A.M.C. Decl. ¶¶ 5, 7–9. Defendants' agents approached A.M.C. right before he entered his home and showed him a photo of a Latino man who did not resemble A.M.C. *Id.* ¶ 8. A.M.C. told one agent that he did not recognize the man. The agent told A.M.C. that because he did not know the man in the photo, he would be arrested instead. *Id.* ¶ 11. Although A.M.C. informed the agents that he had lived in the building for around four years and had a family, the agents grabbed his hands, placed them behind his back, and handcuffed him. *Id.* ¶¶ 8–14.

Plaintiff J.R.H.L. is a Latino man who has lived in New York for over 15 years and had never had any contact with law enforcement or immigration enforcement prior to his June 7, 2025, arrest. J.R.H.L. Decl. ¶¶ 1–3. On that day, he was crossing the public parking lot in front of his house to catch the public bus that he takes to work six days a week when four ICE cars surrounded him. *Id.* ¶¶ 4–7. An ICE agent asked him in Spanish to help them identify a Latino man in a photo they presented to him, and then, immediately after J.R.H.L. responded in Spanish, asked him for his identification and then placed him under arrest. *Id.* ¶¶ 10–12. Before arresting him across the street from the house where he has lived for almost 13 years, the agents never asked him any questions about his community ties, his life and work in New York, or his family here. *Id.* ¶ 15.

7

Plaintiff Darwin Garcia Medrano is a Latino teenager who has lived in New York since he was eleven years old and has approved Special Juvenile Immigrant Status with deferred action. Garcia Medrano Decl. ¶ 1. He was arrested on January 17, 2026, after he finished putting gas in his car while driving his younger brother and a friend, both of whom are also Latino. *Id.* ¶¶ 4–8. After Mr. Garcia Medrano entered his parked car, four masked agents surrounded the vehicle and asked the teenagers for identification. *Id.* ¶¶ 5–6. The agents placed all three adolescents under arrest without ever producing a warrant or asking them any questions at all—the agents made no inquiry as to the teenagers' escape risk or to Mr. Garcia Medrano's immigration status. *Id.* ¶¶ 7–8.

Likewise, Defendants' agents stopped and arrested Plaintiff Hesler Asaf Garcia Lanza, a Latino 24-year-old *magna cum laude* graduate of the City University of New York with Special Juvenile Immigrant Status and deferred action, while he was walking to catch the train to work. Garcia Lanza Decl. ¶¶ 1–5. Agents arrested Mr. Garcia Lanza without a warrant and without making an inquiry into his immigration status or escape risk. *Id.* ¶¶ 3–5. After he had already been arrested, Mr. Garcia Lanza observed an agent creating the warrant purportedly justifying his arrest. *Id.* ¶¶ 6–7.

Defendants' agents similarly stopped and arrested Edy Benjamin Salguero-Castro and three of his coworkers, including G.E.V.S., without asking them any questions pertaining to escape risk. Salguero-Castro Decl. ¶¶ 6–8; G.E.V.S. Decl. ¶¶ 4–8; Perez Decl. ¶¶ 5–10 (description of arrest from Mr. Salguero-Castro's attorney who overheard the encounter). On November 18, 2025, after the men had just returned to their hotel parking lot after shopping at Walmart, Defendants' agents surrounded them and, without any warning, broke one of the car windows and arrested all four occupants of the car—all of whom are Latino men—without producing a warrant or asking

8

the men for *any* information pertaining to their immigration statuses or family and community ties. *Id.*

Plaintiffs R.C.R. and F.R.P.—a married couple with stable lawful employment, living in Buffalo with their two daughters and near F.R.P.'s elderly mother—were arrested on January 24, 2026. R.C.R. Decl. ¶ 7; F.R.P. Decl. ¶ 7. On that date, the couple was walking to their car after shopping at a Walmart in Cheektowaga, New York, when a CBP agent ran towards them shouting "Immigration. Immigration. Let me see your papers." R.C.R. Decl. ¶¶ 7–10; F.R.P. Decl. ¶¶ 7–10. R.C.R. and F.R.P. presented their Employment Authorization Documents and explained they had pending asylum applications, but the agent declared them "illegal" and detained them without reviewing their documents or asking them any further questions. R.C.R. Decl. ¶¶ 10–11; F.R.P. Decl. ¶¶ 10–12. When they called their daughter to help translate, she asked whether the agent had a warrant, and he told her he did not have one but would create one once he took them to his office. R.C.R. Decl. ¶ 11; F.R.P. Decl. ¶ 12.

