# DECLARATION OF HESLER ASAF GARCIA LANZA

Pursuant to 28 U.S.C. § 1746, I, Hesler Asaf Garcia Lanza, declare under penalty of perjury that the following information is true and correct:

1. My name is Hesler Asaf Garcia Lanza. I was born in Honduras on October 7, 2001. I am currently twenty-four years old. I arrived in the United States when I was around nine years old, and have lived in Hempstead, NY ever since. I came to the United States to live a safe life, to pursue an education, and to have opportunities for a better future with my family. I am gay and identify as a member of the LGBTQ+ community. I graduated *magna cum laude* from the New York City College of Technology of The City University of New York in June of 2024 with a Bachelor of Technology degree. I have made significant advances in my field of theater lighting design. I even had the opportunity to work at New York City Fashion Week. I have no criminal history, and I have never had any interaction with immigration enforcement besides what happened to me on January 3, 2026. I currently have deferred action based on the fact that I was granted Special Immigrant Juvenile Status (SIJS), a unique form of humanitarian relief that has placed me on a path towards becoming a lawful permanent resident.

2. However, earlier this year, I almost lost everything I have tried to build for myself in this country. On January 3, 2026, I woke up at 6:00 AM for work, as I always did, not knowing it would be one of the hardest days of my life. I left my house at around 7:00 AM and began the 25-minute walk to the LIRR Hempstead stop. As I approached the crosswalk between Fulton Avenue and Washington Street, an unmarked black SUV with blacked-out windows almost hit me as it stopped halfway past the crosswalk when I had the right of way. I walked

around the car and crossed the street. I continued walking when I noticed the black SUV make an aggressive U-turn and slowly approach me. I immediately became scared, thinking that I was going to get robbed.

3. An agent stepped out of the vehicle on the right side and approached me. Then I noticed at least three other vehicles surrounding me. About four to six other officers got out of their vehicles and surrounded me, yelling out questions at me. I was so scared that I could not process what was happening. I began to shake violently when I realized they were ICE agents and I was likely going to be arrested. One officer asked me for identification, while another asked me, in Spanish, which country I am from and whether I have a green card. I responded in English that I had a work permit, and he took it from me.

4. During this time, officers who weren't speaking began closing in on me to ensure I didn't run away. At no point did I feel like I had the option to leave. One officer proceeded to take a picture of me and then said, "Nice hair color, you look fine, don't worry." At the time, my hair was dyed bright red. The officer then returned to his car with my ID. The officers seemed unsure as to what to do with me. I heard one officer ask another, "What do we do?" The officer holding my work permit said, "We're going to take him with us anyway."

5. While this was happening, I was shaking, trying to call my family members. I managed to get in contact with a family member and asked them to let my stepfather, Jaime, know that I was being arrested by ICE. An officer then told me to put my hands behind my back and face his vehicle. I did as they said because I did not want to make the situation harder on myself. He asked me if I had any weapons or knives, and I told him I had a knife attachment on the multitool in my work bag. One officer handcuffed me, while two others patted me

down. Another officer took my phone, hat, and headphones. I was then placed in a car with another person they had detained. I was terrified. This was my first time ever in a law enforcement vehicle. I could not believe this was happening to me. I have tried to live an exemplary life in order to make myself and my family proud. It saddened me to realize that none of that mattered in this moment. The only thing that mattered to these officers was that I looked Latino. The fact that upon their first interaction with me, they spoke to me in Spanish, confirmed to me that they only stopped me because I looked Latino and was walking in a predominantly Latino and Black area.

6. The vehicle took the other detainee and me down Washington Street, and we entered the Hempstead Armory parking lot. First, they took the other detainee, who was also a person of color, out of the car and put him in waist chains and handcuffed him in the front. Then, they took me out of the car and did the same. At this point, my stepfather and sister arrived, and he told the officers he was my father. They moved me further away from my stepfather and put me in a van. I looked out the van's windshield and noticed one of the officers writing on a piece of paper in a car parked directly in front of the van I was in. The officer then took that piece of paper and showed it to my stepfather.

