**DECLARATION OF H.L.A.O.**

I, **H.L.A.O.**, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is **H.L.A.O.**. I am making this declaration and wish to proceed in this lawsuit using my initials, H.L.A.O.
2. I am 46 years old. I have lived in New York for over 20 years. I have lived in Greenport, New York since 2005.
3. I am Latino.
4. I have never had any contact with law enforcement. Prior to this incident, I had never encountered immigration enforcement.
5. I have four U.S. citizen children under the age of seven: my seven-year-old daughter, my five-year-old son, my twenty-month-old son, and my two-month-old son. Both of my youngest children have serious medical issues. Doctors are monitoring my second youngest child because he might need surgery one day. At the time ICE took me, my youngest child was only ten days old. My wife was still recovering after giving birth, and her health in general is not good because she is diabetic. My wife works, but I am the main breadwinner for my family.
6. I work six days a week in construction and remodeling for a masonry company out on Shelter Island. I have worked there since 2005. From Monday to Saturday, I leave my house in Greenport between 6:00 am and 6:30am to drive to the Shelter Island ferry. I drive my car onto the ferry to get to the island and then return home between 6:00 pm and 7:00pm. My car is registered in my name.
7. On February 4, 2026, I left home in the morning and drove to the Shelter Island ferry, like I do almost any other day. I was first in the car line to get onto the ferry. The ferry was

already docked in front of my car. I sat in my parked car., waiting to drive onto the ferry. Around 6:30am, I saw a blue Ford Explorer behind me. It looked like a normal car to me; there were no markings anywhere. I sat in my car around five to ten minutes. I heard a knock on my driver-side window. I looked out my driver side window and saw a man wearing a bullet proof vest with the word ICE printed on it. On the passenger side of my car, I saw another agent wearing a vest that said ICE through my window. I could see that he had a gun in his belt. I rolled my window down. The agent asked in English for my identification. I can understand enough English. I did not feel like I could leave or decline to hand over my identification. I was stuck in line for the ferry with other people's cars behind me, so I handed over my New York State driver's license, which is active and valid. The man took it and walked back towards his car. The other agent remained where he was by my passenger window.

8. The man who took my driver's license agent came back within a minute or two. He told me in English that he was with ICE and that I needed to come with them. He told me that I was illegally in the U.S. He said to me, you haven't fixed your papers but you have been in the U.S. for so long. I told him I had tried about five years ago to become legal, but I got scammed by an attorney who stole my money without actually helping me. He asked me where I worked, and I told him I was on my way to work and the company I worked for. He asked me about my family. I told him about my kids. I told him that my wife and 10-day old son were still in the hospital and that they were very sick. He told me to get out of the car. I stepped out of the car, and he immediately put handcuffs on me. I was very scared and nervous. I did not ever try to resist arrest.

9. My car was still parked in the line to get onto the ferry. I asked the agent what I should do with my car since it was blocking the way onto the ferry. The agent spoke to a ferry employee. The other agent, without asking me permission, got into my car—the keys were still in the ignition— and parked it in the parking lot.

10. They then put me handcuffed into the Ford Explorer. They drove me to a fire station.

11. In the parking lot of the firefighter station, there were many cars, maybe around four to five more cars. There were two other Latino men that ICE had taken in the parking lot. I was told that the other Latino men were arrested at a school while going to work.

12. The agents took me out of the car and put me in chains that connected my wrists and ankles to my waist. There was a Spanish-speaking agent came up to me. I told the guy in Spanish that they were treating me like a dog. The Spanish speaking agent told me that the more I talked the worse I would be treated. Another agent told the Spanish speaking one that I understood English and that he could leave.

13. At no point did the agents identify themselves, present a warrant, explain why they stopped me, or indicate that they knew me or my name prior to stopping me.

14. Then the agents brought me to Central Islip. Agents took my fingerprints and a photo of my face. The agents showed me a photo of two young Latino men and said they were looking for them. I recognized the men as brothers I knew from Greenport. I told the agents that I knew the boys and had seen them around. I look nothing like the men in the photo because they are young, I think in their twenties, and I am in my forties. I told the agents that they clearly had the wrong guy. A Spanish-speaking agent handed me some papers and tried to get me to sign voluntary departure documents. I told him no, I do not read or write

well, so I wasn't going to sign anything. I also said that I had a family to care for. This agent seemed angry at me for not signing.

15. Then the agents took me to Nassau County Jail, where I spent around three days. The conditions there were really bad. I felt like they treated me like a dog or criminal. I was then taken to a facility in New Jersey where I stayed for another three days. Then I was sent to MDC in Brooklyn where I stayed until I was finally taken to Federal Plaza in Manhattan where I was released on February 26, 2026.

16. As a result of my arrest and detention, I was away from my family for about 23 days. During this time, I was unable to work and help my wife who was caring for our four kids. I was very anxious and stressed because my wife was still recovering from childbirth, and has other health issues, and my two youngest sons have serious medical issues. I could not easily contact my family, which made it worse.

17. Since my release, I have returned to my job and my house. I still drive six days a week to the ferry stop and wait in line at the exact spot where I was arrested. I feel uneasy because I feel like ICE could be in any car and come to take me from my family again. I don't have a choice. I need to go to work to support my family.

18. I am working with my immigration attorney to apply for relief from removal.

19. I understand that in filing this lawsuit, I am seeking to be a class representative for other people who are or will be in a similar situation to me. If this case is certified as a class action, I am willing and able to represent the class and its interests, with the help of my lawyers.

20. I would like to continue under the initials H.L.A.O. I am afraid of retaliation towards me if my identity were to become public due to my participation in this lawsuit. I am afraid I will

be retaliated against and harassed by members of the public on social media given recent reports about people harassing noncitizens online.

21. This declaration was read to me in full in Spanish, the language I understand best, on March 23, 2026 by Magda Aguilar. I completely understand the contents of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Greenport, New York

Executed on 23-3-26
Date

**H.L.A.O.**

CERTIFICATE OF TRANSLATION

I, Magda Aguilar, declare under penalty of perjury:

1. I am competent to interpret between English and Spanish and certify that I have read the attached Declaration of H.L.A.O. into Spanish.
2. The interpretation I provided is true and accurate to the best of my abilities.
3. H.L.A.O. stated that he understood the document's contents.

Dated: March 23, 2026

Magda Aguilar