**Declaration of R.C.R.**

1. My name is **R.C.R.** . I want to continue with my initials R.C.R.
2. I am 55 years old. I am a Latina.
3. I have lived in Buffalo, New York since 2025.
4. I have never had any contact with law enforcement. Prior to this incident, I had never been arrested. My family entered the U.S. with tourist visas and then applied for asylum. We did not have any contact with ICE or CBP before this.
5. I have two children, a nineteen-year-old daughter and a twenty-eight-year-old daughter.
6. When I first got to Buffalo, I worked at a local restaurant as a cook and dishwasher. I have a valid work permit. When I returned from ICE detention, I was told by the restaurant that someone else had taken my job and that they could not re-hire me. I have since worked as a cleaner at a medical clinic.
7. On January 24, 2026, at around 6:00 p.m., my husband picked me up from work and we drove to the Walmart on Walden, where we often shopped, to buy ingredients for soup to prepare for a large winter storm. After we finished shopping, we were speaking in Spanish, discussing our meal plans, as we walked through the parking lot to our car. We were not dressed in work clothing, just our normal jackets.
8. Our car is registered to our eldest daughter and has valid Florida license plates. It is a normal blue Hyundai sedan with four doors. To my knowledge, the car has never received any tickets or been involved in any criminal activity. The car was also properly parked in a handicap spot with our handicap sign clearly displayed. My husband has a medical condition that qualifies him for a handicap plaque.

9. As we approached our car, I saw a red car with its headlights on. The red car was in a parking spot behind our car. The lights illuminated the back of our car.

10. When we got to our car, a man ran out of the red car, towards us. He had his hand on the gun at his waist. He pulled out a badge. He shouted "immigration immigration, let me see your papers" in English. He showed us some sort of badge, but I did not see what it said. I handed him my work permit, Social Security card, and non-driver's REAL ID, and my husband handed him his own work permit, Social Security card, and his driver's license (a REAL ID license from Florida). As soon as we handed over our documents, and without looking at our documents, the officer told my husband and me that we were detained and not to make a scene. The parking lot was crowded and full of people walking to and from their cars. We were the only Latinos that I saw walking around. I saw many white people pass by and the agent ignored them.

    The officer kept one of his hands on his gun in his holster. It was very menacing. I was scared and worried that if we tried to leave, he would shoot us. I had heard about someone who was recently shot and killed by immigration officers in Minnesota.

11. My husband and I stood with the agent in front of our car while the officer held our papers and spoke on a radio device in English. He told my husband and me that we were "illegal." My husband tried to tell him that we had valid employment authorization. My husband asked them to call my daughters. My husband telephoned our younger daughter, who speaks English fluently. The officer spoke with her briefly. It is my understanding that our daughter asked the officer why he had detained us and if he had a warrant for our arrest. The officer told her that he did not need a warrant to arrest us, and that he was

going to create a warrant once he took us to his office. I was crying at this point. The officer did not read us our rights.

12. Approximately three minutes after we were initially stopped, a second officer arrived in a green and white prison-style van. This officer spoke Spanish. The first officer gave him our documents. The second officer told my husband and me to sit in his van. He also had a gun. The Spanish-speaking officer began by asking my husband and me questions about our immigration status and called us "illegals" multiple times. He asked us where we were from, when we came to the United States, and how we got there. He did not ask about our family here, about what work we do, or about any connections we have the community in Buffalo. We answered his questions and explained that we were not unauthorized, and that we were in the process of seeking asylum and had work permits and Social Security cards. The Spanish speaking officer said that our documents weren't valid, and that they didn't give us any valid legal status. He told us that if we did not commit any crimes and we were legal, he would let us go. This agent told us that we had to go to the immigration office with him.

13. The agents never identified themselves or asked us any questions about our life in the U.S. before putting us into the van.

14. After approximately thirty minutes, we were taken to what seemed like a jail in Buffalo. I was kept in that jail for six days. The jail was very cold, and I was not provided adequate food or water. Though I have several chronic conditions, and my children sent in my medical records, I was not given my medication, which I need to take every day. My husband asked the officials to let us stay together, and thankfully they agreed. We were kept in a cell together, without anyone else, until he was transferred.

15. My husband was transferred to Batavia after three days. After he left, I didn't know anybody. I cried every day. After six days, I was transferred to another jail about two hours away, if I am recalling correctly. After about two and a half weeks, I was transferred from there to a facility in Louisiana. I was placed in shackles during the trip. While in Louisiana, I contracted COVID-19, developed an ear infection, a tooth infection, and a gastrointestinal condition, with blood in my stool. I was also not provided a change of clothes or allowed to bathe. I had to sit in soiled underwear for three days.
16. On February 19, 2026, I was released on $25,000 bond and returned from Louisiana to New York. I came back at my own expense, on a plane.
17. To date, the immigration officials have not returned my work permit, my Social Security card, or my REAL ID.
18. Since returning home, I am extremely anxious that I will be targeted by immigration officials again. I am scared to leave the house. I try to only leave the house to go to and from my job, where I work Monday through Friday. We also take our youngest daughter to and from her job, where her days and hours are varied. I also join my husband to visit his elderly mother, who lives a 15-20 minute drive from our home. When we have to go food shopping, we don't shop at the Walmart where we were arrested, but instead shop at a different Walmart that's farther from our home.
19. Since returning home, we have seen other people get arrested. For instance, we saw a Hispanic looking man with a construction vest getting arrested in a McDonald's parking lot.

20. While I am grateful to be back with my family, I cannot simply forget my time in detention. When I remember, I find myself crying. I cry every day remembering what I was put through and what it felt like to be separated from my family and imprisoned.
21. My husband has an ankle monitor and has check-ins with ISAP. The ankle monitor makes me very nervous because ICE knows wherever my husband is. I work and live with my husband, so that means ICE knows where I am too. When my husband has to visit the ISAP office I worry that ICE will take him again.
22. I understand that in filing this lawsuit, I am seeking to be a class representative for other people who are or will be in a similar situation to me. If this case is certified as a class action, I am willing and able to represent the class and its interests, with the help of my lawyers.
23. I would like to use the initials R.C.R. as my name throughout this lawsuit. I am working to seek immigration relief. I am afraid of retaliation towards me if my identity were to become public due to my participation in this lawsuit. I am afraid I will be retaliated against and harassed by members of the public on social media given recent reports about people harassing noncitizens online.
24. This declaration was read to me in full in Spanish, the language I understand best on April 3, 2026, by Hasan Shafiqullah. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Buffalo, New York

Executed on 04/03/26
Date

**R.C.R.**