I, Jessica Maxwell, pursuant to 28 U.S.C.§ 1746, declare as follows:

1.  I am the Executive Director of the Workers Center of Central New York (WCCNY). I have worked at the WCCNY since April 2020.

2.  As part of the leadership of the WCCNY, I am responsible for shaping organizational priorities, supervising staff and projects, fundraising and compliance.

3.  I have personal knowledge of the facts contained in this declaration, including the organization's mission, core activities, programmatic work, staffing, and membership

**The Workers Center of Central New York's Structure, Mission, and Activities**

4.  The WCCNY is a New York-based 501(c)(3) nonprofit corporation founded in 2013. WCCNY focuses on workplace and economic justice. Our mission is to empower and support low-wage workers from all backgrounds to combat workplace abuses and to fight for improved wages and working conditions through policy advocacy, leadership development, organizing, and popular education. We maintain an office in Syracuse, NY and provide services throughout the five Central NY counties, as well as Jefferson and Lewis Counties in northern New York. We occasionally provide support services and referrals for workers in the Mohawk Valley, Fingerlakes, and Western NY regions.

5.  WCCNY's core activities involve assisting workers with information and training on health and safety in the workplace, immigrant worker rights, and basic worker rights information such as minimum wage, discrimination, family leave and employer provided housing, among other topics. In addition to providing education, our core work also involves assisting workers in filing complaints, such as OSHA complaints, or wage theft complaints to the NYS Department of Labor; and we provide interpretation and assist in direct mediation with employers. We also provide referrals to legal, medical, housing, counseling, and other services critical to achieving dignity and quality of life, and we support workers in providing testimony at public hearings or sharing their experiences publicly to create public awareness of the issues facing immigrant and low-wage workers.

6.  WCCNY has roots in the immigrants' rights movement, and most of our members, their family members, and the other individuals we support, such as through our intake hotline, are immigrants. As such, we routinely provide services and resources specific to the needs of the immigrant community, such as know your rights sessions for immigrants, a monthly presentation from an immigration lawyer on timely topics of interest, and operating the Syracuse Immigrant and Refugee Defense Network, which advocates for immigration justice in Central New York through organizing, advocacy, and the operation of an immigration emergency hotline.

7.  The WCCNY is a membership-based organization that services 750–1,000 workers annually, the majority of whom reside in central New York or the North Country.

1

8. Workers join the WCCNY by meeting with a staff or member leader of the organization, or attending an orientation or another outreach or educational event and then completing and signing a membership application where they agree to support the organization's mission and to participate actively in organizational activities such as worker meetings, trainings and campaigns. Members remain as members as long as they do not move out of the general region that we serve or request to terminate their membership.

9. We maintain a database of members. Because of concerns for our members' privacy and because trust and credibility with the community we serve is crucial to the work we do, we do not share membership information with third parties, including government agencies, without member consent.

10. While our general support and educational services are available to any low-income worker in our region through our phone number, web inquiry form, or by coming to our physical office, many training opportunities and more intensive support, such as home visits, are only available to members. Members also receive priority for emergency housing WCCNY provides at the Friends of Farmworker house in Syracuse, which provides temporary free or low-cost housing to workers who have been displaced due to a workplace injury or retaliation.

11. Members are eligible to apply to become part of the WCCNY's board of directors, which is composed of at least 50% worker leaders who are members of the organization. Members may also represent WCCNY in coalitions, campaigns or leadership programs.

12. The WCCNY's membership is comprised of primarily low-income, Spanish speaking immigrant workers. A significant portion of our members work in the agricultural sector in very isolated rural communities and often receive housing through their employer. Many of these workers face significant language, cultural, technological, and transportation barriers to receiving information and services.

13. Many WCCNY members seek referrals for legal services related to their immigration cases. We regularly refer members to immigration legal services providers. Many WCCNY members have pending immigration relief applications, such as asylum, U or T visas, Special Immigrant Juvenile Status (SIJS), and family petitions, among others.

14. Many of our members are in removal proceedings or have pending cases for some form of immigration relief. Over the past year, through our staff, members, volunteers and colleagues, we have observed significant local impacts from the government's policy of engaging in suspicionless stops and warrantless arrests of immigrants in our community. This practice has placed many of our members at risk of being detained and arrested while simply going about their daily routine, even when there has been no material change in their status, they pose no danger to the community, and they are not a flight risk.

