I, Ronald Martinez Enamorado, declare under penalty of perjury the following:

1. My name is Ronald Martinez Enamorado. I am currently 27 years old and I have lived in New York for more than 10 years ago.
2. I rent my home in Brentwood, where I live with my wife, who is a United States citizen. We married in June 2025 and we have lived together at this residence for a year. I am the primary financial provider for our household, contributing to all major expenses, including rent, transportation, and my wife's tuition as she is still pursuing her education. I maintain a close relationship with my wife's family, as well. My mother-in-law, who is also a United States citizen, regards me as a member of her family. I assist her with household responsibilities, including home maintenance and repairs.
3. Since 2018, I have been employed in wood flooring installation and repair. Through this work, I have gained a lot of professional experience and have provided services to numerous homes throughout Long Island. My employment has enabled me to support my family financially.
4. On February 11, 2026 at around 6:15 AM, I had finished picking up my coworker from his home in Central Islip so we could carpool together to work. I was driving our company's van. The vehicle had current license plates and registration. I was obeying all traffic laws.
5. As I was driving on Poplar Street in Central Islip, an unmarked black Chevrolet stopped in front of me and it turned on flashing lights and signaled for me to pull over, which I did. Two more unmarked vehicles subsequently stopped behind me.

6. Approximately 4 masked agents surrounded our vehicle on the driver and passenger side. I saw one agent had a vest that said “HSI” in all caps.
7. The agents ordered us to lower our windows. I lowered my window enough to communicate and to hear the agent. At this moment I started recording the interaction. An agent asked me for the keys to the vehicle. When my coworker asked why, the agent told him that they were conducting an investigation with Homeland Security.
8. They went on to ask for IDs. I provided agents with my valid drivers license. I was then asked what country I was from, and I replied Honduras. At that moment, one of the agents went back to their vehicles, I assume to run our identification. Although they had mentioned Homeland Security, throughout the interaction one of the agents kept saying they were “police” and that they were looking for someone.
9. My coworker continued to ask what was the purpose of the stop and questioned the agent if they were really with the police. We were never told why we were stopped or shown a warrant for our detention. The agents also did not identify us as people they were looking for.
10. One agent then asked us what we did for a living, and my coworker replied that we worked in wood flooring installation. We were asked again what country we were from and we both answered truthfully.
11. My coworker asked the agents again why they were being pulled over if they were with the police. At this moment an agent by the driver side of the vehicle said that we both are going to have to come with them because we are in the country without status. The agent acknowledged that my coworker has a pending immigration case but said that they were still going to arrest him.

12. Because we were concerned for our safety and still were not sure who these agents were, my coworker called the police. At this moment, the agent smashed through my driver side window to pull me out of the vehicle, shattering glass everywhere. The agent on the passenger side put his hand inside the car to open the unlock and open the passenger side. At no moment did we resist arrest. We made no attempt to flee and had no intention to do so.
13. We were both put in handcuffs and then placed inside an unmarked vehicle. As we waited inside the vehicles, Suffolk County Police Department vehicles came to the scene as a result of the call my coworker made. I could see the Suffolk County police officer speaking with the agents but I could not hear what they were saying.
14. Our company's van, which had expensive equipment inside of it, was left on the side of the street unlocked, with a broken window, and shards of glass all over the floor.
15. We were driven to the underground parking lot at the Central Islip court building and we were then switched to another vehicle and subsequently driven to the Nassau County jail. I was not told where I was being taken to, and when I asked to make a phone call I was told I would be able to once we arrived.
16. Once we arrived at the jail our handcuffs were removed and we were chained to the bench to wait to be processed. From around 9 AM to 12:30 PM I was processed. I had my biometrics and photo taken. I was asked questions about my parents, if I had a work permit and if my United States citizen wife petitioned for me. I was also asked if I had gang affiliation, and I responded that I do not. When I was allowed to use the restroom, I had to do so with the door open because an official said they had to make sure I didn't try to escape.

17. I was allowed 5 minutes to make a phone call. I called my mother-in-law.
18. I had a difficult time at the Nassau County jail. I had never been in jail before in the United States or in my home country. The treatment from the jail officials made me feel as if I was a criminal. Jail officials would pass through tapping the jail cells to make it harder for people to sleep. The lights are also kept on throughout the entire night. The drinking water is connected to the toilet. The only food we receive is water, milk, and bread with ham.
19. While at the jail, I met a man from Colombia who lived in Nassau County. He said that after dropping his children at school and buying groceries, ICE agents approached and detained him as he loaded the groceries into his car. He stated that he told the agents he had an open immigration case and offered to show them his paperwork from his vehicle, but they refused to review it.
20. On February 12 around 1 PM we were told we would be transferred to another facility. I was told I could make a phone call so I could inform my family, but I was never actually given the chance to do so because I had to spend the time filling out paperwork before being transferred.
21. We were not told where we were being transferred. The driver told us not to ask any questions. The windows of the vehicle were dark so I was not able to figure out where I was.
22. Approximately thirteen of us were transported to Delaney Hall in New Jersey. Upon arrival, we were held in a lobby area, provided with clothing to change into, and photographed as part of the intake process. We were also medically examined. This entire process took place from around 9 PM to 2 AM. We had not been given any food prior to

our arrival and were extremely hungry. We requested food from officials in the facility, but the amount provided was not enough for everyone, and we had to share it among ourselves.

23. On February 13, a detention official approached me. The only thing he told me was to grab my belongings and to follow him. Although he didn't tell me I was going to be released, I had an idea this was happening because of the conversations I have had with my mother-in-law who told me that she was seeking legal assistance for me to be released. I was released that night around 9:30 PM and I did not arrive home until midnight.

24. Even now, over a month later, I still fear I can be detained. I feel that people like me who Latino/Hispanic are being stopped without reason and ICE agents do not give people the opportunity to explain anything about their lives or situation and to protect themselves. I had never been arrested before and never committed any crimes. I was never shown a warrant when I was arrested.

25. My arrest and time in detention left me afraid to leave behind my wife and my family. I suffered while I was in detention knowing that I could not support my family who depend on me financially. I also feared I wouldn't be able to reach goals I set for myself. Every day I was in detention was a day I could've spent with my wife and family. It was also time I lost from work. My work during this season is less, so each day of work loss greatly affects my income.

26. This experience has also been difficult for my family. My mother has heart issues, she spent the entire time crying because I was detained. My mother-in-law was also deeply affected. I am like a son to her. The moment she learned I was detained she went looking

for help for me. I know this same experience or similar ones is also happening to a lot of other Latino people on Long Island and causing fear and trauma.

DATED: March 26, 2026 Brentwood, NY

Ronald Y. M. E

Ronald Martinez Enamorado

**ATTESTATION AND CERTIFICATE OF TRANSLATION**

I, Rodman Serrano, certify that I am fluent in both English and Spanish. On March 26, 2026, I personally spoke with Ronald Martinez Enamorado and read the foregoing declaration to him, translated into Spanish faithfully and accurately. Ronald Martinez Enamorado affirmed that he understood my translation and that the information in the above declaration is true and accurate.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Name: Rodman Serrano