I, Santos Gonzalez Argueta, declare under penalty of perjury the following:

1. My name is Santos Gonzalez Argueta. I am 33 years old and I live in Roosevelt, New York in Nassau County.
2. I have lived at the same address for almost ten years. My partner and I have a daughter who is four and half years old and was born here on Long Island. I also have two older stepchildren, one is 9 and the other about to turn 16, who are also U.S. citizens. I work in roofing and siding and I have worked for the same boss on Long Island for several years now. I got a tax ID number in 2015 and I have paid income taxes since that time.
3. I am an evangelical Christian and my family and I go to church in Huntington. We go to services there on Sundays and other classes and events on other days.
4. On Tuesday, January 20, I left home around 7:30 a.m. to go to work. I was riding to work with a coworker who lives about five minutes from me and he always comes by at the same time. I got into the van and we went to pick up a couple of other coworkers. We drove about ten minutes, from Roosevelt into Freeport, and picked up two more people. We waited outside for him about five minutes until he came out and got in.
5. As soon as my coworker got in, immigration agents stopped us. It was just one vehicle at first with two agents in it but within two minutes there were at least six cars that arrived and surrounded our van. There were around eight or ten agents in total. Based on what happened to us and what I have seen and heard from other people in the area where I live I think that DHS station themselves in certain places and watch people, especially early in the morning when people are leaving their homes to go to work. I think they see a work van like we were driving and know there are lots of people inside who are Hispanic and working people, so they stopped us.

6. I was seated in the passenger seat. The agents approached both the driver and passenger side windows. The officer nearest me banged very hard on my window and I lowered it. He demanded that I give him an ID. I remember he also told me not to touch my phone. I don't have a driver's license so I showed him a national ID card from El Salvador. Then he told me to get out and put my arms behind me. That was it—he did not ask me any other questions. He handcuffed me and put me in a car. He did not say anything else or ask me a single other question.
7. I saw the same thing happen to my colleagues. Three out of the four of us in the van were detained. The agents did not ask my colleagues any other questions either—as soon as they showed their IDs, they were told to get out and handcuffed. We all complied, no one resisted.
8. It all happened very fast—within 5 minutes we were all handcuffed and detained. The agents drove us to a parking lot in Freeport; we were in a line of maybe four cars, with each of us detained in a different one. I remember in the car the agent asked me three questions: first what country was I from and what did I think of my president. I told him I could not say, I have been in the U.S. a long time so I am not familiar with the situation there. He also asked me if I had children. I told him yes, I have two stepchildren and a daughter. He did not take notes that I saw, I think he was just making conversation.
9. At the parking lot, they moved our handcuffs from behind to the front and then they drove us to the ICE office at the Nassau County Jail.
10. We sat in that small office from 8 a.m. until 5 p.m. There were three of us who arrived together and then 2 more came shortly after, then over the course of the day around 10 more people arrived, all just detained.

11. One person who came later was very elderly; he said he had been detained on his way to a doctor appointment. The agents made him remove the shoelaces from his shoes and a drawstring from his jacket—it was very cold that day, 5 degrees, so we all had jackets on and we had to remove any strings or laces from our clothing. Ten minutes after the old man had done that I heard the agents say that he was a resident. The man laughed and asked them "why did you make me take my shoelaces out before you checked my ID?"
12. After that the agents said they would have to take him back to where he was detained. He was with us in total for about half an hour before they left with him.
13. Among those of us waiting, we all talked and became friends there in the office and afterwards when they put us in cells. Some people were very upset and we tried to support each other. A Honduran man had gone to get fingerprinted at an appointment because he was married to a U.S. citizen, and he was detained as he left. Almost everyone else there that first day had been detained driving. Two people lived in the Bronx but were stopped driving on the 495.
14. The next day I met two people detained walking in Bay Shore. I met another person who said he was buying things in Home Depot in Bay Shore and ICE detained him outside.
15. It was in that office ICE first took our details and gave us a paper about whether we wanted to take voluntary departure and leave this country. They told us that they would give us $1500 if we agreed and told us that if we did that we would only have to stay in our home countries for a short period then we could come back to the U.S. with a visa. I recall they said we can apply for a visa to come back in just six months. One of my coworkers was so desperate that he signed that document. Both of the coworkers I got

detained with have now been deported—but it was not fast. One of them waited over a month in detention.

16. I was detained for seven days in total, from Tuesday until Monday. I stayed for 3 days in Nassau; the third day, I was taken out of the cell with a group of around 12 people around 9 a.m. But the van did not come to get us until 5 p.m. The van stopped at the airport to get two more people and then we went to Delaney Hall in New Jersey. The processing at Delaney was very slow. We got there at 7:30 at night and I did not get into a bed until 4 a.m. and then they got us up to eat breakfast at 5:30 a.m.

17. That afternoon an officer came to get me and said I was being transferred back to Manhattan, to 26 Federal Plaza. He did not know why and I did not know why either at the time but the next day, when I was finally able to speak with a lawyer my family had gotten for me, she explained that she had filed a habeas petition and I was not supposed to leave New York. ICE had taken me to New Jersey anyway but then they had to bring me back again.

18. Then on Monday, six days after I was detained, I was released through the habeas petition. I was able to go home and pick up my daughter and hug my family.

19. My experience was very traumatizing for me and for my family. After I was released, I spent two weeks unable to even go outside. I had tremors and I even threw up a few times. I was not able to go to work. What I had been through was very upsetting.

20. My partner had a lot of nightmares. My daughter, who is 4 years old, also had a lot of trouble sleeping. She would ask me, "when were they coming back for you? When would they take you again?" She has fears that a four-year-old should not have.

21. I have improved now and I am working again but when I think of attending court, or a checkin, my nerves return.

22. I am not alone in what I experienced. In the area where I live, particularly the towns of Freeport, Hempstead, Roosevelt and even Huntington, people are scared to even leave their house. At the Home Depot in Hempstead, people are detained almost every day. The same is true at the 7/11 where people stop to get coffee in the morning.

23. I think ICE knows that as immigrants, we are working. We are out in the morning on our way to work so we are vulnerable, they can stop and arrest us very quickly. From what I have heard and seen, I think they target working people—like my coworkers and I in a work van or gardeners who are out in gardening trucks. A few months ago I heard about six men from the same company all detained while they were working.

24. It is very frightening.

DATED: March 20, 2026

Santos Gonzalez Argueta

## ATTESTATION AND CERTIFICATE OF TRANSLATION

I, Rodman Serrano, certify that I am fluent in both English and Spanish. On March 20, 2026, I personally spoke with Santos Gonzalez Argueta and read the foregoing declaration to him, translated into Spanish faithfully and accurately. Santos Gonzalez Argueta affirmed that he understood my translation and that the information in the above declaration is true and accurate.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Rodman Serrano