**DECLARATION OF ALEXANDRA LAMPERT, ESQ.**

I, Alexandra Lampert, hereby swear under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

1. I am an Associate Director of the New York Immigrant Family Unity Project ("NYIFUP") at Brooklyn Defender Services ("BDS"), in Brooklyn, New York, where I have been employed since April 2017.

2. BDS is a full-service public defender organization whose mission is to provide outstanding representation and advocacy free of cost to people facing loss of freedom, family separation, and other serious legal harms by the government. For more than 25 years, BDS has worked, in and out of court, to protect and uphold the rights of people and to change laws and systems that perpetuate injustice and inequality.

3. NYIFUP is New York's city-funded assigned counsel program for indigent and low-income detained immigrants. In my role as an Associate Director of NYIFUP, I lead a team of immigration attorneys who are litigating removal cases in immigration court, at both the trial and appellate branches of the agency, and in petitions for review in federal courts. I also oversee our unit's federal court practice litigating petitions seeking writs of habeas corpus on behalf of clients who are in immigration detention or facing serious other restraints on their liberty.

4. I write this declaration to describe a pattern of suspicionless stops and warrantless arrests by U.S. Immigration and Customs Enforcement ("ICE") and other federal officials that has come to the attention of our office. This declaration is based primarily on my knowledge and review of federal court filings in connection with petitions seeking writs of habeas corpus, as well as communications with staff members at BDS and a review of case files.

5. The pattern of arrests that we have seen consists of the following: Individuals who are of Latino descent and appearance are stopped while walking on the street or driving in their cars by one or multiple federal officers without explanation. The individuals are stopped even though they are not engaged in any suspicious or criminal activity. The officers often show the individual a photograph of someone they are allegedly looking for as an apparent explanation for the stop. But agents then proceed to question the individual stopped about their own immigration status and subsequently arrest them without a warrant and without, it appears, any individualized assessment that the person is likely to escape.

6. For example, BDS represents the following individuals who have filed petitions seeking writs of habeas corpus after their arrests by ICE in Newburgh, New York, and Manhattan, New York:

**R.P.L.**

7. R.P.L. was detained by ICE on September 18, 2025, in Newburgh, New York.[1] Prior to his ICE detention, he was living with his wife and their teenage son in Newburgh. They had built a life together in New York for over a decade, and he and his wife even ran a small Italian restaurant together in New Windsor, New York. R.P.L. had never before been arrested and had no criminal history.

8. On September 18, 2025, shortly after R.P.L. had left his home and began driving to work, he was startled by the sound of sirens. An unmarked vehicle swerved sharply in front of his car and forced him to brake, another sped toward him from behind, and several others parked nearby. Armed ICE agents in bulletproof vests then approached R.P.L.'s driver-side window and started questioning him in English, which he is not fluent in.

9. An ICE agent told R.P.L. that they were looking for someone who lived at an address, which was next door to his own home. R.P.L. informed the agent that he did not live at that address. The ICE agent proceeded to show R.P.L. a photograph of a person they claimed to be looking for. R.P.L. confirmed that he did not know or recognize the person in the photo.

10. The agent then asked R.P.L. where he was headed, to which he replied he was on his way to work. The agent asked R.P.L. whether they could take a photo of him. R.P.L. felt as though he had no choice and so acquiesced to have his photo taken. The agent then asked R.P.L. if he had any identification "from [his] country." R.P.L. handed the agent his New York driver's license. The agent took his license and walked away.

11. Shortly thereafter, the agent returned, and R.P.L. believed that he was free to leave. However, moments later, agents ordered him to get out of the car, forcibly opened his door, placed his hands behind his back, and handcuffed him. R.P.L. was taken into custody where he continued to be questioned but refused to answer further questions. He was then transferred to the Orange County Jail in Goshen, New York, and subsequently to the Metropolitan Detention Center in Brooklyn, New York.

12. All relevant factors cut against R.P.L. being likely to escape before a warrant could be lawfully obtained. The officers were able to determine R.P.L.'s identity using his state-issued driver's license. Officers also knew R.P.L. had a home, employment, and family, as they arrested him outside his home address, he told them he was on his way to work, and he asked agents if they could wait for his wife to pick up the car.

---

[1] All facts are drawn from the petition and supporting declaration of R.P.L. filed in *R.P.L. v. Maldonado et al.*, 1:25-cv-06886 (E.D.N.Y.).

13. ICE never provided a warrant for the arrest of R.P.L. Instead, ICE tried to justify the warrantless arrest on the basis that R.P.L. had entered the United States without inspection. On December 26, 2025, a federal court granted R.P.L.'s habeas petition, finding that "the government's argument that Petitioner is a flight risk lacks merit" and ordered R.P.L.'s release. *R.P.L. v. Maldonado*, No. 25-CV-6886 (HG), 2025 WL 3731864 (E.D.N.Y. Dec. 26, 2025).

