## <u>DECLARATION OF ROSANNA EUGENIO</u>

I, Rosanna Eugenio, make the following declaration based on my personal knowledge and pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the Legal Director of the New York Immigration Coalition (NYIC), a member-led coalition of over 170 immigrant and refugee organizations representing the collective interests of approximately 4 million New Yorkers. The NYIC works to transform the lives of all New Yorkers by strengthening and building our members' power, organizing and educating our communities and the public, and using our collective voice to advocate for opportunity and justice.

2. The NYIC advocates for laws and policies to improve the lives of immigrants and all New Yorkers, particularly those that live in lower income communities; leverages the political power of immigrant communities by engaging in voter outreach and mobilization for key local, state, and federal elections; cultivates a new generation of immigrant civic leaders and community organizers by offering fellowships and leadership programs; provides multilingual informational materials on a range of issues; works with ethnic and mainstream media to relay important and often time-sensitive updates to immigrant communities; offers workshops and presentations on immigration law and other issues that affect immigrants on a daily basis; provides guidance to community groups, advocates, and legal providers on how to better serve their constituents; and on a limited basis, provides direct services.

3. I have worked at the NYIC since March 11, 2024, and served as the Legal Director since August 2024. I have been practicing law since August 2012, and my entire experience is within the immigration law context. I have appeared before the New York Immigration Courts in non-detained cases, the Board of Immigration Appeals (BIA), USCIS, and immigration-related habeas cases in the SDNY.

4. Since late January 2025, the NYIC has seen a large increase of individuals being stopped based on their Latino ethnicity and arrested by ICE in New York without any warrant or determination that they lack lawful status and are an escape risk. I routinely interview and provide or coordinate legal services to New Yorkers arrested by ICE across the state and participate in legal information sessions at the Buffalo Federal Detention Center in Batavia, NY. As part of this work, I have received detailed accounts from numerous impacted noncitizens, their family members, and colleagues, of ICE stopping people without reasonable suspicion and effectuating warrantless arrests without probable cause.

5. During a legal information visit at Buffalo Federal Detention Facility in Batavia in summer 2025, various detainees told us that they were detained at or near construction sites. They believe they were stopped because they were driving vans carrying supplies typically associated with immigrants and construction labor and/or because they were overheard speaking in Spanish. We are also aware of male Latino immigrants being detained in parking lots of chain stores like Walmart and Home Depot. In all of these cases, the immigration agents who arrested the detainees did not produce warrants and

1

did not ask any questions regarding the arrested individuals' community and family ties prior to conducting the arrest.

6. In particular, the NYIC has noticed an increase in ICE's use of warrantless car stops and collateral arrests. In Buffalo, the NYIC and partners provided legal assistance to immigrants formerly in shelter who resettled in the community, often in the same neighborhood. ICE has engaged in a pattern of watching the homes of these former shelter residents and stopping and arresting the Latino male household members on the way to their car or while driving. ICE and/or CBP will often detain everyone in the car first, without further investigation or determination of flight risk and regardless of status or individual circumstances. ICE and CBP conduct these detentions without producing warrants.

7. Detained community members have told us that ICE officers ask questions about who they live with well after the arrest, for the apparent purpose of gaining information about who else they can arrest in the household. These former shelter families feel stalked like prey, to the point where they can no longer live a normal life. We are aware of one family in Buffalo where, after the male head of household was detained, the other caregivers in the family fled the state after being forced to stay inside their home for weeks with young children out of fear being detained and leaving the children without their caregivers. In at least one case in New York City involving a blind father, ICE officers told his young adult son that they would let the father go if he turned himself in. The son attempted to turn himself in so that his father would be released, but they were both detained. Both men were detained without warrants and without the agents first conducting any inquiry as to their community ties.

8. These detentions are of noncitizens who previously encountered immigration officials at the time they entered the United States, some of whom made an appointment through CBP One to enter. They have not recently arrived in the United States. They have been following the normal course of their immigration process, including attending court hearings and filing applications for asylum and other relief, and therefore their detention serves no purpose. They are integral members of their families and communities, and their detention harms them and their loved ones.

9. In this declaration, I recount three of these cases based on information from my direct conversations with each while they were in ICE custody. I am fluent in English and Spanish, and spoke to each in Spanish, their native language.

