UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

RENE ANTONIO BENITEZ et al.,

Plaintiffs,

v.

Case No. 2:26-cv-2082-SJB-JMW

U.S. DEPARTMENT OF HOMELAND SECURITY et al.,

Defendants.

**Declaration of Kyle Brandel**

I, Kyle Brandel, hereby declare as follows:

1. I am employed by U.S. Customs and Border Protection (CBP). I am currently assigned as a Supervisory Border Patrol Agent at the Buffalo Station within U.S. Border Patrol's Buffalo Sector. The Buffalo Sector is comprised of six Border Patrol stations: Buffalo, Niagara Falls, Rochester, Oswego, and Wellesley Island, all located in New York, and the Erie Station, located in Pennsylvania. I oversee one station within Buffalo Sector and am responsible for oversight of ten Border Patrol Agents, who are responsible for patrolling 45 miles of the international boundary with Canada. I have oversight of the day-to-day law enforcement operations of the U.S. Border Patrol in Buffalo Sector, including the apprehension and processing of aliens.

2. I entered on duty with the U.S. Border Patrol on August 11, 2014, with my first duty assignment in McAllen, Texas. I served as an Acting Supervisory Border Patrol Agent while assigned to McAllen Station. I transferred to the Rio Grande Valley Sector Headquarters on March 13, 2022, and served as Border Patrol Agent - Intelligence. On May 8, 2022, I was promoted to a Supervisory Border Patrol Agent at the McAllen Border Patrol Station. I also served as Acting Watch Commander while assigned to McAllen Station. On March 10, 2024, I was transferred to the Buffalo Station as a Supervisory Border Patrol Agent. In my current role, I am assigned as the Targeting Unit and Riverine Unit Supervisor. I report to the Patrol Agent in Charge and Deputy Patrol Agent in Charge, and I am responsible for all station operations during my assigned shift to include: various enforcement, detention and processing operations; seized property; fleet and facility maintenance and supplies; office and personnel management, and; community relations and outside agency partnerships. I have over four years of first line and second line supervisory experience. I am familiar with CBP's authorities and policies, generally, in sectors covering New York, which I understand are not significantly different.

3. The statements contained in this declaration are based upon my personal knowledge, information made available to me in the course of my official duties and conversations with the arresting Border Patrol agents.

4. CBP is charged, among other things, with enforcing the Nation's immigration laws to protect national security and uphold the integrity of the immigration system. As part of this mission, CBP officers and agents are responsible for preventing the unlawful entry of individuals into the United States and apprehending those who attempt to enter illegally or who have violated the immigration laws. Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States. CBP has multiple components, including the Office of Field Operations, which operates at the ports of entry, managing lawful entry and exit of people and goods at those ports of entry, enforcing customs, immigration, and trade laws. U.S. Border Patrol is another CBP component, which patrols and conducts enforcement activities to detect, deter, and apprehend individuals and contraband illegally transitioning between ports of entry.

5. The actions undertaken by Border Patrol agents are informed by their experience and the comprehensive training they receive at various stages of their careers. Border Patrol

trainees receive comprehensive tactical, operational, and legal training. During this time, they receive legal instruction that is prepared and presented by attorneys within the CBP Office of Chief Counsel (OCC), including First and Fourth Amendment topics. Border Patrol agents also receive training concerning the Immigration and Nationality Act. This training provides agents with the framework necessary to recognize violations of the laws they enforce and to take appropriate law enforcement actions.

6. Following their basic training, Border Patrol agents receive additional on-the-job training and periodic refreshers on a full range of topics including the First and Fourth Amendment to the U.S. Constitution and other relevant legal topics.

7. Border Patrol agents have among several authorities, that of immigration officers under Title 8 of the U.S. Code. Border Patrol agents are trained to identify and articulate when there is reasonable suspicion that an individual is unlawfully present in the United States in order to briefly detain the individual for further investigation into his or her immigration status. Border Patrol agents may develop reasonable suspicion in any number of ways, including but not limited to: subjects making incriminating statements or exhibiting suspicious behavior; subjects failing to produce any documentation during or producing documentation suspected to be fraudulent; and information gleaned from records and database checks. Border Patrol agents are trained not to rely solely on apparent race or ethnicity, though that may be one factor of many. Once probable cause exists that an alien is present unlawfully, Border Patrol agents are trained on several authorities provided by law in order to effect the arrest of aliens present in the United States without valid immigration status, including but not limited to the arrest of any alien who in their presence or view is entering or attempting to enter the United States illegally, and that authority which requires them to obtain a warrant of arrest unless they have reasons to believe that the person is likely to escape before a warrant can be obtained. *See* 8 U.S.C. § 1357; 8 C.F.R. § 287.8(c)(2)(ii).

8. CBP records reflect that two of the named plaintiffs, FRP and RCR, were arrested by Border Patrol agents.

9. On January 24, 2026, Border Patrol agents observed a vehicle displaying Florida license plates parked at a Walmart Supercenter in Cheektowaga, New York within 25 miles of the international border. This business is known to be frequented by illegal aliens not familiar with the area. Agents conducted registration checks and identified the owner as a citizen of Nicaragua who is a B2 visa overstay.

10. Border Patrol agents observed two individuals approaching the vehicle. Agents identified themselves as Border Patrol agents and conducted an immigration inspection. One of the individuals identified himself as Plaintiff with initials F.R.P. and the other identified herself as Plaintiff with initials R.C.R. Both F.R.P and R.C.R. admitted that they did not have any valid immigration documents. Border Patrol agents communicated the subjects' biographical information to Buffalo Sector Law Enforcement Information Systems Specialists, who confirmed both subjects lacked immigration status in the United States. Once confirmation was received from dispatch, Border Patrol agents determined that F.R.P. and R.C.R. would flee given they had ready access to a vehicle, had a Florida address, had

previously lied to immigration officials in order to enter the United States, and based on these facts and the agents' experience in similar circumstances, were unlikely to provide an accurate address. Based on the foregoing, Border Patrol agents had probable cause to believe that F.R.P. and R.C.R. were in the United States illegally and likely to escape before an arrest warrant could be obtained. Agents placed F.R.P. and R.C.R. under arrest and transported them to the Buffalo Border Patrol Station for further processing, to include biometric verification of F.R.P. and R.C.R.'s identity and any adjustment of status that would provide legal justification for their presence in the United States.

11. At the Buffalo Border Patrol Station, F.R.P. and R.C.R.'s fingerprints and biographical information were entered into the Integrated Automated Fingerprint and Biometric Identification System (IAFIS/IDENT). The results of the IDENT/IAFIS query biometrically confirmed F.R.P. and R.C.R.'s identities, and that they had not obtained adjustment of status or otherwise have legal authorization to remain in the United States. Border Patrol agents served R.C.R. with a copy of a Warrant for Arrest for Alien and with a Notice to Appear (DHS Form I-862) alleging a violation of section 237(a)(1)(B) of the Immigration and Nationality Act (INA) in that after admission into the United States under INA section 101(a)(15), R.C.R remained in the United States longer than permitted by her respective B2 visa. Biometric records checks showed that F.R.P. was also a B2 visa overstay who had been ordered removed by an immigration judge. He was processed as a custody redetermination to be held pending his appeal before the Board of Immigration Appeals.

12. CBP records reflect that as of May 27, 2026, neither plaintiff has been re-arrested following these detentions.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief under 28 U.S.C. 1746.

Executed this 28 day of May 2026 at Tonawanda, NY 14150.

Kyle Brandel