UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------x

RENE ANTONIO BENITEZ, J.R.H.L., DARWIN GARCIA
MEDRANO, H.L.A.O., A.M.C., HESLER ASAF GARCIA
LANZA, R.C.R., AND F.R.P., on behalf of themselves and
others similarly situated, AND WORKERS' CENTER OF
CENTRAL NEW YORK,

|  |  |
|---|---|
| Plaintiffs, | Civil Action No. |
| v. | 26-cv-2082 (SJB)(JMW) |

U.S. DEPARTMENT OF HOMELAND SECURITY;
MARKWAYNE MULLIN, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF THE U.S.
DEPARTMENT OF HOMELAND SECURITY; U.S.
IMMIGRATION AND CUSTOMS ENFORCEMENT;
TODD M. LYONS, IN HIS OFFICIAL CAPACITY AS
SENIOR OFFICIAL PERFORMING THE DUTIES OF
DIRECTOR OF U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT; KENNETH GENALO, IN HIS
OFFICIAL CAPACITY AS DIRECTOR OF
ENFORCEMENT AND REMOVAL OPERATIONS,
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,
NEW YORK CITY FIELD OFFICE; TAMMY MARICH,
IN HER OFFICIAL CAPACITY AS ACTING DIRECTOR
OF ENFORCEMENT AND REMOVAL OPERATIONS,
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,
BUFFALO FIELD OFFICE;  U.S. CUSTOMS AND
BORDER PROTECTION; RODNEY S. SCOTT, IN HIS
OFFICIAL CAPACITY AS COMMISSIONER OF U.S.
CUSTOMS AND BORDER PROTECTION;
U.S. BORDER PATROL; MICHAEL W. BANKS, IN HIS
OFFICIAL CAPACITY AS CHIEF OF U.S. BORDER
PATROL; U.S. DEPARTMENT OF JUSTICE; TODD
BLANCHE, IN HIS OFFICIAL CAPACITY AS THE
ACTING ATTORNEY GENERAL OF THE UNITED
STATES; FEDERAL BUREAU OF INVESTIGATION;
KASH PATEL, IN HIS OFFICIAL CAPACITY AS
DIRECTOR OF THE FEDERAL BUREAU OF
INVESTIGATION; U.S. MARSHALS SERVICE; and
GADY ACES S. SERRAL TA, IN HIS OFFICIAL
CAPACITY AS DIRECTOR OF THE UNITED STATES
MARSHALS SERVICE,

Defendants.

------------------------------------------------------------------------------x

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
AND IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
*Attorney for Defendants*

Thomas Price
Marika Lyons
Philip DePaul
Justin Kirschner
Assistant United States Attorney
*Of Counsel*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ..................................................................................................................... 2

    I.    Immigration and Customs Enforcement ....................................................................... 2

    II.   Customs and Border Protection ...................................................................................... 4

LEGAL STANDARDS ........................................................................................................... 6

    A.  Motions Pursuant to Fed. R. Civ. P. 65 ........................................................................ 6

    B.  Motions Pursuant To Fed. R. Civ. P. 12(b)(1) ............................................................. 7

ARGUMENT ........................................................................................................................... 7

    I.    Plaintiffs Cannot Show Substantial Likelihood of Success on the Merits of Their Challenge to Warrantless Arrests ................................................................................. 7

        A.  The Individual Plaintiffs Lack Standing ................................................................... 7

            1.  Past Allegedly Unlawful Government Conduct Does Not Prove Imminent Future Unlawful Government Conduct Against Plaintiffs ............................... 8

            2.  Plaintiffs' Evidence Showing Only Past Arrests And Fear Of Future Arrests is Insufficient ................................................................................................... 12

            3.  Plaintiffs Do Not Adequately Trace Any Allegedly Unlawful Conduct To Any DOJ Defendant ................................................................................................ 18

        B.  The Organizational Plaintiff Lacks Standing ......................................................... 18

        C.  Congress Stripped This Court Of Subject Matter Jurisdiction Over Aspects Of Plaintiffs' Claims ................................................................................................... 22

    II.   PLAINTIFFS CANNOT SHOW THEY ARE ENTITLED TO ANY RELIEF ........ 23

        A.  Plaintiffs Do Not Identify Final Agency Action Subject To Judicial Review Under The APA .................................................................................................... 23

            1.  Plaintiffs Have Not Challenged A Final Action That Is The Consummation Of An Agency Decision-making Process ......................................................... 25

            2.  Plaintiffs Have Not Shown The Alleged General Policy And Practice Itself Has Direct Consequences For Them .............................................................. 27

D.  Plaintiffs Do Not Adequately Allege Violation of the Statues Or Regulations Governing Warrantless Arrests .................................................................... 28

III.  Plaintiffs Have Not Shown Irreparable Harm ............................................................. 323

IV.  The Balance Of The Equities Favors Defendants ......................................................... 33

CONCLUSION ....................................................................................................................... 35

# TABLE OF AUTHORITIES

## CASES

*Alfaro v. Mullin*, 2026 WL 734348 (E.D.N.Y. Mar. 16, 2026) ................................................. 14, 15

*Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.*,
   436 F.3d 82 (2d Cir. 2006) ....................................................................................... 7

*Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) .................................................. 25, 28

*Au Yi Lau v. INS*, 445 F.2d 217 (D.C. Cir. 1971) ................................................................ 29

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) ................................. 31, 32

*Bark v. United States Forest Serv.*, 37 F.Supp.3d 41 (D.D.C. 2014) ..................................... 26, 27

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301 (1991) ................. 33

*Bell Atl. Co. v. Twombly*, 550 U.S. 544 (2007) .................................................................... 31

*Benitez v. Genalo, et al.*, 26-cv-1122 (SJB) (E.D.N.Y.) ......................................................... 17

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................................. 25, 28

*Biden v. Texas*, 597 U.S. 785 (2022) ................................................................................... 28

*Ceesay v. Bondi*, 25-cv-3716, 2025 WL 1435615 (S.D.N.Y. May 16, 2025) ........................... 23

*Chevron Corp. v. Donzinger*, 833 F.3d 74 (2d Cir. 2016) ...................................................... 18

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ..................................................... 9, 11, 12, 13, 14

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................... 11, 12, 13, 19

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
   167 F.4th 605 (2d Cir. 2026) ................................................................................ 20, 21

*Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167 (2d Cir. 2021) ....................................... 20

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) ......................... 25

*Daniel v. Mondelez Int'l., Inc.*, 287 F. Supp. 3d 177 (E.D.N.Y. 2018) ..................................... 8

*De Beers Consol. Mines Ltd. v. United States*, 325 U.S. 212 (1945) ......................................... 7

*Delgado v. Quarantillo*, 643 F.3d 52 (2d Cir. 2011) ............................................................ 22

*Demore v. Kim*, 538 U.S. 510 (2003) ............................................................. 33

*Do No Harm v. Pfizer Inc.*, 126 F. 4th 109 (2d Cir. 2025) ................................ 8

*Elkind v. Revlon Consumer Products Corp.*, 2015 WL 2344134 (E.D.N.Y. May 14, 2015)... 9, 10

*Escobar Molina v. USDHS*, 811 F. Supp. 3d 1 (D.D.C. 2025)............................ 16, 26

*Farm Sanctuary v. United States Dep't of Agric.*, No. 24-382-cv,
2026 WL 1030616 (2d Cir. Apr. 16, 2026) ...................................... 19, 20

*Farrakhan v. Anti-Defamation League*, 2025 WL 24066 (2d Cir. Jan. 3, 2025) ................ 18

*Flores-Linares v. Bondi*, No. 26-CV-00298-SJB, 2026 WL 179208 (E.D.N.Y. Jan. 22, 2026).. 31

*Food and Drug Administration v. Alliance forHippocratic Medicine*,
602 U.S. 367 (2024)............................................... 16, 18, 19, 20, 21

*Garcia Lanza v. Noem, et al.*, 26-cv-29 (GRB) (E.D.N.Y.) ............................... 17

*Garcia Medrano v. Francis, et al.*, 26-cv-330 (NJC) (E.D.N.Y.) ......................... 17

*Gopie v. Lyons*, No. 25-cv-5229, 2025 WL 3167130 (E.D.N.Y. Nov. 13, 2025) .......... 30, 31

*Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423 (1974) ............................ 6

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) ........................ 19

*Hussen v. Noem*, -- F. Supp. 3d --, 2026 WL 657936 (D. Minn. Mar. 9, 2026).......... 11, 12, 16

*Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420 (D.C. Cir. 2004)........................ 287

*Jeannot v. New York State*, 762 F. Supp. 3d 217 (E.D.N.Y. 2025) ........................ 8

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) ....................................... 34

*Lagandaon v. Ashcroft*, 383 F.3d 983 (9th Cir. 2004)................................... 31

*Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) ..................................... 16

*Lujan v. Defs. Of Wildlife*, 504 U.S. 555 (1992).................................... 8

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) ...................... 25, 26, 27

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000)................................ 8

*Marcavage v. City of New York*, 689 F.3d 98 (2d Cir. 2012) ........................... 12

*Martins v. County of Nassau*, 2016 WL 8711208 ................................. 154

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ..................................................................... 6

*M-J-M-A- v. Hermosillo*, --- F. Supp.3d ---, 2026 WL 562063 (D. Or. Feb. 27, 2026) ............... 16

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ........................................................ 6

*Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015) ........................................................ 29

