**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

RENE ANTONIO BENITEZ *et al.*

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY *et al.*

*Defendants*.

Case No. 26-cv-02082-SJB-JMW

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION OR STAY AND PROVISIONAL CLASS CERTIFICATION AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 2

I. Procedural History .......... 2

II. Statutory Framework .......... 3

ARGUMENT .......... 4

I. Defendants Have a Policy and Practice of Making Arrests Without Warrants and Without Probable Cause that the Person is Likely to Escape. .......... 4

A. Plaintiffs' Arrests Illustrate the Challenged Policy and Practice. .......... 4

B. Officers' Testimony Confirms Defendants' Unlawful Policy and Practice. .......... 7

C. Post-Hoc and Invalid Warrants Do Not Cure Unlawful Warrantless Arrests. .......... 9

D. Defendants' MDC Data Confirms the Existence of the Challenged Policy. .......... 11

E. Defendants' Unlawful Policy Remains Pervasive. .......... 12

II. Plaintiffs Face a Substantial Risk of an Unlawful Warrantless Re-Arrest. .......... 13

A. Defendants Stop Anyone Who Broadly Resembles a Target. .......... 13

B. Plaintiffs' Daily Activities Expose Them to a Substantial Risk of Re-arrest. .......... 14

CONCLUSION .......... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berkemer v. McCarty*,
468 U.S. 420 (1984)....................3

*Chaglla v. Maldonado*,
2026 WL 2529494 (E.D.N.Y. Aug. 27, 2026)....................6, 9, 13

*Curimilma Quille v. Blanche*,
2026 WL 1453889 (E.D.N.Y. May 22, 2026)....................13

*Devenpeck v. Alford*,
543 U.S. 146 (2004)....................10

*Escobar Molina v. U.S. Dep't of Homeland Sec.*,
811 F. Supp. 3d 1 (D.D.C. 2025)....................14, 15

*Frey v. City of New York*,
157 F.4th 118 (2d Cir. 2025)....................13

*Garcia Lanza v. Noem*,
822 F. Supp. 3d 326 (E.D.N.Y. 2026)....................5, 6, 9

*Gopie v. Lyons*,
2025 WL 3167130 (E.D.N.Y. Nov. 13, 2025)....................10

*Labarca v. Bausch*,
2026 WL 2364293 (W.D.N.Y. Aug. 14, 2026)....................12

*Lopez Romero v. Genalo*,
2026 WL 2240720 (S.D.N.Y. Aug. 3, 2026)....................9, 13

*M-J-M-A- v. Hermosillo*,
822 F. Supp. 3d 1147 (D. Or. 2026)....................10

*Nahum Blandon v. Maldonado*,
2026 WL 790910 (E.D.N.Y. Mar. 21, 2026)....................10

*Okeke v. Maldonado*,
2026 WL 2056904 (E.D.N.Y. Jul. 16, 2026)....................6, 13

*Pavlo Viner v. Maldonado*,
2026 WL 2355437 (E.D.N.Y. Aug. 14, 2026)....................13

*Ramirez Ovando v. Mullin*,
2026 WL 2641058 (D. Colo. May 12, 2026)....................10

*Ramirez Ovando v. Noem*,
810 F. Supp. 3d 1209 (D. Colo. 2025)....................10

*Rea v. Ball*,
2026 WL 1959270 (N.D.N.Y. July 2, 2026)....................12

*Sanchez Alfaro v. Mullin*,
2026 WL 1382985 (E.D.N.Y. May 18, 2026)....................9

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2016)....................15

*Terry v. Ohio*,
392 U.S. 1 (1968)....................3

*United States v. Bailey*,
743 F.3d 322 (2d Cir. 2014)....................3

*United States v. Newton*,
369 F.3d 659 (2d Cir. 2004)....................3

*Vansh v. Ball*,
2026 WL 2096666 (W.D.N.Y. July 21, 2026)....................12

*Yeleshev v. Larocco*,
2026 WL 1353806 (E.D.N.Y. May 14, 2026)....................10

**Statutes**

5 U.S.C. § 705....................2

8 U.S.C. § 1226(a)....................3

8 U.S.C. § 1357(a)(2).................... *passim*

**Regulations**

8 C.F.R. § 236.1(b)....................3, 4

8 C.F.R. § 239.2(e)....................4

8 C.F.R. § 287.3(d)....................4, 11

8 C.F.R. § 1236.1(b)....................3

## PRELIMINARY STATEMENT

Since Plaintiffs filed their motion for preliminary relief, Defendants have made good on their threats to increase immigration arrests in New York, arresting nearly 2,200 individuals in August 2026 alone. Defendants achieved these historically high numbers in part through the unlawful policy and practice Plaintiffs challenge here. The record, including the now-completed expedited discovery, confirms that Defendants routinely surveil communities throughout New York, arrest people without first issuing warrants or conducting the probable cause analysis that 8 U.S.C. § 1357(a)(2) requires, and only then do they sometimes obtain post-hoc, invalid warrants in an effort to circumvent that statute.

