# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

________________________________

RENE ANTONIO BENITEZ; HESLER ASAF GARCIA LANZA; DARWIN GARCIA MEDRANO; WORKERS' CENTER OF CENTRAL NEW YORK; A.M.C.; F.R.P.; H.L.A.O.; J.R.H.L.; and R.C.R., Individual and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

Case No. 2:26-cv-02082

U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. DEPARTMENT OF JUSTICE; U.S. CUSTOMS AND BORDER PROTECTION; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. BORDER PATROL; U.S. MARSHALS SERVICE; TAMMY MARICH; MARKWAYNE MULLIN; KASH PATEL; RODNEY S. SCOTT; and GADYACES S. SERRALTA,

Defendants.

________________________________

VIDEOTAPED DEPOSITION OF BRENDEN C. CUNI

DATE: Thursday, August 13, 2026

TIME: 10:16 a.m.

LOCATION: U.S. Attorney's Office
610 Federal Plaza
Central Islip, NY 11722

REPORTED BY: Richelle Modestil

JOB NO.: 8389126

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS RENE ANTONIO BENITEZ, HESLER ASAF GARCIA LANZA, DARWIN GARCIA MEDRANO, WORKERS' CENTER OF CENTRAL NEW YORK, A.M.C., F.R.P., H.L.A.O., J.R.H.L., AND R.C.R.:

JILLIAN FEIRSON, ESQUIRE
JEFFREY CAO, ESQUIRE
Pro Hac Vice, Covington & Burling LLP
One CityCenter, 850 Tenth Street Northwest
Washington, D.C. 20001
jfeirson@cov.com
jcao@cov.com
(202) 662-5964
(202) 662-5803

EVAN HENLEY, ESQUIRE
ALICE MIN, ESQUIRE
The Legal Aid Society (Special Litigation Unit)
49 Thomas Street, 10th Floor
New York, NY 10013
ewhenley@legal-aid.org
amin@legal-aid.org
(212) 298-5233
(929) 459-4484

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. CUSTOMS AND BORDER PROTECTION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. BORDER PATROL, U.S. MARSHALS SERVICE, TAMMY MARICH, MARKWAYNE MULLIN, KASH PATEL, RODNEY S. SCOTT, AND GADYACES S. SERRALTA:

THOMAS PRICE, ESQUIRE
DIANE BECKMANN, ESQUIRE
Assistant U.S. Attorney (Civil Division)
271 Cadman Plaza East
Brooklyn, NY 11201
thomas.price@usdoj.gov
diane.beckmann@usdoj.gov
(718) 254-7549
(718) 254-7000

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. CUSTOMS AND BORDER PROTECTION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. BORDER PATROL, U.S. MARSHALS SERVICE, TAMMY MARICH, MARKWAYNE MULLIN, KASH PATEL, RODNEY S. SCOTT, AND GADYACES S. SERRALTA:

GEORGE MATTHEOS, ESQUIRE
U.S. Immigration and Customs Enforcement
201 Varick Street, 5th Floor, Room 507
New York, NY 10014
george.p.mattheos@ice.dhs.gov
(212) 863-3400

A P P E A R A N C E S (Cont'd)

ALSO PRESENT:

Robert Benimoff, Videographer
Justin Kirschner, Observer
Ali Alfaori, Observer
Roman Semenov, Observer
Katie Miner, Observer
Anna Kelley, Observer
Jennifer Pinales, Observer
Harold Solis, Observer
Brian Perbix, Observer
Sara Cummings, Observer
Ify Chikezie, Observer
Amy Belihaus, Observer

I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Ms. Feirson | 11 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Declaration of Brenden Cuni | 39 |
| Exhibit 2 | I-200 Warrant Arrest of an Alien | 101 |
| Exhibit 3 | Notice To Appear | 120 |


retained

B. CUNI

THE VIDEOGRAPHER: Good morning. We're now going on the record approximately 10:16 a.m. on August 13, 2026.

Please note that this deposition is being conducted virtually. Quality of recording depends on the quality of camera and internet connection of participants. What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place until everybody agrees to go off the record.

This is media unit 1 of the video-recorded deposition of Brenden Cuni in the matter of Rene Antonio Benitez, et al., vs. The U.S. Department of Homeland Security, et al., filed in the United States District Court, Eastern District of New York, Case Number 2:26-cv-2082-SJB-JMW.

Location of this deposition is the U.S. Attorney's Office, 610 Federal Plaza, Central Islip, New York.

B. CUNI

My name is Robert Benimoff, representing Veritext, and I'm the videographer. The court reporter is Richelle Modestil from Veritext.

I'm not authorized to administer an oath. I'm not related to any party in this action, nor am I financially interested in the outcome. If there are any objections to the proceeding, please state them now.

Hearing none, all appearances were previously made on stenographic record.

Will the court reporter please swear in the witness? And then we can proceed.

THE REPORTER: Okay. I just want to state for the record that I'm a notary authorized to take acknowledgments and administer oaths in New York. Parties agree that I'll be swearing in the witness.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript

B. CUNI

produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

Can our witness please state his name and address, either business or personal, for the record?