These are not isolated incidents. Defendants' agents have arrested many others in New York without a warrant and without making any inquiry into the person's escape risk. *See, e.g.*, J.G.G. Decl. ¶¶ 6–12 (arrested while waiting for employer); A.J.M.C. Decl. ¶¶ 5–6, 9–18 (same); Estrada Decl. ¶¶ 4–8 (same); Eugenio Decl. ¶ 5 (describing similar arrests); O.T.M.M. Decl. ¶¶ 5–6 (arrested while delivering food); Campos Decl. ¶¶ 4–8 (arrested while on the way to visit his children); Maxwell Decl. ¶ 25 (arrested while on her way to purchase medicine for her daughter); *id.* ¶ 29 (arrested during work commute); G.E.V.S. Decl. ¶¶ 16–18 (same); Angel Decl. ¶¶ 5–12 (same); Gonzalez Decl. ¶¶ 4–8 (same); Eugenio Decl. ¶¶ 15–16 (describing similar arrests); Lampert Decl. ¶¶ 8–20 (same); Maxwell Decl. ¶ 32 (arrested after dropping off his daughters at school); *see also* Gomez Decl. ¶¶ 2–7 (describing routinely observing Defendants' agents stop and

9

arrest Latino people—often with little to no questioning or verbal interaction between the agents and individuals—while working as a taxi driver in Long Island); Eugenio Decl. ¶¶ 4–7, 11, 15–16 (attorney describing increased intakes and clients reporting being arrested without warrants and without any inquiry into escape risk); Chou Decl. ¶¶ 9–14 (community organization describing repeated arrests in Corona of individuals on their way to work or running errands).

IV.    **Plaintiffs and Putative Class Members Face Arrest, Detention, and Separation from Their Families Under Defendants' Unlawful Policy and Practice.**

Plaintiffs and putative class members have suffered significant irreparable harm as a result of Defendants' policy and practice of conducting unlawful warrantless arrests. Those whom Defendants have held in detention have suffered inhumane conditions. *See, e.g.*, Campos Decl. ¶¶ 12–15 (describing being fed only once a day, being taunted by ICE staff, and witnessing people with visible injuries on their faces while in immigration detention); L.R.C. Decl. ¶ 17 (describing fungus growing on body after sleeping on the floor while in detention); J.G.G. Decl. ¶¶ 19–22 (65-year-old describing how his health deteriorated in detention); Eugenio Decl. ¶ 19 (describing untreated hernia and lack of access to hearing device while in detention); Valencia Decl. ¶ 10 (describing spread of untreated medical condition). For example, WCCNY member Jane Doe 2 is a Latina woman whom Defendants' agents arrested six months after she gave birth and while she was still nursing. Maxwell Decl. ¶ 25. She experienced engorgement and pain from the inability to feed her infant while detained. *Id.* ¶ 26. After she begged Defendants' agents for a breast pump, one of them told her, "I don't give a fuck if you have a baby." *Id.*

Plaintiffs and others in detention also must live with the pain of being abruptly separated from their loved ones and left unable to support them. Estrada Decl. ¶ 14 (describing pain of being separated from his five-year-old stepson); N.D.L.A. Decl. ¶ 5 (missing both of his daughters' birthdays while in detention for almost nine months); Vasquez Decl. ¶ 14 (describing how

10

husband's detention devastated their children); X.P.F. Decl. ¶ 23 (describing distress of being family's main breadwinner and being unable to provide for family, including sick wife whose health has been deteriorating); J.G.G. Decl. ¶ 24 (describing his grandsons having to drop out of engineering school because he was longer able to provide for them while in detention); Maxwell Decl. ¶ 32 (describing being sole caregiver for his young daughters after his wife's warrantless arrest and detention); Valencia Decl. ¶ 11 (describing difficulty managing care for her daughter, who lives with a disability, without detained husband's support). Those released from detention have struggled to rebuild normalcy in their daily lives. G.E.V.S. Decl. ¶ 13 (describing pains from detention that impede his ability to return to work); N.D.L.A. Decl. ¶ 19 (similar); Gonzalez Decl. ¶ 19 (describing physical symptoms of trauma after release from detention including tremors and vomiting); Campos Decl. ¶ 20 (describing being fired for missing work due to being detained); V.R.V. Decl. ¶ 35 (same).

Additionally, Plaintiffs and putative class members are suffering ongoing emotional distress and anxiety. They live in a constant state of fear of being arrested and detained again under Defendants' unlawful policy. Garcia Medrano Decl. ¶ 20 ("I have felt nervous and have experienced anxiety since the day I was arrested"); Campos Decl. ¶ 19 (similar); Argueta Decl. ¶ 19 (similar); A.M.C. Decl. ¶ 20 (similar); Cortez Decl. ¶¶ 18, 20 (describing fears of re-arrest); Enamorado Decl. ¶ 24 (similar); Maxwell Decl. ¶ 30 (similar); *Id.* ¶ 32 (describing developing stress-induced chronic disease following his detention and trauma and fear experienced by his young daughters who were detained with him); V.R.V. Decl. ¶ 35 ("Sometimes when I see men dressed in uniform or in a group on a street corner, I get nervous that I am seeing ICE."). Some have been subjected to multiple unlawful arrests under Defendants' policy. G.E.V.S. Decl. ¶¶ 6–8, 16–19. Many continue to live and work in the area where they were previously arrested or where