7. Not until after I was released and my stepfather and I were able to discuss what happened did we realize that the paper I saw the officer writing on was the "warrant for arrest of alien." We put this together because while I was held in the van, my stepfather had asked an officer whether they had a warrant for my arrest. The officer stated that they did, and my stepfather asked to see it. My stepfather then observed the officer walk back to his car and start writing on a piece of paper. The officer then walked back to my stepfather and

showed him what the officer said was a warrant. My stepfather took a picture of the warrant and left with my sister.

8. I was then driven in the van to the Nassau County Correctional Center. Once there, we were taken out of the van one by one and placed in a small shack outside the main jail. Our ankles were then shackled to the benches. Everyone in the small shack was a person of color. An officer arrived minutes later and told me to remove my shoelaces and piercings. I attempted to take all of my piercings out, but two of them proved impossible to remove, no matter how hard I tried. The officer then said, “Let him keep them. Let them yank them out.”

9. Then one Officer Rodriguez began filling out my paperwork. The first question he asked me was whether I identified as a woman or a man. I told him that I identify as a man. He then asked me other questions, such as where I live and what I do for work. I let him know that I am a lighting designer and technician for live entertainment. He then asked me how much money I made. I told him that it varies, but around $3,000 per month. We then waited for what felt like forever. They gave us military-style, ready-made meals to eat.

10. I had a chance to talk a little with two detainees who had been driven to the jail with me, both of whom were people of color. At least one of them was Latino. They explained to me that they had been detained after going about their normal lives. One was detained while walking to a deli, and the other was arrested as he exited a hospital. This was all very troubling for me to hear, given what I had experienced.

11. After a couple of hours, other officers came to take the other detainees and me to the jail. Officer Rodriguez let them know that he was not finished with my paperwork. The other officers did not seem to care and told me, “Let’s go.” I told him that I had not received any

paperwork. Officer Rodriguez told the officer to wait a minute until he had served me my papers. He then held a stack of papers and told me what each document said in general. The officer did not give me a chance to read the documents before they told me to sign them. I told him that I would not sign anything without speaking to my attorney first. He said he understood.

12. After this, I was put in a van with two other men and driven to the main jail. At the jail, I was patted down and made to change clothes. A nurse asked me a couple of questions, and then I was taken to see the doctor. The doctor gave me the all clear, and we waited on a bench for another hour. While I was waiting, I heard an officer exclaim, "I'm debating if to just take them down and put them in their cages." I thought this was extremely condescending and of poor taste. It made me feel afraid that I was nothing more than an animal to them. I felt terrified while I was sitting on the bench waiting. I began to think about all of the negative stereotypes regarding jail, and my heart raced at the thought of having to live through it. I know I do not present stereotypically masculine, and I do not know how to defend myself. I am of a smaller build and consider myself an eccentric person, and thus, I was terrified of what horrors might await me in jail.

13. I was placed in a single cell with one thin mattress, two sheets, one small blanket, one small bar of soap, and one roll of toilet paper. I was not given a toothbrush. I kept telling myself I would be okay because I was in my own cell and did not have to face any other men. Although frightened and cold, I eventually managed to fall asleep. The next morning, I woke up with the same lonely, cold feeling. There were no clocks or windows to indicate the time of day. The hours seemed to stretch forever, just waiting and waiting for something

to happen. Eventually, I was let out to the hallway where an officer gave me a toothbrush and toothpaste.

14. Feeling completely overwhelmed by my helplessness, my first call was to my stepfather. Once I heard his voice, I felt instant relief. He told me he was in contact with my attorney and that they were doing their best to get me out.

15. My time in jail felt like it stretched on forever. I genuinely did not understand what could have led me to this place. The uncertainty of what could become of my situation made me want to scream in frustration. I began to think about what my life would be like if I were sent back to Honduras. Life as I know it would be over. I have no friends or family in Honduras. My degree would be useless. Everything I have worked so hard for is in New York. This is my home. My family, friends, community, and work network are all here.