15. Our WCCNY members face devastating consequences if detained and/or deported, including family separation, loss of jobs, apartments, vehicles, and other belongings, and in many cases face persecution, physical and psychological harm, and even threat of death upon return to their home countries. Many WCCNY members fled their home countries due to persecution, violence, abuse, and armed conflicts and would be exposed to these same threats if they are returned.

**WCCNY's Core Activities**

16. WCCNY's core business activities involve providing direct services, advocacy, and accompaniment to low-wage immigrant workers who are vulnerable to abuse and exploitation at work. Low-wage immigrant workers are often subject to unsafe working conditions and violations of the labor laws. WCCNY's direct services include interpretation/translation, accompaniment to file complaints related to workplace labor standards, transportation support for medical and immigration appointments, assistance obtaining drivers licenses, assistance with workers compensation paperwork, and assistance in calling other service providers for workers who rely on apps such as WhatsApp and are unable to make a regular phone call. WCCNY core activities also involve outreach and education to workers, advocacy and accompaniment on Workers Compensation claims, Wage Theft Claims, unlawful eviction from employer housing or unsafe housing conditions, and referrals to medical and legal services, including immigration legal services.

17. WCCNY holds regular membership meetings to share timely information, provide resources, and build a sense of community among workers who often work long schedules in isolated conditions. These in-person meetings are critical for building trust and sharing information effectively with our members who often have limited technological and literacy skills.

18. As a routine part of our outreach, education and service provision, we screen workers for eligibility for immigration relief, provide Know Your Rights information, and make referrals to immigration legal service providers. As a result of the government's new enforcement tactics, many of the workers we serve are at risk of being arrested and detained as they go about their daily routine or attend mandatory immigration check-ins or court dates. Prior to these new policies, members would typically attend check-ins or court dates without any fear of being arrested. We advised them of the importance of attending all required appointments, and that advice was generally followed. We often accompanied workers to appointments to assist with interpretation. ICE no longer allows us to accompany clients into the building for appointments at the local ICE field office, but we continue providing rides and assisting clients in preparing for their appointments.

19. We also routinely assist workers who have been victims of violations of U.S. labor law, housing law, and anti-discrimination laws. We advise workers as to their rights and opportunities to seek redress and assist workers in filing complaints, such as OSHA health & safety complaints, Department of Labor wage and hour complaints, opening Workers Compensation cases, as well as anti-discrimination and anti-retaliation cases with state and federal agencies. Unfortunately, due to the

current climate of fear, many immigrant workers are now reluctant to denounce such violations for fear that they could be targeted by ICE if they draw attention to themselves in any way.

**The Government's Warrantless Arrests and Suspicionless Stops Policies Have Injured WCCNY**

20. The government's policies and practices of warrantless arrests, profiling, and suspicionless stops have impeded WCCNY's ability to carry out its core business activities in multiple ways. The policies have created a climate of fear, such that many members are afraid to come to our office to receive services or to drive themselves to appointments, because they have heard of multiple cases of other members being stopped and arrested while driving around Syracuse. The policy has also led to a significant volume of requests for emergency assistance and referrals related to immigration stops and detention. Fielding and responding to these requests have made it impossible for WCCNY to continue providing its robust educational programming, assisting in filing worker complaints, and engaging in long-term stabilizing strategies and services to the same extent and degree of efficacy as we did prior to the government's policies. Instead of maintaining our robust focus on these core activities, WCCNY has had to instead meet its members' immediate, detention-related needs through rapid, emergency response to clear the path for them to obtain the other services for which they may be eligible.

21. As one specific example as to how this policy has affected our ability to carry out our mission, we have had to cancel events that we planned to hold at our office. We had promoted a Know Your Rights training for weeks that was supposed to be held on January 28, 2025, at our office, but we had to cancel after a member's neighbor was detained just 3 1/2 miles away from our office as he was leaving his house to take his son to school the previous day, January 27. Word quickly spread among members, creating a sense of fear of driving in Syracuse among the Latino immigrant community.