**G.H.H.**

14. G.H.H. was detained by ICE on January 27, 2026, in Newburgh, New York.[2] Prior to his detention, he had lived and worked in Newburgh for almost forty years, twenty of those working for the same employer. He also has several family members in the United States, including his U.S. citizen brother and nieces.

15. Around 7:00 a.m. on January 27, 2026, while walking to work, G.H.H. was approached by three individuals who appeared to be armed and were wearing bulletproof vests, at least one of which said "ICE" on it. One of the agents started questioning G.H.H. in English, a language that G.H.H. does not speak fluently. The agent held up a photo of a man and instructed G.H.H. to "look at this face." In his basic English, G.H.H. replied to the agents that he did not recognize the person in the photo. The agent nonetheless continued to interrogate G.H.H., thus making him feel as though he was not free to leave.

16. The agent then asked G.H.H. several questions, such as whether he was "illegal" and where he was from. The agent asked G.H.H. whether he had New York identification, and he said no. The agent told G.H.H. that he could not be in this country. At that point, G.H.H. refused to answer any more questions. That agent then told G.H.H. that he was under arrest and handcuffed him. They took him to a second location to continue the interrogation. G.H.H. does not believe the agents asked his name until they were at the office. They then transported him to Orange County Jail in Goshen, New York, and about a week later to the Metropolitan Detention Center in Brooklyn, New York.

17. ICE later attempted to justify the warrantless arrest due to his having an "unknown address," but ICE failed to ever inquire whether he had a stable home. In fact, G.H.H. had a stable address, had lived in Newburgh for decades, had worked at the same company for twenty years, and had U.S. citizen family members. The officers never showed G.H.H. a warrant, nor did they produce one later.

18. On March 20, 2026, a federal judge granted G.H.H.'s petition for writ of habeas corpus, finding that ICE was "detained without prior notice or individualized justification" and

[2] All facts are drawn from the petition and supporting declaration of G.H.H. filed in *G.H.H. v. Genalo et al.*, 1:26-cv-01500 (E.D.N.Y.).

ordered his release. *G.H.H. v. Genalo, et al.*, No. 26-CV-1500 (PKC), 2026 WL 785315 (E.D.N.Y. Mar. 20, 2026).

**J.J.T.**

19. J.J.T was detained by ICE on December 20, 2025, in Manhattan, New York.[3] Prior to his detention, he was a long-time resident of New York City and had lived in the United States for more than 20 years. He is married and has five U.S. citizen children aged 3, 6, 8, 14 and 17. He was the family's sole provider, working as a food delivery driver to support his family.

20. On December 20, 2025, J.J.T. was outside of his family home in East Harlem, preparing to head to work on his bike, when several masked individuals in bulletproof vests approached him. The individuals did not identify themselves as ICE or other federal agents, and J.J.T did not know whether they were law enforcement or bounty hunters looking to round up people on the street to later turn them over to ICE. The individuals questioned J.J.T about his immigration status and asked that he provide identification. Feeling like he had no choice, J.J.T provided his New York State identification card. The individuals then arrested him. While J.J.T was being arrested, his 14-year-old son approached him and witnessed agents take away his father. J.J.T was taken to 26 Federal Plaza, where he remained for the night.

21. On December 22, 2025, at 3:30 p.m., J.J.T's 17-year-old U.S.-citizen son filed a habeas action as "next friend" of J.J.T, *pro se* in the Southern District of New York. Unknown to his son, J.J.T. had already been moved to Delaney Hall, in Newark, New Jersey. The petition was later transferred to the District of New Jersey. While the petition was pending, ICE transferred J.J.T. to a detention center in Florence, Arizona. After BDS began representing J.J.T, BDS filed an amended petition on his behalf in the District of New Jersey.

22. ICE later claimed in a Form I-213 report that the arrest was made "pursuant to a signed I-200" warrant, but also in the same report acknowledged that J.J.T had been encountered incidentally during "surveillance operations" during which they claimed to have a "consensual encounter" after which he was taken into custody. Thus any I-200 warrant must have been generated following the decision to arrest J.J.T.

---

[3] All facts are drawn from the petition and supporting declaration of counsel filed in *[J.J.T.] v. Soto et al.*, 3:25-cv-19007 (D.N.J.).

23. On March 4, 2026, the federal court granted J.J.T.'s habeas petition, ordering that he be provided a bond hearing. *[J.J.T.] v. Francis*, No. 25-19007 (GC), 2026 WL 608802 (D.N.J. Mar. 4, 2026). He was subsequently granted bond and released.

* * *

24. In addition to the clients described above, BDS currently represents at least 16 other clients who were stopped in similar warrantless encounters on the street in other locations throughout New York State between September 2025 to March 2026, in apparent instances of racial profiling. This includes two clients arrested in Queens, six in Brooklyn, one in the Bronx, one additional client in Newburgh, and six in Long Island. These figures include only the number of clients that have filed a habeas petition and thus do not represent all individuals that BDS represents who have recently been arrested without a warrant or without individualized consideration of flight risk, danger, or likelihood of escape.

Dated: April 9, 2026
Brooklyn, NY

Alexandra Lampert, Esq.