**Diego Fernando Mueses Caicedo**

10. I spoke to Diego Fernando Mueses Caicedo on February 28, 2026, and March 5, 2026, via video legal visits while he was detained by ICE at the Port Isabel Detention Center in Texas. Diego is a 31-year-old Ecuadorian who was living in Corona, Queens, NY with his partner and 5-year-old daughter. He worked six days a week and on Sundays he would go out to eat or to the park with his family. He worked as a driver and prior to that in construction.

11. On February 16, 2026, Diego walked out of his apartment to warm up his car at around 7:30AM so that he could take his daughter to her babysitter. School was closed due to a blizzard in New York City. His car was covered in snow, and he couldn't see through to the outside from the windows. ICE officers approached the car suddenly and started to break the windows of the car without saying anything to Diego. The officers punched and hit Diego in the nose, eyes, and legs even though he was not resisting arrest. They then arrested him without asking him anything about his status or his life in the United States. The officers did not have a warrant. In light of his injuries, ICE took Diego to Elmhurst Hospital – a New York City public hospital. ICE lied about his injuries, telling the nurses and doctors that he had fallen. A doctor told Diego that he needed to return in 5 days for surgery if his nose still hurt because it was likely broken.

12. The ICE officers took Diego from the hospital in socks without shoes and without being discharged by the hospital staff. He was taken to ICE's offices at 26 Federal Plaza, but the officers there would not process him. He was then taken to another hospital, but Diego's vision was impaired from being punched in the face, and he could not see which hospital he was taken to. Upon information and belief, it may have been taken to Bellevue Hospital – a New York City public hospital. He was then returned to 26 Federal Plaza and flown to Texas.

13. On the dates of my video legal visits, weeks later, Diego's nose and face still hurt and he had not been treated at the detention center for his likely broken nose. Diego has since been removed from the United States.

### Zabdiel David Herrera Navas

14. I spoke to Zabdiel David Herrera Navas on March 6, 2026, via video legal visit while he was detained at the Buffalo Federal Detention Center in Batavia, NY. After fleeing Venezuela, Zabdiel entered the United States on October 5, 2023, via an appointment scheduled through CBP One. He applied for asylum on or about August 22, 2024, within one year of his arrival in the United States. Zabdiel has applied for Special Immigrant Juvenile Status which has been pending before USCIS since August 8, 2025.

15. Zabdiel works as a manager at a McDonalds in or around Buffalo, NY. On Wednesday, March 4, 2026, Zabdiel and his mother's partner, Greiner Manuel Quintero Pinto, left home for work at around 9:30AM. Greiner was driving the car. Shortly after, the car was cornered on three sides by ICE vehicles and Greiner pulled over the car. ICE officers stepped out of each of the vehicles. Greiner lowered the driver's side window and was asked for papers and ID in English. Zabdiel understands some English, but Greiner does not.

16. After Greiner showed ICE his NYS driver's license, officers opened his door and physically removed him from the car. He was handcuffed behind his back. After handcuffing Greiner, ICE officers opened the passenger door and asked Zabdiel for ID. As Zabdiel handed over his license, ICE officers also physically removed him from the

car. The officers did not look at his license. The officers asked no further questions and instead immediately handcuffed Zabdiel. The officers did not have warrants.

17. Zabdiel and Greiner are currently detained in separate units at the Buffalo Federal Detention Facility. Greiner has been without a hearing assistance device which was left in the car when they were detained. Zabdiel requested that ICE reunite him and Greiner so that he can help Greiner understand what is happening without his hearing aid, but his request was denied. The message said that it was not a priority.

### Greiner Manuel Quintero Pinto

18. I spoke to Greiner Manuel Quintero Pinto on March 23, 2026, via video legal visit while he was detained at the Buffalo Federal Detention Center in Batavia, NY. Greiner fled from Venezuela after threats and the murder of his 15-year-old son. He entered the United States on July 3, 2023. He filed for asylum and was granted Temporary Protected Status. Greiner's account of his arrest and detention is substantially similar to Zabdiel's.

19. Greiner informed me that he has an untreated hernia and uses a hearing device, which he currently does not have at Batavia. Prior to his arrest and detention, he was supposed to have surgery for hernia. The medical staff at Batavia will only give him ibuprofen and acetaminophen but refuse to allow him further treatment.

20. Greiner also reports that there was $5,000 cash in the glove box of the car he was driving when he was detained with Zabdiel. When his partner went to pick up the car that was left behind after he was detained, the money was not in the car and is currently unaccounted for.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 8, 2026.

_____
Rosanna Eugenio