*Munaf v. Green*, 553 U.S. 674 (2008) ........................................................................... 6

*Murthy v. Missouri*, 603 U.S. 43 (2024) ....................................................................... 13

*N.Y.C.L. Union v. N.Y.C Transit Auth.*, 684 F.3d 286 (2d Cir. 2012) ..................................... 18, 19

*Nampiaparampil v. NYC Dept. of Sanitation Enforcement Div.*,
    2026 WL 879416 (E.D.N.Y. Mar. 31, 2026) ............................................................. 9

*Nat'l Treasury Emp's Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025) ................................. 26, 27

*New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) .............................. 6, 7, 32

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................ 33, 34

*Noem v. Perdomo*, 146 S. Ct. 1 (2025) .......................................................... 10, 11, 12, 33, 34

*North Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018) ............................................................................ 7

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ....................................................... 25

*Oriakhi v. DHS*, 762 F. Supp. 3d 183 (E.D.N.Y. 2025)
    *Aff'd* 2026 WL 303642 (2d Cir. Feb. 5, 2026) ...................................................... 23

*Preserve at Connetquot Homeowners Assn., Inc. v. Costco Wholesale Corp.*,
    2019 WL 337093 (E.D.N.Y. Jan. 28, 2019) ......................................................... 9, 12

*Reid v. Metro One Loss Prevention Services Group (Guard Division NY), Inc.*,
    2025 WL 2533377 (E.D.N.Y. Sept. 3, 2025) ......................................................... 9, 12

*Reyes v. County of Suffolk*, 995 F. Supp. 2d 215 (E.D.N.Y. Feb. 6, 2014) ............................... 10

*Sauceda Henriquez v. Noem*, 25-cv-7023, 2026 WL 111665 (E.D.N.Y. Jan. 15, 2026) ............ 23

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .................................................................. 20

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ..................................................... 33

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) ....................................................... 8

*Troy as Next Friend Zhang v. Barr*, 822 Fed. App'x. 38 (2d Cir. 2020)......................................22

*Trump v. CASA*, 606 U.S. 831 (2025)..............................................................................34

*Unicon Mgmt. Corp. v. Koppers Co.*, 366 F.2d 199 (2d Cir. 1966) ................................................6

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) ............................................................33

*United States v. Quintana*, 623 F.3d 1237 (8th Cir. 2010) ........................................................29

*United States v. Texas*, 599 U.S. 670 (2023) ......................................................................15

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ................................................................6

*Villatoro v. Noem*, No. 25-cv-5306, 2025 WL 2880140 (E.D.N.Y. Oct. 9, 2025)......................22

*Villatoro v. Shanahan*, No. 26-cv-1210, 2026 WL 948297 (E.D.N.Y. Apr. 7, 2026)..................23

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ......................................................7, 6

*Yeleshev v. Larocco*, 2026 WL 1353806 (E.D.N.Y. May 14, 2026) ......................................15,,31

## STATUTES

5 U.S.C. § 551(13) ......................................................................................................25

5 U.S.C. § 701-06 ........................................................................................................1

5 U.S.C. § 704............................................................................................................25

8 U.S.C. § 1225(b) ......................................................................................................17

8 U.S.C. § 1226(a) ......................................................................................................17

8 U.S.C. § 1252(a)(5).............................................................................................22, 323

8 U.S.C. § 1252(b)(9) .............................................................................................22, 23

8 U.S.C. § 1252(g) ................................................................................................22, 23

8 U.S.C. § 1325............................................................................................................3

8 U.S.C. § 1326............................................................................................................3

8 U.S.C. § 1357.....................................................................................................5, 10, 28

8 U.S.C. § 1357(a)(2).........................................................................................27, 28, 29

19 U.S.C. § 1589a..........................................................................................................2

## RULES

Fed. R. Civ. P. 12(b)(1) ................................................................................ 7

Fed. R. Civ. P. 65 ...................................................................................... 6

## REGULATIONS

8 C.F.R. § 287.8(c)(2)(ii) ......................................................................... 5, 6

8 C.F.R. § 1236.1 ..................................................................................... 34

## PRELIMINARY STATEMENT

Defendants respectfully submit this memorandum of law in opposition to Plaintiffs' Motion For Preliminary Injunction ("PI"), ECF No. 21 ("PI Motion") and in support of their motion to dismiss for lack of subject matter jurisdiction.

The individual Plaintiffs ("Individual Plaintiffs") consist of six individuals who allege they were arrested by Immigration and Customs Enforcement (ICE) and two individuals who allege they were arrested in the Western District of New York by U.S. Border Patrol (USBP), a subcomponent on Customs and Border Patrol (CBP). There is also one organizational plaintiff. Plaintiff's suit, brought under the Administrative Procedure Act, 5 U.S.C. §§ 701-06 (APA), arises from Plaintiffs' inaccurate presumption that ICE and CBP, agencies in the Department of Homeland Security (DHS), are arresting individuals based on perceived race and without regard for procedure. Plaintiffs ask the Court to enjoin that conduct across New York State and order other relief as well.

However, the parties closely align on key issues. It is already the policy of ICE and USBP to arrest a person pursuant to an administrative warrant when there is probable cause that the person is present unlawfully or otherwise removable, unless there is reason to believe that the person is likely to escape before an arrest warrant can be obtained. The policies Plaintiffs seek are already in place.

Plaintiffs cannot establish a substantial likelihood of success on the merits for several reasons. As an initial matter, they lack standing to sue, as none have been redetained, nor can they meet their burden of showing that it is imminent and nonspeculative that they will be redetained. Moreover, they have not shown that the alleged harms are traceable to the Federal Bureau of Investigation or the U.S. Marshal Service Defendants. The organization Plaintiff lacks standing. Moreover, stringing together disparate actions does not a final agency action make, as needed for

1

an APA claim.

Even if Plaintiffs could establish substantial likelihood of success on the merits, they cannot show irreparable harm, not least because they cannot show they will imminently likely be redetained. Finally, the equities favor the government, inasmuch as enforcement of the nation's immigration laws is a powerful equity.

For all these reasons, the PI motion should be denied. Additionally, the action should be dismissed for lack of subject matter jurisdiction on standing grounds.

## BACKGROUND

### I.    Immigration and Customs Enforcement

ICE, the largest investigative branch of DHS, is charged with enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001 terrorist attacks by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service. ICE's mission is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of two core operational directorates: (1) Enforcement and Removal Operations (ERO), which includes 25 field offices led by Field Office Directors (FODs); and (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge.

ERO deportation officers are immigration officers under Title 8 of the U.S. Code and have been delegated limited customs officer warrantless arrest authority under 19 U.S.C. § 1589a. It is ERO's mission to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who are unlawfully present—including those who enter or remain illegally in the United States, or otherwise undermine the integrity of the immigration

laws and border control efforts. Illegal entry is a federal misdemeanor in the first instance and a felony on repeat offenses (8 U.S.C. § 1325), and illegal reentry after prior removal is a felony (8 U.S.C. § 1326).

The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them or otherwise overseeing their departure from the United States.

ERO officers receive initial training at the Federal Law Enforcement Training Center that covers, among other topics, the Fourth Amendment and ICE's arrest authorities. ERO officers also receive training on the statutory and regulatory provisions of the Immigration and Nationality Act (INA) and relevant DHS and ICE policies. ERO officers continue to receive refresher trainings on ICE's arrest authorities, standards for enforcement activity, and the Fourth Amendment at least twice a year from the Office of the Principal Legal Advisor.

Officers are instructed to follow procedures emphasizing targeted investigations and arrests of aliens with final removal orders and/or serious criminal histories. Nevertheless, ERO officers have the statutory authority to arrest any alien based on probable cause to believe he or she is unlawfully present in, or is otherwise removable from, the United States, regardless of any criminal history.

3

DHS policy applying to both ICE and CBP prohibits reliance on generalized assumptions or stereotypes involving a person's race, ethnicity and other protected characteristics except in limited circumstances. The exceptions include where there is trustworthy specific information, with sufficient details, regarding factors including locality, and time frame to provide assurance that the information is reliable and links persons possessing a particular listed characteristic to a violation of Federal immigration law. A person's race or ethnicity alone may not serve as basis for law enforcement action against the individual.

In contrast, "nationality," *i.e.*, country of citizenship or country of which the person is deemed a national, is not a protected characteristic and may be considered in immigration law enforcement activities in which nationality is expressly relevant to the administration or enforcement of a statute, regulation, or executive order, or in individualized discretionary use of nationality as a screening, investigation, or enforcement factor.

ICE enforcement operations are conducted based on operational planning, intelligence, and investigative leads.

## II.    Customs and Border Protection

CBP is charged, among other things, with enforcing the Nation's immigration laws to protect national security and uphold the integrity of the immigration system. As part of this mission, CBP officers and agents are responsible for preventing the unlawful entry of individuals into the United States and apprehending those who attempt to enter illegally or who have violated the immigration laws. CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States. CBP's organizational structure is divided into several components, including the Office of Field Operations, which operates at the ports of entry conducting customs, immigration and agricultural

inspections. USBP is another CBP component. It is the entity tasked with detecting and preventing the illegal entry or transition of individuals or goods into the United States into or through the United States between ports of entry.

USBP agents' actions are informed by their experience and the comprehensive training they receive at various stages of their careers. USBP trainees receive comprehensive tactical, operational, and legal training. They receive legal instruction that is prepared and presented by attorneys within the CBP Office of Chief Counsel, including First and Fourth Amendment topics, and training concerning the Immigration and Nationality Act. This training provides agents with the framework necessary to recognize violations of the laws they enforce and to take appropriate law enforcement actions.