Defendants' warrantless arrest policy and practice is contrary to law and arbitrary and capricious. DE 21-1 at 13-23. Officer-deponents admitted they have largely abandoned the heightened, unique requirements of § 1357(a)(2) in favor of papering over their violations after-the-fact. But Defendants' post-hoc warrants do not alter the warrantless nature of the initial arrest or obviate compliance with § 1357(a)(2). Congress enacted § 1357(a)(2) for a reason: officers in the field, encountering a person for the first time, lack critical information about whether an arrest is necessary. Absent the detailed consideration that underlies the generation of an arrest warrant—including the Notice to Appear ("NTA") that must, by regulation, accompany or precede it—an officer must have probable cause that the person is likely to escape before making a warrantless arrest. That is not Defendants' practice.

The record also confirms Plaintiffs' standing. Defendants' warrantless arrest practices remain pervasive across New York, and Plaintiffs' quotidian activities place them at substantial risk of experiencing an unlawful re-arrest. Further, the record establishes that Plaintiffs satisfy Rule 23's requirements. The Court should stay Defendants' unlawful policy of making warrantless

arrests without escape risk pursuant to 5 U.S.C. § 705 and grant Plaintiffs' motion for provisional class certification.

## BACKGROUND

### I. Procedural History

Plaintiffs filed this challenge to Defendants' arrest practices in New York in April 2026, DE 1, shortly followed by motions for preliminary relief and class certification related only to their claim that ICE has a policy and practice of making warrantless arrests without probable cause of escape risk, DE 21-22. In support of those motions, Plaintiffs submitted 35 sworn declarations describing dozens of warrantless arrests across the state made without probable cause as to escape risk, DE 21-1 at 5-10, 16-18, including a declaration from Plaintiff WCCNY providing detailed accounts regarding warrantless arrests of its members, DE 21-11 ¶¶ 25-26, 29-32; and 30 news articles and reports describing Defendants' policy, including Defendants' own statements, DE 21-1 at 3-5. Defendants moved to dismiss, and in the face of Plaintiffs' evidence, submitted just two declarations stating, without any documentary support, that all but one of the Individual Plaintiffs' arrests were made either pursuant to a warrant or after officers assessed escape risk. DE 50–54. Defendants did not contest that Plaintiff J.R.H.L. was arrested without a warrant or probable cause that he was likely to escape before one could be obtained. Nor did Defendants dispute that Plaintiff Workers Center of Central New York's members experienced warrantless arrests.

At a June 18, 2026, hearing, the Court suggested further evidence would be helpful to fill evidentiary gaps related to the scope and nature of the challenged policy and raised concerns regarding potential "false statements and perjury" in one of the Defendants' declarations. DE 41 at 11:5-18, 14:17-22, 18:9-10. The following day, Defendants withdrew the potentially perjurious declaration and submitted four new declarations on sur-reply from officers involved in the arrest of four Plaintiffs. *See* DE 65-1–65-4. To address the evidentiary gaps identified by the Court and

the new factual representations made in the sur-reply declarations, Plaintiffs sought limited expedited discovery. DE 68.

On July 2, 2026, Judge Wicks ordered expedited discovery requiring Defendants to produce data regarding individuals detained by Defendants at the Metropolitan Detention Center ("MDC"); Plaintiffs to respond to two requests for admission; and the parties to take four depositions per side pertaining to the four sur-reply declarations. DE 73.

## II. Statutory Framework[1]

Under 8 U.S.C. § 1226(a), DHS may arrest and detain a noncitizen "[o]n a warrant issued by the Attorney General."[2] The implementing regulation provides: "At the time of issuance of the notice to appear, or at any time thereafter . . . the respondent may be arrested and taken into custody under the authority of Form I-200, Warrant of Arrest." 8 C.F.R. § 236.1(b)(1); *accord id.* § 1236.1(b). Only certain supervisory officers may issue administrative warrants, and only officers who have "completed basic immigration law enforcement training," may issue or serve warrants *id.* § 287.5(e)(2)-(3).

DHS cannot issue warrants without a concurrent or prior NTA. The warrant is tied to removal proceedings that have already begun or are beginning contemporaneously, 8 C.F.R.

---

[1] The statutory framework relevant to Plaintiffs' claim is set out more fully at DE 21-1 at 2-3.

[2] The Fourth Amendment permits a brief investigative stop on reasonable suspicion, but a seizure becomes an arrest requiring probable cause when it exceeds those bounds. *Terry v. Ohio*, 392 U.S. 1, 29-30 (1968). Whether that line has been crossed turns on the totality of the circumstances, including the force used, the degree of restraint, and the number of officers present. *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004). Restraints that may be justified where officers confront a suspected armed individual are not justified in a civil immigration encounter, where no criminal activity is suspected. *Cf. United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014) (handcuffing exceeded *Terry* where a patdown confirmed individuals were unarmed). And in all events, an individual is in custody "at least as of the moment he [i]s formally placed under arrest." *Berkemer v. McCarty*, 468 U.S. 420, 434 (1984).