MR. CUNI: Brenden Caesar [ph] Cuni, 26 Federal Plaza, New York, New York.

THE REPORTER: Okay. Thank you. Can you please just raise your right hand?

WHEREUPON,

BRENDEN C. CUNI,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you.

Counsel may now proceed.

B. CUNI

Q Okay. So you just told me they would've been wearing body armor.

A Yes.

Q But they also would've been in plain clothes?

A Yes.

Q So the body armor would've been concealed by their plain clothes?

A I don't recall. I wasn't there. But generally, there is no uniform. Body armors is the ballistic vests. You can put that on top of your plain clothes. You can wear a -- a covert plate carrier underneath your plain clothes.

But to the best of my knowledge, all officers would've been wearing overt plate carriers with agency-issued placards.

Q To your knowledge, were any of the officers not wearing a placard that identified them as police?

A Not to my knowledge.

Q Do officers who report to you sometimes wear plain clothes without any

identification that they're police?

A In what situations?

Q In any situation.

A I don't expect them to wear a placard of that says police going to look; get some food.

Q In any immigration enforcement operation -- well, even more specifically, in any surveillance operation, because that's what you refer to this arrest of A.M.C. in your declaration, in any surveillance operation that you have overseen, have there ever been officers in plain clothes that don't identify them as police?

A At what point in time?

Q Any point in time during which you've been a supervisor of deportation officers.

A It -- it's possible that an officer could be in a covert plate carrier conducting low visibility operations.

Q And so it's possible they could have been on February 24th as well?

B. CUNI

A I -- I don't believe so, due -- due to that having been something that's come up recently. And also, to the best of my knowledge, very few people employ that tactic.

Q And I know that you've said you do not recall the number of agents on the scene. Can you provide an estimate of how many agents you think would've been employed in this operation?

A I don't recall.

Q I understand you don't recall. But based on your role as a supervisor of deportation officers and understanding of this specific operation as outlined in your declaration, how many agents would you have expected to be part of this operation?

A I don't recall, but generally I'd say more than one since they're on the declaration as having been there.

Q Right. And you already did identify two that you believed, but do you think it's only two --

B. CUNI

over the phone?

A Based -- based on my recollection, yes.

Q And but you don't know whether agency policy allows you to issue a warrant over the phone?

A I'm not aware of any agency policy -- policy that would prevent me from doing that.

Q So you're not aware of any agency policy speaking to telephonic warrants generally?

A It's -- it's not a telephonic warrant. I -- I've signed a physical warrant, and I'm just notifying them telephonically. But I'm not aware of any policy or procedure that prevents me from giving them that notification in that manner.

Q So in this scenario, you're informing the individual in the field that you've issued a warrant, but you have also physically signed a piece of paper or electronically signed a warrant; is -- too

B. CUNI

many things in one question.

So when you issue a warrant over the phone, do you also sign a physical piece of paper?

A I -- I don't think it was too many things in one question. I don't think it was -- I just don't think it was a -- a -- an accurate question. There's no telephonic issuance.

There's a physical issuance, whether I sign it by hand or I sign it digitally. The notification is what's in a -- a possible telephonic way, but I'm not issuing a warrant over a -- a phone.

Q So we'll go to the events of February 24th. The officers in the field called you and requested a warrant; right?

A Based on this declaration and my recollection, yes.

Q And what did you do after they requested the warrant?

A In the end, I issued a warrant.

Q And how did you do that?

A By signing it physically.

B. CUNI

Q On a piece of paper?
A Yes.
Q And then how did you relay to them that you had issued the warrant?
A Telephonically.
Q And did the officers in the field receive a copy of that paper that you signed?
A No.
Q Did they receive an electronic version of the paper that you signed?
A No.
Q Did they ever see the warrant before they arrested A.M.C.?
A Not to my knowledge, no. But they were notified by me that an I-200 was signed.
Q So the only way the officers in the field knew that a warrant -- an I-200 had been issued for A.M.C. is because you informed them over the phone?
A Yes.
Q Did those officers who arrested A.M.C. receive a copy of that warrant

after the arrest?
A No.
Q Did they ever see the warrant that you issued for A.M.C.?
MR. PRICE: Objection.
THE WITNESS: I don't know.
BY MS. FEIRSON:
Q Did you ever send them a copy of the warrant you issued for A.M.C.?
A Not that I've been able to find.
Q Did you send anyone a copy of the warrant that you issued for A.M.C.?
A Not that I've been able to find.
Q Did you share the warrant with anyone before or after A.M.C. was arrested?
A Not that I've been able to find. Well, hold on, share -- I telephonically told them on the phone it's signed. You mean share like a -- a --
Q A physical copy or an electronic copy.
A Not that I've been able to find.
Q So sitting here today, the only

evidence that this warrant was issued is your say so?

A Yes.

Q Where were the officers when they called you requesting the warrant?

A Brooklyn.

Q On the scene of the surveillance operation that led to the arrest of A.M.C.?

A I don't -- I don't know exactly. I wasn't there.