11

Defendants regularly operate and face a heightened and imminent risk that they will be re-detained pursuant to Defendants' unlawful warrantless arrest policy. *See, e.g.*, Garcia Medrano Decl. ¶ 20 (describing reports of ICE arrests near his home); L.R.C. Decl. ¶¶ 24–26 (describing fear of re-arrest); N.D.L.A. Decl. ¶ 20 (same); Benitez Decl. ¶ 14 (describing continuing to drive his daughter to school and himself to class and work despite risk of rearrest);  H.L.A.O. Decl. ¶ 17 (similar); Eugenio Decl. ¶ 6 (describing consistent ICE presence in areas where noncitizens reside). Plaintiff J.R.H.L. lives right across from the parking lot where ICE arrested him and must cross it six days a week to get to work. J.R.H.L. Decl. ¶ 21. And some Plaintiffs and putative class members have mandatory ICE check-ins and other conditions placed upon their release that require them to have regular contact with Defendants' agents, leading to frequent encounters with agents who may choose to re-detain them. L.R.C. Decl. ¶ 19 (describing ongoing ICE check-in requirements); J.R.H.L. Decl. ¶ 22 (same); G.E.V.S. Decl. ¶¶ 15, 21 (same); N.D.L.A. Decl. ¶ 17 (same); Maxwell Decl. ¶¶ 30, 32 (same).

## LEGAL STANDARD

To obtain preliminary injunctive relief, Plaintiffs must demonstrate: "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024) (citation omitted). The same standard applies to a motion to stay agency action under the APA, 5 U.S.C. § 705. *Afr. Cmtys. Together v. Lyons*, 799 F.Supp.3d 362, 382 (S.D.N.Y. 2025).

## ARGUMENT

This Court should preliminarily enjoin and stay Defendants' policy and practice of conducting warrantless arrests in New York without making individualized probable cause

12

determinations of escape risk. Plaintiffs are likely to succeed on their claims that the challenged policy and practice violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii) and is arbitrary and capricious. Defendants' policy will undoubtedly subject Plaintiffs to irreparable—indeed, devastating—harm. And the public interest and balance of equities weigh heavily in Plaintiffs' favor. Plaintiffs are therefore entitled to preliminary injunctive relief.

## I.      Plaintiffs Are Likely to Succeed on the Merits.

The APA directs courts to "hold unlawful and set aside" final agency actions that are (1) contrary to law or in excess of statutory authority, or (2) arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A), (C). Defendants' policy and practice is both and should be preliminarily enjoined or stayed.

### A.      The INA and DHS Regulations Require Agents to Make an Individualized Determination That a Person Is Likely to Escape Before Arresting That Person Without a Warrant.

Section 1357(a)(2) requires that federal immigration officials conducting warrantless arrests have "reason to believe" that a noncitizen is "likely to escape before a warrant can be obtained for [their] arrest." 8 U.S.C. § 1357(a)(2); *see also* 8 C.F.R. § 287.8(c)(2)(ii). This probable cause standard requires agents to assess "whether, at the moment the arrest was made … the facts and circumstances within [the arresting officer's] knowledge … were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). It cannot be established by "rumor, suspicion, or even a 'strong reason to suspect.'" *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983) (citation omitted). Probable cause must be "particularized with respect to [each] person" and cannot be established because "coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

13

As explained above, 8 U.S.C § 1357(a)(2) requires that officers have probable cause based on an individualized assessment that the person they are arresting without a warrant is *both* (1) in the United States unlawfully *and* (2) likely to escape arrest before a warrant can be obtained. *See supra* at 2–3. Factors relevant to establishing probable cause of a likelihood of escape include an "officer's ability to determine the person's identity," "attempted flight," "knowledge of the person's prior escapes or evasions of immigration authorities or, on the other hand, prior court attendance or other compliance with authorities," and "ties to the community (including family circumstances, residence, or employment)," and "must be considered as a whole." *Ramirez Ovando*, 810 F.Supp.3d at 1241; *see also Escobar Molina*, 811 F.Supp.3d at 47 ("[T]he arrestees' personal circumstances—such as the person's residence, length of stay in the United States, family members, work history, or anything else about the person's community ties [are] relevant in the consideration of escape risk.").

Because § 1357(a)(2) requires probable cause of both lack of status and likelihood of escape, probable cause as to one prong cannot inherently serve as probable cause for the other. The Supreme Court confirmed this in *Arizona v. United States*, holding that, under § 1357(a)(2), the mere fact that a person is a noncitizen or lacks immigration status is insufficient on its own to show that they are "'likely to escape before a warrant can be obtained.'" 567 U.S. at 407–08 (quoting 8 U.S.C. § 1357(a)(2)). Indeed, the Supreme Court struck down the law challenged in *Arizona* precisely because it permitted officers to arrest noncitizens solely because of their immigration status and "regardless of whether" the person was likely to escape. *Id*. at 408; *see United States v. Pacheco-Alvarez*, 227 F.Supp.3d 863, 889 (S.D. Ohio 2016) ("This flight-risk determination is not mere verbiage. The Supreme Court held officers to this constraint in *Arizona*."). And courts continue to recognize this as the controlling standard. *See, e.g.*, *United*

14

*States v. Puebla-Zamora,* 996 F.3d 535, 538 (8th Cir. 2021) (recognizing § 1357(a)(2) requires probable cause as to unlawful presence and likelihood of escape); *De La Paz v. Coy*, 786 F.3d 367, 376 (5th Cir. 2015) ("[E]ven if an agent has reasonable belief [that an individual is unlawfully present in the United States], before making an arrest, there must also be a likelihood of the person escaping before a warrant can be obtained for his arrest.").