16. Further, as a member of the LGBTQ+ community, I am terrified to be sent back to Honduras. It is well known in and out of Honduras that the government and police do not protect members of the LGBTQ+ community. Members of my community face discrimination and the threat of death in Honduras. Meanwhile, in New York, I feel safe and able to express myself fully. I know that the threat to my safety in Honduras is one of the reasons why a Family Court judge found that it was not in my best interest to return to Honduras. Further, the United States Citizenship and Immigration Services ("USCIS") determined that I am a special immigrant juvenile ("SIJ") and that I require special protections, as evidenced by its approval of my SIJ petition and by the fact that USCIS granted me deferred action status on the basis of my approved SIJ petition. I even got a work permit based on that grant of deferred action. After I went through that process, I

finally felt protected. I do not understand how the government that granted me that protection is the same government that is now trying to put me in harm's way.

17. On Monday, January 5, an officer came to my cell and gave me a phone number with a passkey to make a phone call. At this point, I still had not been able to speak with my attorney, so I did not know exactly what was happening with my case. However, I hoped this was a good sign. I entered the passkey, and then I heard a man on the phone who said he was a judge from the federal court. I had difficulty staying connected to the call because of the phone, but I was able to hear a little. I heard the judge say that ICE did not have a good reason for keeping me detained since I was not a flight risk or a danger to my community. I felt so relieved when the judge said they would try to get me out of here as soon as possible. I finally felt some hope.

18. Hours later, an officer came to my cell and escorted me through the building, where I changed back into my clothes. I then waited for the ICE officers to come. Three officers arrived, and one volunteered to drive me to where I would be released. He then told me I needed to "learn from this and to use this to grow and become a better man." I found his words insulting because I know I have been the best man I can be, and I know I did nothing wrong to end up in this situation. I have never had any issues with the law; instead, I have focused on obtaining legal status, my studies, my family, and building my career. The officer then very briefly reviewed my release papers and had me sign. I asked about my property, which included my phone and identification. He told me that it was sent to NYC because that is where I was going to end up anyway.

19. Around 7:30 PM on January 5, I was finally reunited with my mother, stepfather, and two siblings. It was the most intense relief from anxiety I have ever felt, and I have never been

so happy to see their faces. I am grateful that I have lived my life in a way that allowed the judge to see that I am not a danger to my community. I have worked so hard since arriving in the United States to do the right things, become a successful member of my community, and achieve all my dreams.

20. They never gave me back my phone or wallet when I was released, and my wallet had my work permit. ICE ordered me to a check-in on January 19, 2026, even though it was a federal holiday. I went with my attorney and waited for hours for them to finally give me back my phone and wallet, but they never gave me my work permit–they said it had been sent to Virginia. They have still not given my work permit back to me. My next check-in with ICE is on July 20, 2026.

21. On January 26, 2026, my attorneys learned that my SIJ deferred action had been terminated. We didn't receive a letter about the termination of deferred action until February 2, 2026. The letter said they would take away my work permit within 15 days if I could not prove I had continued deferred action. Thankfully, the judge in my habeas case vacated the termination of my deferred action and work authorization, and told ICE to give my work permit back to me. I ultimately did receive a new work permit.

22. Since I was detained, I have been afraid to leave my house. I work about six days per week. Every time I walk to the train to go to work, I get an immense amount of anxiety. It terrifies me to know that ICE agents can take me at any moment again. Once I arrived in the United States as a young boy, I thought my days of living in fear were over. It saddens me to realize they are not.

23. I hope that what happened to me never happens to anyone else. That is why I am seeking to be a class representative for other people who are or will be in a similar situation to me.

If this case is certified as a class action, I am willing and able to represent the class and its interests, with the help of my lawyers.

Executed on 04/04/2026.

Hesler Asaf Garcia Lanza (Apr 4, 2026 10:39:53 EDT)

HESLER ASAF GARCIA LANZA