22. We have since had to move all of our monthly membership meetings to virtual, which has reduced attendance, reduced the information and supportive materials we are able to provide, and has greatly diminished the quality of WCCNY's trainings. Many of our members have limited technology skills. The vast majority are joining calls on cell phones and unable to see or connect with other members due to the small size of their screens. Additionally, switching from in person to virtual meetings means we are unable to hand out materials, forms or information to workers, and so we have to mail information to workers.

23. Another effect of the government's policies has been that workers are afraid to come to our office to receive services. On March 13, 2026, a long-time member leader of WCCNY, Jane Doe 1, who is from Guatemala and has a pending asylum case, a valid work permit, and both a driver's license and a vehicle, requested our assistance in filling out a passport application for her 18-month-old U.S. citizen son. When we asked if we could schedule her to come to our office, about 20 minutes from where she lives, she said that she was no longer comfortable coming to Syracuse due to all of the Latinos being stopped and detained here. Our staff had to coordinate by phone to assist her and then mail paperwork to her to complete, adding time, effort and cost to the process.

4

24. Additionally, in October of 2025, we hosted a visit from the Mexican consulate to provide mobile consular services during a three-day event from October 22–24 at a church in Syracuse. Several families who had scheduled appointments for consular services, such as registering children for dual nationality and renewing passports, were no-shows for their appointments. One such no-show was a member of our organization. When we reached out to the member to see why she hadn't come for her appointment, she shared that she was too afraid to travel into Syracuse because she had heard ICE and CBP were stopping immigrants along route 81 just north of Syracuse.

**WCCNY's Members are Subject to and Harmed by the Government's Suspicionless Stops and Warrantless Arrests Policies**

25. On May 22, 2025, one of our WCCNY members, Jane Doe 2, left her house in Watertown, New York to make a quick trip to the pharmacy to pick up medication for her sick child. Jane Doe 2 is Latina. She has never been arrested or charged with a crime. She was driving her car, with a valid New York State license plate, and obeying all traffic laws when she was suddenly stopped by CBP. She was not given a reason for the stop. She called our staff when her car was surrounded by CBP and ICE agents attempting to arrest her despite openly acknowledging that they had no warrant for her arrest, and the only information they acknowledged having about her was her name. They did not appear to be familiar with any details of her immigration status. Two of our staff, myself included, remained on speaker phone with her for approximately 90 minutes while she was detained on the side of the road. When Jane Doe 2 asked the agent for a warrant, he responded that they were not going to "get a piece of paper" to make an arrest. We tried to help advocate for her, including informing the agents that she has been in the US for 30 years, since the age of 13; that she has lived for more than a decade in Watertown; that she was not immediately deportable and would agree to attend any appointments or appearances that she was given; and that she has 4 U.S. citizen children, including a then-six-month-old baby whom Jane Doe 2 was still nursing. She also pleaded with the officers and gave them the same information. We made it very clear that she was not an escape risk, but the officers ignored this information and did not ask her or us anything about her life in the United States or her family. Instead, they threatened to shatter her window, scaring her into exiting her car, and then detained her.

26. The agents took Jane Doe 2 to a CBP facility. One the first day, agents had to take her to the local hospital due to pain from engorgement from not being able to nurse and because CBP had no accommodations for her to be able to pump. She pleaded with the officers to release her, and one responded, "I don't give a fuck if you have a baby." While Jane Doe 2 was detained, we were in close contact with her husband, who is also a member of our organization. He reported that the baby was inconsolable at night, as she had never slept without her mother. We coordinated with another nursing mother in the community to donate breast milk to help console and support the well-being of her baby while she was detained. After 3 days, they agreed to release her on the condition she check in with ICE weekly. She has received no assurance she will not be re-detained and rarely goes outside out of

5

fear she will be re-detained. Her older children remain terrified that one of their parents may go outside and never return.