Following their basic training, USBP agents receive additional on-the-job training and periodic refreshers on a full range of topics including the First and Fourth Amendments to the Constitution and other relevant topics.

USBP agents are trained to identify and articulate when there is reasonable suspicion that an individual is unlawfully present in the United States in order to briefly detain the individual for further investigation into his or her immigration status. USBP agents may develop reasonable suspicion in any number of ways, including but not limited to: subjects making incriminating statements or exhibiting suspicious behavior; subjects failing to produce any documentation during or producing documentation suspected to be fraudulent; and information gleaned from records and database checks. USBP agents are trained not to rely solely on apparent race or ethnicity, though that may be one factor of many. Once probable cause exists that an alien is present unlawfully, USBP agents are trained to obtain a warrant of arrest unless they have reasons to believe that the person is likely to escape before a warrant can be obtained. *See* 8 U.S.C. § 1357; 8 C.F.R. §

5

287.8(c)(2)(ii). The likely to escape determination must be made before a warrantless arrest is effectuated.

## LEGAL STANDARDS

### A. Motions Pursuant to Fed. R. Civ. P. 65

Preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (injunction is "a drastic and extraordinary remedy, which should not be granted as a matter of course"); *Munaf v. Green*, 553 U.S. 674, 689-90 (2008); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008) ("extraordinary remedy" awarded only "upon a clear showing that the plaintiff is entitled to such relief").

The fundamental purpose of preliminary injunctive relief is "merely to preserve the relative positions of the parties until a trial on the merits can be had." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *accord Unicon Mgmt. Corp. v. Koppers Co.*, 366 F.2d 199, 204 (2d Cir. 1966) ("It is hornbook law that 'the general purpose of a preliminary injunction is to preserve the status quo pending final determination of the action.'").

Under this standard, "[i]t is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue." *Monsanto*, 561 U.S. at 158 (emphasis in original). Put otherwise, plaintiffs have the burden of proving the need for injunctive relief; defendants bear no burden to defeat the motion. *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 442-43 (1974).

A plaintiff seeking a PI must establish: (i) "that he is likely to succeed on the merits," (ii) "that he is likely to suffer irreparable harm in the absence of preliminary relief," and (iii) "that the balance of equities tips in his favor, and that an injunction is in the public interest." *New York*

*Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).  Where a plaintiff seeks a PI that will alter the status quo, the plaintiff must show "a clear or substantial likelihood of success on the merits." *North Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

Furthermore, the requested injunctive relief must relate to the claims set forth in the complaint. *See De Beers Consol. Mines Ltd. v. United States*, 325 U.S. 212, 220 (1945) ("A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally"; but an injunction is not appropriate if it "deals with a matter lying wholly outside the issues in the suit.").

### B. Motions Pursuant To Fed. R. Civ. P. 12(b)(1)

Dismissal of an action is warranted under Fed. R. Civ. P. 12(b)(1) when "the district court lacks statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The plaintiff bears the burden of showing – by a preponderance of evidence – that the court has jurisdiction. *See id.* Courts may refer to evidence outside the pleadings. *Id.*

### ARGUMENT

### I. PLAINTIFFS CANNOT SHOW SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CHALLENGE TO WARRANTLESS ARRESTS

There are several reasons why Plaintiffs cannot establish entitlement to a PI.

### A. The Individual Plaintiffs Lack Standing

First and foremost, Plaintiffs lack standing, which is required for subject matter jurisdiction. See *Alliance For Environmental Renewal, Inc. v. Pyramid Crossgates Co.,* 436 F.3d 82, 85 (2d Cir. 2006) ("[T]he Supreme Court has . . . rul[ed] that a district court must . . . establish that it has federal constitutional jurisdiction, including a determination that the plaintiff has Article III standing, before deciding a case on the merits.").

The preliminary relief Plaintiffs seek is foreclosed by the doctrine of standing, which bars litigants who lack a personal stake in the outcome from seeking relief. *See Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009). To prove their personal stake, Plaintiffs must show "the irreducible constitutional minimum" that they (i) "suffered an injury in fact" that was "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (ii) that the injury was "fairly traceable to the challenged action of the defendant"; and (iii) that it is "likely" not "merely speculative, that the injury will be redressed by a favorable decision." *See Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiff fail to make this showing.

### 1.    Past Allegedly Unlawful Government Conduct Does Not Prove Imminent Future Unlawful Government Conduct Against Plaintiffs

Because Plaintiffs seek prospective injunctive relief, to prove their personal stake they must "show" it is "likel[y] that [they] will be injured in the future" by the conduct they seek to enjoin. *Jeannot v. New York State*, 762 F.Supp.3d 217, 225 (E.D.N.Y. 2025) (Gonzalez, J.). This means they must show "a substantial risk" that unlawful warrantless arrests of them "will occur" in the future. "[P]ossible future injury" or "past exposure to illegal conduct" will not suffice. *Id.* Put differently, "[i]n establishing a certainly impending future injury, the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought." *See Daniel v. Mondelez Int'l., Inc.*, 287 F.Supp.3d 177, 184-85 (E.D.N.Y. 2018) (Brodie, C.J.) (citing *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012)). And because Plaintiffs seek a PI, their "evidentiary burden to establish standing . . . is more onerous than the burden at the pleading stage." *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 119 (2d Cir. 2025). Rather, Plaintiffs "must set forth by affidavit or other evidence specific facts . . . taken to be true" that prove the elements of standing. *Id.*

Plaintiffs each attest to the circumstances of their respective past arrests. *See* ECF Nos. 21-

3 – 21-10. Each harbors a "fear" or is "nervous," "anx[ious]," or the like about the possibility of future arrests. *See* ECF Nos. 21-3 ¶ 13; 21-4 ¶ 20; 21-5 ¶ 22; 21-6 ¶ 21; 21-7 ¶ 17; 21-8 ¶ 20; 21-9 ¶ 18; 21-10 ¶ 22. They contend that in the future, officers "*may* choose" to "detain" them (Pl. Br. at 12) (emphasis added) and other individuals who have been arrested under the "dragnet" "*arrest everyone* policy" supposedly blanketing New York. Pl. Br. at 5 (emphasis in original). On that basis, they seek a PI that orders Defendants to follow the law in making warrantless immigration arrests in the future, dictates how such arrests are documented, requires training of officers on lawful warrantless arrests, and obligates Defendants to prove their compliance. *See* ECF No. 21-2 at 2-3.

Courts have long rejected the *past must be prologue* theory of standing for an injunction against future conduct based on fears and speculation that unlawful government conduct will happen in the future because it happened in the past. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). In *Lyons*, the Supreme Court held that an individual previously placed in a chokehold (past allegedly unlawful Government conduct) lacked standing to enjoin future chokeholds absent a concrete, imminent threat that he would be choked again. Courts in this District have applied *Lyons* and its progeny in other contexts to hold that a plaintiff lacks standing for future injunctive relief where, as here, they identify past alleged harms and current emotional consequences, but no imminent likelihood the past alleged unlawful conduct will happen again. *See, e.g., Nampiaparampil v. NYC Dept. of Sanitation Enforcement Div.*, 2026 WL 879416, *10 (E.D.N.Y. Mar. 31, 2026) (DeArcy Hall, J.); *Reid v. Metro One Loss Prevention Services Group (Guard Division NY), Inc.*, 2025 WL 2533377, *6 (E.D.N.Y. Sept. 3, 2025) (Choudhury, J.); *Preserve at Connetquot Homeowners Assn., Inc. v. Costco Wholesale Corp.*, 2019 WL 337093, *6, *9 (E.D.N.Y. Jan. 28, 2019) (Bianco, J.); *Elkind v. Revlon Consumer Products Corp.*, 2015 WL

9

2344134, *3 (E.D.N.Y. May 14, 2015) (Seybert, J.); *Reyes v. County of Suffolk*, 995 F. Supp. 2d 215, 232 (E.D.N.Y. Feb. 6, 2014) (Spatt, J.).

ICE officers may conduct warrantless arrests if there is reason to believe that the alien is present in the United States in violation of any U.S. immigration law and is likely to escape before a warrant can be obtained. *See* 8 U.S.C. § 1357; *see also* January 28, 2026, Memorandum from Todd M. Lyons to All ICE Personnel regarding Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests (the "Lyons Memo") at 1-2, n.6. These determinations must be made before a warrantless arrest is effectuated. Immigrations officers may develop reasonable suspicion in any number of ways, including but not limited to: subjects making incriminating statements or exhibiting suspicious behavior during consensual encounters; subjects failing to produce any documentation during consensual encounters or producing documentation suspected to be fraudulent; information from open-source investigations, other law enforcement agencies, informants, and surveillance; and information gleaned from records and database checks. If the officer develops probable cause that a stopped individual is unlawfully present in the United States, the individual may be arrested upon issuance of an arrest warrant or a determination that the individual is likely to escape before an arrest warrant can be obtained.

In the context of immigration stops and arrests, in the grant of the government's application for an interim stay a stay Justice Kavanaugh explained in his concurring opinion that the plaintiffs, who had challenged ICE's stops of individuals, did not have "standing to obtain future injunctive relief . . . merely because [they] experienced past harm and fear its recurrence." *Noem v. Perdomo*, 146 S. Ct. 1 (2025). He reasoned that they had "no good basis to believe that law enforcement will unlawfully stop them in the future . . . and certainly no good basis for believing that any stop is imminent" despite alleging that they "were the subjects of unlawful law enforcement actions in

10

the past.