§ 236.1(b), and the warrant is canceled when the NTA is cancelled, 8 C.F.R. § 239.2(e). Under this framework, the warrant has no force absent a corresponding NTA.

Under the only statutory vehicle for a warrantless immigration arrest an officer may arrest a noncitizen if the officer has reason to believe is in the United States unlawfully "and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2). The implementing regulation requires the officer to determine "within 48 hours of the arrest … whether a notice to appear and warrant of arrest … will be issued." 8 C.F.R. § 287.3(d). The parties agree that "reason to believe" means the officer must have probable cause as to both status and escape risk. *See* DE 54 at 24.

## ARGUMENT

### I. Defendants Have a Policy and Practice of Making Arrests Without Warrants and Without Probable Cause that the Person is Likely to Escape.

#### *A. Plaintiffs' Arrests Illustrate the Challenged Policy and Practice.*

Deposition testimony confirms Defendants arrested Plaintiffs pursuant to their policy of arresting noncitizens without an individualized assessment of whether there is probable cause that the person is likely to escape before a warrant can be obtained while ignoring evidence that no such escape risk exists.

Defendants arrested each Plaintiff before issuing warrants. During each initial stop of Plaintiffs, multiple armed officers surrounded them, and the situation shifted quickly from a stop to an arrest. *See* Belsher Decl. Ex. 10, Petito Tr. 31:20-32:4 (defining an arrest as when someone's "ability for free movement is no longer available to them"). Officers then almost immediately took Plaintiffs' identification documents. *E.g.*, Belsher Decl. Ex. 14, H.L.A.O. Tr. 52:13-17; Ex. 9, A.M.C. Tr. 73:9-12; Ex. 12, Garcia Lanza Tr. 57:8-13; Ex. 11, Garcia Medrano Tr. 52:16-53:2. Plaintiffs were not free to leave; their freedom of movement was significantly constrained by the

officers' intimidating show of authority and force. *See* Belsher Decl. Ex. 12, Garcia Lanza Tr. 58:19-59:6; Ex. 11, Garcia Medrano Tr. 80:14-19; DE 21-6 ¶¶ 7-10 (four cars boxed in J.R.H.L. as an armed officer questioned him); DE 21-8 ¶ 12 (agents surrounded A.M.C.). For example, Officer Petito testified that he and four-to-six other officers surrounded Mr. Garcia Lanza, and within minutes, took his identification, placed him in handcuffs, informed him he was under arrest, and then drove him to a second location where he was placed in a waist-chain. Belsher Decl. Ex. 10, Petito Tr. 150:19-151:24, 174:5-14, 188:5-11, 199:25-200:10.

While Mr. Garcia Medrano and H.L.A.O. were in vehicles when stopped, they had no practical ability to depart. H.L.A.O. was stuck between the officers' car and the entrance to the Shelter Island Ferry. Belsher Decl. Ex. 14, H.L.A.O. Tr. 51:11-25. To leave, H.L.A.O. would have had to turn his car around while in the presence of two armed officers. *Id.* 59:11-17. Similarly, Mr. Garcia Medrano was parked at a gas station when four officers carrying firearms surrounded his car. Belsher Decl. Ex. 11, Garcia Medrano Tr. 80:14-19. Any attempt to depart at this point would have placed Plaintiffs in danger.[3] A.M.C. was similarly trapped between three armed officers and a locked door. Belsher Decl. Ex. 9, A.M.C. Tr. 21:8-10.

To the extent that Defendants issued warrants for Plaintiffs, those came after the arrests. It was only when Mr. Garcia Lanza was already in handcuffs and waist-chains, at a second location, that he witnessed an officer fill out what he later learned was his arrest warrant "[a]s bureaucratic cover for the arrest." *Garcia Lanza v. Noem*, 822 F. Supp. 3d 326, 329 (E.D.N.Y. 2026); *see* Belsher Decl. Ex. 10, Petito Tr. 190:8-23, 203:8-21; Ex. 12, Garcia Lanza Tr. 73:4-16. Officer Mascia's

[3] Defendants' agents have shot at least 17 motorists during immigration operations since January 2025. Belsher Decl. Ex. 3. Plaintiffs' separate motion to supplement the record includes the news reports cited in the Belsher Declaration, along with other news reports, of which the Court can also take judicial notice.

supervisor told him that he was signing the warrant after H.L.A.O. had already been handcuffed and transported to a second location. Belsher Decl. Ex. 13, Mascia Tr. 266:2-10. Defendants cannot provide any evidence beyond Officer Cuni's say-so that the warrant that he supposedly issued prior to A.M.C.'s arrest ever existed. Belsher Decl. Ex. 8, Cuni Tr. 98:1-99:4.[4] The CBP officer who arrested R.C.R. stated that he did not need a warrant to arrest her and would create one later. DE 21-9 ¶ 11. No officer served a warrant on Plaintiffs at the time of their arrest. *See, e.g.,* Belsher Decl. Ex. 10, Petito Tr. 190:8-23, 203:8-21; Ex. 7, Rey Tr. 63:18-22 (stating she "serves" warrants by telling the person she has one).[5]