Q And where were you when the officers called you?

A I don't recall.

Q But you were not in Brooklyn?

A I was not in Brooklyn.

Q And you were not on the scene of the arrest of A.M.C.?

A I was not there.

Q What time of day did they call you?

A The evening.

Q And how long did it take you to issue the warrant after they called?

B. CUNI

A Seconds.

Q Did you stay on the phone or have to call them back to tell them the warrant had been issued?

A I don't recall specifically.

Q You said it took you seconds to issue the warrant, so it could have happened in the one phone call?

A Possibly.

Q And were you at home when you issued the warrant?

A I don't recall.

Q Were you in public?

A I don't recall.

Q Is there any policy that prohibits you from issuing a warrant while you're in public off duty?

A I -- not that I'm aware of.

Q But you had a copy of an I-200 form on you wherever you were?

A Yes.

Q And were able to sign that form within seconds?

A How long it takes me to sign the

B. CUNI

form once the pen is in my hand is seconds.

Q Do you usually carry I-200s on your person?

A Yes.

Q Do you have one with you today?

A Yes.

Q So I would like to go ahead and introduce another exhibit. This will be Exhibit 2. Yeah.

(Exhibit 2 was marked for identification.)

A Thank you.

Q So the document you just received is Exhibit 2. Do you recognize this document?

A I don't recall seeing this before.

Q Do you know what type of document it is?

A This is an I-200 warrant of a -- for arrest of alien.

Q And is it an I-200 for A.M.C.?

A I don't recall his specific

B. CUNI

name, so haven't -- being that you gave it to me, and I'll -- I'll go with the presumption of yes.

Q Right. And it has the initials?

A A.M.C., yes.

Q Yes. When was it issued?

A February 24, 2026.

Q And is that the same day of A.M.C.'s arrest?

A Based on my review of the declaration, yes.

Q And at what time was this I-200 issued?

A I don't know.

Q Is there any way to determine what time an I-200 is issued?

A Possibly.

Q How? What would that be?

A If it's digitally signed or if an -- whatever time the individual who signed it says.

Q Okay. So the word of the individual who signed it or if there's a digital signature?

B. CUNI

than this to -- on a hypothetical.

Q Well, how do you assess an individual's escape risk?

A You could -- visual, what are they doing physically? What's your location? Am I in the side of, you know, the road with 30 acres of woods next to me and the individual is giving me the -- the physical factors of someone that's about to run: he's sweating, looking around.

Am I encountering him in his house? Am I encountering him in his car? I -- there's no end-all be-all list.

Q And is making an assessment of an individual's escape risk something you would do before arresting an individual for an civil immigration violation?

A Possibly.

Q But you're not aware of any specific questions you would ask the individual?

A No specific questions. You -- general -- general questions that you could possibly ask, but I'm not aware

B. CUNI

of any have to questions like you need to say it this way in this -- at this time.

Q When would you need to make an assessment of an individual's escape risk before arresting them?

A Before the arrest, what are they escaping?

Q The area.

A If the subject -- if I -- if the subject is not being detained or stopped or under arrest, why would I be conducting an escape analysis?

Q No, no, no. In the process of making a civil immigration arrest, when would you need to make an assessment of escape risk?

MR. PRICE: Just if I can clarify, you're asking if he's making a warrantless arrest?

MS. FEIRSON: I am.

THE WITNESS: I don't know.

BY MS. FEIRSON:

Q You don't know when you would need to assess escape risk?

B. CUNI

A I don't know specifically for the warrantless arrest. I have the authority to issue I-200s, and I would issue a warrant.

Q And in the circumstance that an individual is arrested without a warrant, would you -- under that circumstance, when would you assess their escape risk?

A Would I?

Q When you were a deportation officer, yes.

A I don't recall ever making a warrantless arrest.

Q Do you recall any of the individuals who report to you making a warrantless arrest?

A No.

Q Would you say that you have a record of a warrant being issued prior to every arrest for the individuals who report to you?

MR. PRICE: Objection.

THE WITNESS: Can you clarify that question?

B. CUNI

BY MS. FEIRSON:

Q Do you have a record that a warrant was issued prior to the arrest for every arrest made by your direct reports?

A I -- I don't have a specific list, but I will say that the individuals that report to me, I'm not -- I have no knowledge of any of them having ever conducted a warrantless arrest while reporting to me.

I have the authority to sign I-200s, and I do so for all of my cases.

Q But since this is not something you document, you can't say whether there have been any warrantless arrests by individuals who report to you?

A I can say that I have no knowledge of any warrantless arrests. And in all of the cases that I am aware of, I issued an I-200 prior to the arrest. Now, if you're questioning my credibility, I don't know, but again, I'm -- I can only tell you what I'm aware of.

Q Do you have a record of all the

CERTIFICATE OF DEPOSITION OFFICER

I, RICHELLE MODESTIL, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

RICHELLE MODESTIL

Notary Public in and for the

State of New York

CERTIFICATE OF TRANSCRIBER

I, DAVID SHAHVERDIAN, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

DAVID SHAHVERDIAN