*Arizona* abrogated two decades-old Second Circuit decisions which impermissibly collapsed the two prongs of § 1357(a)(2) into a single analysis. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128 (2018) ("Absent clear evidence that Congress intended this surplusage, the Court rejects an interpretation of the statute that would render an entire subparagraph meaningless."). Those decisions suggested that in certain cases an agent's awareness of an individual's "clear and undisputed" removability "may" be enough to satisfy § 1357(a)(2)'s "likely to escape" requirement, *see Contreras v. United States*, 672 F.2d 307, 309 (2d Cir. 1982); *Ojeda-Vinales v. Immigr. & Naturalization Serv.*, 523 F.2d 286, 288 (2d Cir. 1975), but those decisions are irreconcilable with *Arizona*. *Cf. United States v. Afriyie*, 27 F.4th 161, 168 (2d Cir. 2022) (circuit precedent is not binding when there is a "conflict, incompatibility, or inconsistency between this Circuit's precedent and the intervening Supreme Court decision"). If removability alone satisfied the flight prong, the Supreme Court could not have held that the law challenged in *Arizona* impinged on federal authority. As courts have repeatedly held following *Arizona*, "likely to escape" is a "specific" and "limited" condition, *Hussen v. Noem*, 2026 WL 657936, at *32 (D. Minn. 2026), meaning "likely to evade detention by immigration officers," *Moreno v. Napolitano*, 213 F.Supp.3d 999, 1006–07 (N.D. Ill. 2016) (collecting cases), or likely to "disappear before a warrant could be obtained," *Campos v. United States*, 888 F.3d 724, 734–35 (5th Cir. 2018). *See also Araujo v. United States*, 301 F.Supp.2d 1095, 1102 (N.D. Cal. 2004) (finding no flight risk

15

where arrestee was living with his wife and had a pending adjustment application, "hardly evincing an intention to flee").

ICE has itself conceded that § 1357 imposes two distinct requirements. In its Broadcast Statement, ICE expressly stated that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be obtained," and identifies community ties, prior evasions, and other individualized factors as central to the inquiry. *See supra* at 2–3. In any event, Defendants' policy does not even satisfy *Contreras*, which held that officers must have objective facts bearing on escape risk before making an arrest but found that such facts existed for the noncitizens there. 672 F.2d at 309 (one noncitizen attempted to evade custody and the other conceded unlawful entry); *see also United States v. Bautista-Ramos*, 2018 WL 5726236, at \*7 (N.D. Iowa Oct. 15, 2018) (distinguishing *Contreras* because in that case, ICE officers did not know the noncitizen's "true name or other identifying information"). Here, by contrast, Defendant's agents either had *no* information relating to Plaintiffs and the other declarants' escape risk, *see* Quintero Decl. ¶ 8; Tobar Estrada Decl. ¶¶ 5–7; G.E.V.S. Decl. ¶¶ 7–8, 17–18, or individuals affirmatively told officers or otherwise indicated they were not unlawfully present, *see, e.g.*, Garcia Medrano Decl. ¶ 6, or officers plainly ignored strong evidence of community and family ties without asking a single question bearing on escape risk, *see supra* Facts § III; *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) ("An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.").

**B.    Defendants' Warrantless Arrest Policy Is a Final Agency Action.**

**1.    Defendants Have a Policy and Practice of Making Warrantless Immigration Arrests Without an Individualized Determination of Escape Risk.**

Defendants have a policy and practice of making warrantless immigration arrests without probable cause that the person is likely to escape before officers could obtain a warrant. Indeed, Defendants have repeatedly and publicly admitted that DHS "uses 'reasonable suspicion' to make arrests." *Escobar Molina*, 811 F.Supp.3d at 16, 45. Pursuant to this policy, federal immigration agents routinely arrest individuals without first determining they have probable cause that the person is likely to escape before a warrant can be obtained. *See, e.g.*, J.R.H.L. Decl. ¶ 12; Garcia Medrano Decl. ¶¶ 4–8; O.T.M.M. Decl. ¶¶ 7–13; Campos Decl. ¶¶ 6–8; Jeylani Decl. ¶¶ 5–9; *see also Escobar Molina*, 811 F.Supp.3d at 16–17, 45 (collecting statements). And while the recently issued Lyons Memo purports to require probable cause, it re-defines escape risk so broadly as to sweep in virtually anyone encountered in public. *See supra* at 4.