27. On March 10, 2025, in Hannibal, NY, a WCCNY member, John Doe 1, received a call from his uncle, who said he had been pulled over while driving John Doe 1's car. John Doe 1 and his uncle are Latino. John Doe 1's uncle does not speak English, so John Doe 1, who is bilingual and a lawful permanent resident, went to the scene. When John Doe 1 arrived, there was only a local police car. However, shortly after John Doe 1 arrived to the scene, he saw two vehicles with flashing lights pull over behind the police car. One of the vehicles had two CBP agents in it, and the other vehicle had one CBP agent. Two CBP agents in green uniforms approached the truck that John Doe 1's uncle was driving. One of the agents went to the driver's side and began questioning his uncle. That agent then told the other agent to grab John Doe 1 and take him behind the vehicle. The agent pushed John Doe 1 up against the vehicle. The agent at the driver's side continued questioning the uncle, eventually arresting him. The other agent, who had detained John Doe 1 at the back of the vehicle, then began to search the truck. John Doe 1 stated that he was the owner of the vehicle and did not consent for it to be searched. The agent stopped the search and then began to question him, asking him where he was from, where he lived, where he worked. He stated that he did not want to answer any questions. A few minutes later the other CBP agent returned and asked him for ID. John Doe questioned why he was being asked for ID and what he had done to be treated this way. The agent again insisted on seeing an ID. John Doe 1 showed his driver's license. The agent looked at the license and then asked if John Doe 1 had anything proving that he was legally present in the US. John Doe 1 asked why the agent was requesting proof of his immigration status and whether it was due to the color of his skin. The agent continued to insist he provide documents, so John Doe 1 showed a picture of his green card that he had on his phone. John Doe 1 believes the agent took a photo of his green card; the agent told John Doe 1 to wait and went back to his CBP vehicle. When he returned to where John Doe 1 was standing, he told him he was free to go.

28. John Doe 1's mother is a long-time member of WCCNY. She has won her asylum case and is in the process of applying for lawful permanent residency. The experience of her son has left her very scared, and we have had to arrange volunteer drivers for her to attend recent medical appointments related to her green card application. John Doe 1's father is also Latino and has since moved out of the house to stay with family who live closer to his place of work due to fear of being stopped and detained when on the road between home and work. This has been hard on his four-year-old U.S. citizen son.

29. On February 10, 2026, in Syracuse, NY, ICE agents detained one of our long-time WCCNY member leaders, John Doe 4, while he was driving to work. John Doe 4 is a Latino man who has lived in the United States for approximately twenty years and has a pending asylum case. He lives in Syracuse, New York with his wife and their three children; the eldest is a lawful permanent resident, and the youngest two are U.S. citizens. His parents also live in Syracuse, in the same apartment complex.

6

John Doe 4 owns his own contracting business and has numerous ties to the local community through work, church, family, and community organizations. He is a board member of our organization, and he has no criminal record of any kind.

30. On the morning of February 10, 2026, John Doe 4 left his house around 7:30AM in his car, which has New York State license plates and is registered under his name. When he was just a few blocks away from his home, three vehicles cut him off and surrounded him. Armed agents stepped out of the vehicles wearing vests that said "ICE." One of the ICE agents came to the door of his vehicle and told him to shut off the vehicle, roll down the window and hand over his keys. ICE agents requested John Doe's identification. He produced his work permit and his valid driver's license. The agents told him that this identification was insufficient and ordered John Doe 4 to step out of his vehicle. He complied. As soon as he stepped out of his vehicle, ICE agents arrested him. ICE agents did not inform John Doe 4 why they decided to stop him. The agents did not ask him any questions when they detained him and they never produced a warrant. ICE agents placed John Doe 4 in handcuffs and searched his car. The agents then took him to an ICE station in the Syracuse, New York area. They asked John Doe 4 to sign deportation documents, and he declined. ICE agents then transferred him to the ICE immigration detention center in Batavia, New York, where he was held for twenty days before his release. At Batavia, John Doe 4 spent days sleeping on the floor, packed in small spaces with up to eighty men who had to share a single bathroom. John Doe 4 was released with an ankle monitor and a requirement to check-in with ICE every month. John Doe 4 was significantly affected by his time in detention. He has returned to his community and family, but fears every time he drives his car to work, to the store, or to his house that he will suddenly be stopped and re-detained.