Another district court recently denied a motion for a PI seeking to enjoin the policies under which immigration arrests were made in the Minneapolis area. *Hussen v. Noem*, No. 26-cv-324 (ECT/ECW), 2026 WL 657936 (D. Minn. Mar. 9, 2026). There, the Court identified the question as "whether the evidence shows a significant probability that Defendants will stop or arrest [the plaintiffs] in the imminent future." 2026 WL 657936, at *40. The answer there was *no*. Why? Notwithstanding that Court's 200-paragraph factual account supporting a conclusion that the plaintiffs would likely succeed in showing the defendants violated the Constitution and the INA Act in the past, it was still "speculative" that the plaintiffs would "likely" be "stop[ped] or arrest[ed]" under the allegedly unlawful policies in the future, and plaintiffs identified zero individuals who had a "subsequent encounter" with immigration authorities, so they had "no good basis to believe that law enforcement will unlawfully stop [or arrest] *them* in the future" in an unlawful manner. *Id.* at *41-*42 (citing *Lyons* and *Perdomo*).

As reasoned in *Hussen*, even where a Government policy or program is alleged to be the authority for the alleged past unlawful conduct, the existence of such authority does not nudge the likelihood of future exposure to its exercise high enough for standing purposes. *Id. Hussen* relied in part on the showing required for standing to challenge allegedly pervasive electronic government surveillance in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013), and its progeny as instructive regarding standing to challenge the immigration enforcement operation in Minneapolis. In *Clapper*, the Supreme Court rejected standing because the plaintiffs offered only speculation that their communications would be monitored under the challenged policy because such policy "at most *authorize[d]*—but does not *mandate* or *direct*—the surveillance that respondents fear." *Id.* at 412. As the Supreme Court concluded, "[s]imply put, respondents can

11

only speculate as to how the Attorney General and the Director of National Intelligence will exercise their discretion in determining which communications to target" in the future and what surveillance authority to monitor under, so the plaintiffs' claims were "necessarily conjectural." *Id.*[1] The *Hussen* court rejected the notion that it was sufficiently likely the defendants would subject the plaintiffs to their allegedly unlawful policies in the future simply because the authority to do so allegedly existed. *See* 2026 WL 657936, at *41.

### 2. Plaintiffs' Evidence Showing Only Past Arrests And Fear Of Future Arrests is Insufficient

Against the backdrop of those principles, the Individual Plaintiffs' attempt to enjoin speculative unlawful immigration-related arrests is a redux of what failed at every turn in *Lyons*, *Clapper*, *Perdomo*, *Hussen*, and related cases.

First, Plaintiffs attest to their past allegedly unlawful warrantless arrests. But as a matter of fact, several of those arrests were pursuant to a warrant. *See* ICE Decl. ¶ 12.. So, much of the prior conduct on which Plaintiffs rely to suggest future unlawful warrantless arrests are likely to occur were not even warrantless arrests to begin with, much less unlawful warrantless arrests.

In any event, as a matter of law, past conduct does not suffice to show a sufficient likelihood of future conduct. *See, e.g., Reid*, 2025 WL 2533377, at *6 (no standing for injunction against future hostile workplace practices where no allegations of "substantial risk" of future harm); *Preserve at Connetquot Homeowners Ass'n*, 2019 WL 337093, at *6 (past sewage clog by flushable wipes insufficient to show chance of future clogs). Not a single Individual Plaintiff or non-Plaintiff declarant states they are under an arrest threat from a federal official or have received any other indication that they will be unlawfully arrested without a warrant in the near future or

---

[1] In reaching that conclusion, the majority repeatedly cited the Honorable Reena Raggi's dissent from a denial of rehearing *en banc* before the Second Circuit, which was joined by Judges Jacobs, Cabranes, Wesley, and Livingston.

ever. Indeed, only one Plaintiff attests to witnessing anyone else getting arrested after their own arrest, and knows nothing about the circumstances of that arrest other than the arrestee was "a Hispanic looking man with a construction vest." *See* ECF No. 21-9 ¶ 19.[2]

Second, Plaintiffs' claim they harbor fears and anxiety they will be arrested in the future without a warrant. But present thoughts and feelings and emotional consequences, no matter how sincerely held, do not show that unlawful conduct in the future is likely to befall Plaintiffs. A party "cannot manufacture standing merely by inflicting harm on [himself] based on [his] fears of hypothetical future harm that is not certainly impending." *Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (quoting *Clapper*, 568 U.S. at 416). Allegations of "subjective apprehensions" of future harm are insufficient to establish standing (even where the party who alleges such apprehensions alleges that he has been subjected to the same type of harm in the past). *See Lyons*, 461 U.S. at 107, n.8.

Indeed, Plaintiffs' fear and speculation that they will be unlawfully arrested without a warrant in the future are belied by recent developments in their own contacts with immigration authorities. Plaintiffs and their declarants argue that it makes it more likely that they will be unlawfully arrested without a warrant in the future because one Plaintiff and some non-Plaintiff declarants "have mandatory ICE check-ins and other conditions placed upon their release that require them to have regular contact with Defendants' agents." *See* Pl. Br. at 12. But what Plaintiffs leave unsaid is that such individuals confirm they have attended ICE check-ins where they *have not* been arrested, much less arrested without a warrant, much less arrested unlawfully without a warrant. *See* ECF No. 21-6 ¶ 22; No. 21-13 ¶ 15; No. 21-15 ¶ 19; No. 21-16 ¶ 17. And though Plaintiffs argue that "some" of the 30-plus declarants supporting this motion "have been subjected

---

[2] Plaintiffs' statements regarding arrests they "heard" about from others or on social media, but did not personally witness, are hearsay and should therefore not be credited. *See, e.g.,* ECF Nos. 21-4 ¶¶ 23-24; 21-6 ¶ 17

to multiple unlawful arrests," (*see* Pl. Br. at 11), they identify only *one* non-Plaintiff who has ever been stopped twice, and he confirms he was released "[a]fter about an hour" once authorities confirmed he was "out on bond." *See* ECF No. 21-13 ¶¶ 6-8, 16-19. Not a single Plaintiff has been arrested a second time. This fact disproves the notion that scheduled contact with immigration authorities or a generalized presence of immigration authorities in New York makes it more likely Plaintiffs will be unlawfully arrested without a warrant in the future.

Third, Plaintiffs claim the "dragnet" covering New York under Defendants' allegedly unlawful policy makes the chance that they will be arrested unlawfully without a warrant in the future sufficiently likely. But Plaintiffs needed to show "a sufficient likelihood that [they] will again be wronged *in a similar way.*" *Lyons*, 451 U.S. at 111 (emphasis added). So, even if a "dragnet" policy of unlawful warrantless arrests existed, it would be insufficient to show standing because it still is "necessarily conjectural" that Plaintiff would be arrested under that policy in the future. That multiple individuals claim to have been arrested without a warrant or to have witnessed warrantless arrests in New York "does not show a substantial risk of a future stop or arrest" for any Individual Plaintiff under the challenged policy. *See Hussen*, 2026 WL 657936, at *41. In other words, even showing that officials may be generally likely to continue to make unlawful warrantless arrests is not enough to show that Plaintiffs themselves would likely be subject to an unlawful warrantless arrest again.

The chance of Plaintiffs being unlawfully arrested without a warrant in the future under a supposed policy is reduced because decisions in this District offer guidance on what circumstances are or are not the type of unlawful warrantless arrest that Plaintiffs fear will happen to them in the future. In *Alfaro v. Mullin*, the Honorable Gary R. Brown held that the escape risk requirement for a warrantless arrest was not satisfied where the alien had lawful prior interactions with immigration

14

authorities, received immigration benefits in the past, had worked and paid taxes, and lacked a criminal record. 2026 WL 734348, at *5 (E.D.N.Y. Mar. 16, 2026) (Brown, J.). And in *Yeleshev v. LaRocco*, this Court observed that "ICE has limited authority to conduct warrantless arrests, . . . which often all turn on the existence of exigent circumstances." 2026 WL 1353806, at *3 (E.D.N.Y. May 14, 2026) (Bulsara, J.). All of Plaintiffs' arrests occurred before *Alfaro* was decided. *See* ECF Nos. 21-3 to 21-10. They now fear what *Alfaro* has already ruled unlawful and seek a PI to force Defendants to comply with the law of warrantless immigration arrests as *Alfaro* articulated it. *See* Pl. Br. at 20-21. Thus the judicial strictures articulated in *Alfaro* already in place, the claim that Defendants will make the unlawful warrantless arrests that Plaintiffs fear in the future in violation of statute and regulation is reduced. *See Martins v. County of Nassau*, 2016 WL 8711208, at *5 E.D.N.Y. Apr. 29, 2016) (Spatt, J.) (prior holding that the plaintiff was unlawfully arrested and prosecuted for protected speech rendered the possibility that he would be arrested again in the future on the same basis "far too remote" for him to have standing to enjoin future arrests on that basis).