But even if a warrant preceded any of Plaintiffs' arrests, the arrest would still have been warrantless for a separate reason: no Plaintiff had an NTA at the time of their arrest, Belsher Decl. Ex. 13, Mascia Tr. 128:4-20, 257:17-258:25; Ex. 10, Petito Tr. 180:16-19; Ex. 8, Cuni Tr. 135:5-18; *see also Garcia Lanza*, 822 F. Supp. 3d at 329 (describing post-hoc initiation of removal proceedings as "baseless"),[6] rendering any such warrant invalid, *see supra* Background II.

Finally, Defendants' agents uniformly failed to conduct any escape risk analysis before arresting Plaintiffs without warrants. Officers' inquiries prior to arrest were almost entirely limited

---

[4] Significant concerns about Officer Cuni's accuracy and credibility have been raised in two recent habeas decisions from this District. *See Chaglla v. Maldonado*, 2026 WL 2529494, at *2 (E.D.N.Y. Aug. 27, 2026) (noting that surveillance footage of the arrest "largely contradicts SDDO Cuni's declaration"); *Okeke v. Maldonado*, 2026 WL 2056904, at *5 n.3 (E.D.N.Y. Jul. 16, 2026) (describing the court's "numerous concerns with the accuracy of" Officer Cuni's declaration).

[5] Warrants, where located, also contained incorrect information. *See, e.g.,* Belsher Decl. Ex. 10, Petito Tr. 211:7-213:18 (checking box that biometrics had confirmed identity where none had yet been taken); DE 59-2 97:19-21, 150:15-17.

[6] ICE understood that Mr. Garcia Lanza could not be removed while his deferred action remained pending, requesting that USCIS revoke his deferred action without basis after his arrest. Belsher Decl. Ex. 10, Petito Tr. 180:22-182:9; *Garcia Lanza v. Noem*, 822 F. Supp. 3d at 329; *see also* Belsher Decl. Ex. 10, Petito Tr. 184:7-11 (testifying that he attempts to seek revocations of deferred action prior to arrest).

to Plaintiffs' immigration status. Belsher Decl. Ex. 12, Garcia Lanza Tr. 56:12-14 (asking for ID, if he was a citizen, and where he was going); DE 21-6 ¶¶ 12-13 (asking J.R.H.L. for his ID and if he had legal status); Belsher Decl. Ex. 11, Garcia Medrano Tr. 50:6-7 (asking only for ID before arrest); DE 21-9 ¶¶ 10-12. Conversely, officers disregarded information that weighed *against* escape risk. *See* Belsher Decl. Ex. 10, Petito Tr. 84:23-86:12, 151:10-12, 168:9-13; 173:17-174:25; 180:20-22; 188:18-189:8, 200:11-201:5, 215:9-11 (officer knew that Mr. Garcia Lanza spoke English, had received SIJS and deferred action, attended school, had immediate family nearby, and was compliant and truthful at all times); Ex. 9, A.M.C. Tr. 71:21-25 (told officers he had lived in the building for three to four years); Ex. 13, Mascia Tr. 254:22-255:13 (receiving instruction to arrest H.L.A.O. despite sick child and wife in hospital); *id*. 239:4-7, 240:25-241:10 (officer knew he had stable employment and longstanding presence); DE 59-2 at 68:15, 70:17 (encountering Mr. Benitez while driving his daughter to school and disregarding other community ties); Belsher Decl. Ex. 7, Rey Tr. 68:9-13.

*B. Officers' Testimony Confirms Defendants' Unlawful Policy and Practice.*

The officers' testimony confirms that ICE rarely, if ever, performs the escape risk analysis required by § 1357(a)(2) and that their consistent practice is instead to attempt to shirk the requirements of the statute by erroneously construing warrantless arrests as arrests pursuant to a warrant. While some officers recognized that probable cause of escape risk is necessary for a warrantless arrest, they had little understanding of what that analysis requires. To the extent officers could recall training on escape risk in any detail, they referenced the flawed factors in the Lyons Memo, *see* Belsher Decl. Ex. 7, Rey Tr. 34:9-23, 35:9-12; Ex. 13, Mascia Tr. 153:17-20, which are insufficient for the reasons discussed in Plaintiffs' prior briefing, *see* DE 59 at 3-6, 25-27.

Moreover, multiple officers referenced instructions that employment authorization, deferred action, and special immigrant juvenile status are no bar to an arrest, even though such factors are highly probative of *lack* of escape risk. *See* Belsher Decl. Ex. 7, Rey Tr. 73:1-6, 97:5-25, 99:1-14; Ex. 10, Petito Tr. 48:24-50:5; 175:2-176:9.