As Plaintiffs' and declarants' statements make clear, prior to conducting a warrantless arrest, Defendants' agents regularly arrest individuals without first asking *any* questions about their lives, including how long the person has lived in the United States, who the person lives with, the person's family members, the person's work history, or anything else about the person's ties to the community—factors that courts and ICE itself have found central to the escape risk analysis. *See, e.g.*, Salguero-Castro Decl. ¶¶ 3–8 (describing arrest of four Latino men without warrants and without agents asking *any* questions at all); Campos Decl. ¶¶ 6–8; N.D.L.A. Decl. ¶ 9; J.G.G. Decl. ¶¶ 8–13; J.R.H.L. Decl. ¶¶ 11–13. Had Defendants' agents conducted the required escape risk inquiry prior to effectuating these arrests, they would have discovered strong family and community ties demonstrating that there was no likelihood of escape. *See, e.g.*, A.J.M.C. Decl. ¶ 4 ("I have lived in Long Island for almost 20 years); G.E.V.S. Decl. ¶ 1 ("I have lived in New

17

York State for the past 16 years); H.L.A.O. Decl. ¶ 2 ("I work six days a week in construction and remodeling for a masonry company … I have worked there since 2005."); Garcia Lanza Decl. ¶ 1 ("I graduated *magna cum laude* from the New York City College of Technology of The City University of New York."); A.M.C. Decl. ¶ 5 ("At the time ICE took me, my daughter was only 12 weeks old."); X.P.F. Decl. ¶ 4 ("I have lived in New York City for about 27 years. I live in Corona, New York with my partner of 22 years, my stepdaughter, and our granddaughter, who is a U.S. citizen.").

Just as problematically, even where evidence confirming individuals' lack of escape risk existed, agents regularly and consistently *ignored* it. *See, e.g.*, Benitez Decl. ¶¶ 6–9 (arrested while driving his daughter to school); H.L.A.O. Decl. ¶¶ 5, 7–13 (arrested after telling Defendants' agents his wife and ten-day-old son were still in the hospital); Maxwell Decl. ¶¶ 25–26 (describing arrest of longtime New York resident who told agents she has three young children and a baby who was still nursing). Moreover, several Plaintiffs and declarants were already known to the government and had lawful immigration status. Several had pending applications before USCIS, were actively participating in immigration court proceedings, or had regularly attended ICE check-ins, rendering any suggestion they posed an escape risk implausible. Garcia Medrano Decl. ¶ 1 (approved SIJS petition and grant of deferred action); L.R.C. Decl. ¶¶ 3–5, 11, 28 (pending asylum and related claims). Further, the only two Plaintiffs for whom officers asked relevant questions gave answers that proved they were not likely to escape, yet Defendants' agents immediately arrested them anyway. A.M.C. Decl. ¶¶ 8, 10 (answering that he had lived in his building for "around 3 to 4 years" and had family in the U.S. when questioned by ICE); H.L.A.O. Decl. ¶ 8 (informing agents that his wife and ten-day-old son were in the hospital and of the name of his workplace).

18

**2.      Defendants' Warrantless Arrest Policy Is a Final Agency Action Under the APA.**

The policy and practice detailed above is a final agency action. A final agency action is one that "mark[s] the consummation of the agency's decisionmaking process and … one by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (citation omitted); *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016). "[F]inality can be gleaned from agency action and the effects thereof and does not require any written evidence." *Velesaca v. Decker*, 458 F.Supp.3d 224, 243 (S.D.N.Y. 2020); *see also Amadei v. Nielsen*, 348 F.Supp.3d 145, 166 (E.D.N.Y. 2018) ("Defendants' own statements and actions" were sufficient to demonstrate "critical indicia of finality" and satisfy the APA's finality requirement). Indeed, "[t]he practical effect of the [agency's] action, not the informal packaging in which it was presented," determines finality. *New York v. Trump*, 767 F.Supp.3d 44, 76 (S.D.N.Y. 2025) (citation omitted).

Defendants' policy and practice satisfies both prongs of the final agency action test. *See Ramirez Ovando*, 810 F.Supp.3d at 1236–37 (holding that ICE's "policy, pattern, or practice of … failing to conduct individualized flight risk assessments during immigration enforcement operations" constituted a "final agency action"); *Escobar Molina*, 811 F.Supp.3d at 48–49 (same).

First, the policy reflects a final decision by CBP and ICE's New York City and Buffalo Field Offices as to how to conduct warrantless immigration arrests in New York State in pursuit of the President's goal of mass immigration arrests and deportations. It is not an action of "merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 178 (1996). Second, it is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc.*, 603 U.S. at 808 (citation omitted). The policy and practice has resulted and will continue to result in the unlawful arrest and detention of thousands of individuals

19

across New York State. *See Doe v. U.S. Immigr. and Customs Enf't*, 490 F.Supp.3d 672, 687 (S.D.N.Y. 2020) ("Agency action that has a 'substantial practical impact' is of 'sufficient legal force' to constitute final agency action and thus warrant judicial review." (citation omitted)); *see Velesaca*, 458 F.Supp.3d at 243 (policies resulting in unlawful detention satisfy the finality requirement).