31. On February 4, 2025, Customs and Border Patrol agents detained WCCNY member Luis Enrique Gomez Garcia while on his way to work in Carthage, NY. Mr. Gomez Garcia is Latino and is an asylum seeker with a valid work permit. He has lived in Carthage, New York for nine years, and until last year, resided with his wife and two daughters, one of whom is a U.S. citizen. His wife was deported last year, and since then, Mr. Gomez Garcia has been raising his daughters alone. CBP arrested Mr. Gomez Garcia's wife on January 24, 2025, after she hit a deer while driving in upstate New York and went to a neighbor's house to ask for help. The neighbor called the police and the police called CBP. Mr. Gomez Garcia was on the phone with his wife when CBP arrived at the scene. Mr. Gomez Garcia overheard a CBP agent aggressively telling his wife that she had no papers. Mr. Gomez Garcia believes he heard the agent then arrest her. He did not hear the CBP agent mention a warrant, and he did not hear the CBP agent ask any questions about his wife's community or family ties before the call dropped. When Mr. Gomez Garcia was able to speak to his wife while she was in immigration detention, she confirmed that the CBP agent never presented a warrant and never questioned her about her family or community ties before placing her under arrest. Mr. Gomez Garcia's wife accepted a voluntary departure after spending six months in detention in July 2025.

7

32.  On the morning of February 4, Mr. Gomez Garcia dropped his daughters off at their elementary school and then drove to his workplace. He was driving a car with New York State license plates and that is registered under his name. Once he parked in the parking lot, approximately six vehicles entered the lot and surrounded him. He recognized some vehicles as CBP vans, while others were unmarked. Numerous agents stepped out of the vehicles—some in green uniforms and others in vests and plainclothes. The agents were carrying weapons, and some stepped out of their vans with dogs. Mr. Gomez Garica did not fear that the agents were there to detain him because he had a pending asylum application and valid work permit and felt he was doing everything correctly. One of the agents asked if his name was Luis, and he said yes. The agents asked for his identification.  Mr. Gomez Garcia provided them with his work permit and valid driver's license. Without further questioning, including without any questioning as to his flight risk, the agents then told Mr. Gomez Garcia that he was under arrest. He asked why, and they told him that he had missed a court date. Mr. Gomez Garcia was surprised because he had never missed an immigration court date. He showed the agents his court date schedule on an app on his phone, which reflected no missed or scheduled court dates. He was also surprised because six months prior, he had renewed his work permit without any issue. Mr. Gomez Garcia then asked if the agents had a warrant. They told him that they did not need one, and that his work permit does not reflect lawful status. Mr. Gomez Garcia repeated his request to see a warrant, and the agents again told him that they did not need one. During this exchange, Mr. Gomez Garcia's bosses came outside and asked the agents if there was anything they could do to stop Mr. Gomez Garcia from being taken away. They also asked the agents if they had a warrant. The agents said there was nothing that the men could do to help Mr. Gomez Garcia, that Mr. Gomez Garcia would be deported, and that they did not need a warrant. The agents then drove Mr. Gomez Garcia to the parking lot of a police station in Carthage. While he was sitting in the car, he overheard the agents on the phone with a caller who said that the agents "had no motive to detain" him. The agents responded, "fuck no, I don't care," and said, "we're not going through all of this trouble for nothing." Mr. Gomez Garcia told the agents that he was concerned about his daughters because they depend on him. The agents then transported him to the elementary school that his children attended and had him sign them out of school. The agents then detained Mr. Gomez Garcia's two daughters, despite the fact the oldest, just 9 at the time, had already filed an asylum application and his youngest daughter, a U.S. citizen, was just 5 years old. The agents then took Mr. Gomez Garcia and his daughters to an immigration office where agents questioned him about his job site, his coworkers, whether his coworkers had legal status, and how many people he works with. Mr. Gomez Garia told them that he has a valid work permit and imagines that his colleagues do, too. While the agents were asking him questions about the people he works with, an agent told him not to worry and that he "will return back to work." Despite this suggestion that the agents would soon release Mr. Gomez Garcia, the agents transported him and his daughters to an ICE detention facility in Batavia, NY, where they were detained overnight. Mr. Gomez Garcia and his daughters were released from Batavia the next day. Mr. Gomez Garcia was given an ankle monitor upon his release. One of the ICE agents told him, "I don't understand why you are here." They also told him that after a week, they could remove his