Fourth, Plaintiffs confirm the preliminary relief they request is not even about ensuring their own future warrantless arrest that they fear would be lawful. Rather, it is about ensuring others are not unlawfully arrested without a warrant. *See* ECF No. 21-3 ¶ 15; .ECF No. 21-5 ¶ 23. But individuals do not have standing to challenge immigration stop or arrest practices as they relate to nonparties. In *United States v. Texas*, 599 U.S. 670 (2023), certain states claimed that the federal government's immigration arrest policies violated certain statutes and sought "to order the Executive Branch to alter its arrest policy." *Id.* at 674. The Supreme Court held that the states lacked standing to bring such claims because it had "long held 'that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor

15

threatened with prosecution.'" *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). For this reason, even if Plaintiffs were correct that the government's immigration arrest policies violate the INA, they lack standing to bring claims challenging federal immigration arrest policies. *Id.* (taking "no position on whether the Executive Branch here is complying with its legal obligations under" the relevant statutes). A cognizable injury requires more than "an asserted right to have the Government act in accordance with law." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Accordingly, the Court's decision in Texas confirms that Plaintiffs here lack standing to challenge arrest policies affecting other nonparties.

Defendants acknowledge that two decisions involving allegations similar to those raised in this action held that those plaintiffs had standing. *M-J-M-A- v. Hermosillo,* No. 25-cv-02011-MTK, 2026 WL 562063 (D. Or. Feb. 27, 2026); *Escobar Molina v. USDHS*, 811 F.Supp.3d 1 (D.D.C. 2025). Those plaintiffs were found to have standing because they had a significantly higher risk of being subjected to illegal conduct because the courts found ICE was targeting the plaintiffs. *M-J-M-A-*, 2026 WL 562063, at *15; *Escobar Molina,* 811 F.Supp.3d at 33. Yet even if they were, that higher risk would not establish that the risk was so high as to satisfy as to make the risk of future harm likely. *See Hussen*, 2026 WL 657936, at *42 (noting that Ninth Circuit precedent, which was binding on the *M-J-M-A-* district court, provides for standing even if the likelihood of future harm "may not be 'high'" (citation omitted)). The risk of future injury to Plaintiffs here is far from likely – as demonstrated by the fact that none of the named Plaintiffs has been stopped or detained twice and only one of the declarants alleges that he has been stopped or detained twice.

Finally, the possibility of re-arrest is even further reduced for the Individual Plaintiffs who habeas petitions that resulted in court orders enjoining or placing limits on any re-detention. Five

16

Plaintiffs filed habeas petitions following their previous arrest and detention. *See Benitez v. Genalo, et al.,* 26-cv-1122 (SJB) (E.D.N.Y.); *Garcia Lanza v. Noem, et al.,* 26-cv-29 (GRB) (E.D.N.Y.); *Garcia Medrano v. Francis, et al.,* 26-cv-330 (NJC) (E.D.N.Y.).[3] With respect to Plaintiff Garcia Medrano, ICE voluntarily released him, and the parties entered a stipulation of dismissal. *See Garcia Medrano,* 26-cv-95, ECF Nos. 11, 13. With respect to Plaintiffs Benitez, Garcia Lanza, A.M.C., and H.L.A.O., not only did the courts grant each habeas relief, but the courts also issued orders which enjoined or placed limits on any re-detention. *See, e.g., Benitez,* 26-cv-1122, ECF No. 7 ("Respondents are enjoined from detaining Petitioner absent further direction from this Court."); *Garcia Lanza,* 26-cv-29, ECF No. 15 (finding that ICE was not authorized to arrest or detain plaintiff Garcia Lanza and ordering that the Court's previous order setting terms and condition of release, which released petitioner on personal recognizance on his promise to appear at proceedings, with no additional conditions of release, remains in effect, and that ICE cannot impose any other terms or conditions of release).[4] Therefore, with respect to these four Plaintiffs, their asserted fears of re-arrest and re-detention are undermined by the existence of the court orders enjoining or placing limits on any further detention.

---

[3] Plaintiffs H.L.A.O. and A.M.C. also filed habeas petitions (in the E.D.N.Y. and S.D.N.Y., respectively); however, each used their full names in those filings. In light of the protective order entered in this matter, Defendants refrain from referring to those dockets, as doing so would lead to the disclosure of their identities. However, Defendants are prepared to provide the Court with the docket numbers and relevant filings and orders in those cases under seal if directed to do so.

[4] In the case filed by A.M.C., the court enjoined re-detention without a valid exercise of discretion under 8 U.S.C. § 1226(a), and further enjoined respondents from denying bond to Petitioner in any subsequent proceeding on the basis that he must be detained pursuant to 8 U.S.C. § 1225(b). In the case filed by H.L.A.O., respondents were enjoined from denying Petitioner bond in any subsequent proceeding on the basis that he must be detained pursuant to 8 U.S.C. § 1225(b). As set forth in footnote 3 above, Defendants refrain from providing citations to the referenced orders but are prepared to do so.

### 3. Plaintiffs Do Not Adequately Trace Any Allegedly Unlawful Conduct To Any DOJ Defendant

Plaintiffs also do not adequately trace their speculative future alleged injuries to any Department of Justice (DOJ) Defendant. Plaintiff must plausibly "demonstrate a causal nexus between the [DOJ Defendants'] conduct and [his] injury." *Chevron Corp. v. Donzinger*, 833 F.3d 74, 121 (2d Cir. 2016). This means they must adequately show that they are likely to be rearrested by the DOJ Defendants, and not as the result of "independent action of some third party not before the court." *Farrakhan v. Anti-Defamation League*, 2025 WL 24066, at *1 (2d Cir. Jan. 3, 2025) (citing *Lujan*, 504 U.S. at 560). The traceability element "precludes speculative links." *Hippocratic Med.*, 602 U.S. at 383.

Plaintiffs plead only the barest allegations regarding the DOJ Defendants. They allege that ICE and CBP agents are "sometimes accompanied by FBI agents and U.S. Marshals." *See* ECF No. 1 ¶ 52. No Plaintiff claims a U.S. Marshal effectuated their past arrest. Only one non-Plaintiff alleges he was apprehended by a group of authorities that included individuals from the U.S. Marshals. *Id.* ¶¶ 80, 146. As for the FBI, only one Plaintiff and one non-Plaintiff claim that an FBI agent was present while ICE made their arrests. *Id.* ¶¶ 86, 319. Moreover, Plaintiffs do not even attempt to argue fear of future allegedly unlawful warrantless arrest effectuated by a DOJ Defendant. The words "FBI" and "Marshal" do not appear in their brief. *See* ECF No. 21-1.

Plaintiffs do not trace any conduct they want to enjoin to the DOJ Defendants.

### B. The Organizational Plaintiff Lacks Standing

Plaintiff WCCNY also lacks standing. In the Second Circuit, "an organization can have standing to sue in one of two ways"—associational standing (*i.e.*, on behalf of a member) and organizational standing (*i.e.*, on behalf of itself). *N.Y.C.L. Union v. N.Y.C Transit Auth.*, 684 F.3d

18

286, 294 (2d Cir. 2012); *see Farm Sanctuary v. United States Dep't of Agric.*, No. 24-382-cv, 2026 WL 1030616, at *2 (2d Cir. Apr. 16, 2026).

For associational standing, the organization must show "that some particular member of the organization would have had standing to bring the suit individually." *N.Y.C.L. Union.*, 684 F.3d at 294. Initially, it is worth noting that none of the Individual Plaintiffs allege that they are members of WCCNY. *See* Compl. ¶¶ 11-19. Nor does WCCNY allege that any of the Individual Plaintiffs are among its members. *See* Compl. ¶ 20. In fact, it appears that none of the individual Plaintiffs *could* be members of WCCNY, because individuals may only "remain as members as long as they do not move out of the general region that [WCCNY] serve[s]," which is "the five Central NY counties, as well as Jefferson and Lewis Counties in northern New York," where none of the individual Plaintiffs reside. *See* ECF No. 21-11 ("Maxwell Decl.") ¶¶ 4, 8; Compl. ¶¶ 11-19.

Setting that aside, the lack of imminence that defeats the Individual Plaintiffs' standing also defeats WCCNY's standing. Associational standing requires proof that an organization's "members would otherwise have standing to sue in their own right" and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hippocratic Med.*, 602 U.S. at 398 (Thomas, J., concurring) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). But just like the Individual Plaintiffs, WCCNY must demonstrate that the "threatened injury [to its members] must be *certainly impending* to constitute injury in fact," and allegations "of *possible* future injury are not sufficient." *Clapper,* 568 U.S. at 409 (emphasis in original); *Farm Sanctuary*, 2026 WL 1030616, at *3 (where the "record lacks any indication that [member] faces an injury that is actual or imminent" is "[f]atal to Farm Sanctuary's purported associational standing.").

19

While it may be that WCCNY has alleged—through inadmissible hearsay—that some of its members have been stopped or detained by immigration authorities in the past, *see* Maxwell Decl., ¶¶ 25-32, any risk of future harm to WCCNY members is purely speculative. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) ("the risk of real harm cannot satisfy the requirement of concreteness" for purposes of standing); *Farm Sanctuary*, 2026 WL 1030616, at *3 (requiring "concrete facts . . . . that confirm the existence of the risks" organization's members face to establish associational standing). Absent any non-speculative probability of injury to its members, an organizational plaintiff, like WCCNY, lacks associational standing.