Discovery revealed that officers continue to make warrantless arrests where no warrant was issued on the day of the arrest. *See* Belsher Decl. Ex. 10, Petito Tr. 74:20-75:22; Ex. 4 at 2. Deponents' testimony also revealed that ICE officers now routinely either issue warrants *after* an arrest or issue a patently invalid warrant (because it precedes the NTA) in an attempt to cure their failure to comply with § 1357. Indeed, recently-disclosed ICE training materials from February 2026—which no deposed officer mentioned—instructs that officers "may carry a blank Form I-200, Warrant for Arrest of Alien, to arrest collaterals with a warrant upon establishing probable cause so that an individualized 'likelihood of [e]scape' analysis is not needed." Belsher Decl. Ex. 15 at 90.

In line with this guidance, officers testified they carry blank, pre-printed I-200s to fill in in the field, Belsher Decl. Ex. 10, Petito Tr. 70:6-16, 192:7-25; Ex. 8, Cuni Tr. 101:20-102:15, and routinely issue warrants over the phone, Ex. 8, Cuni Tr. 96:23-98:7; Ex. 7, Rey Tr. 63:7-11; Ex. 13, Mascia Tr. 130:23-25; Ex. 10, Petito Tr. 84:23-86:12. Officers do not believe they need to obtain or even see an electronic version of the warrant prior to effectuating the arrest.[7] Belsher Decl. Ex. 8, Cuni Tr. 96:23-98:24; Ex. 7, Rey Tr. 63:18-64:2; Ex. 10, Petito Tr. 90:16-91:13. Officers claimed to have "executed" warrants they did not possess and, in some cases, had never even seen. Belsher Decl. Ex. 7, Rey Tr. 64:5-25; DE 59-2 at 74:15-17.

---

[7] Officer Mascia testified that he believed an I-200 had been issued prior to the arrest based on another officer's representation but no officer on scene had personally viewed a copy. Belsher Decl. Ex. 13, Mascia Tr. 260:21-22, 262:13-18.

Beyond timing, the officers all testified about their practice of seeking and issuing warrants in violation of the regulatory requirements, plainly viewing warrants as a box to check rather than a meaningful limit on arrest authority. *See* Belsher Decl. Ex. 8, Cuni Tr. 99:24-100:2, 100:20-101:3 (issuing A.M.C.'s warrant over phone in "seconds"); DE 59-2 at 151:16-19 (officer "decided to create" an arrest warrant after arrest). The officers confirmed they routinely sought or issued warrants where no corresponding NTA exists, *see, e.g.*, Belsher Decl. Ex. 8, Cuni Tr. 134:18-135:18; Ex. 13, Mascia Tr. 62:20-22, largely viewing that requirement as optional.[8]

Finally, Defendants' argument that the policy and practice has changed in light of the multiple judicial decisions finding their practices unlawful, s*ee* DE 54 at 14-15, is squarely repudiated by the officers' testimony, *e.g.*, Belsher Decl. Ex. 13, Mascia Tr. 163:11-15; Ex. 7, Rey Tr. 35:14-20, 55:2-8, 56:21-23, 143:8-17; Ex. 10, Petito Tr. 104:24-105:2.

*C. Post-Hoc and Invalid Warrants Do Not Cure Unlawful Warrantless Arrests.*

Defendants' "practice of issuing warrants post-arrest or prior to the commencement of removal proceedings" is "plainly illegal." *Sanchez Alfaro v. Mullin*, 2026 WL 1382985, at *2 (E.D.N.Y. May 18, 2026). First, "courts have uniformly found" that this practice of "arrest[ing] first and pencil-whip[ping] the I-200 later" is unlawful. *Chaglla v. Maldonado*, 2026 WL 2529494, at *2 (E.D.N.Y. Aug. 27, 2026). Because the lawfulness of an arrest is assessed at the time of arrest, the post-hoc issuance of a warrant does not cure immigration officers' failure to comply with § 1357(a)(2)'s requirements. *See Lopez Romero v. Genalo*, 2026 WL 2240720, at *2 (S.D.N.Y. Aug. 3, 2026) (warrantless arrest unlawful where arrest preceded warrant and officer did not have probable cause of escape risk); *Garcia Lanza*, 822 F. Supp. 3d at 333 (holding a post-arrest

[8] While Officer Petito claimed to bring blank NTAs with him to complete in in the field—a task other deponents testified was not possible, *see* Belsher Decl. Ex. 13, Mascia Tr. 57:4-11, 60:2-25—he also admitted these NTAs could only be completed by including incorrect immigration court appearance dates, Ex. 10, Petito Tr. 69:17-20.

administrative warrant "plainly invalid"); *Ramirez Ovando v. Mullin*, 2026 WL 2641058, at *20 (D. Colo. May 12, 2026) (enforcing preliminary injunction "based on the narrower and unremarkable proposition that the issuance of a field warrant must precede formal arrest"); *Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209, 1226 (D. Colo. 2025) ("But issuing *post hoc* warrants once plaintiffs had already been unlawfully arrested does nothing to cure the initial statutory violation."); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (validity of an arrest under the Fourth Amendment is judged based on "the facts known to the arresting officer at the time of the arrest"). Indeed, Defendants' practice of issuing after-the-fact warrants only underscores their failure to conduct the required escape risk analysis before making a warrantless arrest. *See M-J-M-A- v. Hermosillo*, 822 F. Supp. 3d 1147, 1179 (D. Or. 2026) (finding that after-the-fact warrants are "highly probative" of ICE's failure to make individualized escape-risk determinations).