### C.  Defendants' Warrantless Arrest Policy Violates the INA, Exceeds Defendants' Statutory Authority, and Is Contrary to Law.

"[A]n agency may only act within the authority granted to it by statute." *Nat. Res. Def. Council v. Nat'l. Hwy. Traffic Safety Admin.*, 894 F.3d 95, 108 (2d Cir. 2018). Courts assess that limitation by examining the "plain terms" and "core purposes" of the relevant statute. *Id*. Defendants' warrantless arrest policy and practice violates § 1357(a)(2)'s requirement that agents make an individualized probable cause determination. It is therefore "contrary to law' and 'in excess of statutory authority,' in violation of the APA." *Escobar Molina*, 811 F.Supp.3d at 50 (quoting 5 U.S.C. § 706(2)(A), (C)).

The plain terms and purpose of § 1357(a)(2)'s "likely to escape" prong require an individualized, fact-specific inquiry. *See supra* Argument § I.A. Defendants' policy and practice systematically and intentionally ignores this requirement; agents routinely arrest New Yorkers without any individualized inquiry into their circumstances. *See supra* Argument § I.B.1. What is plain from "the total absence of questions" on community, employment, and familial ties is that "officers did not seek what they did not wish to find." *Ramirez Ovando*, 810 F.Supp.3d at 1231.

The government has conceded in related litigation that if a policy like the type alleged here existed, it would violate both § 1357(a)(2) and the APA. *See Escobar Molina*, 811 F.Supp.3d at 50. Courts across the country have agreed. *See, e.g.*, *id.* at 49 (finding failure to inquire into escape risk amounting to a "systemic failure to apply the probable cause standard" in § 1357(a)(2));

20

*Sanchez Alfaro v. Almodovar,* 2026 WL 734348, at *5 (E.D.N.Y. Mar. 16, 2026) (failure to inquire into escape risk rendered warrantless arrest "plainly illegal"); *Ramirez Ovando*, 810 F.Supp.3d at 1231 (noting "officers asked no questions—until after [plaintiffs'] arrests—bearing on flight risk" and the agency's I-213 arrest forms were "devoid of evidence" of any flight risk determination); *United Farm Workers*, 785 F.Supp.3d at 735 (finding plaintiffs likely to succeed on claims that CBP agents have a pattern or practice of warrantless arrests without probable cause of flight risk required by § 1357(a)(2)). This Court should similarly find Defendants' warrantless arrest policy and practice exceeds statutory authority and is contrary to law under 5 U.S.C. § 706(2)(A) and (C).[1]

**D.      Defendants' Warrantless Arrest Policy Is Arbitrary and Capricious.**

Defendants' policy and practice is also arbitrary and capricious under § 706(2)(A). For decades, and as a matter of statutory and regulatory obligation, ICE conducted individualized, pre-arrest assessments of whether a person was likely to escape before a warrant could be obtained. *See supra* at 2–3. ICE's Broadcast Statement reinforced these requirements and specified the factors officers must consider—community ties, employment, history of evasion—clarifying that unlawful presence alone is insufficient. Yet Defendants have now abandoned that practice: officers routinely effectuate warrantless arrests without developing the facts the agency itself identified as relevant to likelihood of escape. *See supra* at 5–10.

The APA requires that an agency changing course must "at least display awareness that it is changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009); *Encino Motorcars, LLC v. Navarro*, 579 U.S.

---

[1] Plaintiffs are also likely to succeed on their *Accardi* claim—that the defendant agencies have failed to follow their own binding regulations—for the same reasons. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

211, 221–22 (2016). Defendants have satisfied neither requirement. They have not acknowledged the departure from prior practice, explained why warrantless arrest practices are being changed, or engaged with the numerous cases that applied the statutory standard Defendants are now abandoning. The only arguable explanation provided by the agency—the January 2026 Lyons Memo—acknowledges that ICE previously interpreted "likely to escape" as equivalent to "flight risk" and declares that interpretation incorrect. But "so conclusory a statement cannot substitute for reasoned explanation." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 241 (D.C. Cir. 2008). The Lyons Memo redefines "likely to escape" to mean only that a person is "unlikely to be located at the scene of the encounter or another clearly identifiable location[2] once an administrative warrant is obtained," without analyzing the statutory text or regulation, without addressing the many decisions requiring individualized community-ties assessments, and without explaining why the community ties factors ICE itself previously identified as central to the inquiry no longer apply. *See supra* at 2–3. Where the agency "sa[ys] almost nothing" about the reasons for its new position and "d[oes] not analyze or explain why the statute should be interpreted" as it does, its changed position "cannot carry the force of law." *Encino Motorcars*, 579 U.S. at 223–24.