8

ankle monitor in exchange for Mr. Gomez Garcia having weekly mobile ICE check-ins through an app on his phone. He was given a follow up appointment on February 16, 2025, at the Mattydale ICE field office. I accompanied him to the appointment to interpret and his ankle monitor was removed. He was never given any explanation for his detention, other than being told that he had missed a court date, which turned out to be untrue. Since his release, he has completed his mobile ICE check-ins every week. Mr. Gomez Garcia used to live without fear because he was following the rules and had a valid work permit. But now, knowing that CBP and ICE are violating the law, he lives in fear. He knows that even if he abides by all the rules, he is at risk of being arrested again. Because he is playing the role of both father and mother to his young daughters, he is anxious about being detained, and how that would impact his daughters. Mr. Gomez Garcia also struggled mentally with the experience of being detained—just last week, the doctor told him that he had developed psoriasis due to all of the stress that the experience has left him with. The detention has also caused his children to be traumatized and afraid.

**Many WCCNY members have family members, co-workers, and loved ones who have been impacted by the Government's Warrantless Arrests and Suspicionless stops policy**

33. On May 1, 2025, in Lowville, NY, the daughter of a long-time WCCNY member leader, Jane Doe 3, was stopped on her way home from work by CBP agents. She is Latina. The young woman asked if they had a warrant and the CBP agent told her he did not need a warrant because he had a reasonable suspicion of an immigration violation. The women asked what the basis for the suspicion was and the agent did not provide any further information. She was detained on the side of the road for 2 1/2 hours. Agents called in a supervisor and the local Sheriff. They pressured the women to get out of the car and give her ID and she declined. When the Sheriff asked for her ID, she asked if he wanted it or if he was asking on behalf of CBP. The Sheriff made clear that he was not requesting the identification for his own law enforcement purposes, only on behalf of CBP. She declined to give her ID, and the Sheriff left the scene. CBP agents eventually allowed her to leave the scene. Jane Doe 3's mother is a long-time WCCNY member who often helps other members of the immigrant community navigate services. She had hoped to start her own consulting business and already had a business plan that she put together. But due to the government's suspicionless stops and warrantless arrest policies, she has become too afraid to drive and so has put her business plans on hold.

34. On August 12, 2025, in Adams, NY, one of our members reached out asking for help. She is Latina and has a car and a driver's license. Her sister, who lives close by to her, was having intense stomach pains and felt she needed to go to the hospital. The closest hospital was about 20 minutes away in Watertown, and they were terrified of driving there for fear of being stopped and detained pursuant to the government's warrantless arrest, profiling, and suspicionless stops policies. Neither woman has any criminal record. It took us approximately 30 minutes to find a volunteer who could drive to them and accompany them to the hospital, delaying the much-needed care she received there. It's not clear what would have happened if we had not been able to quickly secure a volunteer driver.

35. On January 4, 2026, in Syracuse, NY, I received a call from one of our members, John Doe 3, in distress because his brother-in-law was profiled and stopped by ICE just outside Zaman's coffee shop on Brewerton Road in North Syracuse. The brother-in-law had traveled legally to the US from his home country of Ecuador on a tourist visa and was in the process of seeking a lawyer to assist in filing an asylum application. He has no criminal record. As a result of his detention, he gave up hope of filing for asylum and chose a voluntary departure. John Doe 3 is now fearful of leaving his apartment and is limiting his travels to going to work. He is afraid to give anyone his address.

36. In September of 2025, we began more widely publicizing our emergency hotline for immigrants needing accompaniment to immigration appointments, detention support for loved ones who were suddenly detained, and assistance with know your rights support in encounters with CBP or ICE. Since then, our hotline has been receiving upwards of 55 calls per month. In the past 3 months, at least 33 of those calls were from panicked community members reporting that their neighbor, family member or friend had just been suddenly abducted by federal agents. When a call comes through, a trained operator does a streamlined intake to get basic information about the situation and the support being requested. Depending on the nature of the call, legal referrals may be provided, the case may be forwarded to our detention support team for assistance in locating the abducted person and assisting the family in navigating commissary and detention center phone systems. We also assist with locating and picking up vehicles, provide basic guidance on first and fourth amendment rights and the right to record federal immigration enforcement agents, and may send trained volunteer observers to verify or document incidents that are reported in real time.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on April 10, 2026.

Jessica Maxwell

10