WCCNY also lacks organizational standing. To assert organizational standing, "the organization must show that 'it was directly injured as an organization.'" *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 616 (2d Cir. 2026) (quoting *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021)). It is no longer the case after that expenditure of resources and frustration of an organization's mission are sufficient to establish an injury in fact since the Supreme Court's decision in *Hippocratic Medicine*. In that case, the medical-association plaintiffs asserted that organizational standing exists "when an organization diverts its resources in response to a defendant's actions." 602 U.S. at 395. The Supreme Court rejected that assertion as "not correct." *Id.* Likewise, in *Conn. Fair Hous. Ctr.*, the Second Circuit recently held that an organization that was, like WCCNY, "engaged in advocacy and informational programming" and asserted standing based on "frustration of mission and diversion of resources," had failed to make a sufficient showing. 167 F.4th at 618-19.

This Court should likewise reject WCCNY'S contention of organizational standing. Indeed, WCCNY has not even attempted to allege that it has spent money in response to Defendants' alleged actions. *See generally* Maxwell Decl. Even if it had, such an allegation is not

20

enough to establish organizational standing. *Hippocratic Medicine*, 602 U.S. at 370 (an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."). As for the non-speculative, direct "injuries" that WCCNY does allege, they amount to: (1) cancelling a meeting after a member's neighbor was detained (Compl. ¶ 156; Maxwell Decl. ¶ 21); (2) moving monthly membership meetings to a virtual format (Compl. ¶ 156; Maxwell Decl. ¶ 22); and, (3) increased calls to its telephone hotline (Compl. ¶ 156; Maxwell Decl. ¶ 36).

With respect to the single allegedly cancelled meeting—even assuming, *arguendo*, that could constitute an injury—WCCNY fails to explain how it is directly related to Defendants' alleged actions. WCCNY does not allege that the member's neighbor was detained by Defendants, let alone that the detainee was stopped without reasonable suspicion or arrested without a warrant. *See* Compl. ¶ 156; Maxwell Decl. ¶ 21. With respect to the monthly meetings, WCCNY asserts that the virtual format "reduced the information and supportive  materials WCCNY is able to provide, and greatly diminished the quality and efficacy of WCCNY's trainings." Compl. ¶ 156. But that is exactly the "frustration of mission" injury that the Supreme Court and Second Circuit have rejected. *Hippocratic Medicine*, 602 U.S. at 394; *Conn. Fair Hous. Ctr.* 167 F.4th at 618-19.

And as for the phone calls, WCCNY quantifies the alleged increase at "upwards of 55 calls per month" since September 2025, 33 of which occurred in the past three months and reported detentions of a "neighbor, family member, or friend" by federal agents. *See* Maxwell Decl. ¶ 36. An average of fewer than 2 phone calls a day—to a service that WCCNY was *already* providing, *see* Maxwell Decl. ¶ 6—is not an injury. And, even if it were, it is not directly traceable to the challenged alleged policies, since there are no allegations that the increased calls stem from suspicionless stops or warrantless arrests. *See* Compl. ¶ 156; Maxwell Decl. ¶ 36. More likely, the

alleged increase in calls is attributable to WCCNY itself, who admits that in September 2025, it "began more widely publicizing our emergency hotline for immigrants." Maxwell Decl. ¶ 36. Accordingly, WCCNY's attempts to establish standing fail, and its claims should be dismissed for lack of jurisdiction.

### C. Congress Stripped This Court Of Subject Matter Jurisdiction Over Aspects Of Plaintiffs' Claims

Any injunction that this Court might issue should not apply with respect to aliens who are subject to a final order of removal because district courts lack subject matter jurisdiction to limit ICE's authority to detain an alien who is subject to a final order of removal. The Second Circuit has construed 8 U.S.C. §§ 1252(a)(5) and 1252(b)(9) broadly to preclude district courts from exercising subject matter jurisdiction over an action that challenges, directly or even indirectly, an order of removal. *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) (affirming the dismissal of, *inter alia*, APA claims seeking an order to direct United States Citizenship and Immigration Services (USCIS) to adjudicate Delgado's application for a waiver of inadmissibility because, if USCIS were ordered to adjudicate the application, and were to grant the waiver, she would satisfy a necessary requirement for adjustment of status, and if she then succeeded in having her status adjusted, her removal order would be rendered invalid). Another immigration statute, 8 U.S.C. § 1252(g), precludes district courts from issuing an order that would prevent or hinder ICE from executing a removal order. *Troy as Next Friend Zhang v. Barr*, 822 Fed. Appx. 38, 39 (2d Cir. 2020).

Several district judges in this Circuit, among them three in this District, have held that §§ 1252(a)(5), 1252(b)(9) and/or 1252(g) bar claims to enjoin ICE from detaining an individual for the purpose of removal. *See Villatoro v. Shanahan*, No. 26-cv-1210, 2026 WL 948297, *3 (E.D.N.Y. Apr. 7, 2026) (Donnelly, J.) (holding the action was barred by §§ 1252(a)(5) and

1252(b)(9) as a challenge to the petitioner's removal order because granting the relief sought by the petitioner "would frustrate the government's ability to enforce the removal order"); *Sauceda Henriquez v. Noem*, 25-cv-7023, 2026 WL 111665, at *4 (E.D.N.Y. Jan. 15, 2026) (DeArcy Hall, J.), *appeal filed* January 29, 2026 ("a challenge to a petitioner's detention, following an order of removal, constitutes . . . an indirect challenge to an order of removal" that is precluded by §§ 1252(a)(5) and 1252(b)(9) and the challenge is "'inextricably linked to' a removal order") (quoting *Oriakhi v. DHS*, 762 F.Supp.3d 183, 185-86 (E.D.N.Y. 2025) (Matsumoto, J.), *aff'd* No. 25-cv-243-cv, 2026 WL 303642 (2d Cir. Feb. 5, 2026)); *Villatoro v. Noem*, No. 25-cv-5306, 2025 WL 2880140, at *4 (E.D.N.Y. Oct. 9, 2025) (Merchant, J.) (holding the habeas claim was jurisdictionally barred by § 1252(a)(5) as "a direct attack on the validity of the removal order." ); *see also Ceesay v. Bondi*, 25-cv-3716, 2025 WL 1435615, at *2 (S.D.N.Y. May 16, 2025) (§§ 1252(a)(5) and 1252(g) bar an action for an order prohibiting ICE from detaining Ceesay for the purpose of removing him, because such an order "would . . . interfere with the execution of a lawful removal order").

Thus, should the Court issue an injunction in this action – which the Court should not – it should not apply with respect to aliens that ICE seeks to detain who are the subject of a final order of removal.

## II.    PLAINTIFFS CANNOT SHOW THEY ARE ENTITLED TO ANY RELIEF

### A.    Plaintiffs Do Not Identify Final Agency Action Subject To Judicial Review Under The APA

Plaintiffs contend that they are asserting a challenge to a purported "final decision by CBP and ICE's New York City and Buffalo Field Offices as to how to conduct warrantless immigration arrests in New York State".  Motion for PI, p. 19. The crux of Plaintiffs' argument is that Defendants (1) "no longer require immigration officers to obtain a supervisor's prior approval for

23

an arrest" (Compl. ¶ 41), (2) are making arrests before assessing whether individuals are lawfully in the country (Compl. ¶¶ 1, 39, 78, 149), and (3) are making warrantless arrests without probable cause that the individual is likely to escape before a warrant can be obtained (Compl. ¶¶ 116, 130).

However, these assertions are not true. ICE and USBP require administrative warrants to issue prior to (not after) arrest; at ICE those warrants are issued by supervisory officers. ICE Decl. ¶ 4. ICE and USBP both require probable cause that an individual is not lawfully in the country before arresting an alien, and that if a warrant cannot be obtained because of the likelihood of escape, that assessment must be made prior to arrest. ICE Decl. ¶ 5; *see* CBP Decl. ¶ 7. Moreover, ICE and USBP receive training that the "reason to believe" standard for arrest in Section 1357 means probable cause that an individual is in the country unlawfully and is likely to escape before a warrant can be obtained. ICE Decl. ¶ 6.

Not only do the agency policies not support Plaintiffs' assertions that Defendants do not require supervisory approval for arrests, are making arrests before determining lawful status, and are making unwarranted arrests without assessing likelihood of escape, but also Plaintiffs cannot point to an agency action, decision or guidance that sets forth such a purported policy. Instead, the only written directive Plaintiffs point to is guidance that they assert actually "acknowledges" the "correct[ ]" standard for warrantless arrests. Compl. ¶ 125 (citing Lyons Memo). Further, that same guidance also discusses the process for making arrests *with* warrants, and acknowledges both that such warrants "may only be issued by supervisory detention and deportation officers, supervisory special agents, or their superiors," and that the warrants may issue only if "if probable cause of removability is established." *See generally* Lyons Memo. In short, the only guidance Plaintiffs have pointed to – which they do not appear to be challenging– does *not* set forth a general

24

policy of warrantless arrests or arrests without reason to believe an individual is not lawfully in the country.

To the extent Plaintiffs rely on a purported unwritten custom and practice of engaging in warrantless, unlawful arrests in New York, such a practice would not constitute a "final agency action" subject to review under the APA. In general, judicial review under the APA "is available only for 'final agency action.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (quoting 5 U.S.C. § 704). The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent[,] or denial thereof, or failure to act." 5 U.S.C. § 551(13). In limiting APA review to "final" agency action, Congress restricted "pervasive oversight by federal courts over the manner . . . of agency compliance with . . . congressional directives," which would "inject[] the judge into day-to-day agency management." *Norton v. South Utah Wilderness All.*, 542 U.S. 55, 67 (2004). The Supreme Court has articulated "two conditions that generally must be satisfied for agency action to be 'final' under the APA." *Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154 (1997)). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* (quoting *Bennett*, 520 U.S. at 177). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 177–78). The APA thus permits courts to consider only those claims that challenge discrete, "identifiable" final actions with "concrete effects." *Lujan*, 497 U.S. at 890. Plaintiffs are not challenging any action that meets either condition.