Second, an arrest pursuant to a warrant issued prior to an NTA is a warrantless arrest. *See Gopie v. Lyons*, 2025 WL 3167130, at *1 (E.D.N.Y. Nov. 13, 2025) (post-arrest issuance of both the warrant and the NTA meant ICE arrested the petitioner without authority).[9] The I-200 has no validity independent from an NTA. *See supra* Background II. "ICE has no free ranging arrest warrant authority, but only the ability to use warrants once it has begun removal proceedings." *Yeleshev v. Larocco*, 2026 WL 1353806, at *3 (E.D.N.Y. May 14, 2026); *see also Nahum Blandon v. Maldonado*, 2026 WL 790910, at *5 (E.D.N.Y. Mar. 21, 2026) (regulations require that an NTA at least be served at the time of arrest). And while a regulation permits the post-arrest generation

---

[9] This Court had no occasion to reach the question of whether such arrests complied with § 1357(a)(2) in its prior habeas decisions, as the government never argued it had complied with that statute, arguing it had instead issued valid warrants. Here, Defendants claim that their practice of issuing invalid warrants means they need not comply with § 1357(a)(2).

of a warrant and NTA, that process *requires compliance with Section 1357(a)(2)* at the point of arrest. 8 C.F.R. § 287.3(d). This guardrail is no mere technicality: because a valid I-200 warrant must be preceded or accompanied by an NTA, officers who issue a valid warrant have detailed, critical information about the noncitizen prior to the arrest, Belsher Decl. Ex. 10, Petito Tr. 20:16-21:14. That Defendants—and the officers themselves—do not view such arrests as warrantless, *see, e.g.*, Ex. 8, Cuni Tr. 157:14-21, confirms the need for the relief Plaintiffs seek.

*D. Defendants' MDC Data Confirms the Existence of the Challenged Policy.*

Defendants' data related to people detained at MDC on a single date, June 24, 2026, reflects the warrantless arrests policy and practice Plaintiffs allege. Defendants claim they obtain I-200 warrants before targeted field actions, *e.g.*, Belsher Decl. Ex. 10, Petito Tr. 20:22-21:3, yet only 66 of the 155 people detained on a civil immigration charge had warrants issued prior to the date of their arrest. Belsher Decl. Ex. 4. For over half of these 155 detainees, a warrant "was issued on the same date as the arrest." *Id*. Only 76 of the 155 detainees had an NTA issued prior to their arrest. *Id.* It appears that, at most, 66 of the 155 detainees had both a warrant and an NTA at the point of arrest—the hallmarks of a targeted arrest—and at least thirteen had neither. *Id.*

These figures strongly suggest that most of those held at MDC on June 24 were, like Plaintiffs, "collateral" arrests. Given the officers' testimony about their field warrant practice, *see* Section I.B, *supra*, it is highly likely that a large portion, if not all, of the 81 same-day warrants were issued only *after* the arrest occurred and/or prior to an NTA. In addition, by Defendants' own account, 8 individuals were arrested without any warrant having issued on or before the date of arrest.[10] Belsher Decl. Ex. 4 at 2. The Court can infer from this data a higher number of warrantless arrests than the one-day snapshot provides: many thousands more individuals are held at other

[10] Of these, Defendants note 5 were arrested at ports of entry, leaving 3 interior warrantless arrests. Belsher Decl. Ex. 4.

facilities. During Operation Rotten Apple, ICE arrested 2,197 individuals in New York—more than ten times the number held at MDC on June 24, 2026. Belsher Decl. Ex. 6. Defendants' data almost certainly excludes those promptly released, as they would not be reflected in detention counts.

*E. Defendants' Unlawful Policy Remains Pervasive.*

Any claim that Defendants' warrantless arrest policies have changed is further undermined by numerous recent warrantless arrests across New York. "Border Czar" Tom Homan has now delivered on his promise to "flood the zone," DE 59 at 6, boasting that ICE is arresting more immigrant New Yorkers every month, Belsher Decl. Ex. 2 at 1:38-57, and "deportation-maxxing," Ex. 5. Over 30 days in July and August 2026, as part of "Operation Rotten Apple," ICE arrested almost 2,200 people in New York, including "quite a few" collateral arrests. Belsher Decl. Ex. 2 at 6:10-25, Ex. 6. Defendants tout their record-breaking immigration arrests. *Id.* Ex. 1. Indeed, Operation Rotten Apple arrest numbers marked a more than 40 percent increase over the prior month. Belsher Decl. Ex. 16.