In addition, Defendants' failure to comply with its own regulation is an independent basis to find their policy arbitrary and capricious. Agency actions "may be arbitrary and capricious if they fail to follow their own procedures and regulations." *N. B. v. U.S.*, 552 F.Supp.3d 387, 398 (E.D.N.Y. 2021); *see also Shoaibi v. Mayorkas*, 2021 WL 4912951, at \*5 (W.D.N.Y. Oct. 21, 2021) ("[A]s the Supreme Court has held, an agency 'must comply, at a minimum, with its own internal procedures.'" (citing *Morton v. Ruiz*, 415 U.S. 199, 235 (1974))). The probable cause

---

[2] Defendants are not attempting to meet even this lower standard, routinely ignoring evidence of alternative "clearly identifiable locations" like homes or workplaces when effectuating warrantless arrests. *See Hussen*, 2026 WL 657936, at \*40.

regulation is still on the books. Defendants are not following it. That is the beginning and end of the analysis. *Escobar Molina*, 811 F.Supp.3d at 50 (holding policy and practice of warrantless arrest without probable cause was arbitrary and capricious). Each of these grounds independently requires that Defendants' policy and practice be set aside under § 706(2)(A).

**II.     Plaintiffs Face Irreparable Harm Absent an Injunction.**

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Plaintiffs must show an injury that is "actual and imminent" and not fully remediable after final judgment. *Id.*; *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990). However, they need not prove that the harm has already occurred; it is enough to show a "threat of irreparable harm." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010).

Here, Plaintiffs have already suffered irreparable harm and continue to face the threat of further irreparable harm. Defendants unlawfully arrested Plaintiffs near their homes, in neighborhoods they regularly visit, and on routes they continue to travel to work, attend school, and go about their daily lives. Defendants' policy of making warrantless arrests without probable cause is systemic, pervasive, and ongoing. Santos Decl. ¶ 5 (arrested Feb. 18, 2026); A.M.C. Decl. ¶ 8 (arrested Feb. 24, 2026); Zapata Decl. ¶ 5 (arrested Mar. 9, 2026). Defendants' agents continue to prowl Plaintiffs' neighborhoods and target people who look like Plaintiffs. *See* N.D.L.A. Decl. ¶ 20 (describing ICE returning to his home a week after his release from detention); Ruiz Decl. ¶¶ 7–9 (describing church event cancellations and increased security due to ICE's presence); Gomez Decl. ¶ 5 ("[I]n the Hempstead area [] people are stopped all the time just for being Hispanic."). Plaintiffs' and putative class members' quotidian and necessary activities place them at direct and imminent risk of being targeted for immigration arrests. *See Escobar Molina*, 811

23

F.Supp.3d at 33–34. For example, G.E.V.S. has been repeatedly subjected to Defendants' unlawful practices. G.E.V.S. ¶¶ 16–20.

Therefore, Plaintiffs face an imminent threat of being seized and detained again absent injunctive relief. *Mullins*, 626 F.3d at 55; *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (risk of repeated unlawful seizures establishes irreparable harm). ICE's enforcement in New York has not taken the form of a single, finite surge; as set out above, it has intensified over the past several months across the state, with arrests in the greater New York City area more than tripling, street arrests in the city increasing by over 200%, and detention at ICE's Buffalo Federal Detention Center rising from an average daily population of 638 to 745 so far in FY 2026. *See supra* at 4–5; Scarcella Decl., Ex. 22 (Fanelli).

Defendants' unlawful arrests have irreparably harmed Plaintiffs, and, as described above, Plaintiffs face an imminent risk that they will be profoundly and irreparably harmed by Defendants once again. The sudden and forcible deprivation of their physical liberty—being handcuffed, detained, transported, and held in custody—is quintessential irreparable harm. *See Zadvydas v. Davis,* 533 U.S. 678, 690 (2001) ("Freedom from imprisonment … lies at the heart of the liberty."); *see supra* at 10–12.

Moreover, unlawful immigration detention is irreparable harm in and of itself. *See Velesaca*, 458 F.Supp.3d at 240; *Sajous v. Decker*, 2018 WL 2357266, at *12 (S.D.N.Y. May 23, 2018) ("The deprivation of [a noncitizen's] liberty is, in and of itself, irreparable harm.") (citation omitted) (collecting cases). Even brief unlawful detention constitutes irreparable injury because time spent in custody cannot be undone, compensated, or restored. *See Barker v. Wingo*, 407 U.S. 514, 532–33 (1972) (pretrial detention disrupts employment, family life, and personal liberty); *Castro Coneo v. Almodovar*, 2025 WL 3754079, at *4 (S.D.N.Y. Dec. 29, 2025) ("[T]he loss of

24

physical liberty … constitutes irreparable injury, even for minimal periods of time."). Plaintiffs and the putative class have suffered such harm here. *See supra* at 10–12.