25

### 1. Plaintiffs Have Not Challenged A Final Action That Is The Consummation Of An Agency Decision-making Process

An agency practice is not enough, without more, to meet the first condition. In *Lujan*, the Court explained that the mere fact that an agency has taken multiple similar actions does not suffice to show that a different, discrete final agency action exists knitting them all together. 497 U.S. at 877-78. There, the plaintiffs characterized various individual decisions about public land management as a "land withdrawal review program," and sought review under the APA. The Supreme Court held that the agency decisions could not be combined in this way and considered a single, final "agency action" under the APA. *Id.* at 890; *see also id.* at 891 (APA does not allow plaintiffs to amalgamate actions into a purported overarching policy and then "seek wholesale improvement of.th[e] program by court decree").

Applying *Lujan*, courts reject APA claims like the ones in this case where a plaintiff (1) identifies several discrete, allegedly unlawful acts; (2) claims that a common pattern, policy, or practice underlies all the acts; and (3) attempts to challenge the purported pattern, policy, or practice. *See, e.g., Nat'l Treasury Emp's Union v. Vought*, 149 F.4th 762, 783–84 (D.C. Cir. 2025) (multiple actions that changed an agency's operations characterized as overarching decision to shut down the agency); *Bark v. United States Forest Serv.*, 37 F.Supp.3d 41, 50 (D.D.C. 2014) (claimed policy based on five instances of agency permitting concessioners to improperly charge use fees).[5]

Plaintiffs' APA claims here are like the claims in *Lujan*, *Nat'l Treasury Emp's Union* and *Bark*: Plaintiffs assert that Defendants' conduct in various different arrests shows an agency pattern

---

[5] *But see Molina v. U.S. Dep't of Homeland Security*, 811 F.Supp.3d 1 (D.D.C. 2025) (finding final agency action based on executive order and statements made by agency officials). Defendants respectfully submit that *Molina* was wrongly decided, because under *Lujan*, a series of actions or statements cannot meet the first condition for a final agency action. Furthermore, *Molina* was decided before issuance of the Lyons Memo, which provides written guidance setting forth the statutory standard for arrests without warrants.

26

and practice of not complying with Section 1357(a)(2) that they seek to challenge under the APA. As in *Lujan*, *Nat'l Treasury Emp's Union* and *Bark*, Plaintiffs here have not challenged a final agency action that reflects the consummation of an agency decision-making process, such as a written policy that binds employees. *See Nat'l Treasury Emp's. Union*, 149 F.4th at 787 ("Cases involving final agency action not committed to writing are few and far between."). On the contrary, the only written ICE directive that Plaintiffs refer to provides guidance to officers on complying with Section 1357(a)(2) and provides the correct standard for warrantless arrests, as Plaintiffs acknowledge. Compl. ¶ 125.

Plaintiffs also have not shown that Defendants are "applying some particular measure across the board" in all law enforcement encounters that result in warrantless arrests. *Lujan*, 497 U.S. at 890 n.2. ICE and USBP officers in New York do not make a warrantless arrest each time they encounter an alien whom they have reason to believe is in the United States unlawfully; indeed, most of the Plaintiffs were arrested following the issuance of a warrant by an authorized immigration officer. *See* ICE Decl. ¶ 12. And even if Plaintiffs had shown an across-the-board practice, that still would be insufficient in this case, as they have not shown that such an across-the-board practice is the result of some other "specific order or regulation" that is "final." *Lujan*, 497 U.S. at 890 n.2.

In short, the first condition for final agency action is not met because Plaintiffs have not shown that the purported wrongful pattern and practice is the result of a concrete, identifiable, consummated decision-making process.

### 2. Plaintiffs Have Not Shown The Alleged General Policy And Practice Itself Has Direct Consequences For Them.

Plaintiffs also have not met the second condition for final agency action, *i.e.,* that the challenged action itself determined "rights or obligations" or is a source "from which legal

27

consequences will flow." *Bennett*, 520 U.S. at 177-78. For agency action to be "final," the "legal consequences" of the challenged action must be "direct and appreciable." *Hawkes*, 578 U.S. at 597. An internal directive can meet this test if it binds agency staff to act a certain way that affects third parties. See *Biden v. Texas*, 597 U.S. 785, 808-09 (2022) (memo that "forb[ade]" agency employees from "continu[ing] a program" determined rights and obligations of program's beneficiaries); *cf. Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 426 (D.C. Cir. 2004) (no final agency action where agency letter did not "[c]ompel[] [any] one to do anything").

Here, Plaintiffs do not challenge the written guidance that directs immigration law enforcement agents to comply with Section 1357(a)(2) when making warrantless arrests. Rather, they point to an alleged custom and practice of violating that statutory provision. However, they have not shown that Defendants have made a decision that will assuredly affect Plaintiffs if immigration law enforcement agents encounter them again. Plaintiffs have not shown, for example, that Defendants require that all warrantless arrests in New York be made *without* assessing the statutory factors. In any event, such assertions would be untrue. Nor are immigration officers in New York trained to simply ignore the likelihood of escape when deciding whether to make a warrantless arrest; to the contrary, ICE and USBP officers are trained "on warrantless arrest authority under 8 U.S.C. § 1357," including considering the "likelihood of escape." ICE Decl. ¶ 6; CBP Decl. ¶ 7. There is no policy that predetermines the outcome before the encounter happens— *i.e.*, that mandates an unlawful, warrantless arrest. The purported policy and practice of warrantless arrests thus does not meet the second condition for final agency action.

In sum, neither condition for final agency action is met. Plaintiffs' APA claims challenging the purported policy and practice are unlikely to succeed.

28

**D. Plaintiffs Do Not Adequately Allege Violation of the Statutes Or Regulations Governing Warrantless Arrests**

Even if Plaintiffs had identified a final agency action subject to review, their APA claims still would fail because they have not shown that Defendants have a practice of making warrantless arrests in New York without regard to likelihood of escape, or that such a practice was applied to them. Because Plaintiffs' APA claims are unlikely to succeed, their claims under the "*Accardi* doctrine*" are similarly unlikely to succeed.

Under the INA, once an immigration officer develops "reason to believe" that an alien is in the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion or removal of aliens "is likely to escape before a warrant can be obtained for his arrest," that officer may arrest the alien without a warrant. 8 U.S.C. § 1357(a)(2). The "reason to believe" phrase in Section 1357 "must be considered the equivalent of probable cause." *Au Yi Lau v. INS*, 445 F.2d 217, 222 (D.C. Cir. 1971); *see Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015); *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) ("Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in Section 1357(a)(2) means constitutionally required probable cause."); *see also* Lyons Memo ("ICE immigration officers are required to ensure civil immigration arrest warrants are issued for all target aliens prior to conducting targeted arrests" and "[i]f an authorized supervisory immigration officer is present or otherwise accessible, he or she may immediately issue Form I-200 if probable cause of removability is established. If no supervisor is available to issue an administrative warrant, or a supervisor cannot timely issue an administrative warrant, then the officer or agent must consider whether a warrantless immigration arrest is permissible").

Thus, Plaintiffs fail to state a claim to the extent they believe that ICE and USBP do not agree that when a warrantless arrest is effectuated, it must be preceded by a determination that

29

probable cause exists to believe that the alien is in the United States in violation of immigration laws and a determination that probable cause exists to believe the alien is likely to escape before a warrant can be obtained.

Improper warrantless arrest, therefore, is not the issue as to the Individual Plaintiffs. Of the eight Individual Plaintiffs. Of the eight, six were arrested by ICE,[6] and two were arrested by USBP.[7] *See* ICE Decl. ¶ 12; CBP Decl. ¶ 8. Warrants were issued prior to the arrests of four of the six Plaintiffs arrested by ICE in or after January 2026. *See* ICE Decl. ¶ 12. For Benitez, two warrants were issued before his arrest, but contained incorrect names.[8] A third warrant was issued but only after the arrest had taken place. For J.R.H.L., whose arrest occurred in June 2025 (months before issuance of the Lyons Memorandum); a warrant was not issued until after the arrest. Defendants assert that Benitez's and J.R.H.L.'s arrests were effective in good faith notwithstanding errors in process. These outliers do not constitute a failure to properly implement warrantless arrest policies. USBP's arrests of the other two Individual Plaintiffs were conducted consistent with warrantless arrest authority. After developing probable cause to believe that F.R.P. and R.C.R. were in the United States in violation of immigration laws, and that they were likely to escape before a warrant could be obtained, USBP agents arrested both Plaintiffs. *See* CBP Decl. ¶¶ 9-10.[9]

---

[6] Those six are: Darwin Garcia Medrano, Hesler Asaf Garcia Lanza, A.M.C., H.L.A.O., Rene Antonio Benitez, and J.R.H.L.

[7] Those two are: R.C.R. and F.R.P.

[8] See *Benitez v. DHS*, No. 26-cv-2082 (SJB), testimony of proceedings May 14, 2026.