And during this operation, the four officers testified, incredibly, that they had not been (or could not recall being) instructed to increase the rate of arrests or reach any arrest goals. Belsher Decl. Ex. 8, Cuni Tr. 31:15-25, 32:8-11, 38:3-23; Ex. 13, Mascia Tr. 311:18-312:11; Ex. 10, Petito Tr. 218:13-21, 219:2-25; Ex. 7, Rey Tr. 145:20-146:2. The substantial increase in arrest numbers belies this testimony and speaks for itself. Belsher Decl. Ex. 2 at 1:38-57, Ex. 6.

Moreover, recent arrests demonstrate that Defendants' unlawful warrantless arrest policy remains central to their efforts.[11] *See Labarca v. Bausch*, 2026 WL 2364293, at *6 (W.D.N.Y. Aug. 14, 2026) (warrantless arrest unlawful where officers did not meet requirements of § 1357(a)(2)); *Vansh v. Ball*, 2026 WL 2096666, at *3 (W.D.N.Y. July 21, 2026) (same); *Rea v. Ball,* 2026 WL

[11] Plaintiffs have submitted 11 additional recent declarations detailing recent warrantless arrests with their motion to supplement the record.

1959270, at *3 (N.D.N.Y. July 2, 2026) (same); *Curimilma Quille v. Blanche*, 2026 WL 1453889, at *6 (E.D.N.Y. May 22, 2026) (same). Officers continue to issue post-arrest warrants, which often also precede NTAs. *See, e.g.*, *Lopez Romero*, 2026 WL 2240720, at *2-3 & n.2 (arrest was unlawful where it preceded warrant and NTA, and the arresting officers did not establish probable cause of escape risk under § 1357(a)(2)); *see also Chaglla*, 2026 WL 2529494, at *2-3 (arrest was unlawful where it preceded NTA or warrant); *Pavlo Viner v. Maldonado*, 2026 WL 2355437, at *2 (E.D.N.Y. Aug. 14, 2026); *Okeke v. Maldonado*, 2026 WL 2056904, at *4 (E.D.N.Y. July 16, 2026).

## II. Plaintiffs Face a Substantial Risk of an Unlawful Warrantless Re-Arrest.

Plaintiffs are living amid Defendants' increased immigration enforcement dragnet. They have standing because they face a substantial risk of re-arrest pursuant to Defendants' unlawful warrantless arrest policy and practice. *See Frey v. City of New York*, 157 F.4th 118, 137 (2d Cir. 2025). Plaintiffs face a substantial risk that Defendants' agents will stop them again. Plaintiffs cannot avoid engaging in quotidian activities in locations where Defendants' agents stop anyone who remotely resembles intended targets identified with only vague, broadly applicable criteria and, as described, have a policy and practice of arresting first and completing the paperwork later without engaging in the escape risk analysis that § 1357(a)(2) requires. Belsher Decl. Ex. 10, Petito Tr. 93:3-16. Defendants' arrest policies and practices, Plaintiffs' vulnerability to these practices, and the massive scale of Defendants' enforcement operations, place Plaintiffs at imminent risk of an additional unlawful arrest.

### *A. Defendants Stop Anyone Who Broadly Resembles a Target.*

Officers described their targets in generic terms that broadly apply to Latinos—and, therefore, Plaintiffs—and made the decision to stop Plaintiffs because they matched this generic

description.[12] Belsher Decl. Ex. 10, Petito Tr. 135:17-22 ("I know the target was Hispanic, light-skinned, and that's pretty much it"); Ex. 7, Rey Tr. 88:23-24 (describing target as "male, dark hair, curly"); DE 21-7 ¶ 14 (describing how officers showed H.L.A.O. a photo of two men half his age); DE 21-6 ¶ 11 (same for J.R.H.L.); DE 59-2 at 19:4-10. Under the cover of pursuing specific targets for whom they have warrants, officers remain "constantly" in the field to "be encountering people all day long." Belsher Decl. Ex. 10, Petito Tr. 145:22-146:3; *see id.* at 145:4-9 (officer unsure whether he located any of the multiple targets that day).

Officers surround suspected "targets" so that they cannot flee, Belsher Decl. Ex. 10, Petito Tr. 149:8-150:18, 152:17-21, and continue to detain and interrogate them even where officers quickly ascertain they are not in fact the target, Ex. 13, Mascia Tr. 224:22-25, 228:2-12; Ex. 10, Petito Tr. 35:16-36:9; Ex. 9, A.M.C. Tr. 78:8-10. Officers look for any basis to arrest these "collaterals" as unlawfully present. Belsher Decl. Ex. 10, Petito Tr. 36:3-9, 38:5-20; Ex. 7, Rey Tr. 29:20-25. Aside from R.C.R., DE 21-9 ¶ 8, Plaintiffs were "collaterals," stopped and arrested during an operation targeting someone else. *E.g.*, Belsher Decl. Ex. 8, Cuni Tr. 89:2-11; Ex. 13, Mascia Tr. 194:3-9; Ex. 10, Petito Tr. 160:17-161:2; Ex. 7, Rey Tr. 26:20-24.