These liberty harms are compounded by other cascading, irreparable consequences. Unlawful arrests and detention predictably destabilize employment and family life—harms that cannot be repaired after the fact. *See supra* at 10–12. Plaintiffs and putative class members also report fear, anxiety, sleeplessness, and an inability to safely engage in ordinary daily activities such as commuting to work, attending school functions, or seeking medical care. *See, e.g., id.*; N.D.L.A. Decl. ¶ 20 (describing spending increased time at home due to fear of rearrest); J.R.H.L. Decl. ¶ 21 (same). Such emotional and psychological harms, especially when tied to unlawful detention or the threat of renewed arrest, constitute irreparable injury. *See Hernandez v. Sessions,* 872 F.3d 976, 995 (9th Cir. 2017) (recognizing that immigration detention provides "subpar medical and psychiatric care" and yields "economic burdens [that are] imposed on detainees and their families [and] … collateral harms to children of detainees whose parents are detained"); *Abdi v. Duke*, 280 F.Supp.3d 373, 404–06 (W.D.N.Y. 2017) (finding irreparable harm based on the "negative physical and mental health effects" of detention).

### III. The Equities Weigh Heavily in Plaintiffs' Favor and a Preliminary Injunction Will Serve the Public Interest.

The balance of equities and public interest also favor Plaintiffs. "[B]ecause the Government is a party, and 'the Government's interest is the public interest,' the balance of hardships and public interest merge as one factor." *Saget v. Trump*, 375 F.Supp.3d 280, 339–40 (S.D.N.Y. 2019) (quoting *New York v. U.S. Dep't of Commerce*, 351 F.Supp.3d 502, 673 (S.D.N.Y. 2019)).

Here, as described above, the injuries to Plaintiffs and putative class members are significant. *Supra* at 10–12. On the other side of the scale, the government has no legitimate interest in flouting its own regulations and statutory obligations. Ultimately, "there is no public

interest in allowing Defendants to proceed with unlawful, arbitrary, and capricious executive or agency actions that exceed their statutory authority." *Make the Road N.Y. v. Pompeo*, 475 F.Supp.3d 232, 269 (S.D.N.Y. 2020); *Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F.Supp.3d 308, 343 (S.D.N.Y. 2018) ("There is generally no public interest in the perpetuation of unlawful agency action … there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (cleaned up)).

Moreover, the relief that Plaintiffs seek is narrowly tailored to address the unlawful conduct at issue. It would not impede lawful immigration arrests—even warrantless arrests—by Defendants. Plaintiffs principally request the Court to order Defendants and their agents to refrain from making warrantless immigration arrests without the probable cause findings required by § 1357(a)(2), and to comply with DHS's Broadcast Statement of Policy. Plaintiffs also seek compliance-reporting in the form of periodic production of arrest documentation, and that Defendants train all agents authorized to conduct arrests in New York State on their legal obligations and the compliance-reporting requirements.[3] These reasonable and minimally intrusive requirements are necessary to ensure that Defendants' conduct conforms to the requirements of § 1357(a)(2).

---

[3] Courts confronting analogous warrantless arrest policies have included this type of compliance reporting to ensure their orders are effective and to avoid repeat motion practice over compliance. *See Escobar Molina v. D.H.S.,* No. 1:25-cv-03417 (D.D.C. 2025), Dkt. No. 67; *United Farm Workers v. Noem*, No. 1:25-cv-00246 (E.D. Cal. 2025), Dkt. No. 47 (requiring production of documentation describing detentive stops and warrantless arrests, plus directives and documentation showing training on the order's requirements).

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' request for preliminary injunctive relief and enjoin or stay Defendants' policy and practice of making warrantless immigration arrests without the required probable cause findings.

Dated: April 13, 2026          /s/ Mark Gimbel
      New York, NY          Mark Gimbel
                                  Giovanni J. Scarcella
Cecile Duncan (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
30 Hudson Yards
New York, New York, 10001
Phone: 212-841-1000
mgimbel@cov.com
gscarcella@cov.com
cduncan@cov.com

Jeffrey Cao (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001
Phone: 202-662-6000
jcao@cov.com

Amy Belsher
Ifeyinwa Chikezie
Wafa Junaid
Molly Biklen
NEW YORK CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 19th Floor
New York, NY 10004
Phone: 212-607-3300
abelsher@nyclu.org
ichikezie@nyclu.org
wjunaid@nyclu.org
mbiklen@nyclu.org

Meghna Philip
Hasan Shafiqullah
Evan Henley
Brian Perbix
THE LEGAL AID SOCIETY

27

49 Thomas Street, 10th Floor
New York, NY 100013
Phone: 212-577-3300
mphilip@legal-aid.org
hhshafiqullah@legal-aid.org
ewhenley@legal-aid.org
bperbix@legal-aid.org

Paige Austin
Harold Solis
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: 718-418-7690
paige.austin@maketheroadny.org
harold.solis@maketheroadny.org

*Attorneys for Plaintiffs*

28

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this Memorandum of Law complies with the length restrictions in Local Civil Rule 7.1(c) because it contains 8,636 words, as counted by the Microsoft Word-processing program used to prepare this document. This word count excludes the caption, table of contents, table of authorities, signature blocks, and this certificate as provided for by Local Civil Rule 7.1(c).

*/s/ Mark Gimbel*

Mark Gimbel