[9] The Complaint, at ¶ 131, n.127, refers to concerns raised by the Court in other cases regarding the timing of the issuance of Notices to Appear ("NTA") (*Gopie v. Lyons*, No. 25-cv-5229, 2025 WL 3167130 (E.D.N.Y. Nov. 13, 2025); *Yeleshev v. LaRocco*, 26-cv-2294, 2026 WL 1353806 (E.D.N.Y. May 14, 2026)), and the conclusion that, where a warrant is issued before an NTA, the warrant is "invalid." *Yeleshev*, 2026 WL 1353806, at *3-4. To the extent that warrants were issued with respect to the Individual Plaintiffs prior to the NTAs, Defendants respectfully submit that there are valid reasons why NTAs may be not be issued until shortly after arrests of individuals who were not previously encountered by ICE or USBP and are only first encountered by officers in the field. As explained by the ICE deportation officer who performed the arrest in *Yeleshev*, "there are things that go into an NTA that have to be

In addition to Plaintiffs' failure to adequately allege that ICE or USBP violated their own policies as to the Individual Plaintiffs, they fail to address any statute, regulation or policy that DOJ defendants (FBI and USMS) have violated. *See generally* Compl. Even taking the Complaint's allegations as true, there are no allegations that FBI or USMS made illegal immigration arrests of Plaintiffs in violation of immigration laws asserted in the complaint. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," but it is not a "probability requirement." *Id.* (quoting *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 556 (2007)).

Notably, the only allegations involving the FBI in the Complaint are: (1) a news report that alleges that "ICE and FBI agents" arrested four unidentified roofers in Buffalo, New York, on May 12, 2025 (Compl. ¶ 58, n.54); (2) "[e]ight to nine officers . . . wearing bulletproof vests that said 'FBI' or 'ICE'" arrested non-plaintiff declarant L.R.C. on June 11, 2025, in a parking lot in Glen Cove, New York (*id.* ¶ 86);  and (3) five agents, who "surrounded Plaintiff A.M.C.," were "wearing bulletproof vests. Some were green and said FBI; others were black and said ICE." (*id.* ¶ 319). Plaintiffs do not plead any facts demonstrating that any FBI agent made an immigration arrest or violated any statute or policy. *See generally id.*

---

done very efficiently and detailed . . . there are certain programs and computer systems that we use back in our intake facility that we don't have mobile[-]y . . . the application that we use on [DHS's database, to issue an NTA] has 40 plus questions and different sworn statements that we need to process an individual's entire packet, and that's not something that is feasible with time doing [while in the field]." *See Yeleshev*, 26-cv-2294, ECF No. 18 (transcript) at pp.25-26 (Exhibit A to Declaration of Assistant US. Attorney Marika Lyons).

Respondents respectfully submit that the applicable regulation does not require an NTA to issue beforehand, but also contemplates that an NTA can issue "at the time of" an arrest. *See* 8 C.F.R. 1236.1. Respondents further respectfully submit that "at the time of" means contemporaneously, rather than beforehand, or the regulation would not have provided the alternative of *other than* beforehand, and that an NTA issued the same day, even if issued minutes or hours after arrest, is sufficiently contemporaneous to meet the "at the time of" standard. *See, e.g., Flores-Linares v. Bondi*, No. 26-CV-00298-SJB, 2026 WL 179208, at *2 (E.D.N.Y. Jan. 22, 2026) (considering what "at the time of" means in the context of the timing of filing of a habeas petition, and concluding that "at the time of" means during the calendar day. "With very limited exceptions . . . common law legal systems have long reckoned periods of legal significance by the calendar, not by the clock.") (citing *Lagandaon v. Ashcroft*, 383 F.3d 983, 990 (9th Cir. 2004)).

Similarly, the only allegations against the USMS are that: (1) "ICE agents and U.S. Marshals wearing military vests and carrying long guns got out [of five unmarked cars] and approached," non-plaintiff declarant A.J.M.C. and "other Latino men" in a Home Depot parking lot on June 5, 2025 (Compl. ¶ 80); and (2) the "ICE agents and U.S. Marshals arrested A.J.M.C. without a warrant." *Id.* ¶ 146. Again, Plaintiffs do not plead facts demonstrating that any U.S. Marshal made an immigration arrest or violated any statute or policy. *See generally id.*

In any event, ERO acknowledges that it was the agency that conducted the arrests of six of eight Individual Plaintiffs, ICE Decl. ¶ 12. USBP acknowledges that it was responsible for the other two. *See* CBP Decl. ¶ 8. There is no evidence that FBI or USMS were responsible for any Individual Plaintiff's arrests.

A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Banneker Ventures*, 798 F.3d at 1129. Here, Plaintiffs plead no allegations suggesting any FBI or USMS employee engaged in any wrongful conduct, and thus, Plaintiffs fail to state a claim against the FBI or Director Patel, or against the USMS or Director Serralta.

## III.   PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM

Even could Plaintiffs establish the requisite substantial likelihood of success on the merits, Plaintiffs also cannot establish the second prong, that they are "likely to suffer irreparable harm in the absence of preliminary relief." *New York Progress,* 733 F.3d at 486. As set forth above at 7-17, Plaintiffs' allegations of future harm (re-arrest) are nothing more than speculation. There is no substantial threat of re-arrest - the imminent harm they fear.

32

## IV. THE BALANCE OF THE EQUITIES FAVORS DEFENDANTS

Even if Plaintiffs could establish the first two prongs for a PI (*see supra* at 6-7), Plaintiffs cannot establish the third prong, that the equities favor them. Where the government is a party to an action, the balance of equities and public interest factors "merge." *Nken,* 556 U.S. at 435. Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan,* 501 U.S. 1301, 1305 (1991). Here, the balance of the equities and public interest tips decisively in Defendants' favor.

The Government has a significant and compelling interest in the steady enforcement of its immigration laws. *See, e.g., Demore v. Kim,* 538 U.S. 510, 523 (2003); *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1140 (9th Cir. 2009) (holding that the court "should give due weight to the serious consideration of the public interest" in enacted laws). In order to enforce immigration laws, Defendants must be allowed to effectuate arrests as permitted under the applicable statutory and regulatory scheme. New York State is a priority for immigration enforcement, and the proposed PI would throw a central element of immigration enforcement–immigration arrests–into intolerable uncertainty. Granting the PI would risk unintended operational consequences and public-safety concerns. *See Perdomo,* 146 S. Ct. at 4 (Kavanaugh, J., concurring) (quoting *United States v. Brignoni-Ponce,* 422 U.S. 873, 878 (1975)) (finding that balance of harms and equities tips in favor of the Government in immigration enforcement given the "myriad 'significant economic and social problems' caused by illegal immigration[.]"). Indeed, as shown by Plaintiffs' proposed PI order, such an injunction would inject the judiciary (and Plaintiffs' counsel) into micromanaging every operation and stop conducted in New York State. That is untenable.

The public interest favors lawful, effective enforcement within constitutional limits. *Nken,* 556 U.S. at 435; *Jennings,* 583 U.S. at 286. Preventing the Executive Branch from implementing a major enforcement priority and effectuating the immigration laws Congress enacted weighs in

33

favor of denying the PI. *See Perdomo*, 146 S.Ct. at 6 ("[W]e now likewise must decline to step outside our constitutionally assigned role to improperly restrict reasonable Executive Branch enforcement of the immigration laws."). "The Judiciary does not set immigration policy or decide enforcement priorities" but merely "ensure[s], in justiciable cases, that the Executive Branch acts within the confines of the Constitution and federal statutes." *Id.* at 5. As shown above, Defendants are acting within these parameters. The proposed injunction also would inflict irreparable harm on Defendants by supplanting the political branches' judgments and intruding on the separation of powers. *See Trump v. CASA*, 606 U.S. 831, 857-58 (2025). In contrast, "[t]he interests of individuals who are illegally in the country in avoiding" arrest "is ultimately an interest in evading the law[,]" which "is not an especially weighty legal interest." *Perdomo*, 146 S.Ct. at 5.

Plaintiffs offer no argument or analysis to dispute Defendants' authority to enforce immigration laws. Plaintiffs fail to acknowledge the substantial governmental harm an injunction imposes by usurping authority over enforcement of the immigration laws, which the Constitution and federal statutes commit to the Executive Branch. *See Perdomo,* 146 S.Ct. at 4 (quoting *CASA*, 606 U.S. at 861 ("Any time that the Government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (cleaned up)). Accordingly, on balance, the public interest far from favors granting Plaintiffs' requested injunctive relief.

34

## CONCLUSION

For the reasons stated herein, the motion for preliminary injunction should be denied and the action should be dismissed for lack of standing.

Dated:     Brooklyn, New York
           May 28, 2026

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
*Attorney for Defendants*
271-A Cadman Plaza East
Brooklyn, New York 11201

By:    */s/ Thomas Price*
       Thomas Price
       Marika Lyons
       Philip DePaul
       Justin Kirschner
       Assistant United States Attorneys
       (631) 715-7893
       thomas.price@usdoj.gov

## CERTIFICATE OF COMPLIANCE

The foregoing Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction contains 11,351 words, excluding the cover, tables and signature block.

Dated:  Central Islip, New York
       May 28, 2026

\

                                 JOSEPH NOCELLA, JR.
                                 UNITED STATES ATTORNEY
                                 Eastern District of New York
                                 Attorney for Defendants

By:    s/s_____
         THOMAS PRICE
         Assistant U.S. Attorney
         (631) 715-7893
         thomas.price@usdoj.gov