*B. Plaintiffs' Daily Activities Expose Them to a Substantial Risk of Re-arrest.*

Plaintiffs face a substantial risk that Defendants will stop and arrest them again because they continue to engage in the same activities that originally exposed them to arrest. *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 34 (D.D.C. 2025). Plaintiffs were arrested while going about their daily lives. Belsher Decl. Ex. 12, Garcia Lanza Tr. 46:14-48:16 (arrested during his commute); Ex. 14, H.L.A.O. Tr. 28:6-10 (same); Ex. 9, A.M.C. Tr. 29:4-10 (arrested outside of home returning from work); Ex. 11, Garcia Medrano Tr. 81:1-16 (arrested after

---

[12] None of the deposed officers could describe their targets that day in any detail. *See, e.g.,* Belsher Decl. Ex. 13, Mascia Tr. 194:16-22; 198:7-23.

getting gas). Since their release from detention, Plaintiffs have returned to their daily routines. Belsher Decl. Ex. 14, H.L.A.O. Tr. 25:21-27:23 (still drives to the Shelter Island Ferry for work); Ex. 9, A.M.C. Tr. 35:13-36:14 (still walks to the same workplace); Ex. 12, Garcia Lanza Tr. 108:17-109:5 (still commutes from the train station); Ex. 11, Garcia Medrano Tr. 20:19-24 (travels all over Long Island for work). Through these daily, necessary actions, Plaintiffs are exposed to Defendants' agents. *See* Belsher Decl. Ex. 13, Mascia Tr. 188:5-24; Ex. 10, Petito Tr. 132:2-20; Ex. 7, Rey Tr. 136:6-7.

Plaintiffs are especially vulnerable to re-arrest due to Defendants' sweeping "target" profiling and arrest practices. Because the vast majority of people arrested (and presumably targeted) by Defendants in New York are Latinos, *see, e.g.*, DE 59-3, Plaintiffs remain at risk of being mistaken for targets and stopped. Indeed, Officer Petito testified that he has encountered people who had already been released on bail or bond in the field "numerous times." Belsher Decl. Ex. 10, Petito Tr. 44:21-45:4.

Once stopped, Plaintiffs face a substantial risk of rearrest. No officer identified any relevant policy or practice change between Plaintiffs' arrests and the present. *See, e.g.*, Belsher Decl. Ex. 10, Petito Tr. 103:20-105:2 (testifying that no arrest practices changed following June 2026 quarterly training). Therefore, Plaintiffs face the same risk of an unlawful arrest as they did at the time of their initial arrest.

In sum, Plaintiffs are "'realistically threatened by a repetition of [their] experience.'" *Escobar Molina*, 811 F. Supp. 3d at 34 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)); *cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2016) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" (citation omitted)).

## CONCLUSION

The Court should grant Plaintiffs' motions for preliminary relief and provisional class certification and deny Defendants' motion to dismiss.

Dated: September 14, 2026
Washington, D.C.

*/s/ Jeffrey Cao*
Jeffrey Cao (admitted pro hac vice)
Jillian Feirson (admitted pro hac vice)
Nicole Robinson (admitted pro hac vice)
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001
Phone: 202-662-6000
jcao@cov.com
jfeirson@cov.com
nrobinson@cov.com

Mark Gimbel
Giovanni Scarcella
Cecile Duncan (admitted pro hac vice)
Kezia Otinkorang (admitted pro hac vice)
COVINGTON & BURLING LLP
30 Hudson Yards
New York, New York, 10001
Phone: 212-841-1000
mgimbel@cov.com
gscarcella@cov.com
cduncan@cov.com
kotinkorang@cov.com

Amy Belsher
Ifeyinwa Chikezie
Wafa Junaid
Molly Biklen
NEW YORK CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 19th Floor
New York, NY 10004
Phone: 212-607-3300
abelsher@nyclu.org
ichikezie@nyclu.org
wjunaid@nyclu.org
mbiklen@nyclu.org

Philip Desgranges

Hasan Shafiqullah
Evan Henley
Brian Perbix
Alice Min
THE LEGAL AID SOCIETY
49 Thomas Street, 10th Floor
New York, NY 100013
Phone: 212-577-3300
pdesgranges@legal-aid.org
hhshafiqullah@legal-aid.org
ewhenley@legal-aid.org
bperbix@legal-aid.org
amin@legal-aid.org

Paige Austin
Harold Solis
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: 718-418-7690
paige.austin@maketheroadny.org
harold.solis@maketheroadny.org

*Attorneys for Plaintiffs*

**WORD COUNT CERTIFICATION**

The undersigned certifies that, using the "word count" feature of Microsoft Word and excluding the caption, table of contents, table of authorities, signature blocks, and any certifications, the Supplemental Memorandum of Law in Support of Plaintiffs' Motions for a Preliminary Injunction and Class Certification and Opposition to Defendants' Motion to Dismiss dated September 14, 2026, contains 5,033 words.

*/s/ Jeffrey Cao*
Jeffrey Cao